# 25-977

## United States Court of Appeals
### *for the*
## Second Circuit

ASSOCIATION OF CONTRACTING PLUMBERS OF THE CITY OF NEW YORK, INC.; PLUMBING-HEATING-COOLING CONTRACTORS—NATIONAL ASSOCIATION; PLUMBERS LOCAL UNION NO. 1, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA; NEW YORK STATE ENERGY COALITION, INC.; PLUMBING FOUNDATION CITY OF NEW YORK, INC.; LICENSED PLUMBING ASSOCIATION OF NEW YORK CITY, INC., d/b/a Master Plumbers Council of the City of New York; and BUILDING INDUSTRY ASSOCIATION OF NEW YORK CITY, INC,

*Plaintiffs-Appellants,*

– v. –

CITY OF NEW YORK,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Southern District of New York, No. 1:23-cv-11292,
Hon. Ronnie Abrams, District Judge

## JOINT APPENDIX

BRIAN C. BARAN
REICHMAN JORGENSEN LEHMAN
  & FELDBERG LLP
1909 K Street NW, Suite 800
Washington, DC 20006
(202) 894-7310
bbaran@reichmanjorgensen.com

SARAH O. JORGENSEN
REICHMAN JORGENSEN LEHMAN
  & FELDBERG LLP
1201 West Peachtree Street,
  Suite 2300
Atlanta, Georgia 30309
(650) 623-1401
sjorgensen@reichmanjorgensen.com

*Attorneys for Plaintiffs-Appellants*
*(For additional counsel see inside cover)*

REBECCA VISGAITIS
   ASSISTANT CORPORATION
   COUNSEL
NEW YORK CITY LAW DEPARTMENT
*Attorneys for Defendant-Appellee*
100 Church Street
New York, New York 10007
(212) 356-0858
rvisgait@law.nyc.gov

# TABLE OF CONTENTS

| ECF No. | Description | Date | Page |
|---|---|---|---|
|  | District Court Docket |  | JA1 |
| 1 | Complaint for Declaratory and Injunctive Relief | 12/29/2023 | JA14 |
| 1-1 | Exhibit A: Testimony of the Mayor's Office Before the New York City Council Committee on Environmental Protection, Nov. 17, 2021 | 12/29/2023 | JA40 |
| 1-2 | Exhibit B: Transcript of the Minutes of the Committee on Environmental Protection, New York City Council, Dec. 14, 2021 | 12/29/2023 | JA45 |
| 1-3 | Exhibit C: Transcript of the Minutes of the City Council of New York Stated Meeting, Dec. 15, 2021 | 12/29/2023 | JA62 |
| 1-4 | Exhibit D: New York City Department of Buildings, LL154 of 2021: NYC Building Electrification Law | 12/29/2023 | JA78 |
| 51 | Opinion & Order Granting Motion to Dismiss | 03/18/2025 | JA80 |
| 52 | Judgment | 03/18/2025 | JA96 |
| 55 | Notice of Appeal | 04/17/2025 | JA97 |

SDNY CM/ECF NextGen Version 1.8.3

**Query    Reports    Utilities    Help    Log Out**

CLOSED,APPEAL,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:23-cv-11292-RA

Association of Contracting Plumbers of The City of New York, Inc. et al v. City of New York
Assigned to: Judge Ronnie Abrams
Cause: 42:6201 Energy Policy & Conservation Act (statement of purpose)

Date Filed: 12/29/2023
Date Terminated: 03/18/2025
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Plaintiff**

**Association of Contracting Plumbers of The City of New York, Inc.**

represented by **Courtland Reichman**
Reichman Jorgensen Lehman & Feldberg LLP
100 Marine Parkway
Suite 300
Redwood Shores, CA 94065
650-623-1401
Fax: 650-623-1449
Email: creichman@reichmanjorgensen.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah O. Jorgensen**
Reichman Jorgensen Lehman & Feldberg LLP
1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
650-623-1401
Email: pacer-sjorgensen@reichmanjorgensen.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian C. Baran**
Reichman Jorgensen Lehman & Feldberg LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
650-623-1401
Email: pacer-bbaran@reichmanjorgensen.com
*ATTORNEY TO BE NOTICED*

**Caroline Walters**
Reichman Jorgensen Lehman & Feldberg

JA1

LLP
100 Marine Parkway
Suite 300
Redwood Shores, CA 94065
650-623-1401
Fax: 650-623-1449
Email: cwalters@reichmanjorgensen.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Plumbing-Heating-Cooling Contractors-National Association**

represented by **Courtland Reichman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah O. Jorgensen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian C. Baran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Caroline Walters**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Plumbers Local Union No. 1, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada**

represented by **Courtland Reichman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah O. Jorgensen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian C. Baran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Caroline Walters**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**New York State Energy Coalition, Inc.**

represented by **Courtland Reichman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah O. Jorgensen**

JA2

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian C. Baran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Caroline Walters**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Plumbing Foundation City of New York, Inc.**                     represented by   **Courtland Reichman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah O. Jorgensen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian C. Baran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Caroline Walters**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Licensed Plumbing Association of New York City, Inc.**
*doing business as*
Master Plumbers Council of the City of New York                     represented by   **Courtland Reichman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah O. Jorgensen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian C. Baran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Caroline Walters**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Building Industry Association of New York City, Inc.**                     represented by   **Courtland Reichman**
(See above for address)
*LEAD ATTORNEY*

JA3

*ATTORNEY TO BE NOTICED*

**Sarah O. Jorgensen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian C. Baran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Caroline Walters**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**City of New York**                         represented by **Alice R Baker**
                                             NYC Law Department
                                             Environmental Division
                                             100 Church Street
                                             New York, NY 10007
                                             716-982-9798
                                             Email: baker.alice@gmail.com
                                             *ATTORNEY TO BE NOTICED*

                                             **Christian Chase Harned**
                                             New York City Law Department
                                             Environmental Law Division
                                             100 Church Street
                                             Ste 6-127
                                             New York, NY 10007
                                             212-356-1676
                                             Email: chharned@law.nyc.gov
                                             *ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**WE ACT for Environmental Justice**         represented by **Dror Ladin**
                                             Earthjustice
                                             48 Wall Street
                                             Ste 15
                                             New York, NY 10005
                                             917-410-8701
                                             Email: dladin@earthjustice.org
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

                                             **Meagan Burton**
                                             Earthjustice
                                             48 Wall Street
                                             15th Floor
                                             New York, NY 10005

JA4

212-845-7376
Email: mburton@earthjustice.org
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**New York Geothermal Energy Organization**            represented by   **Dror Ladin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Meagan Burton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Natural Resources Defense Council**            represented by   **Joseph Vukovich**
1152 15th St NW
Suite 300
Washington, DC 20005
202-717-8344
Email: jvukovich@nrdc.org
*TERMINATED: 07/01/2024*
*LEAD ATTORNEY*

**Thomas Zimpleman**
Natural Resources Defense Council (DC)
1152 15th St. NW Ste. 300
Washington, DC 20005
(202)-513-6244
Email: tzimpleman@nrdc.org
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/29/2023 | 1 | COMPLAINT against CITY OF NEW YORK. (Filing Fee $ 405.00, Receipt Number ANYSDC-28751038)Document filed by Licensed Plumbing Association of New York City, Inc., Plumbers Local Union No. 1, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Plumbing-Heating-Cooling Contractors-National Association, Building Industry Association of New York City, Inc., Association of Contracting Plumbers of The City of New York, Inc., New York State Energy Coalition, Inc., Plumbing Foundation City of New York, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D). (Walters, Caroline) (Entered: 12/29/2023) |
| 12/29/2023 | 2 | CIVIL COVER SHEET filed..(Walters, Caroline) (Entered: 12/29/2023) |

JA5

7/22/25, 10:32 AM                                    SDNY CM/ECF NextGen Version 1.8.3

| | | |
|---|---|---|
| 12/29/2023 | 3 | REQUEST FOR ISSUANCE OF SUMMONS as to City of New York, re: 1 Complaint,,. Document filed by Association of Contracting Plumbers of The City of New York, Inc., Building Industry Association of New York City, Inc., Licensed Plumbing Association of New York City, Inc., New York State Energy Coalition, Inc., Plumbers Local Union No. 1, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Plumbing Foundation City of New York, Inc., Plumbing-Heating-Cooling Contractors-National Association..(Walters, Caroline) (Entered: 12/29/2023) |
| 12/29/2023 | 4 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Association of Contracting Plumbers of The City of New York, Inc., Building Industry Association of New York City, Inc., Licensed Plumbing Association of New York City, Inc., New York State Energy Coalition, Inc., Plumbers Local Union No. 1, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Plumbing Foundation City of New York, Inc., Plumbing-Heating-Cooling Contractors-National Association..(Walters, Caroline) (Entered: 12/29/2023) |
| 01/02/2024 | | ***NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney Caroline Walters. The party information for the following party/parties has been modified: Licensed Plumbing Association of New York City, Inc., CITY OF NEW YORK. The information for the party/parties has been modified for the following reason/reasons: party name was entered in all caps; alias party type was entered incorrectly. (vf) (Entered: 01/02/2024) |
| 01/02/2024 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Gregory H. Woods. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(vf) (Entered: 01/02/2024) |
| 01/02/2024 | | Magistrate Judge Robyn F. Tarnofsky is designated to handle matters that may be referred in this case. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (vf) (Entered: 01/02/2024) |
| 01/02/2024 | | Case Designated ECF. (vf) (Entered: 01/02/2024) |
| 01/02/2024 | 5 | ELECTRONIC SUMMONS ISSUED as to City of New York. (vf) (Entered: 01/02/2024) |
| 01/04/2024 | 6 | MOTION for Sarah O. Jorgenson to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-28767095. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Association of Contracting Plumbers of The City of New York, Inc., Building Industry Association of New York City, Inc., Licensed Plumbing Association of New York City, Inc., New York State Energy Coalition, Inc., Plumbers Local Union No. 1, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Plumbing Foundation City of New York, Inc., Plumbing-Heating-Cooling Contractors-National Association. (Attachments: # 1 Affidavit of Sarah O. Jorgensen, # 2 Proposed Order for Admission PHV of Sarah O. Jorgensen).(Jorgensen, Sarah) (Entered: 01/04/2024) |
| 01/04/2024 | | >>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 6 MOTION for Sarah O. Jorgensen to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-28767095. Motion and supporting papers to be reviewed by |

JA6

SDNY CM/ECF NextGen Version 1.8.5

| | | |
|---|---|---|
| | | **Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (rju)** (Entered: 01/04/2024) |
| 01/04/2024 | 7 | SUMMONS RETURNED EXECUTED. City of New York served on 1/4/2024, answer due 1/25/2024. Document filed by Licensed Plumbing Association of New York City, Inc.; Plumbers Local Union No. 1, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada; Plumbing-Heating-Cooling Contractors-National Association; Building Industry Association of New York City, Inc.; Association of Contracting Plumbers of The City of New York, Inc.; New York State Energy Coalition, Inc.; Plumbing Foundation City of New York, Inc...(Walters, Caroline) (Entered: 01/04/2024) |
| 01/08/2024 | 8 | MOTION for Brian C. Baran to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-28783394. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Association of Contracting Plumbers of The City of New York, Inc., Building Industry Association of New York City, Inc., Licensed Plumbing Association of New York City, Inc., New York State Energy Coalition, Inc., Plumbers Local Union No. 1, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Plumbing Foundation City of New York, Inc., Plumbing-Heating-Cooling Contractors-National Association. (Attachments: # 1 Affidavit of Brian C. Baran, # 2 Proposed Order for Admission PHV of Brian C. Baran).(Baran, Brian) (Entered: 01/08/2024) |
| 01/09/2024 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 8 MOTION for Brian C. Baran to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-28783394. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (rju)** (Entered: 01/09/2024) |
| 01/11/2024 | 9 | MOTION for Courtland L. Reichman to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-28796654. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Association of Contracting Plumbers of The City of New York, Inc., Building Industry Association of New York City, Inc., Licensed Plumbing Association of New York City, Inc., New York State Energy Coalition, Inc., Plumbers Local Union No. 1, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Plumbing Foundation City of New York, Inc., Plumbing-Heating-Cooling Contractors-National Association. (Attachments: # 1 Affidavit of Courtland L. Reichman, # 2 Proposed Order for Admission PHV of Courtland L. Reichman).(Reichman, Courtland) (Entered: 01/11/2024) |
| 01/11/2024 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 9 MOTION for Courtland L. Reichman to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-28796654. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (rju)** (Entered: 01/11/2024) |
| 01/16/2024 | | NOTICE OF CASE REASSIGNMENT to Judge Ronnie Abrams and Judge Ronnie Abrams. Judge Gregory H. Woods is no longer assigned to the case. (tro) (Entered: 01/16/2024) |
| 01/18/2024 | 10 | ORDER granting 6 Motion for Sarah O. Jorgensen to Appear Pro Hac Vice. (HEREBY ORDERED by Judge Ronnie Abrams)(Text Only Order) (arc) (Entered: 01/18/2024) |
| 01/18/2024 | 11 | ORDER granting 8 Motion for Brian C. Baran to Appear Pro Hac Vice. (HEREBY ORDERED by Judge Ronnie Abrams)(Text Only Order) (arc) (Entered: 01/18/2024) |

JA7

| 01/18/2024 | 12 | ORDER granting 9 Motion for Courtland L. Reichman to Appear Pro Hac Vice. (HEREBY ORDERED by Judge Ronnie Abrams)(Text Only Order) (arc) (Entered: 01/18/2024) |
| 01/18/2024 | 13 | ORDER AND NOTICE OF INITIAL CONFERENCE: Initial Conference set for 3/15/2024 at 02:00 PM before Judge Ronnie Abrams. The parties shall use the following dial-in information to call in to the conference: Call-in Number: (888) 363-4749; Access Code: 1015508. This conference line is open to the public. Plaintiff is ordered to serve Defendant with a copy of this order and to file an affidavit on ECF certifying that such service has been effectuated. SO ORDERED. (Signed by Judge Ronnie Abrams on 1/18/2024) (mml) (Entered: 01/18/2024) |
| 01/22/2024 | 14 | AFFIDAVIT OF SERVICE of Order and Notice of Initial Conference (Doc. 13) served on City of New York on January 18, 2024. Service was made by Email. Document filed by Association of Contracting Plumbers of The City of New York, Inc., Building Industry Association of New York City, Inc., Licensed Plumbing Association of New York City, Inc., New York State Energy Coalition, Inc., Plumbers Local Union No. 1, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Plumbing Foundation City of New York, Inc., Plumbing-Heating-Cooling Contractors-National Association..(Jorgensen, Sarah) (Entered: 01/22/2024) |
| 01/22/2024 | 15 | NOTICE OF APPEARANCE by Christian Chase Harned on behalf of City of New York..(Harned, Christian) (Entered: 01/22/2024) |
| 01/23/2024 | 16 | NOTICE OF APPEARANCE by Alice R Baker on behalf of City of New York..(Baker, Alice) (Entered: 01/23/2024) |
| 01/23/2024 | 17 | LETTER MOTION for Extension of Time *and to Adjourn Case Management Conference* addressed to Judge Ronnie Abrams from Sarah Jorgensen dated 1/23/24. Document filed by Association of Contracting Plumbers of The City of New York, Inc., Building Industry Association of New York City, Inc., Licensed Plumbing Association of New York City, Inc., New York State Energy Coalition, Inc., Plumbers Local Union No. 1, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Plumbing Foundation City of New York, Inc., Plumbing-Heating-Cooling Contractors-National Association..(Jorgensen, Sarah) (Entered: 01/23/2024) |
| 01/25/2024 | 18 | ORDER granting 17 Letter Motion for Extension of Time. Application granted. SO ORDERED. (Signed by Judge Ronnie Abrams on 1/25/2024) (ks) (Entered: 01/25/2024) |
| 01/25/2024 | | Set/Reset Deadlines: ( Motions due by 3/1/2024., Responses due by 3/29/2024, Replies due by 4/19/2024.) (ks) (Entered: 01/25/2024) |
| 03/01/2024 | 19 | MOTION to Dismiss . Document filed by City of New York. Responses due by 3/29/2024. (Harned, Christian) (Entered: 03/01/2024) |
| 03/01/2024 | 20 | MEMORANDUM OF LAW in Support re: 19 MOTION to Dismiss . . Document filed by City of New York..(Harned, Christian) (Entered: 03/01/2024) |
| 03/01/2024 | 21 | NOTICE OF APPEARANCE by Dror Ladin on behalf of WE ACT for Environmental Justice, New York Geothermal Energy Organization..(Ladin, Dror) (Entered: 03/01/2024) |
| 03/01/2024 | 22 | NOTICE OF APPEARANCE by Meagan Burton on behalf of New York Geothermal Energy Organization, WE ACT for Environmental Justice..(Burton, Meagan) (Entered: 03/01/2024) |
| 03/01/2024 | 23 | MOTION to Intervene . Document filed by New York Geothermal Energy Organization, WE ACT for Environmental Justice. (Attachments: # 1 Exhibit Proposed Intervenor-Defs' |

JA8

| | | |
|---|---|---|
| | | MOL in Support of Dismissal).(Ladin, Dror) (Entered: 03/01/2024) |
| 03/01/2024 | 24 | MEMORANDUM OF LAW in Support re: 23 MOTION to Intervene . . Document filed by New York Geothermal Energy Organization, WE ACT for Environmental Justice..(Ladin, Dror) (Entered: 03/01/2024) |
| 03/01/2024 | 25 | DECLARATION of Sonal Jessel in Support re: 23 MOTION to Intervene .. Document filed by New York Geothermal Energy Organization, WE ACT for Environmental Justice. (Attachments: # 1 Exhibit A, Unequal Air and Care Report, # 2 Exhibit B, Asthma Fact Sheet, # 3 Exhibit C, Out of Gas, In with Justice Report, # 4 Exhibit D, GasFreeNYC Press Release, # 5 Exhibit E, GasFreeNYC Rally Flyer, # 6 Exhibit F, Jessel LL 154 Testimony, # 7 Exhibit G, Carforo LL 154 Testimony, # 8 Exhibit H, NYC Mayor LL 154 Press Release, # 9 Exhibit I, PowerUp NYC Plan Excerpt, # 10 Exhibit J, National Building Pollution Report).(Ladin, Dror) (Entered: 03/01/2024) |
| 03/01/2024 | 26 | DECLARATION of Bill Nowak in Support re: 23 MOTION to Intervene .. Document filed by New York Geothermal Energy Organization, WE ACT for Environmental Justice. (Attachments: # 1 Exhibit A, Nowak LL 154 Testimony).(Ladin, Dror) (Entered: 03/01/2024) |
| 03/01/2024 | 27 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by WE ACT for Environmental Justice..(Ladin, Dror) (Entered: 03/01/2024) |
| 03/01/2024 | 28 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by New York Geothermal Energy Organization..(Ladin, Dror) (Entered: 03/01/2024) |
| 03/08/2024 | 29 | CONSENT MOTION to File Amicus Brief *in support of Defendant*. Document filed by Natural Resources Defense Council. (Attachments: # 1 Exhibit Proposed amicus curiae brief from Natural Resources Defense Council).(Vukovich, Joseph) (Entered: 03/08/2024) |
| 03/08/2024 | 30 | MEMORANDUM OF LAW in Support re: 29 CONSENT MOTION to File Amicus Brief *in support of Defendant*. . Document filed by Natural Resources Defense Council.. (Vukovich, Joseph) (Entered: 03/08/2024) |
| 03/08/2024 | 31 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Joseph John Vukovich to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-29057062. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Natural Resources Defense Council. (Attachments: # 1 Proposed Order Proposed order granting pro hac vice admission, # 2 Affidavit affidavit of Joseph Vukovich).(Vukovich, Joseph) Modified on 3/11/2024 (rju). (Entered: 03/08/2024) |
| 03/11/2024 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 31 MOTION for Joseph John Vukovich to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-29057062. Motion and supporting papers to be reviewed by Clerk's Office staff.. The filing is deficient for the following reason(s): missing Certificate of Good Standing from Supreme Court of Maryland; District of Columbia; Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order. (rju)** (Entered: 03/11/2024) |
| 03/11/2024 | 32 | MOTION for Joseph John Vukovich to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Natural Resources Defense Council. (Attachments: # 1 Proposed Order proposed order granting admission PHV, # 2 Affidavit affidavit of Joseph Vukovich, # 3 Supplement DC certificate of good standing, # 4 Supplement MD certificate of good standing).(Vukovich, Joseph) (Entered: 03/11/2024) |

JA9

SDNY CM/ECF NextGen Version 1.8.3

| | | |
|---|---|---|
| 03/12/2024 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 32 MOTION for Joseph John Vukovich to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (rju)** (Entered: 03/12/2024) |
| 03/12/2024 | 33 | LETTER addressed to Judge Ronnie Abrams from Sarah Jorgensen dated 03/12/2024 re: Individual Rule 4(C) Notice. Document filed by Association of Contracting Plumbers of The City of New York, Inc., Building Industry Association of New York City, Inc., Licensed Plumbing Association of New York City, Inc., New York State Energy Coalition, Inc., Plumbers Local Union No. 1, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Plumbing Foundation City of New York, Inc., Plumbing-Heating-Cooling Contractors-National Association..(Jorgensen, Sarah) (Entered: 03/12/2024) |
| 03/12/2024 | 34 | MOTION for Thomas David Zimpleman to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-29071677. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Natural Resources Defense Council. (Attachments: # 1 Affidavit Affidavit of Thomas Zimpleman, # 2 Exhibit IL Certificate of good standing, # 3 Exhibit DC Certificate of good standing, # 4 Proposed Order Text of proposed order).(Zimpleman, Thomas) (Entered: 03/12/2024) |
| 03/13/2024 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 34 MOTION for Thomas David Zimpleman to Appear Pro Hac Vice . Filing fee S 200.00, receipt number ANYSDC-29071677. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (rju)** (Entered: 03/13/2024) |
| 03/13/2024 | 35 | ORDER granting 32 Motion for Joseph John Vukovich to Appear Pro Hac Vice (HEREBY ORDERED by Judge Ronnie Abrams)(Text Only Order) (arc) (Entered: 03/13/2024) |
| 03/13/2024 | 36 | ORDER granting 34 Motion for Thomas David Zimpleman to Appear Pro Hac Vice (HEREBY ORDERED by Judge Ronnie Abrams)(Text Only Order) (arc) (Entered: 03/13/2024) |
| 03/13/2024 | 37 | MEMO ENDORSEMENT granting 29 Motion to File Amicus Brief. ENDORSEMENT Application granted. SO ORDERED. (Signed by Judge Ronnie Abrams on 3/13/2024) (jca) (Entered: 03/13/2024) |
| 03/15/2024 | 38 | MEMORANDUM OF LAW in Opposition re: 23 MOTION to Intervene . . Document filed by Association of Contracting Plumbers of The City of New York, Inc., Building Industry Association of New York City, Inc., Licensed Plumbing Association of New York City, Inc., New York State Energy Coalition, Inc., Plumbers Local Union No. 1, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Plumbing Foundation City of New York, Inc., Plumbing-Heating-Cooling Contractors-National Association..(Jorgensen, Sarah) (Entered: 03/15/2024) |
| 03/22/2024 | 39 | LETTER addressed to Judge Ronnie Abrams dated March 22, 2024 re: Issue of Joint Briefing. Document filed by City of New York..(Harned, Christian) (Entered: 03/22/2024) |
| 03/22/2024 | 40 | REPLY MEMORANDUM OF LAW in Support re: 23 MOTION to Intervene . . Document filed by New York Geothermal Energy Organization, WE ACT for Environmental Justice.. (Ladin, Dror) (Entered: 03/22/2024) |
| 03/29/2024 | 41 | MEMORANDUM OF LAW in Opposition re: 19 MOTION to Dismiss . . Document filed by Association of Contracting Plumbers of The City of New York, Inc., Building Industry Association of New York City, Inc., Licensed Plumbing Association of New York City, Inc., New York State Energy Coalition, Inc., Plumbers Local Union No. 1, United |

JA10

| | | |
|---|---|---|
| | | Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Plumbing Foundation City of New York, Inc., Plumbing-Heating-Cooling Contractors-National Association..(Jorgensen, Sarah) (Entered: 03/29/2024) |
| 04/10/2024 | 42 | LETTER addressed to Judge Ronnie Abrams from Christian Harned dated April 10, 2024 Document filed by City of New York..(Harned, Christian) (Entered: 04/10/2024) |
| 04/19/2024 | 43 | REPLY MEMORANDUM OF LAW in Support re: 19 MOTION to Dismiss . . Document filed by City of New York..(Harned, Christian) (Entered: 04/19/2024) |
| 06/28/2024 | 44 | MOTION for Joseph Vukovich to Withdraw as Attorney *for Natural Resources Defense Council*. Document filed by Natural Resources Defense Council..(Vukovich, Joseph) (Entered: 06/28/2024) |
| 07/01/2024 | 45 | MEMO ENDORSEMENT granting 44 Motion to Withdraw as Attorney. ENDORSEMENT: Application granted. SO ORDERED. Attorney Joseph Vukovich terminated. (Signed by Judge Ronnie Abrams on 7/1/2024) (tg) (Entered: 07/01/2024) |
| 02/21/2025 | 46 | MEMORANDUM OPINION AND ORDER re: 23 MOTION to Intervene . filed by New York Geothermal Energy Organization, WE ACT for Environmental Justice. For the foregoing reasons, the motion to intervene is denied, but the Court invites Proposed Intervenors' participation as amici curiae. If Proposed Intervenors seek to participate as amici, they shall file a letter motion no later than one week from the date of this order attaching their proposed submission. The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 23. SO ORDERED. (Signed by Judge Ronnie Abrams on 2/21/2025) (tg) (Entered: 02/21/2025) |
| 02/26/2025 | 47 | LETTER MOTION to File Amicus Brief addressed to Judge Ronnie Abrams from Dror Ladin dated 2/26/25. Document filed by WE ACT for Environmental Justice, New York Geothermal Energy Organization. (Attachments: # 1 Appendix Proposed Amicus Brief). (Ladin, Dror) (Entered: 02/26/2025) |
| 02/27/2025 | 48 | ORDER granting 47 Letter Motion to File Amicus Brief. Application granted. SO ORDERED. (Signed by Judge Ronnie Abrams on 2/27/2025) (tg) (Entered: 02/27/2025) |
| 03/06/2025 | 49 | ORDER: Oral argument will be held on Defendant's Motion to Dismiss on March 13, 2025 at 11:00 a.m. at the Thurgood Marshall United States Courthouse, Courtroom 1506, 40 Foley Square, New York, NY, 10007. SO ORDERED. (Signed by Judge Ronnie Abrams on 3/6/2025) ( Oral Argument set for 3/13/2025 at 11:00 AM in Courtroom 1506, 40 Centre Street, New York, NY 10007 before Judge Ronnie Abrams.) (ks) (Entered: 03/06/2025) |
| 03/10/2025 | 50 | LETTER addressed to Judge Ronnie Abrams from Sarah Jorgensen dated March 10, 2025 re: Authorization to Bring Electronic Devices to Oral Argument on 3/13/2025. Document filed by Association of Contracting Plumbers of The City of New York, Inc., Plumbing-Heating-Cooling Contractors-National Association, Plumbers Local Union No. 1, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, New York State Energy Coalition, Inc., Plumbing Foundation City of New York, Inc., Licensed Plumbing Association of New York City, Inc., Building Industry Association of New York City, Inc...(Jorgensen, Sarah) (Entered: 03/10/2025) |
| 03/13/2025 | | Minute Entry for proceedings held before Judge Ronnie Abrams: Oral Argument held on 3/13/2025 re: 19 MOTION to Dismiss . filed by City of New York. (Court Reporter Nicole Di Masi) (arc) (Entered: 03/13/2025) |

JA11

| 03/18/2025 | 51 | OPINION AND ORDER re: 19 MOTION to Dismiss . filed by City of New York. For the foregoing reasons, the motion to dismiss is granted. Because "an amended complaint could not cure the substantive deficiencies of these claims," the complaint is dismissed with prejudice. Peralta v. New York City Dep't of Educ., No. 21-CV-6833, 2023 WL 6201507, at *6 (E.D.N.Y. Sept. 22, 2023). The Clerk of Court is respectfully directed to terminate all pending motions and close this case. SO ORDERED. (Signed by Judge Ronnie Abrams on 3/18/2025) (tg) Transmission to Orders and Judgments Clerk for processing. (Entered: 03/18/2025) |
|---|---|---|
| 03/18/2025 | 52 | CLERK'S JUDGMENT re: 51 Opinion & Order. in favor of City of New York against Association of Contracting Plumbers of The City of New York, Inc., Building Industry Association of New York City, Inc., Licensed Plumbing Association of New York City, Inc., Natural Resources Defense Council, New York Geothermal Energy Organization, New York State Energy Coalition, Inc., Plumbers Local Union No. 1, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Plumbing Foundation City of New York, Inc., Plumbing-Heating-Cooling Contractors-National Association, WE ACT for Environmental Justice. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Opinion and Order dated March 18, 2025the motion to dismiss is granted. Because "an amended complaint could not cure the substantive deficiencies of these claims," the complaint is dismissed with prejudice. Peralta v. New York City Dep't of Educ., No. 21-CV- 6833, 2023 WL 6201507, at *6 (E.D.N.Y. Sept. 22, 2023); accordingly, the case is closed. (Signed by Clerk of Court Tammi Hellwig on 03/18/2025) (Attachments: # 1 Notice of right to appeal) (nd) (Entered: 03/18/2025) |
| 03/25/2025 | 53 | TRANSCRIPT of Proceedings re: ORAL ARGUMENT held on 3/13/2025 before Judge Ronnie Abrams. Court Reporter/Transcriber: Nicole DIMasi, (212) 805-0320. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/15/2025. Redacted Transcript Deadline set for 4/25/2025. Release of Transcript Restriction set for 6/23/2025.. (McGuirk, Kelly) (Entered: 03/25/2025) |
| 03/25/2025 | 54 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a ORAL ARGUMENT proceeding held on 3/13/2025 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 03/25/2025) |
| 04/17/2025 | 55 | NOTICE OF APPEAL from 52 Clerk's Judgment,,,,,. Document filed by Association of Contracting Plumbers of The City of New York, Inc., Building Industry Association of New York City, Inc., Licensed Plumbing Association of New York City, Inc., New York State Energy Coalition, Inc., Plumbers Local Union No. 1, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Plumbing Foundation City of New York, Inc., Plumbing-Heating-Cooling Contractors-National Association. Filing fee $ 605.00, receipt number ANYSDC-30945574. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Jorgensen, Sarah) (Entered: 04/17/2025) |
| 04/17/2025 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 55 Notice of Appeal. (tp) (Entered: 04/17/2025) |
| 04/17/2025 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 55 Notice of Appeal,, filed by Plumbers Local Union No. 1, United |

JA12

Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Licensed Plumbing Association of New York City, Inc., Association of Contracting Plumbers of The City of New York, Inc., Building Industry Association of New York City, Inc., New York State Energy Coalition, Inc., Plumbing-Heating-Cooling Contractors-National Association, Plumbing Foundation City of New York, Inc. were transmitted to the U.S. Court of Appeals..(tp) (Entered: 04/17/2025)

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 07/22/2025 13:31:46 | | |
| PACER Login: | rejolf22 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:23-cv-11292-RA |
| Billable Pages: | 13 | Cost: | 1.30 |

JA13

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ASSOCIATION OF CONTRACTING PLUMBERS OF THE CITY OF NEW YORK, INC.; PLUMBING-HEATING-COOLING CONTRACTORS—NATIONAL ASSOCIATION; PLUMBERS LOCAL UNION NO. 1, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA; NEW YORK STATE ENERGY COALITION, INC.; THE PLUMBING FOUNDATION CITY OF NEW YORK, INC.; LICENSED PLUMBING ASSOCIATION OF NEW YORK CITY, INC., d/b/a MASTER PLUMBERS COUNCIL OF THE CITY OF NEW YORK; and BUILDING INDUSTRY ASSOCIATION OF NEW YORK CITY, INC., | : | **Civil Action No. 1:23-cv-11292** |
| | : | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| Plaintiffs, | : | |
| v. | : | |
| CITY OF NEW YORK, | : | |
| Defendant. | : | |

## INTRODUCTION

1.      Plaintiffs Association of Contracting Plumbers of the City of New York, Inc.; Plumbing-Heating-Cooling Contractors—National Association; Plumbers Local Union No. 1, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada; New York State Energy Coalition, Inc.; The Plumbing Foundation City of New York, Inc.; Licensed Plumbing Association of New York City, Inc., d/b/a Master Plumbers Council of the City of New York; and Building Industry Association of New York City, Inc., seek declaratory and injunctive relief under federal law against enforcement of the City of New York's ordinance that bans combustion appliances (the "ban" or "gas ban") that are subject to regulation under the federal Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6201-6422.

2.      The City of New York's effective ban on gas or oil equipment in new buildings is preempted by EPCA and therefore unenforceable.  As the only federal appellate court to have addressed this issue recognized, EPCA preempts state and local laws relating to the use of energy, such as gas or heating oil, by covered appliances and equipment.  The City's ban prohibits any combustion equipment with carbon dioxide emissions levels over a certain threshold, as determined by the Energy Information Administration's emissions factors; by design, the City set that level so low as to ban all gas and oil appliances.  The City's gas ban thus prohibits all fuel gas appliances, violating federal law.  EPCA reflects Congress's decision that the nation's energy policy cannot be dictated by state and local governments; such a patchwork approach would be the antithesis of a national energy policy.

3.      Further, millions of New York City residents use fuel gas (including natural gas and heating oil) for home heating, cooking, and hot water, and the decision to outright prohibit the use of all fuel gas in new buildings is at odds with citizens' and businesses' need for reliable,

2

JA15

resilient, and affordable energy. Prohibiting gas-powered cooking ranges, water heaters, furnaces, and other appliances or equipment is fundamentally inconsistent with the public interest and consumer choice, exacerbates the problem of housing affordability, and will shift energy demand onto already overburdened electric grids. Plaintiffs support achieving the City's (and State's) climate goals, but with the majority of New York's electric generating capacity coming from gas-fired power plants, banning gas in homes will do little if anything to advance those goals—and in all events, the City must comply with federal law.

4.      Plaintiffs are trade associations and a union whose members rely on the availability of gas and oil appliances and systems for their livelihoods. Plaintiffs and their members work in various industries such as construction, delivery, and servicing related to fuel gas and fuel gas appliances. New York City's ban, which is set to go into effect on January 1, 2024, is already chilling and undermining the livelihoods of Plaintiffs' members, decreasing job opportunities and construction project work, disrupting long-term business strategy and asset planning, and jeopardizing jobs and hiring and training programs. Ultimately, the ban will compel Plaintiffs' members to exit some or all of their work, businesses, or jobs—all despite the ban's express preemption under federal law. The ban presents a significant threat for businesses in New York City that sell, install, and service gas plumbing and infrastructure, and already it is causing irreparable harm to Plaintiffs and their members.

5.      The federal energy policy reflected in EPCA was born out of the oil crisis of the 1970s and reflects concerns with energy independence, domestic supply, and national security. The federal regulatory scheme requires a practical approach to energy regulation, maintaining neutrality on energy sources and recognizing the need for a diverse energy supply. This is for good reason: A patchwork approach is unworkable, undercuts a coordinated national energy

3

policy, overlooks the public's need for reliable and resilient energy, and denies consumers choice.

6.     EPCA implements a national energy policy that, among other things, regulates the energy use and energy efficiency of appliances.  The thrust of EPCA is that nationally uniform energy use and energy efficiency standards are the best way to promote conservation goals while ensuring energy security and domestic supply, and that those standards should use consumption objectives that do not favor one type of energy or appliance over another.  EPCA thus expressly preempts state and local regulations concerning the energy efficiency and energy use of products for which EPCA sets energy conservation standards, leaving only narrow room for concurrent state and local regulations that meet certain stringent statutory conditions.  EPCA's default rule is federal preemption; Congress intended for national policy to control.  *See, e.g.*, 42 U.S.C. § 6297(c); S. Rep. No. 100-6, at 4 (1987); H.R. Rep. No. 100-11, at 24 (1987).

7.     Indeed, the United States Court of Appeals for the Ninth Circuit recently invalidated the City of Berkeley's prohibition on gas piping in new buildings, holding that it was preempted by EPCA.  *See Cal. Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045 (9th Cir. 2023), *petition for reh'g en banc filed*, No. 21-16278 (9th Cir. May 31, 2023).  The unanimous Ninth Circuit panel emphasized that "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings," and that Berkeley could not do indirectly (by prohibiting gas piping) what it could not do directly.  *Id.* at 1056.  New York City's ban on combustion emissions in new buildings prohibits use of gas appliances and thus does exactly what the Ninth Circuit concluded was preempted.  No statutory exemption to preemption applies to New York City's ban.

8.     In short, New York City's gas ban is already causing substantial adverse consequences for Plaintiffs and the public.  New York City's effort to bypass federal law to

4

implement its own energy policy violates EPCA, is contrary to the public interest, and causes irreparable harm to Plaintiffs and their members. Plaintiffs accordingly bring this action seeking a declaration that New York City's gas ban is preempted by EPCA and therefore unenforceable, as well as an injunction preventing its enforcement.

## JURISDICTION

9.     This Court has federal question jurisdiction over this matter under 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law.

## VENUE

10.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendant New York City is the sole defendant and resides in this District within the meaning of § 1391(c)(2). Venue is also proper under § 1391(b)(2) because a substantial part of the acts and events giving rise to the claim occurred in this District, including because the local law at issue will be enforced here.

## PARTIES

11.     Plaintiff Association of Contracting Plumbers of the City of New York, Inc. is a nonprofit trade association organized under the laws of New York with its principal office in New York City. The Association of Contracting Plumbers represents union-affiliated licensed master plumbers in the City of New York. Its 63 member firms employ several thousand plumbing technicians, including union journeymen and apprentices of the UA Plumbers Local 1, and are responsible for a large variety of new construction work in New York City, including large high-rise residential and commercial buildings, as well as industrial work and repair work. Among the Association of Contracting Plumbers' purposes are to improve public health through the proper

and adequate installation of sanitary systems, to support good relations with the public and the building construction industry, and to ensure its members' ability to provide quality plumbing contracting services for all New York City consumers and builders.

12.      The impending gas ban is causing current and imminent harm to the Association of Contracting Plumbers' members.  One or more members are suffering, or are imminently facing, harm to profits and operations from the gas ban.  At least one member has already lost business opportunities because long-term residential construction projects are being designed or are being re-designed to proceed without gas infrastructure plans in preparation for compliance with the gas ban.  With the gas plumbing work eliminated from many building projects, the projects will involve roughly 18% to 25% less plumbing work overall and therefore will employ fewer plumbers.  Members are having to consider changes in their long-term asset investments and planning and will likely face decisions on the number of technicians to employ, hire, or train for installation as well as for service visits.

13.      The Plumbing-Heating-Cooling Contractors—National Association ("PHCC") is a nonprofit 501(c)(6) trade association that represents the interests of plumbing and heating, ventilation, and air conditioning (HVAC) contractors across the United States.  PHCC is organized under the laws of Delaware with its principal office in Falls Church, Virginia.  PHCC is dedicated to the advancement of the plumbing and HVAC trades through education, training, and the promotion of industry safety and best practices.

14.      PHCC estimates that its approximately 3,200 U.S.-based plumbing and HVAC contractor members employ over 64,000 plumbing and HVAC professionals across the United States, many of which sell, install, and service gas combustion plumbing and HVAC equipment, parts, controls, and supplies on both a residential and commercial scale.  In the State of New York,

6

there are approximately 212 plumbing and HVAC contractors who are PHCC members via its state affiliate, the New York State Plumbing-Heating-Cooling Contractors, and its regional affiliate, the Association of Contracting Plumbers of the City of New York, Inc.  All members of the regional affiliate and many members of the state affiliate have plumbing and/or HVAC contracting businesses domiciled in New York City or are otherwise licensed to perform plumbing and/or HVAC services in New York City and its surrounding metropolitan areas.

15.    PHCC and its New York affiliates are harmed or will imminently be harmed by the impact of New York City's gas ban in new construction as it will render obsolete a critical skillset of the plumbing and HVAC trades.  The elimination and/or phaseout of gas connections in construction contracts will force plumbing and HVAC professionals out of work and reduce the need for their services.  Residential and commercial plumbing and HVAC customers will have fewer and arguably less reliable choices in how heat and comfort are provided in their dwellings.

16.    Plaintiff Plumbers Local Union No. 1, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada ("Local 1") is a labor union with its principal office in New York City.  It represents the employees of New York City licensed plumbing contractors and has approximately 6,000 members who work in all five boroughs of New York City in the industrial, commercial, institutional, and residential sectors of the construction industry.  Its members provide sophisticated piping systems and their work spans from underground installations to final connections of fixtures and equipment.  Local 1 spends millions of dollars annually in training and educating its members in code, theory, and certification of all installations.  Local 1's mission is to educate and train highly skilled journeymen and apprentices, to support the working conditions and environment of its members, and to protect the health of New York City residents through providing quality plumbing services.

JA20

17.     The impending gas ban is causing current and imminent harm to Local 1 and its members.  The loss of work on gas infrastructure as a result of the ban will cost some of its members their jobs, result in lower hours worked by members, or lead to hiring freezes.

18.     Plaintiff New York State Energy Coalition, Inc. (the "Coalition") is a nonprofit trade association organized under the laws of New York with its principal office in Hauppauge, New York.  Its members include retail heating oil providers, wholesale and terminal operators supplying those retailers with heating oil, independent transporters and associate members who are affiliated in one way or another with the heating oil industry.  Its members have businesses and work in the five boroughs of New York City, Long Island, and Westchester.  Its mission is to provide representation, education, and constructive ideas on industry issues for its members including representing its interests to other branches of industry and to government.  The Coalition safeguards the interests of its members in conducting their business in economic freedom and the integrity of the industry it represents to ensure public acceptance of its products.

19.     The impending gas ban is causing current and imminent harm to the Coalition's members who do business in New York City.  At least one member has already suffered or will imminently suffer harm to its business in the loss of potential customers, reduced business opportunities, and reduced sales.  Its members are also impacted in terms of planning for long-term investments, such as transport or service vehicles, and for hiring and training employees.

20.     Plaintiff The Plumbing Foundation City of New York, Inc. is a nonprofit trade association of licensed contracting firms, engineering associations, manufacturers, and suppliers and is organized under the laws of New York with its principal office in New York City.  Its members comprise approximately 195 union and non-union New York City licensed master plumbers, who employ thousands of technicians in the City, as well as approximately 15 associate

8

members including engineering firms, manufacturers, and supply houses. Its Gas Operator Qualification Membership Program has approximately 800 New York City licensed plumbing companies and 2,000 technicians. The Plumbing Foundation also has reciprocal memberships with associations like the International Association of Plumbing & Mechanical Officials and NYS American Society of Plumbing Engineers. Its mission is to ensure the public health through the enactment and enforcement of safe plumbing codes and to educate the plumbing industry and the general public on issues relating to plumbing.

21.     The impending gas ban is causing current and imminent harm to The Plumbing Foundation's members who do business in New York City. Gas plumbing constitutes anywhere from about 20% to a substantial majority of the work of member master plumbers, and members have already experienced or will imminently experience adverse economic impacts from the New York City ban. At least one member, which has roughly 20% to 25% of its work come from gas plumbing, has already seen a reduction in business, as builders are designing or redesigning projects to eliminate gas. The member is already having to assess the impact on long-term investments for its business, such as the number of service vans that will be needed. Another member has already experienced a roughly 30% drop in sales of plumbing supplies, such as piping and fittings.

22.     Plaintiff Licensed Plumbing Association of New York City, Inc., d/b/a Master Plumbers Council of the City of New York ("Master Plumbers Council") is a nonprofit corporation organized under the laws of New York with its principal office in Queens County, New York. The Master Plumbers Council is a professional trade association whose membership comprises licensed master plumbers and their affiliates in the City of New York. It has more than 300 members, including nearly 250 licensed plumbers in New York City, along with associated

businesses.  The Master Plumbers Council strives to promote the licensed plumbing industry and the benefits of hiring a licensed and insured firm, as well as providing education and clarification on a wide assortment of code issues.

23.    One or more members of the Master Plumbers Council are suffering, or are imminently facing, lost business as a result of the gas ban.  For example, building renovations planned with gas piping have been changed to use all-electric systems, resulting in members' contracts being downsized or canceled; eliminating gas piping reduces the amount of plumbing work a project requires.  At least one member has also experienced an overall reduction in business hours.

24.    Plaintiff Building Industry Association of New York City, Inc. is a not-for-profit corporation organized and existing pursuant to the laws of the state of New York with its principal office in Staten Island.  The Building Industry Association's members generally comprise builders, developers, architects, and related trades engaged primarily in the construction of one- and two-family houses and similar buildings in New York City; of 89 members, roughly 30 are builders or developers.  The Building Industry Association's stated purpose is to promote cooperation "with all branches of the home building industry including, but not limited to homebuilders, contractors, sub-contractors, manufacturers, dealers, suppliers, tradesmen, mechanics and financial institutions within the City of New York, principally in the boroughs of Staten Island and Brooklyn, for the purpose of mutual advantage and for the benefit of the industry as a whole."

25.    The impending gas ban is causing current and imminent harm to the Building Industry Association's members.  One or more members are suffering, or are imminently facing, harm to profits and operations from the gas ban.  The specific manner by which its members will suffer harm includes an inability to market and sell new construction to prospective purchasers

JA23

who prefer gas appliances and heat because the ban prevents members from making gas appliances available in new construction; the likelihood that prospective home purchasers will purchase new construction outside of New York City due to their inability to have gas appliances, resulting in lost business; and the inability of its members to develop and sell new construction with gas appliances if electric infrastructure becomes unable to support such construction.  Further, the cost associated with the installation of electric appliances will increase the expense associated with such construction and make new homes less marketable.  Members are having to consider changes in their long-term investments and planning and will likely face decisions on the number and type of employees to hire or train.

26.    Accordingly, Plaintiffs and their members are experiencing or will imminently experience harm in the form of economic injuries, altered business practices, and compliance burdens because of the impending gas ban.  For example, a member of one Plaintiff has already seen its business drop by 30%, and members of other Plaintiffs have seen construction projects and contracts modified to remove gas plumbing, which can constitute from 18% to 25% of the plumbing work in new buildings.  Other Plaintiffs' members have suffered or will imminently suffer reduced work hours, impacts on long-term planning and investment, and diminished company values.

27.    Plaintiffs each have standing to bring this action because the interests they seek to address through this action are germane to their fundamental purposes; each Plaintiff has one or more members that are or will be injured as a result of the ban and would independently have standing; and the claims asserted seek only declaratory and injunctive relief and therefore do not require participation of individual members.

11

28.     Defendant City of New York is a municipal corporation existing under the laws of the State of New York.

29.     An actual and substantial controversy has arisen and now exists between Plaintiffs and Defendant concerning the validity of New York City's gas ban.  Plaintiffs contend that the gas ban is preempted by EPCA.  Plaintiffs are informed and believe, and on that basis allege, that Defendant disagrees with Plaintiffs' contentions and asserts that its gas ban is lawful and enforceable.

30.     Enforcement of the gas ban will injure Plaintiffs or their members.  Those injuries will likely be redressed by a favorable ruling from this Court.

31.     Plaintiffs challenge the facial validity of certain provisions of the New York City gas ban.  There is no set of circumstances under which New York City's gas ban would be valid under federal law.

## ALLEGATIONS

### The New York City Gas Ban

32.     On December 15, 2021, the New York City Council passed Local Law No. 154 of 2021.  The Mayor of New York City approved the law on December 22, 2021.  *See* N.Y.C. Local Law No. 154 (2021) (codified at N.Y.C. Admin. Code §§ 24-177.1, 28-506.1).

33.     The law's intent and effect is to ban gas and fuel oil appliances in new buildings.

34.     The law amended the New York City Administrative Code to add section 24-177.1, "Prohibited emissions," which states:

a.     Buildings shall be subject to the emission limits set forth in this section in accordance with section 28-506.1.

b.     No person shall permit the combustion of any substance that emits 25 kilograms or more of carbon dioxide per million British thermal units of energy, as determined by the United States energy information administration, within such building.

12

JA25

c.     Notwithstanding the prohibition in subdivision b, combustion of a substance that emits 25 kilograms of carbon dioxide per million British thermal units of energy or more shall be permitted for use within such a building where the combustion of such substance occurs in connection with a device that contains no connection to a building's gas supply line or fuel oil piping system, is used on an intermittent basis, and is not used to supply a building with heat or hot water.

d.     This section may be enforced by the department or the department of buildings.

35.     The law also created section 28-506.1 of the Administrative Code, which provides that section 24-177.1's ban applies to "[n]ew buildings." N.Y.C. Admin. Code § 28-506.1. Specifically, section 28-506.1 provides:

New buildings shall be subject to the emissions limits set forth in section 24-177.1. The commissioner shall not approve an application for the approval of construction documents, nor issue any permit in connection therewith, for a new building that does not comply with section 24-177.1.

36.     Section 28-506.1 provides that the ban takes effect for new buildings "less than seven stories" beginning January 1, 2024, and for new buildings "seven stories or more" beginning July 2, 2027. N.Y.C. Admin. Code § 24-177.1(1) to -(2). Buildings for which "an application for the approval of construction documents" is submitted before the effective date are not subject to the ban. *Id.*

37.     Section 28-506.1 also grants exceptions to various buildings, including where combustion equipment "is necessary for a manufacturing use or purpose, or for the operation of a laboratory, laundromat, hospital, crematorium, commercial kitchen as defined in section 602 of the New York city fire code, or where used for emergency or standby power, or other use allowed by rule of the department, to the extent necessary for, and in the space occupied by such use or purpose." N.Y.C. Admin. Code § 24-177.1(9).

38.     The United States Energy Information Administration determines emissions of kilograms of carbon dioxide per million British thermal units of energy for various substances.

13

JA26

The right-hand column of the following chart shows those determinations as of September 2023:

**Carbon Dioxide Emissions Coefficients by Fuel**

| Carbon Dioxide (CO₂) Factors: | Pounds CO₂ Per Unit of Volume or Mass | Kilograms CO₂ Per Unit of Volume or Mass | Pounds CO₂ Per Million Btu | Kilograms CO₂ Per Million Btu |
|---|---|---|---|---|
| **For homes and businesses** | | | | |
| Propane | 12.68 gallon | 5.75 gallon | 138.63 | 62.88 |
| Diesel and Home Heating Fuel (Distillate Fuel Oil) | 22.45 gallon | 10.19 gallon | 163.45 | 74.14 |
| Kerosene | 21.78 gallon | 9.88 gallon | 161.35 | 73.19 |
| Coal (All types) | 3,890.78 short ton | 1,764.83 short ton | 211.47 | 95.92 |
| Natural Gas | 120.96 thousand cubic feet | 54.87 thousand cubic feet | 116.65 | 52.91 |
| Finished Motor Gasoline[a] | 17.86 gallon | 8.10 gallon | 148.57 | 67.39 |
| Motor Gasoline | 19.37 gallon | 8.78 gallon | 155.77 | 70.66 |
| Residual Heating Fuel (Businesses only) | 24.78 gallon | 11.24 gallon | 165.55 | 75.09 |

*Carbon Dioxide Emissions Coefficients*, U.S. Energy Info. Admin. (Sept. 7, 2023), https://www.eia.gov/environment/emissions/co2_vol_mass.php.

39.    As can be seen in the Energy Information Administration's chart, all listed fuel gases for homes and businesses are well over the New York City law's 25 kg $CO_2$/MBtu limit, and even the lowest emissions factor, for natural gas, is still more than twice the City's limit.

40.    Accordingly, as a practical matter, the City's emissions standard functions to ban all use of fuel gas appliances in new buildings.

41.    That was the point. The Mayor's Office provided testimony in support of the ban, making clear that the law's purpose and effect is to require all-electric buildings and to eliminate the use of all gas appliances:

> The next generation of buildings is electric. Setting ambitious targets for new buildings to be built without reliance on fossil fuels presents an opportunity for us to shape the future of our city and lead the world in developing the high-efficiency, electric buildings of the future.

> To meet our carbon-neutrality goals, improve air quality, and create a city that is cleaner and greener, it is time for new buildings to be built without on-site combustion of fossil fuels. Gas or oil heating systems lock buildings into fossil fuel infrastructure for years to come and those are years that we do not have to waste.

14

Testimony of the Mayor's Office Before the New York City Council Committee on Environmental Protection, Nov. 17, 2021 (addressing the proposed ban, Intro. 2317 A) (attached as Exhibit A).

42.     The New York City Council Committee on Environmental Protection, in voting on the bill, described it as a "Bill that will ban the use of natural gas in new buildings." Transcript of the Minutes of the Committee on Environmental Protection, New York City Council, Dec. 14, 2021, at 3 (Committee Chair James F. Genarro) (attached as Exhibit B).

43.     Likewise, during the debate on the bill, City Council members referred to it as the "gas ban bill." *See, e.g.*, Transcript of the Minutes of the City Council of New York Stated Meeting, Dec. 15, 2021, at 67, 88 (excerpts attached as Exhibit C); *see also id.* at 23 (Speaker Johnson: "Among the Bills is one to ban the use of gas in new buildings, helping us transition to a greener future."); *id.* at 47-48, 59.

44.     The New York City Department of Buildings published a "What You Need to Know" sheet that described Local Law 154 as the "NYC Building Electrification Law." It explained:

> The City is phasing out the usage of natural gas and fuel oil in buildings for cooking, heating and service hot water (Service HW). This impacts appliances such as cooking ranges and clothes dryers.

N.Y.C. Dep't of Buildings, LL154 of 2021: NYC Building Electrification Law, https://www.nyc.gov/assets/buildings/pdf/ll154.pdf (last accessed December 27, 2023) (attached as Exhibit D).

**Federal Energy Policy and Regulation**

45.     Born out of the oil crisis the United States faced in the early 1970s, the Energy Policy and Conservation Act of 1975, 42 U.S.C. §§ 6201-6422, establishes a "comprehensive energy policy" designed to address "the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources." *Air Conditioning &*

15

JA28

*Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 498 (9th Cir. 2005), *abrogated in other part by Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938 (2016); *see also Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 185 (2d Cir. 2004). Among other topics, EPCA regulates the energy efficiency and energy use of covered appliances and equipment.

46.     Congress has amended EPCA several times since it was first enacted in 1975, and has progressively moved away from a laissez faire approach to appliance efficiency, which relied on consumers to choose more efficient appliances, and toward binding federal standards. Each amendment to EPCA further emphasized the federal government's intent to regulate appliance energy use and energy efficiency itself and further limited state and local government authority in this area.

47.     In its original form, EPCA's provisions regarding consumer appliances focused on requiring labeling of appliances, reasoning that consumers would choose more efficient appliances if they had access to accurate information about efficiency. Thus, the statute "required manufacturers to label their appliances and provided that the Secretary of the Federal Energy Administration should utilize energy efficiency standards if the labeling program proved ineffective." *Air Conditioning*, 410 F.3d at 499; *Nat. Res. Def. Council*, 355 F.3d at 185. The legislative history memorializes Congress's intent at the time: "[I]t is the Committee's hope that voluntary efforts by manufacturers and better consumer information will make energy efficiency standards unnecessary; however, should the labeling program not suffice, energy efficiency standards should be utilized to achieve the goals of the legislation." H. Rep. No. 94-340, at 95 (1975).

16

48.     In that early form, EPCA permitted significant state involvement, allowing "state regulations that differed from the federal regulations if the state regulations were justified by a substantial state or local need, did not interfere with interstate commerce, and were more stringent than the federal standard." *Air Conditioning*, 410 F.3d at 499.

49.     In 1977, President Carter created the federal Department of Energy to coordinate a federal response to the nation's energy problems.  And the next year, Congress passed a range of statutes known as the National Energy Act, which gave the federal government broader authority over energy policy and sought to ensure national security, decrease energy consumption, reduce dependency on energy imports, generate a strategic petroleum reserve, and broadly develop reliable sources of energy for sustained economic growth.

50.     As part of that 1978 effort, Congress amended EPCA.  Rather than relying exclusively on labeling, the new approach "required the [Department of Energy] to prescribe minimum energy efficiency standards" for certain products.  *Air Conditioning*, 410 F.3d at 499; *see also Nat. Res. Def. Council*, 355 F.3d at 186.  The amendment also strengthened EPCA's preemption, allowing state regulations "*only* if the Secretary [of Energy] found there was a significant state or local interest to justify the state's regulation and the regulation would not unduly burden interstate commerce." *Air Conditioning*, 410 F.3d at 499.

51.     Despite these new requirements, the Department of Energy did not adopt federal minimum energy standards.  Instead, it "initiated a general policy of granting petitions from States requesting waivers from preemption.  As a result, a system of separate State appliance standards ha[d] begun to emerge and the trend [was] growing." S. Rep. No. 100-6, at 4 (1987).

52.     Congress responded in 1987 by again amending EPCA.  Among other changes, Congress added the preemption provision at issue here.  *See* National Appliance Energy

17

Conservation Act of 1987, Pub. L. No. 10012, § 7, 101 Stat. 103, 117-22.

53.     The purpose of the 1987 amendment was "to reduce the regulatory and economic burdens on the appliance manufacturing industry through the establishment of national energy conservation standards for major residential appliances." S. Rep. No. 100-6 at 2. As Congress recognized, varying state standards created "the problem of a growing patchwork of differing state regulations which would increasingly complicate [appliance manufacturers'] design, production and marketing plans." *Id.* at 4 (alteration incorporated); *see also* H.R. Rep. No. 100-11, at 24 (1987) ("Section 7 is designed to protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements.").

54.     The amended statute broadly preempts state and local regulations concerning the energy use or energy efficiency of covered appliances, but then it allows certain exceptions for state and local governments to regulate, so long as they comply with the statutory terms. States can still seek permission under the amended statute to establish their own standards, but "achieving the waiver is difficult." S. Rep. No. 100-6 at 2. It requires showing an unusual and compelling local interest, and the waiver cannot be granted if the "State regulation is likely to result in the unavailability in the State of a product type or of products of a particular performance class, such as frost-free refrigerators." *Id.* Moreover, Congress intended to allow only "performance-based codes" that "authorize builders to adjust or trade off the efficiencies of the various building components so long as an energy objective is met." *Id.* at 10-11. To avoid preemption, a state or local building code provision must, among other requirements, "establish 'credits' for various conservation measures, to provide, to the greatest degree possible, one-for-one equivalency between the energy efficiency of these differing measures and the credits provided for such energy efficiency." *Id.* at 11.

18

JA31

55.     In 1992, Congress again amended EPCA, expanding its federal appliance program to include commercial and industrial appliances.

56.     Congress has made a handful of minor amendments to EPCA's preemption provisions since 1987, none of which are relevant here.

**EPCA's Express Preemption Provisions**

57.     EPCA expressly preempts state and local regulations concerning the energy use or energy efficiency of covered appliances, subject to a few narrow exceptions.  The statute sets out specific requirements that must be met to qualify for those exceptions.  That structure reflects Congress's choice to preempt all regulations concerning energy use and energy efficiency by covered appliances, subject to detailed conditions that must be met for state or local laws in this area to avoid preemption.

58.     EPCA regulates the energy efficiency and energy use of a variety of consumer and industrial products, which the statute calls "covered products."  Its standards for "consumer product[s]" cover a range of appliances, including water heaters, furnaces, dishwashers, and stoves.  42 U.S.C. §§ 6291(1)-(2), 6292(a).  It also contains standards for "industrial equipment," including furnaces and water heaters.  *Id.* § 6311(2)(A).  Those definitions are not tied to who is using the product.  A product qualifying as a "consumer product" but used in a commercial enterprise is still a "consumer product."  *See id.* §§ 6291(2), 6929(a), 6311(2)(A)(iii).

59.     The express preemption provision in EPCA's consumer product regulations states that "effective on the effective date of an energy conservation standard established in or prescribed under [42 U.S.C. § 6295] for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation" falls within certain enumerated exceptions.  42 U.S.C. § 6297(c).

19

60.    "State regulation" is defined to include "a law, regulation, or other requirement of a State or its political subdivisions." 42 U.S.C. § 6297(a)(2)(A).

61.    "[E]nergy use" is defined as "the quantity of energy directly consumed by a consumer product at point of use." 42 U.S.C. § 6291(4).  "[E]nergy" is defined as "electricity, or fossil fuels." *Id.* § 6291(3).

62.    Putting these definitions together, EPCA preempts regulations relating to "the quantity of [fossil fuel] directly consumed by" covered consumer appliances at the place where those appliances are used.  42 U.S.C. §§ 6291(3)-(4), 6297(c).

63.    Similarly, EPCA's industrial equipment provisions expressly preempt "any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established" in the federal statute.  42 U.S.C. § 6316(b)(2)(A).  In the industrial product standards, "energy use" means "the quantity of energy directly consumed by an article of industrial equipment at the point of use." *Id.* § 6311(4).  And "energy" is defined in the same way as for the consumer product standards. *Id.* §§ 6311(7), 6291(3).

64.    EPCA thus preempts regulations relating to the "quantity of [fossil fuel] directly consumed by" covered industrial equipment at the place where those appliances are used.  42 U.S.C. § 6311(4), (7); *id.* § 6291(3).

**New York City's Gas Ban Is Preempted by EPCA**

65.    New York City's gas ban is preempted by EPCA's express preemption provisions. The gas ban is a regulation concerning the energy use or energy efficiency of appliances covered by EPCA in that it "prevent[s] such appliances from using" fossil fuels, such as propane or natural gas. *Cal. Rest.*, 65 F.4th at 1048 (emphasis omitted).  The gas ban therefore is preempted by federal law.

20

66.     The Ninth Circuit—the only federal court of appeals to have addressed the scope of preemption under § 6297(c)—recently held in *California Restaurant Association v. City of Berkeley*, *supra*, that "[b]y its plain text and structure," § 6297(c)'s preemption provision "encompasses building codes that regulate natural gas use by covered products," including those that "prevent[] such appliances from using natural gas." 65 F.4th at 1048 (emphasis omitted). That case involved a Berkeley, California ordinance that, rather than "directly banning those appliances in new buildings," banned fuel gas piping in new construction, "rendering the gas appliances useless." *Id.*

67.     The unanimous Ninth Circuit panel explained that "EPCA preempts regulations that relate to 'the quantity of [natural gas] directly consumed by' certain consumer appliances at the place where those products are used." *Cal. Rest.*, 65 F.4th at 1050-51. "[A] regulation that prohibits consumers from using appliances necessarily impacts the 'quantity of energy directly consumed by [the appliances] at point of use.'" *Id.* at 1051. Berkeley's gas ban thus was preempted by EPCA "because it prohibits the installation of necessary natural gas infrastructure on premises where covered natural gas appliances are used." *Id.*

68.     New York City's gas ban is functionally indistinguishable from Berkeley's preempted ordinance. New York City, rather than banning gas piping, banned the use in new buildings of any combustion materials that have emissions of kg of $CO_2$ per unit of energy (MBtu) over a level that the City set with the intent and effect of banning the use of any fuel gas. Indeed, there is not a single substance for which the Energy Information Administration reports a $CO_2$ coefficient that can satisfy New York City's law. *See Carbon Dioxide Emissions Coefficients*, *supra* ¶ 38. So although the local law nominally contemplates that buildings may still have a "gas supply line or fuel oil piping system," *see* N.Y.C., N.Y., Admin. Code § 24-177.1(c), it prohibits

any appliance connected to such a system from using the energy it could provide.  Simply put, under New York City's ban, fuel gas appliances—including those covered by EPCA—cannot be used in new buildings.

69.     The gas ban does not qualify for any of EPCA's narrow exceptions to preemption.

70.     On information and belief, neither New York City nor the State of New York has applied for a waiver from the Secretary of Energy, as would be required for § 6297(d)'s exception. Nor could either lawfully obtain such a waiver.  The Secretary is authorized to grant waivers only where the "regulation is needed to meet unusual and compelling State or local energy . . . interests." 42 U.S.C. § 6297(d)(1)(B); *see id.* § 6297(d)(1)(C)(i) (interests must be "substantially different in nature or magnitude than those prevailing in the United States generally").  And EPCA prohibits the Secretary from granting waivers that would "significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis," *id.* § 6297(d)(3), or where "the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the" waiver, *id.* § 6297(d)(4).

71.     Nor can the gas ban satisfy the exception for certain building code requirements. 42 U.S.C. § 6297(f)(3).  That exception requires a regulation to meet seven specific requirements that, taken together, are intended to allow only codes that use consumption objectives and give builders choice about how to increase overall efficiency, ensuring an evenhanded policy that does not force builders to choose one type of appliance over another.  *See* S. Rep. 100-6 at 10-11 (1987).

72.     The gas ban is not included in a building code, but rather in Title 24 of New York City's Administrative Code, which addresses "Environmental Protection and Utilities."

Regardless, the ban fails several of the requirements for exemption. It does not "permit[] a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective," 42 U.S.C. § 6297(f)(3)(A). Rather, without regard to any consumption target—or even whether the result of applying the ban makes a building use more or less energy—the ban prevents builders from selecting any appliances that use fuel gas. Nor does it provide credits "for installing covered products having energy efficiencies exceeding" federal standards "on a one-for-one equivalent energy use or equivalent cost basis," *id.* § 6297(f)(3)(C). No matter how far they exceed federal standards, fuel gas appliances get no credit at all because they cannot be installed. And the gas ban does not "specif[y]" any "energy consumption or conservation objective," let alone do so "in terms of an estimated total consumption of energy" calculated in the manner prescribed by statute, *id.* § 6297(f)(3)(F).

73.     Similar to the consumer product provisions, EPCA contains only limited exceptions to the default rule of preemption of state or local regulations concerning the energy use of industrial appliances. 42 U.S.C. § 6316(2)(B).

74.     To avoid preemption for industrial appliances, a state or local regulation in a building code must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1." 42 U.S.C. § 6316(2)(B)(i).

75.     New York City's gas ban does not qualify for that exception because it is not in a building code and, in any event, it bans all gas appliances, even when they meet the efficiency standards in ASHRAE/IES Standard 90.1.

## CAUSE OF ACTION:
## FEDERAL PREEMPTION BY THE ENERGY POLICY AND CONSERVATION ACT

76.     Plaintiffs re-allege the preceding paragraphs as though set forth fully herein.

23

JA36

77.    New York City's gas ban is preempted by EPCA.

78.    The gas ban concerns the energy use of all gas appliances, including appliances covered by EPCA, in newly constructed buildings included within the statute.

79.    The gas ban does not qualify for any of EPCA's exemptions from preemption because:

    a.  The gas ban has not received—and is not eligible for—a waiver of preemption;

    b.  It is not in a building code;

    c.  It does not set objectives in terms of total consumption of energy;

    d.  It does not permit builders to select items otherwise acceptable under federal regulations whose combined energy efficiencies meet an objective for total energy consumption, but rather requires a particular category of items (electric appliances) while it precludes other categories of items (gas appliances);

    e.  It does not give credit on a one-for-one basis for all appliances whose energy efficiency exceeds the federal standards because it gives no credit for (and indeed bans) gas appliances no matter their efficiency; and

    f.  It bans all gas appliances, even when those appliances meet the federal standards.

80.    Plaintiffs and their members will be irreparably harmed if the gas ban becomes effective and is enforced.  Plaintiffs and their members have already experienced and will continue to face economic injuries, including lost sales, lost customers, lost work hours, and ultimately the demise of certain businesses or lines of business or certain jobs; their business planning, investments, and hiring decisions are and will be affected; and they face compliance burdens associated with the gas ban.

JA37

81.     Plaintiffs and their members have no adequate remedy at law for these irreparable harms.  Unless New York City is enjoined from effectuating the gas ban, Plaintiffs and their members will continue to be denied their legal rights.

82.     There will be no significant harm to New York City from an injunction because the City has no legitimate interest in enforcing an invalid law.  The balance of harms thus favors injunctive relief.

83.     An injunction is also in the public interest.  The public interest is not served by enforcing invalid laws.  Moreover, EPCA embodies a strong public interest in the uniform national regulation of energy conservation and use policy, encouraging diverse domestic supply of energy, ensuring energy security, and protecting consumer choice, all of which is undermined by conflicting local regulation of these matters, exemplified by the City's gas ban.

84.     Plaintiffs therefore request that the Court (i) declare that the gas ban is preempted by EPCA and (ii) enjoin New York City from enforcing the gas ban.

## REQUESTED RELIEF

85.     Plaintiffs therefore request that the Court award the following relief:

a.  a declaratory judgment under 28 U.S.C. § 2201(a) that the gas ban, New York City Administrative Code §§ 24-177.1, 28-506.1, is preempted by federal law because it concerns the energy use of appliances covered by the federal Energy Policy and Conservation Act and is therefore void and unenforceable;

b.  a permanent injunction enjoining Defendant from enforcing or attempting to enforce the gas ban, New York City Administrative Code §§ 24-177.1, 28-506.1;

25

c.  costs of this suit, including reasonable attorneys' fees; and

d.  such other and further relief as the Court may deem just and proper.

Dated:  December 29, 2023                Respectfully submitted,

*/s/ Caroline M. Walters*
Caroline M. Walters (NY Bar No. 5780739)
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
400 Madison Ave., Suite 14D
New York, NY 10017
Telephone: (212) 381-1965
Facsimile: (650) 560-3501
cwalters@reichmanjorgensen.com

Sarah O. Jorgensen (*pro hac vice* forthcoming)
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
1201 West Peachtree St., Suite 2300
Atlanta, GA 30309
Telephone: (650) 623-1403
Facsimile: (650) 560-3501
sjorgensen@reichmanjorgensen.com

Courtland L. Reichman (*pro hac vice* forthcoming)
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Telephone: (650) 623-1401
Facsimile: (650) 560-3501
creichman@reichmanjorgensen.com

Brian C. Baran (*pro hac vice* forthcoming)
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
1909 K St. NW, Suite 800
Washington, DC 20006
Telephone: (202) 894-7310
Facsimile: (650) 560-3501
bbaran@reichmanjorgensen.com

*Attorneys for Plaintiffs*

26

JA39

# Exhibit A



**TESTIMONY OF THE MAYOR'S OFFICE**
**BEFORE THE NEW YORK CITY COUNCIL**
**COMMITTEE ON**
**ENVIRONMENTAL PROTECTION**
*November 17, 2021*

### I.  Introduction

Good afternoon. My name is Ben Furnas and I am the Director of the Mayor's Office of Climate and Sustainability. I am joined by Anthony Fiore, the Deputy Commissioner and Chief Energy Management Officer at the Department of Citywide Administrative Services and Gina Bocra, the Chief Sustainability Officer at the Department of Buildings. I want to thank Chair Gennaro and members of the committee for this opportunity to testify on building electrification and Introductions 2317, 2196, and 2091.

### II.  Climate Crisis

A recent report by the Intergovernmental Panel on Climate Change (IPCC) found that unless there are immediate and large-scale reductions in greenhouse gas emissions, the world will continue to see increases in the frequency and intensity of extreme weather events and heat waves that would imperil global agriculture and health. New Yorkers are already too familiar with the serious consequences of extreme weather, most recently managing the impacts of Tropical Storm Henri and Hurricane Ida.

As world leaders convened in Glasgow for the U.N. climate change negotiations over the past weeks, it was clear that cities are leading the way in the fight against climate change. The federal Infrastructure Investment and Jobs Act provides support for major new investments in decarbonization and signals that cities will be critical in our country's work against climate change.

Cities are taking ambitious action to confront the climate crisis and build a green and just world, and New York City is leading the charge.

Together with Council, we have taken bold action to cut greenhouse gas emissions from all sectors as fast as possible, including requiring buildings to undergo retrofits, transitioning to renewable energy, accelerating the shift to cleaner modes of transportation, and creating green jobs; but there is more we can do and we must take every opportunity to reduce greenhouse gas emissions for our city and our planet.

### III.  Electric Buildings

New York City is committed to achieving carbon neutrality by 2050.

The fossil fuels used to heat, cool, and power our buildings are responsible for nearly 70% of greenhouse gas emissions in New York City. They also emit a wide range of air pollutants that harm the health of New Yorkers, especially our most vulnerable.

JA41

New York City has already been a global leader in building emission reductions, notably through the passage and implementation of the Climate Mobilization Act and its centerpiece, Local Law 97, which places caps on greenhouse gas emissions from existing large buildings.

With the legislation being proposed here today, we can lead again.

The next generation of buildings is electric. Setting ambitious targets for new buildings to be built without reliance on fossil fuels presents an opportunity for us to shape the future of our city and lead the world in developing the high-efficiency, electric buildings of the future.

To meet our carbon-neutrality goals, improve air quality, and create a city that is cleaner and greener, it is time for new buildings to be built without on-site combustion of fossil fuels. Gas or oil heating systems lock buildings into fossil fuel infrastructure for years to come – years that we do not have to waste.

All-electric buildings are a solution to improving the climate and the health of our residents. Buildings with efficient electric heating and cooling have existed for decades and are currently being built all over the world, including in New York City. The technology is reliable and functional, even in very cold weather.

Cold climate air source heat pumps provide clean electric interior comfort well-suited to New York's weather. These systems offer efficient cooling, heating from temperatures below -10°F and operate at more than double the efficiency of resistance or gas systems.

These benefits to New Yorkers come with a reasonable price tag. The cost to construct a new all-electric building is relatively similar to that of constructing a new building that heats with gas, and because the building can be designed climate-friendly from the beginning, they can avoid costly retrofits down the line as we race towards carbon neutrality.

The International Energy Agency reports that globally, almost 180 million heat pumps were used in 2020, and that to reach net zero emissions, heat pump use will need to increase significantly. The IEA has also noted the importance of setting a date certain when new buildings will be electric buildings in order to keep the world on what they describe as the "narrow but achievable" path to carbon neutrality by mid-century.

Electrifying buildings to cut greenhouse gas emissions is also in line with recommendations by the New York State's Climate Action Council.

In 2021, the City conducted a study entitled *Pathways to Carbon Neutral NYC,* in partnership with our utilities Con Edison and National Grid. The study found that electrifying heating and domestic hot water systems can provide immediate emissions benefits in efficient buildings, even with today's grid, and that these buildings get greener as the grid gets cleaner.

In 2019, New York State passed the Climate Leadership and Community Protection Act (CLCPA). The CLCPA committed to 100% zero-emission electricity by 2040. Even today, before the projected increase in renewable energy, a building drawing electricity from the grid creates lower greenhouse gas emissions and less air pollution than one burning fossil fuels on-site for heat.

JA42

## IV.   Assist Building Owners

We are committed to working with building owners to provide them with the support they need to shift away from fossil fuels buildings. We have already launched a number of programs providing personalized, technical assistance and connecting building owners and operators with financing.

The NYC Accelerator is a $33M commitment to support a rapid transition toward decarbonizing our city's buildings – including electrification and other alternative technologies to reduce emissions from existing building system.

As part of this citywide effort, the Accelerator has expanded its training and technical assistance offerings to support high-performance new construction electric buildings that will set a new precedent for the future of our homes, schools, and offices.

We're also ready to support these changes with financing. Property Assessed Clean Energy (PACE) financing gives building-owners access to loans with no upfront capital with payments that are tied to the property tax bill.

I'm also pleased to share that staring in January, thanks to legislation passed by the City Council, PACE financing will be available for new construction of electric buildings. We believe this shift will continue to grow the electric building industry in New York, support the next generation of high-efficiency buildings without fossil fuels on site, and would help developers and builders comply with Int. 2317.

## V.   Legislation

Now I'll speak briefly about each of the bills that are being heard today.

### a.   Int. 2317 (in relation to the use of substances with certain emissions profiles)

We are excited to testify today on Int. 2317. This bill represents a major shift in how new buildings will use energy to provide heating and cooling, and we support this critical climate action. We are looking forward to working with the Council to ensure that the bill is as ambitious as possible, while still being achievable for builders and developers throughout the City.

### b.   Int. 2091 (in relation to studying the feasibility of electrifying existing buildings)

Int. 2091 would require a study to determine the feasibility of electrifying existing buildings. The NYC Accelerator does a lot of work to assist existing buildings in efforts to electrify. We would like to continue to work with buildings to eliminate, as much as possible, fossil fuels on site. The bill as currently drafted adds this study to the Long-Term Energy Plan. We believe this is an important topic that warrants further detailed study, but the Long-Term Energy Plan is well underway, so we are happy to discuss with the Council an alternative mechanism to get this work done.

### c.   Int. 2196 (in relation to a study of the health impacts from gas stoves)

Int. 2196 would require a study on the health impacts of gas stoves and a recommendation as to whether it would be appropriate to phase-out gas stoves. Robust research exists on the health impacts of gas stoves at the national level, and we support producing a report on the existing research in this

JA43

space – at both the national and local level and inclusive of equity implications – to inform policy recommendations and implementation in residential settings.

**VI.     Conclusion**

We look forward to working with the Council on leading the way. Thank you. I am now happy to answer any questions.

# Exhibit B

1

CITY COUNCIL
CITY OF NEW YORK

------------------------ X

TRANSCRIPT OF THE MINUTES

              Of the

COMMITTEE ON ENVIRONMENTAL
PROTECTION

------------------------ X

                    December 14, 2021
                    Start:  4:04 P.M.
                    Recess:  4:20 P.M.


HELD AT:   REMOTE HEARING VIRTUAL ROOM 2

B E F O R E: CHAIR JAMES F. GENNARO


COUNCIL MEMBERS: JAMES F. GENNARO
                 HELEN ROSENTHAL
                 CARLOS MENCHACA
                 DARMA DIAZ
                 STEPHEN LEVIN
                 ANTONIO REYNOSO

JA46

2

A P P E A R A N C E S  (CONTINUED)

```
1    COMMITTEE ON ENVIRONMENTAL PROTECTION
                   3
2

3                SGT. MARTINEZ:  PC is up.

4                SGT. LUGO:  Cloud is done.  Good

5    afternoon, everyone.  Welcome to today's remote New

6    York City Council vote of the Committee on

7    Environmental Protection.  At this time would all

8    panelists please turn on your video.  To minimize

9    disruption, please place electronic devices to

10   vibrate or silent.  Thank you for your cooperation.

11   Chair, we are ready to begin.

12               CHAIR JAMES GENNARO:  Okay.  Good

13   afternoon.  I'm Jim Gennaro, Chair of the Committee

14   on Environmental Protection.  Today we will be voting

15   on three Bills.  Two Bills that will reduce

16   unnecessary illumination on city owned and controlled

17   buildings, and one Bill that will ban the use of

18   natural gas in new buildings.  All this legislation

19   will help us to reduce our greenhouse gas emissions,

20   reduce our greenhouse gases, and transition to a

21   sustainable future.  Reducing unnecessary

22   illumination across the city is not simply a matter

23   of energy usage and carbon emissions.  According to

24   the Audubon Society, New York City is located at a

25   point of concentration on the Atlantic fly away bird
```

JA48

```
 1   COMMITTEE ON ENVIRONMENTAL PROTECTION
                                ʌ
 2   migration route.  Twice a year, migratory birds fly

 3   along this path northward towards breeding grounds in

 4   spring and south towards warmer climates in the fall.

 5   The city's wide variety of habitats do attract many

 6   migratory species to the area for resting and

 7   nourishment along their journeys leading to making us

 8   be designated a high priority global important bird

 9   area for our bird life international and the Audubon

10   Society.  Unfortunately, the city's illuminated

11   buildings have the potential to significantly entrap

12   fly roots and can cause disorientation and wasted

13   energy resources as birds fly in confusion.  This

14   wasted energy can lead; I can't wait to read the rest

15   of this statement, (inaudible), terrible; by

16   resulting in fewer birds able to complete their

17   journeys successfully.  Today, the Council will act

18   to protect the hundreds of birds that use the

19   Atlantic fly for migration.  We're going to hear from

20   Helen about this.  We're also here to vote on Intro

21   271-A, one of the lighting Bills which will reduce

22   unnecessary illumination on city owned spaces by

23   creating a phased timeline stipulating that 50

24   percent of city owned and city-controlled buildings

25   comply with occupancy sensor installation
```

JA49

```
 1  COMMITTEE ON ENVIRONMENTAL PROTECTION
 2  requirements by 2020, 80 percent by 2025, and 100
 3  percent by 2030.  This Bill will also require the
 4  Department of Citywide Administrative Services to
 5  submit an annual report to the Mayor and the Speaker
 6  of the City Council outlining changes in the number
 7  of buildings, a percentage of compliant buildings and
 8  a number of buildings that became complaint in the
 9  previous calendar year.  This local Law would take
10  effect immediately.  We'll also hear and vote on
11  Intro 274-A, which mandates that city-owned buildings
12  turn off nonessential outdoor lightening between the
13  hours of 11:00 P.M. and 6:00 A.M. during peak avian
14  migration periods, from April 15 to May 31, and again
15  from August 15 through November 15 each year.  This
16  local Law will take effect immediately.  Finally, we
17  will vote on Intro 2317-A which would prohibit the
18  compression of any substance that emits 25 kilograms
19  or more of carbon dioxide per million BTUs of energy
20  as determined by the U.S. Energy Information
21  Administration and any newly constructed building and
22  (inaudible) to deny construction documents and
23  permits in connection with the building that would
24  require the (inaudible) of these substances with
25  exceptions for emergency standby power, a hardship
```

```
 1   COMMITTEE ON ENVIRONMENTAL PROTECTION
                            6
 2   preventing compliance with the Bill, where the

 3   compression of the substance is required by certain

 4   enumerated industries and whether combustion of the

 5   substance is used on intermittent basis in connection

 6   with a device that is not connected to the buildings

 7   gas supply line.  This Bill will further require the

 8   Mayor's Office of (inaudible) to conduct two studies,

 9   one a study regarding the use of a heat pump

10   technology, and two, a study of the impact of the

11   spill on the city's grid.  This local Law will take

12   effect immediately.  I'd like to thank the most

13   terrific staff of the committee who have done such

14   great work over the years, counsel of the committee,

15   Tamara Swanson (SP?), Policy Analysis Nadia Johnson

16   (SP?), Ricky Chala (SP?), and Financial Analysist,

17   Jonathan Seltzer (SP?), and finally my Legislative

18   Director with his great work, Navi Cara (SP?) for

19   their hard work and it's not in the statement, but

20   I'd be remiss if I didn't thank them in a special

21   way, all the late nights that led up to, you know,

22   2317-A and the very intense negotiations on that Bill

23   which was a hard Bill to negotiate and edit it just

24   right, but we struck that balance and I thank Jeff in

25   a special way.  Now, the prime sponsor of 2317 is
```

JA51

```
1    COMMITTEE ON ENVIRONMENTAL PROTECTION
                          7
2    Council Member Ampry-Samuel.  It's not in the

3    statement.  I just know that, and I know that Helen

4    is either 271-A or 274-A; one is Helen, one is

5    Brannan, and we'll be bringing Helen on.  She will

6    tell us all about that.  Let me just recognize some

7    of the Council Members that are here.  We already

8    know, we've already been going back and forth with

9    Council Member Diaz, Council Member Rosenthal, I saw

10   Steve Levin, Council Member Reynoso I see, Council

11   Member Barron is on, now I see Steve, and I think

12   I've covered everyone, and with that, it is my

13   privilege to recognize Council Member Rosenthal for a

14   statement and she will tell us whether she is the

15   prime sponsor of 271-A or 274-A, okay?

16             COUNCIL MEMBER HELEN ROSENTHAL:  Right,

17   right.  Thank you so much.  Thank you so much, Chair

18   Gennaro.  I really appreciate you and appreciate your

19   leadership on this committee.  My Bill, which is

20   0274-A, compliments Council Member Brannan's Bills,

21   so together, they are basically going to end having

22   illumination outside city buildings during peak

23   migratory times, and you know, according to the

24   Audubon Society, between 90,000 and 230,000 migrating

25   birds died from …
```

JA52

```
1   COMMITTEE ON ENVIRONMENTAL PROTECTION
2           CHAIR JAMES GENNARO:  Segreant, if I
3   could just jump in for a second.  Sergeant, we seem
4   to have some background noise.  Someone's on the
5   phone or something.
6           COUNCIL MEMBER HELEN ROSENTHAL:  No,
7   there's background noise where I am.
8           CHAIR JAMES GENNARO:  Oh, I'm sorry.
9           COUNCIL MEMBER HELEN ROSENTHAL:  I'm
10  sorry.
11          CHAIR JAMES GENNARO:  Oh no, it's okay.
12  As long as it's you, I didn't want you to be
13  interrupted, but if you're interrupting yourself,
14  knock yourself out.
15          COUNCIL MEMBER HELEN ROSENTHAL:  Thank
16  you.  No, I mean, if it's too loud, I can …
17          CHAIR JAMES GENNARO:  No, no, it's fine,
18  it's fine.  I just didn't want, I didn't want, for
19  your sake, I was doing it, yeah.
20          COUNCIL MEMBER HELEN ROSENTHAL:  I
21  appreciate you.  So, anyway, hundreds of thousands of
22  birds are killed every year because of the lights,
23  because New York City is right in the path for these
24  migrating birds so, we're going to, you know,
25  meaningfully impact those, have a decrease in those
```

```
 1    COMMITTEE ON ENVIRONMENTAL PROTECTION
 2    numbers.  This year in particular, we lost hundreds
 3    and thousands of beautiful, yellow songbirds which
 4    was heartbreaking.  For those of you who are
 5    interested in helping track this information, you can
 6    go onto the Audubon Society's website and download an
 7    app and you can help the Audubon Society track when
 8    you find dead birds, but the numbers should be going
 9    down tremendously over the next few years which is
10    great.  My office is right next door to the wild bird
11    fund where at these two times of the year, people
12    come in with birds that have been stunned and have
13    fallen to the ground and have been stunned, and
14    actually the wild bird fund can give information
15    about how to revive the birds.  Often times, they're
16    stunned, they're not dead, so a lot of people care
17    deeply about this issue.  I'm so proud to be the
18    sponsor of one of these Bills.  I really want to
19    thank Tamera Swanson who has worked on these and
20    other Bills tirelessly for so many years.  It's just
21    been a pleasure working with you, and of course,
22    thank former Council Member Costa Constantinides who
23    has led so much on these issues, and to Jeff Baker
24    and to all the committee staff and to the Sergeants
25
```

JA54

```
                                                      10
 1   COMMITTEE ON ENVIRONMENTAL PROTECTION

 2   here, thank you so much for all of your support,

 3   assistance, thank you.  That's it for me.

 4               CHAIR JAMES GENNARO:  Thank you, Council

 5   Member Rosenthal.  You made a great contribution

 6   here.  It was a very, you know, it was a very

 7   illuminating hearing, hearing all of the, you know,

 8   stories of strikes and the impact of lighting and how

 9   they can be used, and at the end of the day, we're

10   talking about city owned buildings here.  So, there's

11   no reason whatsoever why the city shouldn't step up

12   in its own buildings, and make sure that it does the

13   right thing, and you know, because of it's Bill and

14   its companion Bill by Council Member Brannan, you

15   know, that would be the case.  So, this is really a

16   great day and for birds, and yeah, does anyone else

17   wish to be heard before I ask the clerk to call the

18   roll?  Seeing no one else wishing to be heard, I'll

19   ask the clerk to call the roll on all items which

20   will be coupled.

21               COMMITTEE COUNSEL:  Thank you and good

22   afternoon.  This is the Committee on Environmental

23   Protection, roll call vote on Proposed Intros 271-A,

24   274-A, and 2317-A.  Chair Gennaro.

25               CHAIR JAMES GENNARO:  I.
```

JA55

```
 1   COMMITTEE ON ENVIRONMENTAL PROTECTION
                   11
 2              COMMITTEE COUNSEL:  Council Member Levin.
 3              COUNCIL MEMBER STEPHEN LEVIN:  Yes, Mr.
 4   Chairman, I'd like to vote I on all, and I'd like to
 5   sign on to every Bill being heard today, thank you.
 6              COMMITTEE COUNSEL:  Thank you.  Council
 7   Member Menchaca.
 8              COUNCIL MEMBER CARLOS MENCHACA:  Hi
 9   everyone, thank you, and I just want to say thank you
10   to Council Member Helen Rosenthal.  You know, during
11   COVID, I feel like one of the things that I got
12   reconnected to as a boy scout, as an early boy scout
13   back in my youth was birdwatching, and I feel like
14   this Bill has had multiple conversations about it,
15   and my District really came together and sent me a
16   lot of messages about it.  Of course, I said I'm
17   supporting it from the beginning, but it was not easy
18   to get these Bills done in these last six months.
19   Helen understands that.  Now, all the Bills that we
20   wanted to get done, got done, but I'm glad this one
21   did.  Thank you, Helen, from the bottom of my heart,
22   and all of the people in my district that emailed
23   about this, and to all the birds that I do see, you
24   know, dead, I think about what we're going to do
25   today, and I'm thankful.  Thank you, Helen.  I vote I.
```

JA56

```
 1    COMMITTEE ON ENVIRONMENTAL PROTECTION
                         13
 2            CHAIR JAMES GENNARO:  Thank you, Council

 3    Member Menchaca.  I'm sorry, I didn't see you on the

 4    screen when I read out the Council Members before.  I

 5    don't think …

 6            COUNCIL MEMBER CARLOS MENCHACA:  That's

 7    okay, Chair.  It's all good.  I still love you.

 8            CHAIR JAMES GENNARO:  Okay, but I

 9    appreciate that and I appreciate you and I appreciate

10    your valuable contributions to the committee and

11    thank you for your kind statement towards Helen and

12    all of the good work that she has done.

13            COMMITTEE COUNSEL:  Council Member Darma

14    Diaz.

15            COUNCIL MEMBER DARMA DIAZ:  Yes, it's

16    been a pleasure.  I think it's officially my last

17    hearing, my last vote as a Council Member and there's

18    no greater pleasure than closing my voting with Chair

19    Gennaro.  Thank you very much.

20            CHAIR JAMES GENNARO: Thank you so much,

21    Darma, and on that really sweet note, but we're going

22    to see you tomorrow, Darma, we're seeing you

23    tomorrow.

24            COUNCIL MEMBER DARMA DIAZ:  Yes, yes,

25    but…
```

JA57

```
1    COMMITTEE ON ENVIRONMENTAL PROTECTION
                        13
2              CHAIR JAMES GENNARO:  … we're seeing you
3    tomorrow.
4              COUNCIL MEMBER DARMA DIAZ:  As for
5    committees, this is it.  This should be it.
6              CHAIR JAMES GENNARO:  (Crosstalk).  Okay,
7    I look forward to seeing you and everyone else
8    tomorrow.  With that, this hearing is adjourned.
9              CHAIR DARMA DIAZ:  Thank you.
10             COUNCIL MEMBER ANTONIO REYNOSO:  John, I
11   don't think I got the opportunity to vote.
12             CHAIR JAMES GENNARO:  Oh.
13             COUNCIL MEMBER CARLOS MENCHACA:  Hi
14   Reynoso.  Sorry, it's okay.
15             COUNCIL MEMBER ANTONIO REYNOSO: Oh, my
16   goodness.  I was just about to line our Gennaro being
17   the kindest Chair I've ever met in my life.
18             CHAIR JAMES GENNARO:  Oh, my God.
19             COUNCIL MEMBER ANTONIO REYNOSO:  I'm not
20   even going to make that statement anymore.
21   (Crosstalk).
22             CHAIR JAMES GENNARO:  I'm blaming the
23   clerk.  I'm blaming the clerk (laughing).
24             COUNCIL MEMBER ANTONIO REYNOSO: I want to
25   be added on to all the Bills.  I vote I, and Gennaro,
```

```
     COMMITTEE ON ENVIRONMENTAL PROTECTION
 1                            14
 2   you're truly like a ray of sunshine, positive energy

 3   that is all too needed in this type of work, so I

 4   want to thank you for how you Chaired it.

 5   Congratulations to Council Member Helen Rosenthal and

 6   please add me to all the Bills. I think this is great

 7   day for this committee and for New York City too.

 8            CHAIR JAMES GENNARO:  Thank you, Council

 9   Member, a pleasure, and you know, yeah, sorry about

10   it.  It looks like we're all one family now.

11   Everything together (crosstalk) in the picture as

12   well, and so that makes it even sweeter.  Okay, for

13   the second time.

14            COUNCIL MEMBER STEPHEN LEVIN:  Wait

15   Chair, hold on, hold on, I just want to second

16   Antonio's remarks and say just categorically what a

17   delight it is to have you back in the Council

18   Chairing this committee.  You're one of the best.

19            CHAIR JAMES GENNARO:  Thank you, Steve,

20   and after all I said about one of your Bills

21   recently, you're so nice to say that, you know.  I

22   went after Steve on one of his Bills like Gennaro-

23   style, you know, he's a champ and look how sweet he

24   is being.  So, thank you, Steve.

25
```

JA59

1    COMMITTEE ON ENVIRONMENTAL PROTECTION
                        15
2                COMMITTEE COUNSEL:  Chair Gennaro, I just

3    wanted to let you know that the items were adopted by

4    a vote of four in the affirmative, zero in the

5    negative, and two abstentions, thank you, sir.

6                CHAIR JAMES GENNARO:  Of course, they

7    were.  Who would vote against us?  But thank you, Mr.

8    Clerk.  Okay, so I'm going for the, well, I left my

9    gavel at home, so I can't do it like officially, so,

10   with that, this hearing is officially adjourned.

11   It's been fun.  Okay, take care.  See you all

12   tomorrow.

13

14

15

16

17

18

19

20

21

22

23

24

25

JA60

## C E R T I F I C A T E

World Wide Dictation certifies that the
foregoing transcript is a true and accurate
record of the proceedings. We further certify that
there is no relation to any of the parties to
this action by blood or marriage, and that there
is interest in the outcome of this matter.



Date ____ January 31, 2022 _____

# Exhibit C

1

CITY COUNCIL
CITY OF NEW YORK

------------------------ X

TRANSCRIPT OF THE MINUTES

        Of the

CITY COUNCIL STATED MEETING

------------------------ X

                    December 15, 2021
                    Start:  1:55 p.m.
                    Recess:  5:40 p.m.


HELD AT:          Council Chambers - City Hall

B E F O R E:      Corey D. Johnson
                  Speaker

COUNCIL MEMBERS:  Adrienne Adams
                  Alicka Ampry-Samuel
                  Diana Ayala
                  Inez D. Barron
                  Joseph Borelli
                  Justin Brannan
                  Selvena N. Brooks-Powers
                  Tiffany Cabàn
                  Fernando Cabrera
                  David M. Carr
                  Margaret S. Chin
                  Robert E. Cornegy, Jr.
                  Laurie A. Cumbo
                  Ruben Diaz, Sr.
                  Darma V. Diaz
                  Eric Dinowitz
                  Daniel Dromm
                  Mathieu Eugene
                  Oswald Feliz
                  James F. Gennaro
                  Deborah L. Gibson

JA63

2

A P P E A R A N C E S (CONTINUED)

Council Members:

        Mark S. Gjonaj
        Barry S. Grodenchik
        Robert F. Holden
        Ben Kallos
        Peter A. Koo
        Karen Koslowitz
        Brad S. Lander
        Stephen T. Levin
        Mark Levine
        Farah N. Louis
        Alan N. Maisel
        Carlos Menchaca
        I. Daneek Miller
        Francisco P. Moya
        Bill Perkins
        Keith Powers
        Antonio Reynoso
        Kevin C. Riley
        Carlina Rivera
        Ydanis A. Rodriguez
        Deborah L. Rose
        Helen K. Rosenthal
        Rafael Salamanca, Jr.
        Mark Treyger
        Eric A. Ulrich
        Paul A. Vallone
        James G. Van Bramer
        Inna Vernikov
        Kalman Yeger

3

A P P E A R A N C E S

Reverend Mark Erson
Pastor and Spiritual Leader at St. John's
Lutheran Church

```
 1        STATED MEETING OF THE NEW YORK CITY COUNCIL  23

 2             SPEAKER JOHNSON:  I vote aye.

 3             COUNCIL CLERK:  Thank you.

 4             MAJORITY LEADER CUMBO:  Okay, all Land

 5    Use Call Ups were adopted in the affirmative in a

 6    vote of 46 in the affirmative, zero negative and zero

 7    abstentions.

 8             We will now have communication from

 9    Speaker Corey Johnson.

10             SPEAKER JOHNSON:  Thank you Madam

11    Majority Leader.  Good afternoon everyone.  Happy

12    Wednesday, welcome to today's Stated Meeting.  The

13    last Stated Meeting of this City Council's

14    legislative session.  As I usually do, I want to

15    remind all members that masks are required to be worn

16    throughout the Stated, even when speaking.

17             Today, we're voting on 28 Bills and 13

18    Resolutions.  Among the Bills is one to ban the use

19    of gas in new buildings, helping us transition to a

20    greener future.  This legislation is part of our

21    efforts to protect our environment and to reach

22    carbon neutrality by the year 2050.  Also, as

23    prepared food is a growing part of New Yorkers diets,

24    this afternoon we're voting on a bill to require

25    added sugar notification in the menu of chain
```

```
1        STATED MEETING OF THE NEW YORK CITY COUNCIL   46
2   sponsored by Council Member Rafael Salamanca will
3   allow sidewalk café applicants to prepare their own
4   plans rather than use an architect.  For these two
5   bills, I want to thank Stephanie Jones, Leah Skrzpiec
6   and Noah Meixler.
7           Now, from the Committee on Health, we
8   have Introduction Number 1326 A sponsored by the
9   Chair Mark Levine that will require added sugar
10  notifications in chain restaurant menus.  From the
11  staff, I want to thank Sara Liss, Harbani Ahuja,
12  Jayasri Ganapathy and Zeah Manuel Halu(SP?).
13          Our last Bill of the day and of the
14  2018-2021 legislative session will help us curve,
15  will help us reach the city's net zero for carbon
16  neutrality by 2050.  We're in a climate crisis and we
17  must take all necessary steps to fight climate change
18  and protect our city.  Introduction 2317 A sponsored
19  by Council Member Alicka Ampry-Samuel will ban the
20  combustion of substances with certain emission
21  profiles in new buildings in certain renovations.
22  This bill will direct the Commissioner of Buildings
23  to deny construction documents and permits in
24  connection with a new building that would require the
25  combustion of the substances with some exceptions.  I
```

JA67

1          STATED MEETING OF THE NEW YORK CITY COUNCIL   47

2     want to thank from the staff Genan Zilka, Samara

3     Swanston, Nadia Johnson, Ricky Challah, Brad Reed and

4     Terzah Nasser.  That is our final agenda and this

5     final Stated Meeting of the New York City Council for

6     this legislative session.

7               And with that, with gratitude, what

8     thanks to you Madam Majority Leader for presiding

9     over this body in a very great way over the last four

10    years, I turn it back to you.

11              MAJORITY LEADER CUMBO:  Thank you so much

12    Speaker Corey Johnson for that very robust

13    legislative package.  We will now move into

14    discussion of General Orders.

15              Seeing that we have on the docket, we

16    will begin with Council Member Gennaro followed by

17    Council Member Rosenthal, Rivera, Kallos, and Chin

18    and then Koo.

19              COUNCIL MEMBER GENNARO:  Thank you Madam

20    Majority Leader.  Regarding Intro. 2317 A, which the

21    Speaker just referenced, [INAUDIBLE 49:49].  I thank

22    Council Member Ampry-Samuel for her leadership and

23    putting forward this great bill, which will

24    ultimately lead the city to an all-electric city

25    drawing from 100 percent green and renewable grid.

JA68

```
1        STATED MEETING OF THE NEW YORK CITY COUNCIL   48
2    We are light years away from that now but this puts
3    us irreversibly on that course.  This bill alone will
4    yield a savings of 2.1 million tons of Co2 by 2040,
5    which is equal to the carbon as reduced from 450,000
6    cars in a whole year.  But that is just the
7    beginning.  When first put forward this bill was more
8    of a concept bill and the journey of this bill from
9    concept at detailed final bill was one of the most
10   difficult negotiations of the hundreds of
11   negotiations I have done over the years.  And with
12   stakeholder meetings with advocates, industry, labor
13   and the Administration, including the Mayor himself
14   was the most challenging.
15        I thank Council Member Ampry-Samuel for
16   being steadfast on the elements of the bill that were
17   a must for her.  I thank the Speaker and Jason
18   Goldman for their great leadership and for giving
19   what I thought was the most ambitious yet
20   implementable possible.  And very special thanks to
21   Jeff Baker for being with me the whole way to get the
22   great bill to what we have today.  One that will be a
23   template for the nation as we charter course through
24   a carbon neutral future.  Special thanks as well for
25   Paul Ochoa and Ben Ferguson from the Administration
```

JA69

```
1        STATED MEETING OF THE NEW YORK CITY COUNCIL   49

2   and to [INAUDIBLE 51:13] and Advanced Energy Studies

3   [INAUDIBLE 51:18] who provided critical guidance and

4   to my wonderful LB Maddie Cower(SP?) for her great

5   work on this bill.  But we wouldn't be here today

6   without Council Member Ampry-Samuel's vision.  So, I

7   will end where I began in thanking her for putting

8   this bill forward and being a great advocate for it.

9   Her legacy is a green city and a growing green

10  economy to get us there.

11            SERGEANT AT ARMS:  Time.

12            COUNCIL MEMBER GENNARO:  Thank you very

13  much.  Thank you very much.

14            MAJORITY LEADER CUMBO:  Thank you.  We'll

15  now have Council Member Rosenthal then Rivera.

16            COUNCIL MEMBER ROSENTHAL:  Thank you so

17  much.  I'm proud to speak today about my bills that

18  are passing.  We owe a debt of gratitude to our

19  Speaker, Corey Johnson whose brilliant staff

20  negotiated the strongest language possible to help

21  all New Yorkers.  Because of their work, all job

22  postings must include salary ranges which have been

23  shown to close the gender pay gap.  We have to

24  address street harassment, which many of us have

25  experienced particularly women, the LGBTQAI plus
```

```
 1          STATED MEETING OF THE NEW YORK CITY COUNCIL   59

 2                Thank you also to Speaker Johnson and

 3     Chair Holden.  All the advocates who supported this

 4     bill and my own staff.  Thank you.  Happy holidays.

 5                MAJORITY LEADER CUMBO:  Council Member

 6     Lander.

 7                COUNCIL MEMBER LANDER:  Thank you very

 8     much Madam Majority Leader.  I'll save my mushy

 9     remarks for when I vote to speak to bills now.

10                First, I'm so excited about Intro. 2317

11     A, that Council Member Alicka Ampry-Samuel is

12     sponsoring to transform our city into an all-electric

13     city.  We do not have time to continue to burn fossil

14     fuels.  I want to give props to the coalition that

15     fought for that and I want to give special props to

16     Alicka Ampry-Samuel because I know it was a big,

17     strong fight.

18                We have a lot of work to do to make sure

19     that we convert our energy grid to solar and wind and

20     renewables, so that the energy power that is powering

21     our buildings is clean and renewable as well.  And I

22     look forward to fighting hard to continue that in the

23     Comptroller's office and I know this body will as

24     well.

25
```

JA71

```
 1        STATED MEETING OF THE NEW YORK CITY COUNCIL   65
 2    my colleagues discussions on this bill.  For those of
 3    you that cosponsored it and supported it, I
 4    appreciate your collaboration.  I'm hopeful that this
 5    bill will pass in the next session.  This is a bill
 6    that is about affording everybody in our city, all of
 7    us who are Gods children, the right to dignity with a
 8    roof over their head.  Whether they have a criminal
 9    history or not.  Everybody deserves to have a home.
10    And so, I'm disappointed that this bill is not
11    passing today but I am very confident, very confident
12    that in the future this legislation will pass and I
13    look forward to seeing that day here in the New York
14    City Council.  And I'll come back on my next round to
15    talk about that.  [APPLAUSE]
16             MAJORITY LEADER CUMBO:  Thank you Council
17    Member Levin, we'll now go to Council Member Ampry-
18    Samuel followed by Borelli.
19             COUNCIL MEMBER AMPRY-SAMUEL:  Our city
20    and state has set lofty goals to reduce our gas
21    related emissions.  As many children of the 70's and
22    80's, I remember celebrating Earth Day and taking
23    personal responsibility for the earth and
24    environment.  We people have had to contend with the
25
```

JA72

```
1        STATED MEETING OF THE NEW YORK CITY COUNCIL   66
2    effects of global warming in the forms of record
3    breaking fatal weather events year after year.
4            The responsibility has always been on
5    individuals.  Multiuse water bottles, shorter
6    showers, home recycling, this Council also prohibited
7    single use straws, plastic bags and reduce the usage
8    of plastic flatware.  We have literally made personal
9    environmental responsibility a letter of the law.
10   But buildings are responsible for nearly half of the
11   greenhouse emissions that are destroying our earth
12   every day.
13           Today, is the last Stated of this Council
14   term and it has been an honor and privilege to
15   represent my community where we see a 32 percent
16   higher exposure rate to dangerous pollutants from
17   greenhouse emissions.  A community where the Council
18   staff recognizes best practices and believes in New
19   York as a leader.  So much so that they brought this
20   idea to me in its infancy stages.  Immediately
21   recognizing the intersectionality of climate and
22   racial justice.  I knew that this was a charge that
23   the 41st Council must have set.  Together, we worked
24   tirelessly with advocates to develop this bill and
25   push it through.
```

JA73

```
 1        STATED MEETING OF THE NEW YORK CITY COUNCIL   67
 2              Although we have few surprising allies,
 3    we have some surprising challengers as well.  But we
 4    held strong and as we look to the future, I thank
 5    Speaker Johnson and my colleagues for supporting this
 6    gas ban bill which essentially codifies our emission
 7    reduction goals.  And I thank Jim Gennaro, excuse me,
 8    I thank Council Member Gennaro — can you give me one
 9    minute?
10              I thank Council Member Gennaro for
11    helping me to sharpen my debate skills.  That was
12    quite the challenge.  So, as I come to a close with
13    my remarks and my time in the Council, I thank all of
14    the advocates that gave us a master class and data
15    for days on emissions, gas, the grid, pollutants.  I
16    thank Pete Sikora and Johnathan, We Act NYCC and
17    countless others.  And I want to really thank Jeff
18    and Jason for working so hard because I know at
19    midnight on some days, I could have been a bit much.
20    It was tough but worth the fight.
21              I want to also thank my staff Naomi
22    Hopkins and my Legislative Director Everton Smith for
23    their support and also, my staff in the Council,
24    Jennifer Joseph, Kim Robinson, Christina Serrano,
25    Takirra Jackson, and Maurice Cummings for their
```

JA74

```
 1          STATED MEETING OF THE NEW YORK CITY COUNCIL  68
 2    amazing team work.  I want to thank you all and
 3    remind you that climate justice is racial justice.
 4    So, let's keep putting people first.  Thank you.
 5               MAJORITY LEADER CUMBO:  Thank you Council
 6    Member Ampry-Samuel so much.  Council Member Borelli.
 7               COUNCIL MEMBER BORELLI:  I like to stand
 8    at my desk.  I don't like the stand up comedy routine
 9    that we do now.  [APPLAUSE]  Yes, thank you, thank
10    you.  I feel like Jerry Seinfeld up there you know.
11               I just want to say number one, I will say
12    my emotional farewell to everyone.  I don't see Corey
13    here but I wanted to say it's been a really wonderful
14    four years working alongside the Speaker.  You know
15    through all the work the Council did.  Even though of
16    course we disagree many times, it's nice to have a
17    partner in government and also a friend in government
18    and I really thank you for your service to the City
19    of New York.  Whatever you go on to do next, that
20    institution or whatever will be very lucky to have
21    you.  And the rest of you guys, you're not very good,
22    so.  No, I'm kidding.
23               I should have done the stand up comedy
24    routine.  It's been a privilege to work with so many
25    of you over the past four years.  Some of you longer.
```

JA75

```
 1        STATED MEETING OF THE NEW YORK CITY COUNCIL  88

 2    2424-B being led by Council Member Rosenthal, where

 3    it will create an advisory board to help address New

 4    Yorkers who continue to be harassed as the walk

 5    through the streets in New York City and we hope that

 6    we'll be able to do some great work with that board.

 7    And with that, I am proud to vote aye on all.  Thank

 8    you.

 9            MAJORITY LEADER CUMBO:  Thank you.

10            COUNCIL CLERK:  Council Member Cabàn?

11            COUNCIL MEMBER CABÀN:  Permission to

12    explain my vote?

13            MAJORITY LEADER CUMBO:  Permission

14    granted.

15            COUNCIL MEMBER CABÀN:  Thank you Majority

16    Leader.  First, just congratulations to my colleagues

17    on passing such wonderful bills today.  Particularly,

18    Council Member Ampry-Samuels gas ban bill.  That is

19    such an incredible achievement.  Thank you.  I do

20    really wish that Council Member Levin's Fair Chance

21    for Housing Bill was on the agenda today too but I do

22    look forward to passing it next term.  And I vote aye

23    on all with the exception of Intro.'s 2476 and 2439

24    in which I vote no, thank you.

25            COUNCIL CLERK:  Council Member Cabrera?
```

JA76

# C E R T I F I C A T E

World Wide Dictation certifies that the
foregoing transcript is a true and accurate
record of the proceedings. We further certify that
there is no relation to any of the parties to
this action by blood or marriage, and that there
is interest in the outcome of this matter.



Date _____ February 7, 2022 _____

# Exhibit D



# LL154 OF 2021:
# NYC BUILDING ELECTRIFICATION LAW

## WHAT YOU NEED TO KNOW...

*Local Law 154 of 2021 prohibits the onsite combustion of fuels that emit more than 25kg $CO_2$/MMBTU.*

### What does this mean?

The City is phasing out the usage of natural gas and fuel oil in buildings for cooking, heating and service hot water (Service HW). This impacts appliances such as cooking ranges and clothes dryers.

### What types of applications are affected and when?

New Building or Alt-CO New Building with Existing Elements to Remain (alterations that must be filed as New Buildings), submitting applications on or after these dates:

- **January 1, 2024:** for Group R-3 (1,2 family homes) and all occupancies less than 7 stories (excluding Service HW)
- **December 31, 2024:** for NYC School Construction Authority projects
- **December 31, 2025:** for Affordable Housing* less than 7 stories (excluding Service HW)
- **July 2, 2027:** for all occupancies (includes Service HW)
- **December 31, 2027:** for Affordable Housing* 7 stories or taller (includes Service HW)

*50% or more of the units are subject to a regulatory agreement, restrictive declaration, or similar instrument with a federal, state, or local governmental entity or instrumentality for the creation or preservation of affordable housing.*

### Are there exceptions to the law?

Yes. The following are exceptions to the law:

- Buildings used by a regulated utility for energy generation
- Buildings operated by DEP for treatment of sewage or food waste
- Specific spaces within buildings in which fossil fuels are necessary for a manufacturing use or purpose, such as:
  - Laboratories
  - Laundromats
  - Hospitals and Crematoria
  - Commercial Kitchens
  - For Emergency or Standby Power

For more details read the law at **www.nyc.gov/assets/buildings/local_laws/ll154of2021.pdf**.

**CONTACT US: sustainability@buildings.nyc.gov**        **VISIT US: nyc.gov/buildings**

NYC Buildings

JA79

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ASSOCIATION OF CONTRACTING
PLUMBERS OF THE CITY OF NEW YORK,
INC.; PLUMBING-HEATING COOLING
CONTRACTORS–NATIONAL ASSOCIATION;
PLUMBERS LOCAL UNION NO. 1, UNITED
ASSOCIATION OF JOURNEYMEN AND
APPRENTICES OF THE PLUMBING AND
PIPEFITTING INDUSTRY OF THE UNITED
STATES AND CANADA; NEW YORK STATE
ENERGY COALITION, INC.; THE PLUMBING
FOUNDATION CITY OF NEW YORK, INC.;
LICENSED PLUMBING ASSOCIATION NEW
YORK CITY, INC., d/b/a MASTER PLUMBERS
COUNCIL OF THE CITY OF NEW YORK; and
BUILDING INDUSTRY ASSOCIATION OF
NEW YORK CITY, INC.,

Plaintiffs,

v.

CITY OF NEW YORK,

Defendant.

23-CV-11292 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

Plaintiffs, a group of trade associations and a union whose members work in the construction, delivery, and servicing of fuel gas systems and appliances, bring this action against the City of New York, asserting that Local Law 154 of 2021, also known as the New York City Building Electrification Law, is preempted by the Energy Policy Conservation Act of 1975 ("EPCA"), *see* 42 U.S.C. §§ 6201–6422, and seeking a declaratory judgment and permanent injunction to that effect. Before the Court is Defendant's motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the motion is granted.

## BACKGROUND[1]

On December 22, 2021, the City of New York enacted Local Law 154 of 2021 ("Local Law 154" or the "Law"), which generally prohibits the use of fossil fuels such as natural gas and heating fuel in newly constructed residential buildings in New York City.  The City enacted the law as part of an effort to "meet [New York City's] carbon-neutrality goals, improve air quality, and create a city that is cleaner and greener." *Hearing on Intro. 2317-2021-A Before the N.Y. City Council Comm. on Env't Protection*, Nov. 17, 2021 (Testimony of the Mayor's Office).  It provides that "[n]o person shall permit the combustion of any substance that emits 25 kilograms or more of carbon dioxide per million British thermal units of energy, as determined by the United States [E]nergy [I]nformation [A]dministration," within buildings it covers.  N.Y.C. Admin. Code § 24-177.1.[2]  This category of substances includes all home and business fuel sources measured by the United States Energy Information Administration, *see Carbon Dioxide Emissions Coefficients*, U.S.      Energy      Info.      Admin.      (Sept.      18,      2024), https://www.eia.gov/environment/emissions/co2_vol_mass.php; Compl. ¶ 38–39, several of which are commonly used for home heating, cooking, and hot water, Compl. ¶ 3.  After the Law's effective date, the Commissioner of the Department of Buildings may not approve a construction application for any non-compliant new building, although older buildings are exempted.  N.Y.C. Admin. Code § 28-506.1.[3]

Plaintiffs are six trade associations and a union whose members work in the construction,

---

[1] The Court draws the following facts from the Complaint, accepting all "well-pleaded factual allegations" as true, as it must, for purposes of deciding a motion to dismiss.  *Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020).
[2] The Law provides an exception for, among other things, buildings where the combustion of prohibited substances is "necessary for a manufacturing use or purpose, or for the operation of a laboratory, laundromat, hospital, crematorium, commercial kitchen . . . , or where used for emergency or standby power, or other use allowed by rule of the [D]epartment [of Buildings], to the extent necessary for, and in the space occupied by such use or purpose."  N.Y.C. Admin. Code § 28-506.1.
[3] The Law took effect on January 1, 2024 for most new buildings of less than seven stories, and will take effect on July 2, 2027 for most new buildings of seven or more stories.  N.Y.C. Admin. Code § 28-506.1.

2

JA81

delivery, and servicing of fuel gas systems and appliances, and who rely on the availability of such systems for their livelihoods.  Compl. ¶ 4.  The Association of Contracting Plumbers of the City of New York, Inc. is a nonprofit trade association that represents union-affiliated licensed master plumbers in the City of New York.  Compl. ¶ 11.  The Plumbing-Heating-Cooling Contractors— National Association is a nonprofit trade association that represents the interests of plumbing and heating, ventilation, and air conditioning ("HVAC") contractors across the United States, *id.* ¶ 13, including approximately 212 plumbing and HVAC contractors in New York state, *id.* ¶ 14.  The New York State Energy Coalition, Inc. is a nonprofit trade organization whose members include businesses in the heating oil industry.  *Id.* ¶ 18.  The Plumbing Foundation City of New York, Inc. is a nonprofit trade association whose members comprise approximately 195 union and non-union New York City licensed master plumbers.  *Id.* ¶ 20.  The Licensed Plumbing Association of New York City, Inc., d/b/a Master Plumbers Council of the City of New York is a nonprofit trade association whose membership comprises licensed master plumbers and their affiliates in New York City.  *Id.* ¶ 22.  Building Industry Association of New York City, Inc. is a not-for-profit corporation whose members comprise builders, developers, architects, and related trades engaged primarily in the construction of one- and two-family houses and similar buildings in New York City.  *Id.* ¶ 24.  Finally, Plumbers Local Union No. 1, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, is a labor union that represents the employees of New York City licensed plumbing contractors.  *Id.* ¶ 16.

Plaintiffs assert that Local Law 154 is expressly preempted by EPCA, which prescribes energy conservation standards for various consumer and industrial products identified therein ("covered products").  The City has moved to dismiss the complaint, arguing that EPCA's preemption clause does not reach Local Law 154.  *See* ECF No. 20 ("Mot.").  Plaintiffs opposed

3

the motion, *see* ECF No. 41 ("Opp'n"), and the City filed a reply, *see* ECF No. 43.  The Court has received amicus curiae submissions from the Natural Resources Defense Council, *see* ECF No. 29-1, and WE ACT for Environmental Justice and the New York Geothermal Energy Organization, *see* ECF No. 47-1.  The Court heard oral argument on the motion to dismiss on March 13, 2025.

## LEGAL STANDARDS

### I.    Motion to Dismiss

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action," which are "supported by mere conclusory statements, do not suffice." *Id.*  In deciding a motion to dismiss, the Court construes "the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002), although the court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555.[4]

### II.    Preemption

The Supremacy Clause of the U.S. Constitution provides that the laws of the United States "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  "Thus, state laws that interfere with, or are contrary to, federal law must be invalidated."

---

[4] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and omissions, and adopt alterations.

4

JA83

*Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 101 (2d Cir. 2009).  "There are three types of preemption:" express, field, and conflict preemption. *Art & Antique Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423, 428 (2d Cir. 2024).  In this action, Plaintiffs contend that EPCA expressly preempts Local Law 154.

"Preemption is a matter of statutory interpretation," and thus the Court must "ascertain the intent of Congress."  *Buono v. Tyco Fire Prods., LP*, 78 F.4th 490, 495 (2d Cir. 2023).  Accordingly, "[a]s with any question of statutory interpretation," the Court must "begin with the text of the statute," *Catskill Mountains Chapter of Trout Unlimited, Inc. v. Env't Prot. Agency*, 846 F.3d 492, 512 (2d Cir. 2017), and "move on, as need be, to the structure and purpose of the Act in which it occurs," *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010).  If "the statute's language is plain," then that is "where the inquiry should end." *Commonwealth Of Puerto Rico v. Franklin California Tax-free Tr.*, 579 U.S. 115, 125 (2016).

The Court, "do[es] not invoke any presumption against pre-emption when a statute contains an express-preemption clause." *Buono*, 78 F.4th at 495.  However, "if a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." *Id.* at 495–96.  Thus, in interpreting a preemption clause, a court must "identify the domain expressly pre-empted." *Id.* at 496.

## DISCUSSION

This case turns on the scope of EPCA's preemption clause, which provides as follows:

> "[O]n the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product."

5

42 U.S.C. § 6297(c).[5]  Plaintiffs contend that this provision preempts Local Law 154 because the latter "concern[s]" the "energy use" of covered products, in that it "ban[s] an appliance from using any energy[,] . . . thus setting its maximum energy use to zero." Opp'n at 1.  For the reasons that follow, the Court disagrees and concludes that EPCA's preemption clause does not apply. Plaintiffs have therefore failed to state a claim upon which relief can be granted.

## I.    The Energy Policy Conservation Act

Congress enacted EPCA in 1975, "in the aftermath of the oil embargo imposed against the United States in 1973 and 1974 by certain petroleum-producing countries." *Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1364 (D.C. Cir. 1985).  "EPCA was designed, in part, to reduce the United States' domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 498–99 (9th Cir. 2005).  Initially, Congress pursued this goal by requiring manufacturers to label their appliances with measures of energy efficiency and energy use, as it "believed that better informed consumers and voluntary efforts by manufacturers would make energy efficiency standards unnecessary." *Id.* at 499.

"A few years later, Congress took EPCA a step further, establishing a nationwide conservation program for consumer appliances." *California Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1120 (9th Cir. 2024) (Friedland, J., dissenting from denial of rehearing en banc).  The National Energy Conservation and Policy Act, Pub. L. No. 95–619, 92 Stat. 3206 (1978), "created a nationwide conservation program for appliances and required the [Department of Energy] to

---

[5] This provision pertains to consumer products, as opposed to industrial equipment.  *See* 42 U.S.C. § 6292.  However, EPCA also preempts state and local regulations "concerning the energy efficiency or energy use" of industrial equipment for which federal standards are prescribed.  *See* 42 U.S.C. § 6316(b)(2)(A).  Because the two preemption provisions function in the same manner, the Court considers them together.  For simplicity, all citations are to the provisions governing consumer products unless otherwise noted.

6

prescribe minimum energy efficiency standards for thirteen covered products," *Air Conditioning*, 410 F.3d at 499, such as kitchen ranges and ovens, clothes dryers, and furnaces, *Herrington*, 768 F.2d at 1362 n.1.  The Department of Energy largely failed to prescribe such standards, however, and instead granted waivers that allowed states to establish their own standards.  *Air Conditioning*, 410 F.3d at 499.  This resulted in a "growing patchwork of differing State regulations" that complicated the "design, production, and marketing" of appliances.  *Id.* at 500 (quoting S. Rep. No. 100–6, at 4 (1987)).

"Frustrated by the lack of uniformity, manufacturer trade associations negotiated with the Natural Resources Defense Council to establish uniform national standards that would ease the burden on manufacturers while promoting energy conservation." *Cal.fornia Rest. Ass'n*, 89 F.4th at 1120 (Friedland, J.).  Congress adopted those standards into the National Appliance Energy Conservation Act of 1987, Pub. L. No. 100–12, 101 Stat. 103 (1987), which established federal energy efficiency standards for residential appliances and amended EPCA's preemption clause to "counteract the systems of separate state appliance standards." *Air Conditioning*, 410 F.3d at 499–500.

Thus, in its current iteration, EPCA requires that covered products meet statutorily and/or administratively prescribed energy conservation standards.  *See* 42 U.S.C. §§ 6295, 6313.  In general, before a manufacturer may distribute a covered product in commerce, it must (1) perform test procedures on the product, *see generally*, 42 U.S.C. §§ 6293, 6314; 10 C.F.R. §§ 430–31; (2) certify to the Department of Energy that the product meets the applicable energy conservation standard, *see* 10 C.F.R. § 429.12, i.e., a "performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use" or a "design requirement" for the product, 42 U.S.C. § 6291(6); and (3) include on the product a label containing the energy

7

efficiency and energy use information required by applicable regulations, *see* 42 U.S.C. §§ 6294, 6315; *see also, e.g.,* 16 C.F.R. § 305.17.

## II.    Express Preemption under EPCA

As relevant here, EPCA preempts state regulations "concerning the . . . energy use" of covered products.  42 U.S.C. § 6297(c).  Accordingly, the Court must determine (1) the meaning of "energy use;" and (2) whether Local Law 154 "concern[s]" energy use within the meaning of EPCA.  The City contends that "energy use" refers to a fixed value—determined through pre-market testing—that is used to measure a product's compliance with energy conservation standards.  Thus, the City argues, EPCA's preemption clause reaches only state regulations that "directly or indirectly establish energy conservation standards."  Mot. at 12.  Plaintiffs respond, first, that "energy use" includes the actual ability of covered products to consume energy, and second, that Local Law 154 sets fossil-fuel-powered appliances' maximum energy use to zero by prohibiting them from using any energy.  *See* Opp'n at 1.  Accordingly, they argue that Local Law 154 "concern[s]" the energy use of covered products, and that the City is prohibited from "doing indirectly what Congress says [it] can't do directly."  *Id.*; *see also id.* at 19–20.  Although Plaintiffs are generally correct that a state may not indirectly regulate subject matter that it is preempted from directly regulating, *see, e.g, Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 371–73 (2008); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 385–86 (1992), the Court concludes that EPCA does not preempt Local Law 154 because it does not concern energy use as EPCA defines that term.

### A.  The Meaning of "Energy Use"

"When a statute includes an explicit definition of a term," a court "must follow that definition, even if it varies from a term's ordinary meaning." *Van Buren v. United States*, 593 U.S.

8

JA87

374, 387 (2021). EPCA defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title." 42 U.S.C. § 6291(4).[6] Section 6293 requires that such test procedures be "reasonably designed to produce test results which measure [the] . . . energy use . . . of a covered product during a representative average use cycle or period of use." 42 U.S.C. § 6293(b)(3). Considered together, these provisions indicate that "energy use" is a fixed value, determined using administratively prescribed testing procedures, *see* 10 C.F.R. § 429.13, that represents the amount of energy a product consumes under typical conditions.

The Court therefore declines to adopt the interpretation of "energy use" employed by the Ninth Circuit in *California Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024), which, in this Court's view, rested on a flawed reading of the term "point of use." In that case, which involved a challenge to a municipal regulation prohibiting the installation of natural gas piping within newly constructed buildings, the court interpreted "point of use" to mean the "place where something is used." *Id.* at 1101. Based on that interpretation, the court concluded that "EPCA is concerned with the end-user's ability to *use* installed covered products at their intended final destinations." *Id.* at 1102. But as Judge Friedland persuasively explained in dissent, "EPCA is a technical statute," and thus "key terms" must be interpreted in accordance with their "specialized meanings." *Id.* at 1121 (Friedland, J.). "Point of use" is one such term; it means only that a covered product's energy use—when determined in accordance with prescribed test procedures— should be measured "without adjustment for any energy loss in the generation, transmission, and distribution of that energy." *Energy Intensity Indicators: Terminology and Definitions*, U.S. Dep't of Energy, https://www.energy.gov/eere/analysis/energy-intensity-indicators-terminology-and-

---

[6] EPCA uses a substantively identical definition of "energy use" for provisions pertaining to industrial equipment. *See* 42 U.S.C. § 6311(4).

9

JA88

definitions. *See also*, *California Rest. Ass'n*, 89 F.4th at 1123–25 (Friedland, J.) (discussing technical definition of "point of use"). It does not, however, expand EPCA's scope to reach the actual use of covered products, nor does it grant consumers an absolute right to use such products. Rather, it fits neatly into the statutory definition of "energy use," which refers to a covered product's characteristics as manufactured.

This conclusion finds support in EPCA's structure, as well as in the context of its implementing regulations, which are incompatible with Plaintiffs' interpretation of "energy use." First, the energy conservation standard applicable to a covered product sets either a maximum energy use or a minimum energy efficiency, *see id.* § 6291(6), the latter of which is calculated based on the product's energy use, *see* 42 U.S.C. § 6291(5) ("'Energy efficiency' means the ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures under section 6293 of this title."). A covered product may not enter commerce if it does not meet these standards. *See* 10 C.F.R. § 429.12. If, as Plaintiffs contend, "energy use" refers to the amount of energy a product actually consumes in the hands of a consumer, then this rule would be impossible to implement. Second, and relatedly, EPCA "permits [the Department of Energy] to require that manufacturers submit information or reports with respect to the energy use of covered products to demonstrate their compliance with EPCA's standards and to facilitate DOE's administration of the statute." *California Rest. Ass'n*, 89 F.4th at 1122–23 (Friedland, J.) (citing 42 U.S.C. § 6296(d)(1)). "This provision does not require manufacturers to somehow monitor consumers' use of appliances after installation." *Id.* at 1123. Third, energy use and energy efficiency information are used to populate blank fields on a standardized label, *see, e.g.,* 16 C.F.R. § 305.17(a)(9) (requiring that labels for water heaters contain the text: "Estimated yearly energy use: _____ [kWh or therms]"), which must be affixed

10

JA89

to a product *before* it enters commerce, *see generally* 42 U.S.C. § 6294. In sum, none of these applications of "energy use" would function effectively if that term accounted for the quantity of energy actually used by covered products in the hands of consumers.

Accordingly, considering EPCA's text, structure, and context, the Court concludes that "energy use" refers to a predetermined fixed value that measures the characteristics of a covered product as manufactured.

**B. Local Law 154 Does Not Concern Energy Use**

With the statutory definition of "energy use" in mind, the Court next considers whether Local Law 154 "concern[s] . . . energy use" such that it is preempted by EPCA. 42 U.S.C. § 6297(c). As an initial matter, it notes that the binding authority addressing express preemption of indirect state regulation largely involves federal statutes preempting state laws that "relate to" the subject matter of the federal statute. *See, e.g., Rowe*, 552 U.S. at 368; *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004); *Morales*, 504 U.S. at 378–79; *Metro. Taxicab*, 615 F.3d at 156. The Supreme Court has described the phrase "related to" as "express[ing] a broad pre-emptive purpose," *Morales*, 504 U.S. at 383, that "reach[es] any subject that has a connection with, or reference to, the topics the statute enumerates," *Coventry Health Care of Missouri, Inc. v. Nevils*, 581 U.S. 87, 96 (2017). By contrast, here, EPCA preempts state regulations "*concerning* the . . .energy use" of covered products. 42 U.S.C. § 6297(c) (emphasis added). "As with any preemption provision," the Court must "construe [EPCA] fairly but narrowly, mindful in the appropriate case that each phrase within the provision limits the universe of state action pre-empted by the statute." *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 445 (2d Cir. 2015). The Supreme Court has, in some instances, suggested that "concerning" and "related to" carry the same meaning, *see, e.g Lamar, Archer & Cofrin, Llp v. Appling*, 584 U.S.

11

709, 717 (2018) ("The Court finds no basis to conclude, however, at least in this [non-preemption] context, that 'related to' has a materially different meaning than 'about,' 'concerning,' 'with reference to,' and 'as regards.'"); *Morales*, 504 U.S. at 383 (defining "related to" as, among other things, "to have bearing or concern"), and the parties urge the Court to adopt that interpretation here. However, both the Second Circuit and the Supreme Court have also suggested that, at least in the context of preemption, the word "concerning" is analogous to the term "with respect to," both of which convey a "preemptive scope" that is "narrower than the broad form of 'relating to' preemption." *Galper*, 802 F.3d at 446, 447 n.8; *see also Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 261 (2013) (using "concern" and "with respect to" interchangeably, and noting that "the addition of the words 'with respect to the transportation of property' . . . massively limits the scope of preemption"). Congress may therefore have intended EPCA to have a narrower preemptive scope than statutes that use "related to."

The Court need not rely on this interpretive distinction, however, because Local Law 154 does not "relate to" the subject matter of EPCA any more than it "concern[s]" it. A state regulation "relates to" preempted subject matter if it has a (1) "connection with;" or (2) "reference to" that subject matter. *Morales*, 504 U.S. at 384. "[T]o determine whether a state law has the forbidden connection," a court must "look both to the objectives of the [federal] statute as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law" on the subject matter of the federal statute. *California Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 325 (1997). Relatedly, "[w]here a State's law acts immediately and exclusively upon" the subject matter of the federal statute, "or where the existence of [that subject matter] is essential to the law's operation, . . . that 'reference' will result in pre-emption." *Id.* In conducting this analysis, the Court is mindful that, although the words

12

JA91

"related to" have an "expansive sweep," *Morales*, 504 U.S. at 384, that breadth "does not mean the sky is the limit," *Dan's City*, 569 U.S. at 260.

As discussed above, with respect to the statutory scheme at issue here, EPCA sets energy conservation standards for covered products and requires that they be tested for compliance with such standards and labeled accordingly. A covered product's "energy use" is a component of that scheme; it represents the amount of energy a covered product consumes under typical conditions. Once a federal energy conservation standard takes effect for a covered product, state regulations concerning the product's energy efficiency or energy use—the bases upon which energy conservation standards are determined, *see* 42 U.S.C. § 6291(6)—are preempted. Moreover, Section 6297(c) is titled "General rule of preemption for energy conservation standards when Federal standard becomes effective for product," which suggests that Congress intended to preempt state regulations that act as energy conservation standards, i.e., requirements that bear on the performance of a product as manufactured. *See Yates v. United States*, 574 U.S. 528, 552 (2015) (Alito, J., concurring) ("Titles can be useful devices to resolve doubt about the meaning of a statute[,] . . . especially [where they] reinforce[] what the text's nouns and verbs independently suggest."). EPCA's text and structure thus make clear that its objective is "the establishment of national energy conservation standards for major residential appliances," S. Rep. 100-6, at 2 (1987), to "avoid the burdens of a patchwork of conflicting and unpredictable State regulations," *id.* at 12. The preemption clause ensures that state regulations do not frustrate that purpose.

Local Law 154 does not have a connection with EPCA's subject matter because it does not "focus[] on" the performance standards applicable to covered products. *Rowe*, 552 U.S. at 371. Indeed, the Law does not draw any distinction between products based on their energy efficiency or energy use as manufactured. It instead regulates, indirectly, the type of fuel that a covered

13

product may consume in certain settings, irrespective of that product's energy efficiency or use. Regulations prohibiting the use of certain types of fuels and appliances in residential, commercial, and industrial settings are integral to municipal construction and fire codes. *See, e.g.,* N.Y.C. Admin. Code, Fuel Gas Code § 623.1.1 (prohibiting cooking appliances from using liquefied petroleum gas); *id.*, Mechanical Code § 922.1 (prohibiting the installation of kerosene and oil-fired stoves); *id.* § 918.1 (prohibiting unvented fuel-fired furnaces); *id.*, Fire Code § 313.3 (prohibiting the indoor use of kerosene space heaters); *id.*, Mechanical Code § 917.2 (prohibiting the installation of commercial cooking appliances in domestic dwelling units). Were Plaintiffs correct about the scope of EPCA, these vital safety regulations would likewise be preempted—an absurd result that the Court must avoid. *See Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 160 (2d Cir. 2007). For example, if EPCA preempts a regulation effectively banning the use of fossil fuel powered appliances in a subset of new residential buildings, then by the same logic it might preempt a regulation that effectively prohibits the use of such appliances in close proximity to gas station pumps, *see, e.g.,* N.Y.C. Admin. Code, Fire Code § 2304.1.1, or in "sleeping rooms, bathrooms, toilet rooms, storage closets or surgical rooms," *see id.*, Fuel Gas Code § 303.3. Nothing in EPCA's text, structure, or legislative history suggests that Congress did not expect such regulations to survive preemption. To the contrary, regulations of that sort are "peculiarly within the province of state and local legislative authorities," and thus it is "hardly doubtful that [they] . . . fall[] outside the preemptive sweep" of EPCA. *Dan's City*, 569 U.S. at 264.

Nor does Local Law 154 have a "significant impact" on "Congress' deregulatory and pre-emption-related objectives," *Rowe*, 552 U.S. at 371, which in EPCA focus on eliminating the "burdens" imposed on manufacturers by "a patchwork of conflicting and unpredictable State regulations." S. Rep. 100-6, at 12, (1987). Unlike "differing State regulations," which "complicate

14

[manufacturers'] design, production and marketing plans," *id.* at 4, state laws like Local Law 154 do not risk creating a patchwork of conflicting standards because they neither require anything of manufacturers nor constrain their activities, *see Dan's City*, 569 U.S. at 263–64.  Manufacturers may see reduced demand for certain products as a result of the Law, but they remain subject to a single, nationally uniform set of energy conservation standards.  Local Law 154 is therefore "not the kind of burdensome state . . . regulation Congress sought to preempt." *Id.* at 264.

Further, as discussed, the Law affects the type of fuel that covered products may use in certain settings, not the performance standards applicable to covered products, and thus it neither "acts immediately and exclusively upon" EPCA's regime of uniform national standards, nor makes "the existence of" such standards "essential to [its] operation." *Dillingham*, 519 U.S. at 325. Plaintiffs' reliance on *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152 (2d Cir. 2010), is therefore misplaced.  That case involved City rules that favored hybrid and clean diesel taxis and penalized non-hybrid, non-clean diesel taxis. *Id.* at 155.  Interpreting a provision of EPCA that preempts state laws "related to fuel economy standards," *see* 49 U.S.C. § 32919(a), the Second Circuit held that the City rules "reference[d]" fuel economy standards because the rules' distinction between hybrid and non-hybrid vehicles was "equivalen[t]" to distinguishing between "vehicles with greater or lesser fuel efficiency." *Id.* at 157.  Here, by contrast, prohibiting certain fuel types in certain settings does not impose performance standards by proxy.  Indeed, "some gas appliances are more efficient than electric appliances, so [the Law] may have the indirect effect of *increasing* energy consumption in new buildings in some circumstances." *California Rest. Ass'n*, 89 F.4th at 1126 (Friedland, J.) (citing 10 C.F.R. § 430.32(e)(1)(ii) (setting a more stringent standard for gas furnaces than for electric furnaces)).  Accordingly, Local Law 154 does not "reference" the subject matter of EPCA.

15

JA94

In sum, the Court concludes that Local Law 154 does not "relate to," and thus does not "concern," "energy use" within the meaning of EPCA.[7]  It is therefore not preempted.

## CONCLUSION

For the foregoing reasons, the motion to dismiss is granted.  Because "an amended complaint could not cure the substantive deficiencies of these claims," the complaint is dismissed with prejudice.  *Peralta v. New York City Dep't of Educ.*, No. 21-CV-6833, 2023 WL 6201507, at *6 (E.D.N.Y. Sept. 22, 2023).  The Clerk of Court is respectfully directed to terminate all pending motions and close this case.

SO ORDERED.

Dated:      March 18, 2025
              New York, New York

Ronnie Abrams
United States District Judge

---

[7] To the extent those terms do not carry the same meaning, the Court interprets EPCA's use of "concerning" to indicate Congress's intent that the statute's preemptive reach be no greater than that of statutes that use "related to."  *See Galper*, 802 F.3d at 446, 447 n.8.

16

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
ASSOCIATION OF CONTRACTING
PLUMBERS OF THE CITY OF NEW
YORK, INC.; PLUMBING-HEATING
COOLING CONTRACTORS–NATIONAL
ASSOCIATION; PLUMBERS LOCAL
UNION NO. 1, UNITED ASSOCIATION OF
JOURNEYMEN AND APPRENTICES OF
THE PLUMBING AND PIPEFITTING
INDUSTRY OF THE UNITED STATES
AND CANADA; NEW YORK STATE
ENERGY COALITION, INC.; THE
PLUMBING FOUNDATION CITY OF
NEW YORK, INC.; LICENSED
PLUMBING ASSOCIATION NEW YORK
CITY, INC., d/b/a MASTER PLUMBERS
COUNCIL OF THE CITY OF NEW YORK;
and BUILDING INDUSTRY
ASSOCIATION OF NEW YORK CITY,
INC,

                                    Plaintiffs,

        -against-                                          23 **CIVIL** 11292 (RA)

                                                           **JUDGMENT**

CITY OF NEW YORK,

                                    Defendant.
-------------------------------------------------------------X

It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Opinion and Order dated March 18, 2025the motion to dismiss is granted.

Because "an amended complaint could not cure the substantive deficiencies of these claims," the

complaint is dismissed with prejudice. Peralta v. New York City Dep't of Educ., No. 21-CV-

6833, 2023 WL 6201507, at *6 (E.D.N.Y. Sept. 22, 2023); accordingly, the case is closed.

**Dated:**  New York, New York

    March 18, 2025

                                        **TAMMI M. HELLWIG**
                                        _____
                                        **Clerk of Court**

                              BY: _____
                                        **Deputy Clerk**

JA96

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ASSOCIATION OF CONTRACTING PLUMBERS OF THE CITY OF NEW YORK, INC.; PLUMBING-HEATING-COOLING CONTRACTORS—NATIONAL ASSOCIATION; PLUMBERS LOCAL UNION NO. 1, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA; NEW YORK STATE ENERGY COALITION, INC.; THE PLUMBING FOUNDATION CITY OF NEW YORK, INC.; LICENSED PLUMBING ASSOCIATION OF NEW YORK CITY, INC., d/b/a MASTER PLUMBERS COUNCIL OF THE CITY OF NEW YORK; and BUILDING INDUSTRY ASSOCIATION OF NEW YORK CITY, INC., | Civil Action No. 1:23-cv-11292-RA |
| Plaintiffs, | |
| v. | |
| CITY OF NEW YORK, | |
| Defendant. | |

**NOTICE OF APPEAL**

All plaintiffs appeal to the United States Court of Appeals for the Second Circuit from the judgment entered March 18, 2025 (Dkt. 52).

Dated: April 17, 2025

Respectfully submitted,

_/s/ Sarah O. Jorgensen_

Brian C. Baran (*pro hac vice*)
REICHMAN JORGENSEN
 LEHMAN & FELDBERG LLP
1909 K Street, NW, Suite 800
Washington, DC 20006
Telephone: (202) 894-7310
bbaran@reichmanjorgensen.com

Sarah O. Jorgensen (*pro hac vice*)
REICHMAN JORGENSEN
 LEHMAN & FELDBERG LLP
1201 West Peachtree Street, Suite 2300
Atlanta, GA 30309
Telephone: (404) 609-1040
sjorgensen@reichmanjorgensen.com

*Attorneys for Plaintiffs*

1

JA97