# No. 25-977

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————————

Association of Contracting Plumbers of the City of New York, Inc., Plumbing-Heating-Cooling Contractors-National Association, Plumbers Local Union No. 1, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, New York State Energy Coalition, Inc., Plumbing Foundation City of New York, Inc., Licensed Plumbing Association of New York City, Inc., DBA Master Plumbers Council of the City of New York, Building Industry Association of New York City, Inc.,

Plaintiffs-Appellants,

v.

City of New York

Defendant-Appellee.

———————————

On Appeal from the United States District Court
for the Southern District of New York

———————————

## BRIEF FOR THE UNITED STATES
## AS *AMICUS CURIAE* SUPPORTING APPELLANTS

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

THOMAS PULHAM
CHARLES E.T. ROBERTS
  Attorneys
  *Civil Division, Room 3617*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1141*
  charles.roberts2@usdoj.gov

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION AND STATEMENT OF INTEREST ............................. 1

STATEMENT OF THE CASE ........................................................... 3

    A.    Statutory Background ....................................................3

    B.    Prior Proceedings .........................................................6

ARGUMENT ............................................................................... 7

I.    EPCA Preempts New York City's Ban on Using Products Subject to a Federal Standard............................................... 7

    A.    EPCA's Text Preempts Local Law 154...........................9

    B.    EPCA's Statutory Context Confirms It Preempts Local Law 154. ................................................................17

    C.    EPCA's Statutory History Confirms It Preempts Local Law 154. ................................................................24

    D.    Adopting the City's Interpretation Would Disrupt the Federal Administration of EPCA. .................................28

CONCLUSION...........................................................................31

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                 **Page(s)**

*Air Conditioning & Refrigeration Inst. v. Energy Res.*
  *Conservation & Dev. Comm'n,*
  410 F.3d 492 (9th Cir. 2005) ........................................ 3, 3-4, 4, 24, 28

*American Trucking Ass'ns, Inc. v. City of Los Angeles,*
  569 U.S. 641 (2013) ...................................................... 12

*Brogan v. United States,*
  522 U.S. 398 (1998) ...................................................... 15

*Buono v. Tyco Fire Prods., LP,*
  78 F.4th 490 (2d Cir. 2023) ........................................... 8

*California Rest. Ass'n v. City of Berkeley,*
  89 F.4th 1094 (9th Cir. 2024),
  *amended on denial of reh'g en banc.* ................................. 2, 9, 10, 11, 13, 14,
                                                                      16, 20, 21, 22, 25, 30

*Champion v. Ames,*
  188 U.S. 321 (1903) ...................................................... 17

*Crosby v. National Foreign Trade Council,*
  530 U.S. 363 (2000) ...................................................... 7

*Dan's City Used Cars, Inc. v. Pelkey,*
  569 U.S. 251 (2013) ...................................................... 8

*Encino Motorcars, LLC v. Navarro,*
  584 U.S. 79 (2018) ........................................................ 10, 14

*Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.,*
  541 U.S. 246 (2004) ...................................................... 12, 13

*Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc.,*
  554 U.S. 33 (2008) ........................................................ 23

*Henson v. Santander Consumer USA Inc.,*
  582 U.S. 79 (2017) ........................................................ 16

*Kansas v. Garcia,*
    589 U.S. 191 (2020) ............................................................... 8

*Lamar, Archer & Cofrin, LLP v. Appling,*
    584 U.S. 709 (2018) ............................................................. 11

*Medtronic, Inc. v. Lohr,*
    518 U.S. 470 (1996) ......................................................... 8, 18

*Morales v. Trans World Airlines, Inc.,*
    504 U.S. 374 (1992) ....................................................... 16, 17

*National Meat Ass'n v. Harris,*
    565 U.S. 452 (2012) ............................................................. 12

*Puerto Rico v. Franklin Cal. Tax-Free Tr.,*
    579 U.S. 115 (2016) ............................................................... 8

*Rowe v. New Hampshire Motor Transp. Ass'n,*
    552 U.S. 364 (2008) ............................................................. 12

*Rudisill v. McDonough,*
    601 U.S. 294 (2024) ............................................................. 16

*Wyeth v. Levine,*
    555 U.S. 555 (2009) ............................................................. 28

**U.S. Constitution:**

Art. VI, cl. 2 ............................................................................ 7

**Statutes:**

Energy Policy and Conservation Act (EPCA):
    42 U.S.C. § 6291(1) ........................................................... 10
    42 U.S.C. § 6291(3) ........................................................... 10
    42 U.S.C. § 6291(4) ................................................. 4, 10, 16
    42 U.S.C. § 6291(5) ........................................................... 22
    42 U.S.C. § 6291(6) ................................................... 16, 22
    42 U.S.C. § 6292 ........................................................... 4, 10
    42 U.S.C. § 6293 ............................................................... 4

iii

42 U.S.C. § 6295 ................................................................ 4

42 U.S.C. § 6295(h) .......................................................... 11

42 U.S.C. § 6295(o)(4) ...................................................... 19

42 U.S.C. § 6296(d)(1) ...................................................... 22

42 U.S.C. § 6297(a)(2)(A) .................................................. 9

42 U.S.C. § 6297(c) ........................... 1, 2, 4, 15, 18, 23, 26, 31

42 U.S.C. § 6297(c)(2) ...................................................... 5

42 U.S.C. § 6297(c)(3) .................................................. 5, 21

42 U.S.C. § 6297(d) ................................................ 5, 18, 31

42 U.S.C. § 6297(d)(1)(A) .................................................. 25

42 U.S.C. § 6297(d)(1)(B) .................................................. 21

42 U.S.C. § 6297(d)(3) ...................................... 5, 19, 20, 21

42 U.S.C. § 6297(d)(4) ................................................ 5, 18, 21

42 U.S.C. § 6297(f)(3) ................................................. 5, 21

42 U.S.C. § 6297(f)(3)(A) .................................................. 22

42 U.S.C. § 6297(f)(3)(B) .................................................. 22

42 U.S.C. § 6297(f)(3)(F) .................................................. 22

42 U.S.C. § 6302(a)(5) ...................................................... 4

42 U.S.C. § 6314 ............................................................ 4

Pub. L. No. 94-163, 89 Stat. 871 (1975) ................... 24, 25, 27

Pub. L. No. 95-619, 92 Stat. 3206 (1978) ................. 24, 25, 27

Pub. L. No. 100-12, 101 Stat. 103 (1987) ................ 25, 26, 27

15 U.S.C. § 1203(a) ........................................................ 16

15 U.S.C. § 1476(a) ........................................................ 16

21 U.S.C. § 360ss .......................................................... 16

21 U.S.C. § 387p(a)(3)(A) ................................................ 16

42 U.S.C. § 5403(d) ....................................................... 16

42 U.S.C. § 7543(c) ....................................................... 16

N.Y.C. Admin. Code § 24-177.1 ...................................... 5, 6

N.Y.C. Admin. Code § 24-177.1(b) ..................................... 6

iv

N.Y.C. Admin. Code § 28-506.1 ............................................. 5

**Regulations:**

10 C.F.R. § 430.32(d) ...................................................... 11

10 C.F.R. § 430.32(j) ....................................................... 1

16 C.F.R. § 305.17(a)(9) ................................................... 22

**Legislative Material:**

S. Rep. No. 100–6 (1987) .................................................29

**Other Authorities:**

*Final Rule for Clothes Dryers and Kitchen Ranges and Ovens,*
    47 Fed. Reg. 57,198 (Dec. 22, 1982) ...................... 22, 26, 27

*Procedures, Interpretations, and Policies for Consideration
    of New or Revised Energy Conservation Standards and
    Test Procedures for Consumer Products and Certain
    Commercial/Industrial Equipment,*
    90 Fed. Reg. 16,093 (Apr. 17, 2025) .......................... 28-29

*Proposed Rulemaking and Public Hearings Regarding
    Energy Efficiency Standards for Refrigerators and
    Refrigerator-Freezers, Freezers, Clothes Dryers, Water
    Heaters, Room Air Conditioners, Kitchen Ranges and
    Ovens, Central Air Conditioners, and Furnaces,*
    47 Fed. Reg. 14,424 (Apr. 2, 1982) ................................ 26

*Statement of Policy for Adopting Full-Fuel-Cycle Analyses
    Into Energy Conservation Standards Program,*
    76 Fed. Reg. 51,281 (Aug. 18, 2011) .......................... 10, 14

U.S. Dep't of Energy, *Secretarial Order: Unleashing the
    Golden Era of American Energy Dominance* (Feb. 5, 2025),
    https://perma.cc/8GHX-PRA5 ........................................28

U.S. Energy Info. Admin., *Carbon Dioxide Emissions Coefficients*
(Sept. 18, 2024), https://perma.cc/VD46-7BBG ...............................................6

## INTRODUCTION AND STATEMENT OF INTEREST

The question in this appeal is whether a city can accomplish indirectly what Congress expressly preempted the city from doing directly. The answer is no.

The Energy Policy and Conservation Act (EPCA) directs the Department of Energy (Department) to establish energy conservation standards for certain consumer products and industrial equipment—such as appliances—and then expressly preempts state and local "regulations concerning the . . . energy use" of those products that the Federal Government has authorized to be sold. 42 U.S.C. § 6297(c). This broad preemption provision enables appliance manufacturers to design, produce, and market appliances across the country in accordance with a single set of nationally applicable regulations. But New York City's Local Law 154 bans the use of certain products that meet federal standards by prohibiting them from combusting *any* natural gas or fuel oil (and therefore using any energy from those sources), making them effectively unmarketable by manufacturers and unavailable to consumers. Regulating—indeed, prohibiting—the "energy use" of federally authorized appliances in this manner is preempted, a conclusion mandated by EPCA's plain text,

consideration of the statutory context and history, and the Department's implementation of the statutory regime. *Id.* As the only other court of appeals to have addressed this question recognized, "States and localities can't skirt the text of broad preemption provisions by doing *indirectly* what Congress says they can't do *directly*." *California Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1107 (9th Cir. 2024), *amended on denial of reh'g en banc*. This Court should do the same and reverse the district court's judgment.

The United States submits this brief as *amicus curiae* to advance its interests in the administration of EPCA by the Department of Energy, including by ensuring the utility of nationally applicable standards adopted by the Department and preempting any state and local regulations that would undermine those standards.[1]

---

[1] The United States previously addressed the scope of EPCA preemption in a challenge to an ordinance adopted by the City of Berkeley, California, that banned natural gas hookups in new construction. *See* Brief for the United States in Support of Appellee, *California Rest. Ass'n v. City of Berkeley*, No. 21-16278 (9th Cir. Feb. 8, 2022) (Panel *Amicus* Br.); Brief for the United States as *Amicus Curiae* in Support of Petition for Rehearing, *California Rest. Ass'n*, No. 21-16278 (June 12, 2023) (*En Banc Amicus* Br.). In that case the government argued that the Berkeley ordinance was not preempted because it did not "concern[ ] . . . energy use" by covered products. On further reflection and in light of the Ninth Circuit's persuasive opinion holding the contrary, the United States has reconsidered its position.

## STATEMENT OF THE CASE

### A.    Statutory Background

**1.**  Congress passed EPCA to establish a "comprehensive energy policy" addressing "the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources" laid bare by the early 1970s oil crisis.  *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n,* 410 F.3d 492, 498 (9th Cir. 2005).  In service of its goals to promote both domestic energy supply and energy conservation, Congress began regulating many appliances' energy efficiency and energy use.  *See id.*

Originally, EPCA permitted more substantial state and local involvement in appliance regulation.  *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 499.  But Congress narrowed that authority as it directed increasingly greater federal involvement.  Amendments in the 1970s and 1980s eventually mandated federal standards for many appliances and authorized the Department to issue new or revised standards. *See id.* at 499–

3

500.[2]  Products covered by EPCA now may only be "distribute[d] in commerce" if they conform with the applicable federal standard, which requires rigorous testing among other things.  42 U.S.C. § 6302(a)(5); *see id.* §§ 6292, 6293, 6295, 6314.[3]

To give effect to federal standards and ensure that manufacturers are able to market and sell products that conform with them, Congress broadened EPCA's preemption clause.  As amended, EPCA preempted not only state and local regulations that are stricter than (and therefore would effectively supersede) a federal standard, but more broadly any regulation "concerning the energy efficiency, energy use, or water use of" products subject to a federal standard.  § 6297(c).  EPCA defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use." § 6291(4).

---

[2] EPCA addresses consumer products and industrial equipment separately.  *See* 42 U.S.C. §§ 6291–6309 (consumer); *id.* §§ 6311–6317 (industrial).  The provisions are substantially similar, and nothing at issue turns on the specific type of product involved.  For convenience, this brief cites the consumer product provisions.  *Cf. Air Conditioning & Refrigeration Inst.*, 410 F.3d at 496 n.2 (taking a similar approach).

[3] Unless otherwise indicated, all section (§) citations refer to Title 42 of the U.S. Code.

4

States and localities may ask the Department of Energy to waive this preemption, but Congress strictly cabined waiver authority both procedurally and substantively. *See* § 6297(c)(2), (d). For example, EPCA prohibits waiving preemption of State and local measures that are "likely to result in the unavailability . . . of performance characteristics [or] features" in covered products available within a state or locality. § 6297(d)(4). So too if the "regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis." § 6297(d)(3).

Congress also specified that "regulation[s] or other requirement[s] contained in a State or local building code for new construction concerning the energy efficiency or energy use of [a] covered product" are preempted *unless* they satisfy specific conditions. § 6297(f)(3); *see* § 6297(c)(3).

2. New York City enacted Local Law 154 in December 2021 to prohibit the use of natural gas and other combustible fuels in most newly constructed buildings. N.Y.C. Admin. Code §§ 24-177.1, 28-506.1. The measure prohibits "permit[ting] the combustion of any substance that emits 25 kilograms or more of carbon dioxide per million British thermal units of energy, as determined by the United States energy information administration, within

5

such building." *Id.* § 24-177.1(b).  Because using *any* product that runs on

the combustion of natural gas or fuel oil would exceed that low emission level

(no matter what the particular characteristics or features of the appliance

may be),[4] this restriction prohibits using all appliances that run on those

fuels, like a stove or oven.  There is an exception if "the combustion . . .

occurs in connection with a device that contains no connection to a building's

gas supply line or fuel oil piping system, is used on an intermittent basis, and

is not used to supply a building with heat or hot water." *Id.* § 24-177.1.  It is

undisputed that this measure "will effectively require new construction to be

electric," D. Ct. Dkt. 20 at 3, including by prohibiting the use of all appliances

that run on natural gas or fuel oil.

　　The City has not sought a preemption waiver from the Department for

Local Law 154.

### B.　Prior Proceedings

　　After plaintiffs—trade associations and a union—brought suit in

December 2023, the City moved to dismiss their one-count complaint.  JA14;

---

[4] No fossil fuels listed by the Energy Information Administration
satisfy the City's limit when combusted.  *See* U.S. Energy Info. Admin.,
*Carbon Dioxide Emissions Coefficients* (Sept. 18, 2024),
https://perma.cc/VD46-7BBG.

D. Ct. Dkt. Nos. 20, 41, 43. The district court determined that plaintiffs failed to state an express preemption claim under EPCA and granted the motion to dismiss. JA80. The court "conclude[d] that EPCA's preemption clause does not apply" to Local Law 154 "because it does not concern energy use as EPCA defines that term." JA85, 87. The court interpreted "energy use" to mean "a predetermined fixed value that measures the characteristics of a covered product as manufactured." JA90 (quotation marks omitted). And it concluded that because Local Law 154 has no "connection with" or "reference to" energy conservation standards, it does not "concern" "energy use." JA90–94. Instead, to be preempted, a state or local regulation must "act as [an] energy conservation standard[ ]" or "bear on the performance of a product as manufactured" or "focus on the performance standards applicable to covered products." JA92.

## ARGUMENT

## I.   EPCA Preempts New York City's Ban on Using Products Subject to a Federal Standard.

A fundamental principle underlying the Constitution's Supremacy Clause is that "Congress has the power to preempt state law." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000); *see* U.S. Const. art. VI, cl. 2 ("[T]he Laws of the United States . . . shall be the supreme Law

7

of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."). Congress may order such preemption in express terms. *Kansas v. Garcia*, 589 U.S. 191, 202 (2020). When a statute preempts state law expressly, a court's only remaining "task is to identify the domain expressly pre-empted." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) (quotation marks omitted). To do so, courts use the typical tools of statutory interpretation, starting with "the language of the statute itself" and ending there if "the statute's language is plain." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (quotation marks omitted); *see Buono v. Tyco Fire Prods., LP*, 78 F.4th 490, 496 (2d Cir. 2023). The surrounding "statutory framework" may also help inform a preemption provision's meaning. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996). Courts "do not invoke any presumption against pre-emption" when the statute "contains an express preemption clause." *Franklin*, 579 U.S. at 125 (quotation marks omitted); *see Buono*, 78 F.4th at 495.

EPCA's broad preemption provision bars state and local measures, like New York City's, that prohibit products subject to a federal energy conservation standard from using energy. As the Ninth Circuit explained, "a building code that prohibits consumers from using natural gas-powered

8

appliances in newly constructed buildings necessarily regulates the 'quantity of energy directly consumed by [the appliances] at point of use.'" *California Rest. Ass'n*, 89 F. 4th 1094, 1102 (9th Cir. 2024) (alteration in original), *amended on denial of reh'g en banc*.  Indeed, to conclude otherwise would require holding that a ban on using energy somehow does *not* "concern[ ] . . . energy use."  EPCA requires no such linguistic strain.  On the contrary, text, context, and history all confirm that Local Law 154 is preempted.  Meanwhile a contrary ruling would disrupt the federal administration of the statute.

### A.    EPCA's Text Preempts Local Law 154.

**1.**  Section 6297(c) provides that, once the Department of Energy has approved a standard for a covered product, "no State regulation concerning the . . . energy use . . . of such covered product shall be effective."  The domain expressly preempted is therefore "state regulations 'concerning . . . energy use,'" and the resolution of this case turns on whether that language covers Local Law 154.  JA87.

To start, the term "State regulation" includes laws of "political subdivisions" like New York City.  § 6297(a)(2)(A).  Next, the subject of preempted regulations is "energy use," a term defined in EPCA to mean "the quantity of energy directly consumed by a consumer product at point of use,

9

determined in accordance with test procedures under section 6293 of this title." § 6291(4). "Energy," in turn, "means electricity, or fossil fuels," of which natural gas is one. § 6291(3). A "consumer product" is "any article" which "consumes, or is designed to consume" energy and is distributed in commerce for personal use, such as a kitchen appliance. § 6291(1); *see* § 6292 (identifying covered products). Point of use is not defined in the statute, but, giving the term its ordinary meaning, *see Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 85 (2018), the phrase means the "place where something is used." *California Rest. Ass'n*, 89 F.4th at 1101 (quotation marks omitted); *see also Statement of Policy for Adopting Full-Fuel-Cycle Analyses Into Energy Conservation Standards Program*, 76 Fed. Reg. 51,281, 51,283 (Aug. 18, 2011) (explaining that the "point-of-use method for measuring energy consumption considers the use of electricity, natural gas, propane, and/or fuel oil by an appliance at the site *where the appliance is operated*" (emphasis added)). Putting all this together, then, EPCA preempts city regulations concerning the quantity of natural gas consumed by a covered product where that product is used, once the Department has set a standard to cover that specific type of product. *See California Rest. Ass'n*, 89 F.4th at 1101.

10

This rule plainly covers Local Law 154.  By banning the combustion of natural gas, it "necessarily regulates" how much energy gas-powered products consume when used, because the only permissible quantity of gas use under the City's law is zero.  *California Rest. Ass'n*, 89 F.4th at 1102–03. Because federal standards exist for several types of such products—*see, e.g.*, § 6295(h) (standards for kitchen ranges and ovens); 10 C.F.R. §§ 430.32(d) (standards for water heaters), 430.32(j) (standards for cooking products)— Local Law 154 is preempted as applied to those products.

But were there any doubt on this score, EPCA's preemption clause sweeps even more broadly than facial regulations of a product's energy use. Section 6297(c) displaces any regulation "concerning" energy use of a covered product.  "Concerning means relating to, and is the equivalent of regarding, respecting, about."  *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018) (quotation marks omitted).  The use of such words "in a legal context generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject."  *Id.*  Congress therefore intended for EPCA's preemption clause to reach broadly, a choice that must be given meaningful effect.  That reach is not unlimited, *see infra* Part I.D., but at a bare minimum, a law that prohibits

11

the use of energy by a particular type of product "relates to" the "energy use" of that product.

Further, the Supreme Court has repeatedly instructed that such a broadly worded preemption clause cannot be evaded by slightly "shifting the[ ] regulatory focus" to employ an "indirect but wholly effective means" of achieving a preempted objective. *American Trucking Ass'ns, Inc. v. City of Los Angeles*, 569 U.S. 641, 652 (2013); *see also National Meat Ass'n v. Harris*, 565 U.S. 452, 463-64 (2012) (holding that a State could not evade a preemption clause aimed at requirements "with respect to" slaughterhouses by framing its regulation "as a ban on the sale of meat produced in whatever way the State disapproved"); *Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 372 (2008) (preempting "the very effect that the federal law sought to avoid" even if pursued "less direct[ly] than it might be" (quotation marks omitted)).

Especially instructive here is *Engine Manufacturers Association v. South Coast Air Quality Management District*, 541 U.S. 246 (2004). That case concerned a provision of the Clean Air Act that preempted any standard "relating to the control of emissions from new motor vehicles" and local rules that prohibited the purchase of vehicles that did not comply with certain

12

emission requirements. *Id.* at 249, 252 (quotation marks omitted). The Supreme Court rejected the district court's attempt "to draw a distinction between purchase restrictions (not pre-empted) and sale restrictions (pre-empted)." *Id.* at 252. The Court explained that "[t]he manufacturer's right to sell federally approved vehicles is meaningless in the absence of a purchaser's right to buy them." *Id.* at 255.

Here, EPCA authorizes only the sale of covered products that conform with federal standards and preempts State and local attempts to restrict that authorization. And here, as in *South Coast Air*, the right of manufacturers to sell conforming products is meaningless if consumers cannot buy those products or if consumers can buy but cannot use the products. For that reason, as the Ninth Circuit recognized, "Congress ensured that States and localities could not prevent consumers from using covered products in their homes, kitchens, and businesses. So EPCA preemption extends to regulations that address the products themselves *and* building codes that concern their *use* of natural gas." *California Rest. Ass'n*, 89 F.4th at 1103.

**2.** The district court committed two fundamental errors in its textual analysis of § 6297.

*First*, the court "decline[d] to adopt" the Ninth Circuit's interpretation of "energy use" because it viewed that interpretation as "rest[ing] on a flawed reading of the term 'point of use.'" JA88. Instead of giving that undefined phrase its ordinary meaning, *see Encino Motorcars*, 584 U.S. at 85, the district court treated "point of use" as a "specialized" term meaning that a product's energy is "measured 'without adjustment for any energy loss in the generation, transmission, and distribution of that energy.'" JA88; *see also California Rest. Ass'n*, 89 F.4th at 1123–25 (Friedland, J., dissenting from denial of en banc) (adopting the same definition). Although it is true that compliance testing for EPCA standards happens in a laboratory setting that is intended to eliminate real-world variables, the Department nonetheless considers "where the appliance is operated," 76 Fed. Reg. at 51,283, which is consistent with the Ninth Circuit's focus on the energy used by covered products "at their intended final destinations," *California Rest. Ass'n*, 89 F.4th at 1102.

More fundamentally, though, even accepting a more technical definition of "point of use" would not change the result. Regardless of the precise time or means of measurement, Local Law 154 prohibits gas and fuel products that are compliant with EPCA standards *because* their energy use

is too high. For a manufacturer to comply with the City's standard, it would have to design and manufacture a product that uses zero energy from natural gas or fuel oil—regardless of whether that energy usage was measured based on actual consumers' use or in a laboratory setting. And that is why Local Law 154 is preempted. The City functionally is setting standards that Congress determined are preempted (absent a waiver). § 6297(c).

*Second*, the district court concluded that Local Law 154 should not be understood to concern energy use because it is not sufficiently connected to the performance standards that the court viewed as EPCA's primary "subject matter." JA91. Even if the district court were correct in its assessment of EPCA's "focus" and "purpose," JA92–93, it erred in trying to "restrict the unqualified language of a statute to the particular evil that Congress was trying to remedy." *Brogan v. United States*, 522 U.S. 398, 403 (1998). Section 6297(c)'s text sweeps more broadly than the preemption of "energy conservation standards" or "performance standards" to reach *any* "regulation concerning the . . . energy use" of a covered product. § 6297(c). Congress not only differentiated "energy use" from "performance standard,"

15

§ 6291(4), (6),[5] but as explained above, further broadened its preemptive sweep through the use of "concerning." These deliberate choices must be given effect. *See Rudisill v. McDonough*, 601 U.S. 294, 308 (2024) (Courts "generally 'presume differences in language like this convey differences in meaning.'" (quoting *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017)); *see Morales v. Trans World Airlines, Inc.*, 504 U.S 374, 386 (1992) (regulations need not "specifically address[ ]" preempted subject matter given "the sweep of the 'relating to' [or concerning] language").

Even if "regulation concerning . . . energy use" were synonymous with "energy conservation standard," Local Law 154 would be preempted, because it "prescribes . . . a maximum quantity of energy use" for many covered products, or at least functions as such a prescription. § 6291(6). By prohibiting natural-gas-powered products from consuming any fuel, the law sets the maximum amount of energy such an appliance can use at zero. *See California Rest. Ass'n*, 89 F.4th at 1102 (rejecting the argument that the Berkeley ordinance does not "prescribe[ ] an affirmative quantity of energy"

---

[5] Indeed, Congress routinely focuses preemption provisions specifically on product, manufacturing, or similar technical "standards." *E.g.*, 15 U.S.C. § 1203(a); 15 U.S.C. § 1476(a); 21 U.S.C. § 360ss; 21 U.S.C. § 387p(a)(3)(A); 42 U.S.C. § 5403(d); 42 U.S.C. § 7543(c).

because "it is well accepted in ordinary usage that zero is a quantity" (quotation marks omitted)).  It is undisputed that a local law prescribing the maximum quantity of energy use at some miniscule, unattainable value just greater than zero would be preempted by EPCA.  There is no logical reason why lowering that quantity to zero should lead to a different result.

Indeed, Local Law 154 is the most burdensome form of energy conservation standard for these covered products one can imagine:  It requires conserving their energy entirely and effectively prohibits certain products, thus requiring consumers to choose other, more favored products.[6]

This effect on energy use is not merely incidental, let alone "tenuous" or "remote."  *Morales*, 504 U.S. at 390 (quotation marks omitted).  It is intentional and core.

### B.   EPCA's Statutory Context Confirms It Preempts Local Law 154.

Because the plain text of § 6297(c) displaces Local Law 154, the Court's inquiry could properly stop there.  But if more were needed, related provisions of EPCA confirm that conclusion.

---

[6] The Supreme Court has established that a "regulation may . . . assume the form of [a] prohibition."  *Champion v. Ames*, 188 U.S. 321, 329 (1903).

17

**1.** One is subsection (d), which permits the Department of Energy to waive preemption in certain circumstances. The Supreme Court has observed that exceptions to a preemption clause are helpful in interpreting a preemption provision's scope. *See Medtronic*, 518 U.S. at 486. And here, EPCA's waiver from preemption provides an especially important part of the "'statutory framework' surrounding" the preemption provision and, therefore, a significant source of evidence regarding § 6297(c)'s scope. *Id.* The waiver provides relief in appropriate circumstances from the general rule of preemption set out in § 6297(c), but Congress strictly limited authority to grant waivers. § 6297(d). A form of regulation for which Congress precluded a waiver is especially likely to be one that Congress expected to be covered by the preemption provision in the first place. Otherwise, there would be no need to limit waiving preemption of that form of regulation.

Local Law 154 falls within two separate categories of regulation for which waiver is unavailable, thereby demonstrating Congress's intent that such regulations should be (and remain) preempted. *First*, § 6297(d)(4), which the district court did not address, prohibits waiving preemption of regulations that are "likely to result in the unavailability . . . of performance

18

characteristics (including reliability), features, sizes, capacities, and volumes" in "any covered product type (or class)" "that are substantially the same as those generally available" in the regulating jurisdiction when the Secretary decides whether to waive preemption.[7] Thus, Congress intended to preempt regulations that eliminate currently authorized products' performance characteristics from the market. But that is precisely what Local Law 154 seeks to do. It is intended to phase out such products and thus interferes with Congress's objectives. JA28, 79 (The Department of Buildings has stated that it "is phasing out the usage of natural gas and fuel oil in buildings for cooking, heating[,] and service hot water.").

*Second*, § 6297(d)(3) prohibits waiver if the "regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis." A law preventing the use of natural-gas and fuel-oil combustion by personal appliances in owners' residences will necessarily burden the *sale* (and manufacturing, marketing,

---

[7] Another provision, § 6295(o)(4) similarly prohibits the Department from promulgating an energy conservation standard if "the standard is likely to result in the unavailability in the United States in any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the United States at the time of the Secretary's finding."

19

and distribution) of those appliances. Several "relevant factors" the Secretary "shall evaluate" to determine the regulation's burdens prove the point. If Local Law 154 functions as intended and leads to a reduction in fossil fuel consumption by covered products, it

- "will disadvantage smaller manufacturers, distributors, or dealers or lessen competition in the sale of the covered product[s] in" New York;

- "would result in a reduction— (i) in the current models, or in the projected availability of models, that could be shipped" to New York or "(ii) in the current or projected sales volume of the covered product type (or class)" in New York; and

- "is likely to contribute significantly to a proliferation of" similar requirements in other local jurisdictions pursuing similar electrification agendas which would have a "cumulative impact" on the market for covered appliances.

§ 6297(d)(3); *see also California Rest. Ass'n*, 89 F.4th at 1104 ("[N]o doubt, Berkeley's ban, if adopted by States and localities throughout the country, would 'significantly burden' the 'sale' of covered products 'on a national basis.'").[8] Further, as the Ninth Circuit observed, this provision requires the Department to "consider the complete lifecycle of an appliance—from

---

[8] Congress's inclusion of not just a given "covered product" but also "product *type*" and "*class*" in both § 6297(d)(3) and (4) further underscores that bans targeting whole classes of covered products (like natural gas or fuel oil-consuming products) fall within EPCA's preemptive reach.

20

manufacturing to servicing"—which would make "little sense if the scope of EPCA's preemption ends with the design or manufacture of the product." *California Rest. Ass'n*, 89 F.4th at 1104.

At the same time, the waiver provision's focus on regulations "needed to meet unusual and compelling State or local energy or water interests" does not help the City. § 6297(d)(1)(B). A regulation restricting energy use under certain circumstances, such as in response to weather-related or other emergencies, may satisfy that standard. As explained, though, Congress determined that a regulation "likely to result in the unavailability in the State of any covered product type" or that "will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis" cannot. § 6297(d)(3), (4); *see supra* pp. 18–21.

**2.** Another relevant exception from EPCA preemption, which the district court did not contend with, is for certain building codes. § 6297(c)(3), (f)(3). The statute provides that "a regulation . . . contained in a State or local building code for new construction concerning the . . . energy use of such covered product is not superseded" if it "complies with all" of seven specified requirements. § 6297(f)(3). By exempting only a narrow sliver of energy use regulations contained in building codes, and preempting all others, Congress

21

again underscored that "EPCA's preemptive scope extends beyond direct or facial regulations of covered products" and prevents States and localities from evading preemption by regulating appliances indirectly through other types of measures. *Caiifornia. Rest. Ass'n*, 89 F.4th at 1101.[9]

**3.** Instead of discussing these obviously relevant provisions, the district court claimed to find contextual support for its conclusion in other parts of EPCA. But its efforts were unavailing. The court pointed to definitions that contemplate a single value for the energy use of a covered appliance and requirements that manufacturers provide information about energy use to government regulators or consumers. JA89 (citing §§ 6291(5), (6) and 6296(d)(1), and 16 C.F.R. § 305.17(a)(9)). But these provisions do not indicate that the administration of EPCA would be "impossible" if the preemption provision were read in the manner compelled by its plain text.

---

[9] New York City has not contended, and the district court did not suggest, that Local Law 154 would satisfy the stringent requirements that a building code regulation must meet to escape preemption. Among others, a qualifying building code must allow builders to "select[ ] items whose combined energy efficiencies meet" an overall conservation objective. § 6297(f)(3)(A), (B), (F). But that forecloses imposing product-specific requirements like Local Law 154. *See Final Rule for Clothes Dryers and Kitchen Ranges and Ovens*, 47 Fed. Reg. 57,198, 57,215 (Dec. 22, 1982) ("Standards subject to preemption would include standards for any particular type (or class) of covered products established by mandatory State or local building codes . . . .").

22

JA89. Rather, they signal that local laws that prevent consumers from ever using federally authorized products—for example by banning all energy input into a gas-powered stove—undermine the utility and value of the federal standards. This is an argument *for* preemption not against it. Again, Local Law 154 outlaws products that already are compliant with EPCA energy conservation standards because those products fail to meet the City's more stringent energy use standard. And, in any event, such local laws still "concern[ ]" those "energy use" values (whether singular or not) by intentionally prohibiting them from ever being attained. § 6297(c).

The district court also gave undue weight to § 6297(c)'s heading. JA92. Most fundamentally, headings "cannot substitute for the operative text of the statute." *Florida Dep't of Revevnue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008). As explained, § 6297(c) must reach more broadly than energy conservation standards for numerous textual reasons. *See supra* Part I.A. If Congress had intended to limit preemption to "energy conservation standards," it could have said so in the operative text. And whatever value may be ascribed to *subsection* (c)'s heading is further diluted by *section* 6297's broader heading: "Effect on other law."

23

### C. EPCA's Statutory History Confirms It Preempts Local Law 154.

EPCA's statutory history further confirms that regulations like New York City's are preempted. Both the preemption and waiver provisions have evolved over time, further restricting State and local interference with federally covered products.

*First*, from 1975 to the present version, Congress has extended the preemption provision to cover more than just "energy conservation standards" or their equivalents. *See Air Conditioning & Refrigeration Inst.v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 500 (9th Cir. 2005). The three versions are reproduced in relevant part below:

**1975:** "This part supersedes any State regulation insofar as such State regulation may now or hereafter *provide for . . . any energy efficiency standard or similar requirement with respect to* energy efficiency or energy use of a covered product . . . ."
Pub. L. No. 94-163, 89 Stat. 871, 926–27 (1975) (emphasis added) ("Effect on Other Law").

**1978:** "If a State regulation is prescribed *which establishes an energy efficiency standard or other requirement respecting* energy use or energy efficiency of a type (or class) of covered products and which is not superseded by subsection (a)(2) or (b)(2), then" a regulated party may petition for preemption.
Pub. L. No. 95-619, 92 Stat. 3206, 3263–64 (1978) (emphasis added) ("Effect of Standards on Other Laws").

24

**1987:** "[N]o State *regulation concerning* the energy efficiency or energy use of such covered product shall be effective with respect to such product."
Pub. L. No. 100-12, 101 Stat. 103, 118 (1987) (emphasis added) ("Effect on Other Law").

The 1975 version is the narrowest substantively. Whatever regulations it covered beyond formal "energy efficiency standard[s]" had to provide for a "*similar* requirement with respect to . . . energy use." 89 Stat. at 927 (emphasis added). The 1978 version is broader substantively but narrower procedurally. It replaced "similar requirement," *id.*, with "*other* requirement respecting energy use;"[10] and it imposed a requirement to "petition" the Department for preemption to be effective, 92 Stat. at 3263–64 (emphasis added). Today's version, from 1987, is broader still. *See California Rest. Ass'n*, 89 F.4th at 1104 n.6 (describing the 1978 version as "narrower than today"). No longer does the provision specify "energy efficiency standard[ ]" (or energy conservation standard) in a way that might suggest a regulation must at least be like an energy conservation standard to be preempted. *See id.* Nor must the state or local measure "establish[ ]" a "requirement." *Id.*

---

[10] The current waiver provision retains the 1978 "other requirement" language, but this holdover does not negate the 1987 change to the preemption provision's operative language. § 6297(d)(1)(A). And, in any event, Local Law 154 still would fit the bill, because it "require[s]" zero "energy use" by covered products. *Id.*

It now covers any "regulation *concerning* . . . energy use." 101 Stat. at 118 (emphasis added). And it removes the petition requirement for preemption to be effective. *Id.* This evolution puts to rest any contention that the operative language equates "regulation concerning . . . energy use" with "energy conservation standard." § 6297(c). And because more than just standards are preempted, a regulation like Local Law 154 that forbids energy used by covered products must be covered. *See supra* Part I.A.

Even under the narrower 1978 language, the Department interpreted EPCA to preempt indirect bans on products subject to a federal standard. *Final Rule for Clothes Dryers and Kitchen Ranges and Ovens*, 47 Fed. Reg. 57,198, 57,215 (Dec. 22, 1982).[11] In addition to the "building codes discussed above," the Department advised that a "[p]rohibition of hook-ups for

---

[11] This interpretation followed a proposed rule that "[m]any commenters indicated [left] uncertainty as to the State and local laws that would qualify as an 'energy efficiency standard or other requirement with respect to . . . energy use.'" 47 Fed. Reg. at 57,215; *see Proposed Rulemaking and Public Hearings Regarding Energy Efficiency Standards for Refrigerators and Refrigerator-Freezers, Freezers, Clothes Dryers, Water Heaters, Room Air Conditioners, Kitchen Ranges and Ovens, Central Air Conditioners, and Furnaces*, 47 Fed. Reg. 14,424, 14,455 (Apr. 2, 1982) (focusing on "energy efficiency standards" under the header "Preemption of State Regulations"). Yet even that proposed rule recognized that "effectively ban[ning] appliances using certain types of fuel" "should not be the consequence of standards" because EPCA's focus on "saving energy is relative, not absolute." 47 Fed. Reg. at 14,434.

26

appliances with less than a certain efficiency" and "[p]rohibitions on standing pilot lights" in products subject to a federal standard would both "be subject to preemption." *Id.* & n.34 (emphasis omitted). Neither hook-ups nor standing pilot lights were covered products subject to their own energy efficiency standards; nor did prohibiting them establish a standard in its own (technical) right. Yet such prohibitions could be viewed either as functional "standards" or, more likely, as "other requirement[s] respecting energy use" that are preempted. 92 Stat. at 3263–64. All the more so today for a requirement like the City's that covered products use no energy.

*Second*, the waiver provision's history tells a similar story. Originally, waiver was impermissible unless, among other things, "such State regulation contains a more stringent energy efficiency standard than the corresponding Federal standard." 89 Stat. at 927 (Sec. 327(b)(2)(C)). Similarly, the 1978 version required that "such State regulation contains a more stringent energy efficiency standard than such Federal standard." 92 Stat. at 3264. But the 1987 amendments eliminated that stringency requirement, replacing it with a more reticulated set of requirements aimed at determining whether "such State regulation is needed to meet unusual and compelling State or local energy interests." 101 Stat. at 119; *see supra* p. 21. This makes sense

27

not just because of Congress's goal to make waiver "more difficult for states to obtain," *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 500, but also because Congress intended to preempt more than just explicit state and local energy efficiency standards and their equivalents, to instead encompass State and local regulations "concerning" energy use and energy efficiency.

### D. Adopting the City's Interpretation Would Disrupt the Federal Administration of EPCA.

EPCA prevents states and localities from interfering with what the Department of Energy does at the federal level. If products authorized for sale pursuant to a federal energy conservation standard can be categorically outlawed by any state or locality, that would disrupt the Department's administration of EPCA's Energy Conservation Program. *Cf. Wyeth v. Levine*, 555 U.S. 555, 576 (2009) ("[W]e have attended to an agency's explanation of how state law affects the regulatory scheme."). In particular, recognizing such authority to end-run EPCA would run directly counter to the Department's goals of reducing costs and increasing choice for consumers, alongside increasing domestic energy supply and energy conservation. *See* U.S. Dep't of Energy, *Secretarial Order: Unleashing the Golden Era of American Energy Dominance* (Feb. 5, 2025), https://perma.cc/8GHX-PRA5; *Procedures, Interpretations, and Policies for*

28

*Consideration of New or Revised Energy Conservation Standards and Test Procedures for Consumer Products and Certain Commercial/Industrial Equipment*, 90 Fed. Reg. 16,093, 16,096–97 (Apr. 17, 2025); *see also* S. Rep. No. 100–6, at 2 (1987) (1987 amendment was intended to "reduce the regulatory and economic burdens on the appliance manufacturing industry").

Permitting states and localities to evade EPCA also would undermine federal neutrality between energy technologies and energy sources for covered products. EPCA's definitions are technology-neutral and source-neutral: They apply equally to natural gas, fuel oil, and electric products. The Department's regulations, in turn, are primarily performance-based and do not mandate or prefer one fuel source. Thus, EPCA's preemption provision prevents jurisdictions from functionally banning a disfavored fuel class and, with it, all federally authorized products that depend on it.

EPCA's preemptive reach, of course, is not unlimited, but this is not an edge case. There is no need to decide the outer limits of that scope here, because a complete ban on covered products using energy comfortably falls within them—whereas state and local measures concerning subjects other than energy use likely present different issues. Here, though, New York City has banned federally authorized products from using *any* energy.

29

Applying EPCA's plain text to preempt such measures does not threaten states and localities' ability to regulate dangerous or unsafe conditions. Nor would that application require that health and safety regulations' incidental impacts on covered products trigger preemption. It merely would prevent products subject to a federal standard, after rigorous testing, from being banned from using any energy. *See California Rest. Ass'n*, 89 F.4th at 1101 (emphasizing ruling's "limited" reach). States and localities would remain free to experiment with different approaches to matters within their historical police powers. And Congress contemplated that states and localities would collaborate with the Federal Government on such experimentation through the waiver provision. Thus, the district court's concern about fundamentally different "safety regulations" is misplaced. JA92–94. Indeed, there has been no flood of challenges to such safety regulations in the Ninth Circuit despite the *California Restaurant Association* decision.[12]

---

[12] On the contrary, if preemption were to turn on the state or locality's "reasons" for enacting a provision—as the *California Restaurant Association* dissent suggested, 89 F.4th at 1126 (Friedland, J., dissenting from the denial of rehearing *en banc*)—courts would become awash with litigation over the diverse intentions of officials, agencies, and elected bodies. Such litigation should reach the same result here because New York City's

*Continued on next page.*

Nor should there be concern over the Department's implementation of the statutory waiver provision. The United States previously expressed concern that interpreting EPCA's preemption provision to cover more than just energy conservation standards or their technical equivalents could "put enormous strain on the waiver process." *En Banc Amicus* Br. 20; Panel *Amicus* Br. 25. Yet in the nearly two-and-a-half years since the *California Restaurant Association* panel decision issued (and more than year-and-a-half since the denial of rehearing *en banc* there), the Department has *not* received any new waiver request under § 6297(d), let alone a flood thereof.

For decades, the Department of Energy has promulgated energy conservation standards without concern that states and localities may end-run those standards by outright banning covered products. If the district court's misguided decision stands, that painstaking and vital work may be for naught.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

---

intentions are plain, but the more appropriate focus is on a provision's effects. *See* § 6297(c) ("no State regulation concerning . . . energy use . . . shall be *effective*" (emphasis added)).

31

Respectfully submitted,

August 2025

BRETT A. SHUMATE
  *Assistant Attorney General*

THOMAS PULHAM
CHARLES E.T. ROBERTS
  Attorneys
  *Civil Division, Room 3617*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1141*
  charles.roberts2@usdoj.gov

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 29.1(c) because it contains 6,586 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in CenturyExpdBT 14-point font, a proportionally spaced typeface.


*/s/ Charles E.T. Roberts*
Charles E.T. Roberts

**ADDENDUM**

# TABLE OF CONTENTS

42 U.S.C. § 6291 (excerpts)..................................................................A1

42 U.S.C. § 6292 ...............................................................................A2

42 U.S.C. § 6293 (excerpts)..................................................................A4

42 U.S.C. § 6295 (excerpts)..................................................................A4

42 U.S.C. § 6297 ...............................................................................A5

42 U.S.C. § 6302 (excerpts)................................................................A15

**42 U.S.C. § 6291 (excerpts)**

**§ 6291. Definitions**

For purposes of this part:

(1) The term "consumer product" means any article (other than an automobile, as defined in section 32901(a)(3) of Title 49) of a type—

(A) which in operation consumes, or is designed to consume, energy or, with respect to showerheads, faucets, water closets, and urinals, water; and

(B) which, to any significant extent, is distributed in commerce for personal use or consumption by individuals;

without regard to whether such article of such type is in fact distributed in commerce for personal use or consumption by an individual, except that such term includes fluorescent lamp ballasts, general service fluorescent lamps, incandescent reflector lamps, showerheads, faucets, water closets, and urinals distributed in commerce for personal or commercial use or consumption.

(2) The term "covered product" means a consumer product of a type specified in section 6292 of this title.

(3) The term "energy" means electricity, or fossil fuels. The Secretary may, by rule, include other fuels within the meaning of the term "energy" if he determines that such inclusion is necessary or appropriate to carry out the purposes of this chapter.

(4) The term "energy use" means the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title.

(5) The term "energy efficiency" means the ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures under section 6293 of this title.

(6) The term "energy conservation standard" means—

(A) a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use, or, in the case of showerheads, faucets, water closets, and urinals, water use, for a

A1

covered product, determined in accordance with test procedures prescribed under section 6293 of this title; or

(B) a design requirement for the products specified in paragraphs (6), (7), (8), (10), (15), (16), (17), and (20) of section 6292(a) of this title; and

includes any other requirements which the Secretary may prescribe under section 6295(r) of this title.

…

## 42 U.S.C. § 6292

### § 6292. Coverage

(a) In general

The following consumer products, excluding those consumer products designed solely for use in recreational vehicles and other mobile equipment, are covered products:

(1) Refrigerators, refrigerator-freezers, and freezers which can be operated by alternating current electricity, excluding--

(A) any type designed to be used without doors; and

(B) any type which does not include a compressor and condenser unit as an integral part of the cabinet assembly.

(2) Room air conditioners.

(3) Central air conditioners and central air conditioning heat pumps.

(4) Water heaters.

(5) Furnaces.

(6) Dishwashers.

(7) Clothes washers.

(8) Clothes dryers.

(9) Direct heating equipment.

(10) Kitchen ranges and ovens.

(11) Pool heaters.

A2

(12) Television sets.

(13) Fluorescent lamp ballasts.

(14) General service fluorescent lamps, general service incandescent lamps, and incandescent reflector lamps.

(15) Showerheads, except safety shower showerheads.

(16) Faucets.

(17) Water closets.

(18) Urinals.

(19) Metal halide lamp fixtures.

(20) Any other type of consumer product which the Secretary classifies as a covered product under subsection (b).

(b) Special classification of consumer product

(1) The Secretary may classify a type of consumer product as a covered product if he determines that--

(A) classifying products of such type as covered products is necessary or appropriate to carry out the purposes of this chapter, and

(B) average annual per-household energy use by products of such type is likely to exceed 100 kilowatt-hours (or its Btu equivalent) per year.

(2) For purposes of this subsection:

(A) The term "average annual per-household energy use with respect to a type of product" means the estimated aggregate annual energy use (in kilowatt-hours or the Btu equivalent) of consumer products of such type which are used by households in the United States, divided by the number of such households which use products of such type.

(B) The Btu equivalent of one kilowatt-hour is 3,412 British thermal units.

(C) The term "household" shall be defined under rules of the Secretary.

A3

**42 U.S.C. § 6293 (excerpts)**

**§ 6293. Test procedures**

. . .

(b) Amended and new procedures

    (1) Test procedures.—

        . . .

        (B) The Secretary may, in accordance with the requirements of this subsection, prescribe test procedures for any consumer product classified as a covered product under section 6292(b) of this title.

        . . .

    . . .

    (3) Any test procedures prescribed or amended under this section shall be reasonably designed to produce test results which measure energy efficiency, energy use, water use (in the case of showerheads, faucets, water closets and urinals), or estimated annual operating cost of a covered product during a representative average use cycle or period of use, as determined by the Secretary, and shall not be unduly burdensome to conduct.

        . . .

. . .


**42 U.S.C. § 6295 (excerpts)**

**§ 6295. Energy conservation standards**

(a) Purposes. The purposes of this section are to—

    (1) provide Federal energy conservation standards applicable to covered products; and

    (2) authorize the Secretary to prescribe amended or new energy conservation standards for each type (or class) of covered product.

. . .

(o) Criteria for prescribing new or amended standards

A4

. . .

(4) The Secretary may not prescribe an amended or new standard under this section if the Secretary finds (and publishes such finding) that interested persons have established by a preponderance of the evidence that the standard is likely to result in the unavailability in the United States in any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the United States at the time of the Secretary's finding. The failure of some types (or classes) to meet this criterion shall not affect the Secretary's determination of whether to prescribe a standard for other types (or classes).

## 42 U.S.C. § 6297

### § 6297. Effect on other law

(a) Preemption of testing and labeling requirements

(1) Effective on March 17, 1987, this part supersedes any State regulation insofar as such State regulation provides at any time for the disclosure of information with respect to any measure of energy consumption or water use of any covered product if—

(A) such State regulation requires testing or the use of any measure of energy consumption, water use, or energy descriptor in any manner other than that provided under section 6293 of this title; or

(B) such State regulation requires disclosure of information with respect to the energy use, energy efficiency, or water use of any covered product other than information required under section 6294 of this title.

(2) For purposes of this section, the following definitions apply:

(A) The term "State regulation" means a law, regulation, or other requirement of a State or its political subdivisions. With respect to showerheads, faucets, water closets, and urinals, such term shall also mean a law, regulation, or other requirement of a river basin commission that has jurisdiction within a State.

(B) The term "river basin commission" means—

(i) a commission established by interstate compact to apportion, store, regulate, or otherwise manage or coordinate the management of the waters of a river basin; and

(ii) a commission established under section 1962b(a) of this title.

(b) General rule of preemption for energy conservation standards before Federal standard becomes effective for product.

Effective on March 17, 1987, and ending on the effective date of an energy conservation standard established under section 6295 of this title for any covered product, no State regulation, or revision thereof, concerning the energy efficiency, energy use, or water use of the covered product shall be effective with respect to such covered product, unless the State regulation or revision—

(1)(A) was prescribed or enacted before January 8, 1987, and is applicable to products before January 3, 1988, or in the case of any portion of any regulation which establishes requirements for fluorescent lamp ballasts, was prescribed or enacted before June 28, 1988, or in the case of any portion of any regulation which establishes requirements for fluorescent or incandescent lamps, flow rate requirements for showerheads or faucets, or water use requirements for water closets or urinals, was prescribed or enacted before October 24, 1992; or

(B) in the case of any portion of any regulation that establishes requirements for general service incandescent lamps, intermediate base incandescent lamps, or candelabra base lamps, was enacted or adopted by the State of California or Nevada before December 4, 2007, except that—

(i) the regulation adopted by the California Energy Commission with an effective date of January 1, 2008, shall only be effective until the effective date of the Federal standard for the applicable lamp category under subparagraphs (A), (B), and (C) of section 6295(i)(1) of this title; and

(ii) the States of California and Nevada may, at any time, modify or adopt a State standard for general service lamps to conform with Federal standards with effective dates no earlier than 12 months prior to the Federal effective dates prescribed under subparagraphs (A), (B), and (C) of section 6295(i)(1) of this title, at which time any prior

A6

regulations adopted by the State of California or Nevada shall no longer be effective.

(iii) Repealed. Pub.L. 112-210, § 10(a)(9)(C), Dec. 18, 2012, 126 Stat. 1525

(2) is a State procurement regulation described in subsection (e);

(3) is a regulation described in subsection (f)(1) or is prescribed or enacted in a building code for new construction described in subsection (f)(2);

(4) is a regulation prohibiting the use in pool heaters of a constant burning pilot, or is a regulation (or portion thereof) regulating fluorescent lamp ballasts other than those to which paragraph (5) of section 6295(g) of this title is applicable, or is a regulation (or portion thereof) regulating fluorescent or incandescent lamps other than those to which section 6295(i) of this title is applicable, or is a regulation (or portion thereof) regulating showerheads or faucets other than those to which section 6295(j) of this title is applicable or regulating lavatory faucets (other than metering faucets) for installation in public places, or is a regulation (or portion thereof) regulating water closets or urinals other than those to which section 6295(k) of this title is applicable;

(5) is a regulation described in subsection (d)(5)(B) for which a waiver has been granted under subsection (d);

(6) is a regulation effective on or after January 1, 1992, concerning the energy efficiency or energy use of television sets; or

(7) is a regulation (or portion thereof) concerning the water efficiency or water use of low consumption flushometer valve water closets.

(c) General rule of preemption for energy conservation standards when Federal standard becomes effective for product.

Except as provided in section 6295(b)(3)(A)(ii) of this title, subparagraphs (B) and (C) of section 6295(j)(3) of this title, and subparagraphs (B) and (C) of section 6295(k)(3) of this title and effective on the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation—

A7

(1) is a regulation described in paragraph (2) or (4) of subsection (b), except that a State regulation (or portion thereof) regulating fluorescent lamp ballasts other than those to which paragraph (5) of section 6295(g) of this title is applicable shall be effective only until the effective date of a standard that is prescribed by the Secretary under paragraph (7) of such section and is applicable to such ballasts, except that a State regulation (or portion thereof) regulating fluorescent or incandescent lamps other than those for which section 6295(i) of this title is applicable shall be effective only until the effective date of a standard that is prescribed by the Secretary and is applicable to such lamps;

(2) is a regulation which has been granted a waiver under subsection (d);

(3) is in a building code for new construction described in subsection (f)(3);

(4) is a regulation concerning the water use of lavatory faucets adopted by the State of New York or the State of Georgia before October 24, 1992;

(5) is a regulation concerning the water use of lavatory or kitchen faucets adopted by the State of Rhode Island prior to October 24, 1992;

(6) is a regulation (or portion thereof) concerning the water efficiency or water use of gravity tank-type low consumption water closets for installation in public places, except that such a regulation shall be effective only until January 1, 1997; or

(7)(A) is a regulation concerning standards for commercial prerinse spray valves adopted by the California Energy Commission before January 1, 2005; or

(B) is an amendment to a regulation described in subparagraph (A) that was developed to align California regulations with changes in American Society for Testing and Materials Standard F2324;

(8)(A) is a regulation concerning standards for pedestrian modules adopted by the California Energy Commission before January 1, 2005; or

(B) is an amendment to a regulation described in subparagraph (A) that was developed to align California regulations to changes in the Institute for Transportation Engineers standards, entitled "Performance Specification: Pedestrian Traffic Control Signal Indications"; and

A8

(9) is a regulation concerning metal halide lamp fixtures adopted by the California Energy Commission on or before January 1, 2011, except that—

(A) if the Secretary fails to issue a final rule within 180 days after the deadlines for rulemakings in section 6295(hh) of this title, notwithstanding any other provision of this section, preemption shall not apply to a regulation concerning metal halide lamp fixtures adopted by the California Energy Commission—

(i) on or before July 1, 2015, if the Secretary fails to meet the deadline specified in section 6295(hh)(2) of this title; or

(ii) on or before July 1, 2022, if the Secretary fails to meet the deadline specified in section 6295(hh)(3) of this title.

(d) Waiver of Federal preemption

(1)(A) Any State or river basin commission with a State regulation which provides for any energy conservation standard or other requirement with respect to energy use, energy efficiency, or water use for any type (or class) of covered product for which there is a Federal energy conservation standard under section 6295 of this title may file a petition with the Secretary requesting a rule that such State regulation become effective with respect to such covered product.

(B) Subject to paragraphs (2) through (5), the Secretary shall, within the period described in paragraph (2) and after consideration of the petition and the comments of interested persons, prescribe such rule if the Secretary finds (and publishes such finding) that the State or river basin commission has established by a preponderance of the evidence that such State regulation is needed to meet unusual and compelling State or local energy or water interests.

(C) For purposes of this subsection, the term "unusual and compelling State or local energy or water interests" means interests which—

(i) are substantially different in nature or magnitude than those prevailing in the United States generally; and

(ii) are such that the costs, benefits, burdens, and reliability of energy or water savings resulting from the State regulation make such regulation preferable or necessary when measured against the costs, benefits,

A9

burdens, and reliability of alternative approaches to energy or water savings or production, including reliance on reasonably predictable market-induced improvements in efficiency of all products subject to the State regulation.

The factors described in clause (ii) shall be evaluated within the context of the State's energy plan and forecast, and, with respect to a State regulation for which a petition has been submitted to the Secretary which provides for any energy conservation standard or requirement with respect to water use of a covered product, within the context of the water supply and groundwater management plan, water quality program, and comprehensive plan (if any) of the State or river basin commission for improving, developing, or conserving a waterway affected by water supply development.

(2) The Secretary shall give notice of any petition filed under paragraph (1)(A) and afford interested persons a reasonable opportunity to make written comments, including rebuttal comments, thereon. The Secretary shall, within the 6-month period beginning on the date on which any such petition is filed, deny such petition or prescribe the requested rule, except that the Secretary may publish a notice in the Federal Register extending such period to a date certain but no longer than one year after the date on which the petition was filed. Such notice shall include the reasons for delay. In the case of any denial of a petition under this subsection, the Secretary shall publish in the Federal Register notice of, and the reasons for, such denial.

(3) The Secretary may not prescribe a rule under this subsection if the Secretary finds (and publishes such finding) that interested persons have established, by a preponderance of the evidence, that such State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis. In determining whether to make such finding, the Secretary shall evaluate all relevant factors, including—

(A) the extent to which the State regulation will increase manufacturing or distribution costs of manufacturers, distributors, and others;

(B) the extent to which the State regulation will disadvantage smaller manufacturers, distributors, or dealers or lessen competition in the sale of the covered product in the State;

A10

(C) the extent to which the State regulation would cause a burden to manufacturers to redesign and produce the covered product type (or class), taking into consideration the extent to which the regulation would result in a reduction—

(i) in the current models, or in the projected availability of models, that could be shipped on the effective date of the regulation to the State and within the United States; or

(ii) in the current or projected sales volume of the covered product type (or class) in the State and the United States; and

(D) the extent to which the State regulation is likely to contribute significantly to a proliferation of State appliance efficiency requirements and the cumulative impact such requirements would have.

(4) The Secretary may not prescribe a rule under this subsection if the Secretary finds (and publishes such finding) that interested persons have established, by a preponderance of the evidence, that the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the Secretary's finding, except that the failure of some classes (or types) to meet this criterion shall not affect the Secretary's determination of whether to prescribe a rule for other classes (or types).

(5) No final rule prescribed by the Secretary under this subsection may—

(A) permit any State regulation to become effective with respect to any covered product manufactured within three years after such rule is published in the Federal Register or within five years if the Secretary finds that such additional time is necessary due to the substantial burdens of retooling, redesign, or distribution needed to comply with the State regulation; or

(B) become effective with respect to a covered product manufactured before the earliest possible effective date specified in section 6295 of this title for the initial amendment of the energy conservation standard established in such section for the covered product; except that such rule may become effective before such date if the Secretary finds (and publishes such finding) that, in addition to the other requirements of this

A11

subsection the State has established, by a preponderance of the evidence, that—

(i) there exists within the State an energy emergency condition or, if the State regulation provides for an energy conservation standard or other requirement with respect to the water use of a covered product for which there is a Federal energy conservation standard under subsection (j) or (k) of section 6295 of this title, a water emergency condition, which—

(I) imperils the health, safety, and welfare of its residents because of the inability of the State or utilities within the State to provide adequate quantities of gas or electric energy or, in the case of a water emergency condition, water or wastewater treatment, to its residents at less than prohibitive costs; and

(II) cannot be substantially alleviated by the importation of energy or, in the case of a water emergency condition, by the importation of water, or by the use of interconnection agreements; and

(ii) the State regulation is necessary to alleviate substantially such condition.

(6) In any case in which a State is issued a rule under paragraph (1) with respect to a covered product and subsequently a Federal energy conservation standard concerning such product is amended pursuant to section 6295 of this title, any person subject to such State regulation may file a petition with the Secretary requesting the Secretary to withdraw the rule issued under paragraph (1) with respect to such product in such State. The Secretary shall consider such petition in accordance with the requirements of paragraphs (1), (3), and (4), except that the burden shall be on the petitioner to show by a preponderance of the evidence that the rule received by the State under paragraph (1) should be withdrawn as a result of the amendment to the Federal standard. If the Secretary determines that the petitioner has shown that the rule issued by the State should be so withdrawn, the Secretary shall withdraw it.

(e) Exception for certain State procurement standards

Any State regulation which sets forth procurement standards for a State (or political subdivision thereof) shall not be superseded by the provisions of this

A12

part if such standards are more stringent than the corresponding Federal energy conservation standards.

(f) Exception for certain building code requirements

(1) A regulation or other requirement enacted or prescribed before January 8, 1987, that is contained in a State or local building code for new construction concerning the energy efficiency or energy use of a covered product is not superseded by this part until the effective date of the energy conservation standard established in or prescribed under section 6295 of this title for such covered product.

(2) A regulation or other requirement, or revision thereof, enacted or prescribed on or after January 8, 1987, that is contained in a State or local building code for new construction concerning the energy efficiency or energy use of a covered product is not superseded by this part until the effective date of the energy conservation standard established in or prescribed under section 6295 of this title for such covered product if the code does not require that the energy efficiency of such covered product exceed—

> (A) the applicable minimum efficiency requirement in a national voluntary consensus standard; or

> (B) the minimum energy efficiency level in a regulation or other requirement of the State meeting the requirements of subsection (b)(1) or (b)(5),

whichever is higher.

(3) Effective on the effective date of an energy conservation standard for a covered product established in or prescribed under section 6295 of this title, a regulation or other requirement contained in a State or local building code for new construction concerning the energy efficiency or energy use of such covered product is not superseded by this part if the code complies with all of the following requirements:

> (A) The code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective.

> (B) The code does not require that the covered product have an energy efficiency exceeding the applicable energy conservation standard

A13

established in or prescribed under section 6295 of this title, except that the required efficiency may exceed such standard up to the level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).

(C) The credit to the energy consumption or conservation objective allowed by the code for installing covered products having energy efficiencies exceeding such energy conservation standard established in or prescribed under section 6295 of this title or the efficiency level required in a State regulation referred to in subparagraph (B) is on a one-for-one equivalent energy use or equivalent cost basis.

(D) If the code uses one or more baseline building designs against which all submitted building designs are to be evaluated and such baseline building designs contain a covered product subject to an energy conservation standard established in or prescribed under section 6295 of this title, the baseline building designs are based on the efficiency level for such covered product which meets but does not exceed such standard or the efficiency level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).

(E) If the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective, for every combination which includes a covered product the efficiency of which exceeds either standard or level referred to in subparagraph (D), there also shall be at least one combination which includes such covered product the efficiency of which does not exceed such standard or level by more than 5 percent, except that at least one combination shall include such covered product the efficiency of which meets but does not exceed such standard.

(F) The energy consumption or conservation objective is specified in terms of an estimated total consumption of energy (which may be calculated from energy loss- or gain-based codes) utilizing an equivalent amount of energy (which may be specified in units of energy or its equivalent cost).

(G) The estimated energy use of any covered product permitted or required in the code, or used in calculating the objective, is determined using the applicable test procedures prescribed under section 6293 of this title, except that the State may permit the estimated energy use

calculation to be adjusted to reflect the conditions of the areas where the code is being applied if such adjustment is based on the use of the applicable test procedures prescribed under section 6293 of this title or other technically accurate documented procedure.

(4)(A) Subject to subparagraph (B), a State or local government is not required to submit a petition to the Secretary in order to enforce or apply its building code or to establish that the code meets the conditions set forth in this subsection.

(B) If a building code requires the installation of covered products with efficiencies exceeding both the applicable Federal standard established in or prescribed under section 6295 of this title and the applicable standard of such State, if any, that has been granted a waiver under subsection (d), such requirement of the building code shall not be applicable unless the Secretary has granted a waiver for such requirement under subsection (d).

(g) No warranty

Any disclosure with respect to energy use, energy efficiency, or estimated annual operating cost which is required to be made under the provisions of this part shall not create an express or implied warranty under State or Federal law that such energy efficiency will be achieved or that such energy use or estimated annual operating cost will not be exceeded under conditions of actual use.

**42 U.S.C. § 6302 (excerpts)**

**§ 6302. Prohibited acts**

(a) In general

It shall be unlawful--

> . . .

> (5) for any manufacturer or private labeler to distribute in commerce any new covered product which is not in conformity with an applicable energy conservation standard established in or prescribed under this part, except to the extent that the new covered product is covered by a regional standard that is more stringent than the base national standard;

> . . .

A15

(b) "New covered product" defined

For purposes of this section, the term "new covered product" means a covered product the title of which has not passed to a purchaser who buys such product for purposes other than (1) reselling such product, or (2) leasing such product for a period in excess of one year.