# 25-977

## United States Court of Appeals
### for the Second Circuit

ASSOCIATION OF CONTRACTING PLUMBERS OF THE CITY OF
NEW YORK, INC.; PLUMBING-HEATING-COOLING
CONTRACTORS—NATIONAL ASSOCIATION; PLUMBERS LOCAL
UNION NO. 1, UNITED ASSOCIATION OF JOURNEYMEN AND
APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY
OF THE UNITED STATES AND CANADA;

[*caption continued on inside cover*]

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR DEFENDANT-APPELLEE

MURIEL GOODE-TRUFANT
*Corporation Counsel*
*of the City of New York*
Attorney for Defendant-
Appellee
100 Church Street
New York, New York 10007
212-356-0858
rvisgait@law.nyc.gov

RICHARD DEARING
CLAUDE S. PLATTON
REBECCA L. VISGAITIS
    *of Counsel*

October 30, 2025

[*continued caption*]

NEW YORK STATE ENERGY COALITION, INC.; PLUMBING
FOUNDATION CITY OF NEW YORK, INC.; LICENSED
PLUMBING ASSOCIATION OF NEW YORK CITY, INC., D/B/A
MASTER PLUMBERS COUNCIL OF THE CITY OF NEW YORK;
and BUILDING INDUSTRY ASSOCIATION OF NEW YORK CITY,
INC.,

*Plaintiffs-Appellants*,

*against*

CITY OF NEW YORK,

*Defendant-Appellee.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................. iii

PRELIMINARY STATEMENT ......................................................... 1

ISSUES PRESENTED ................................................................... 2

STATEMENT OF THE CASE ........................................................... 3

    A. EPCA's regime for appliance energy consumption ............ 3

        1. EPCA's appliance energy consumption standards and testing and labeling requirements ................................. 3

        2. EPCA's preemption of other energy conservation standards ........................................................ 7

    B. New York City's Local Law 154, which prohibits fuel combustion in new buildings ............................................. 9

    C. The district court's dismissal of plaintiffs' complaint alleging that Local Law 154 is preempted by EPCA ........ 11

SUMMARY OF ARGUMENT ......................................................... 13

ARGUMENT ............................................................................. 15

    LOCAL LAW 154 IS OUTSIDE EPCA'S PREEMPTIVE REACH ................................................................................ 15

    A. EPCA preempts only state and local laws that concern covered products' energy consumption. .......................... 17

        1. The text of the preemption provision shows that it preempts only state regulations concerning covered products' energy consumption as designed. ............... 17

# TABLE OF CONTENTS (cont'd)

**Page**

2. The statutory structure confirms that Congress was focused on energy conservation standards for covered products...........................................21

3. EPCA's legislative and regulatory history further support this limited scope.............................................24

B. EPCA's preemption provision does not enshrine a right to use all appliances that are subject to energy conservation standards.......................................27

1. "Energy use" refers to a fixed value based on product design, not the ability to use a product. ......................27

2. Nothing else in EPCA's text supports plaintiffs' broad view of its preemption provision. ................................32

C. Local Law 154 does not "concern[]" "energy use" or "energy efficiency" because it prohibits gas appliances regardless of their energy consumption...........................40

CONCLUSION.....................................................48

CERTIFICATE OF COMPLIANCE..................................49

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Air Conditioning & Refrigeration Inst. v. Energy Res.*
  *Conservation & Dev. Comm'n,*
  410 F.3d 492 (9th Cir. 2005) ...........................................4, 8, 24, 25

*Altria Grp., Inc. v. Good,*
  555 U.S. 70 (2008) ................................................................. 16

*Arizona v. United States,*
  567 U.S. 387 (2012) ............................................................... 16

*Ass'n v. AG N.J.,*
  93 F.4th 122 (3d Cir. 2024) .................................................... 16

*Bldg. Indus. Ass'n v. Wash. State Bldg. Code Council,*
  683 F.3d 1144 (9th Cir. 2012) ............................................37, 38

*Buono v. Tyco Fire Prods., LP,*
  78 F.4th 490 (2d Cir. 2023) .................................................... 16

*Burgess v. United States,*
  553 U.S. 124 (2008) ...........................................................18, 27

*Cal. Div. of Labor Stds. Enforcement v. Dillingham,*
  519 U.S. 316 (1997) ............................................................... 43

*California Restaurant Association v. City of Berkeley,*
  89 F.4th 1094 (9th Cir. 2024) ..........................................*passim*

*Chamber of Com. of U.S. v. Whitting,*
  563 U.S. 582 (2011) ............................................................... 16

*Corning Glass Works v. Brennan,*
  417 U.S. 188 (1974) ............................................................... 28

*Coventry Health Care of Missouri, Inc. v. Nevils,*
  581 U.S. 87 (2017) ................................................................. 41

*Critcher v. L'Oreal USA, Inc.,*
  959 F.3d 31 (2d Cir. 2020) ..................................................... 13

*Dan's City Used Cars, Inc. v. Pilkey,*
  569 U.S. 251 (2013) ........................................................34, 46, 47

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Davis v. Mich. Dep't of the Treasury,*
    489 U.S. 803 (1989) ........................................................................ 18

*Gobeille v. Liberty Mut. Ins. Co.,*
    577 U.S. 312 (2016) ................................................................... 41, 42

*Lee v. Bankers Trust Co.,*
    166 F.3d 540 (2d Cir. 1999) ........................................................ 24

*Medtronic, Inc. v. Lohr,*
    518 U.S. 470 (1996) ...................................................................... 16

*Metropolitan Taxicab Board of Trade v. City of New York,*
    615 F.3d 152 (2d Cir. 2010) ...................................................... 42, 43

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v.*
*Travelers Ins. Co.,*
    514 U.S. 645 (1995) ...................................................................... 16

*Nat. Res. Def. Council, Inc. v. Herrington,*
    768 F.2d 1355 (D.C. Cir. 1985) ................................................ 3, 24

*Puerto Rico v. Franklin Cal. Tax-Free Trust,*
    579 U.S. 115 (2016) ...................................................................... 16

*Rudisill v. McDonough,*
    601 U.S. 294 (2024) ...................................................................... 23

*United States v. Kelly,*
    128 F. 4th 387 (2d Cir. 2025) ..................................................... 18

*Van Buren v. United States,*
    593 U.S. 374 (2021) ........................................................... 18, 27, 28

**Statutes**

42 U.S.C. § 6201 ................................................................................. 3

42 U.S.C. § 6291 .......................................................................*passim*

42 U.S.C. § 6291(4) ........................................................................ 19

42 U.S.C. § 6293 .......................................................................*passim*

42 U.S.C. § 6294 ................................................................... 7, 20, 22

## TABLE OF AUTHORITIES (cont'd)

                                                                **Page(s)**

42 U.S.C. § 6295.................................................................*passim*

42 U.S.C. § 6296 ...........................................................7, 20, 22

42 U.S.C. § 6297.................................................................*passim*

42 U.S.C. § 6297(c).............................................................*passim*

N.Y.C. Administrative Code § 24-177.1 ............................... 10

N.Y.C. Administrative Code § 28-501.1 ............................... 10

N.Y.C. Administrative Code § 28-506.1 ............................... 10

N.Y.C. Fire Code § 313.3 ................................................... 45

N.Y.C. Mechanical Code 917.1............................................ 45

Pub. L. No. 94-163, § 321 ............................................25, 26

Pub. L. No. 94-163, § 327 ...................................................26

Pub. L. No. 95-619 § 422 ......................................................4

Pub. L. No. 102-486 (1992)...................................................5

Pub L. No. 110-140 (2007)....................................................5

## Other Authorities

10 C.F.R. 430.23...................................................................7

133 Cong. Rec. 3070-3072................................................ 24

144 Cong. Rec. S12706-07 (Oct. 20, 1998)........................ 29

76 Fed. Reg. 51281, 51282 (Aug. 18, 2011)........................ 28

David Santana Ortiz and Mark Allen Bernstein, RAND,
  *Measures of residential energy consumption and their*
  *relationships to DOE policy* (1999); *available at*
  https://www.rand.org/content/dam/rand/pubs/monog
  raph_reports/2005/MR1105.0.pdf.................................. 29

*Environmental Research and Public Health* 20, no. 1: 75,
  https://doi.org/10.3390/ijerph20010075 ...................... 10

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

H.R. Rep. 94-340, pt. V (1978)....................................................................3

H.R. Rep. 94-340, pt. V (1978) .................................................. 3

H.R. Rep. 94-340, pt. V (1978)............................................. 24

H.R. Rep. No. 100-11.......................................................... 24

H.R. Rep. No. 100-11.......................................................... 25

N.Y.C. Admin. Code §§ 27-2034, 27-2035(a) ...................................... 45

S. Rep. No. 100-6................................................................ 8, 24

S. Rep. No. 100-6.................................................................. 24

S. Rep. No. 100-6 (1987) .........................................................4

U.S. Dep't of Energy, *Energy Intensity Indicators: Terminology and Definitions*, https://perma.cc/7782-P3XE ............................................................. 29

U.S. Dep't of Energy, *Reporting Guidance for Federal Agency Annual Report on Energy Management* 6 (Sept. 2023), *available at* https://perma.cc/ZLF2-NEUD.......................................................... 29

## PRELIMINARY STATEMENT

Local Law 154 of 2021 effectively prohibits the use of appliances that combust fossil fuels in newly constructed buildings in New York City as a means to reduce carbon emissions and improve local air quality. In a thorough decision, the United States District Court for the Southern District of New York (Abrams, J.) rejected plaintiffs' contention that Local Law 154 is preempted by the federal Energy Policy and Conservation Act (EPCA). This Court should affirm.

The district court correctly recognized that EPCA and Local Law 154 regulate in different spheres. As pertinent here, EPCA directs the U.S. Department of Energy (DOE) to promulgate and enforce nationwide energy conservation standards for covered appliances—meaning standards for the quantity of energy those appliances consume that manufacturers must meet when designing their products. To spare manufacturers from conflicting obligations, EPCA expressly preempts state regulations that would effectively impose such standards—whether in form or function.

But that is not what Local Law 154 does. It has nothing to say about the quantity of energy that any appliances are designed to consume or how efficiently they use energy. Instead, it regulates the *type* of energy used, effectively eliminating the use of fossil-fuel-powered

building systems, appliances, or other equipment in new construction and thereby preventing the installation and operation of products that use those fuel sources, regardless of their designed-for level of energy consumption. The law thus operates in an entirely different regulatory domain from EPCA and is not preempted by it.

Plaintiffs cannot avoid this straightforward conclusion. At its core, their argument hinges on giving a key statutory term a different meaning than is expressly provided in EPCA. By that maneuver, they seek to transform EPCA's preemption of state and local regulations concerning energy conservation into a sweeping guarantee that products meeting federal conservation standards cannot be carefully regulated or banned on grounds entirely unrelated to their designed-for level of energy consumption. To be sure, as plaintiffs emphasize, the Ninth Circuit endorsed that gambit. But this Court should not make the same mistake.

## ISSUES PRESENTED

Did the district court correctly dismiss plaintiffs' complaint on the ground that EPCA's regime of energy conservation standards does not preempt a local law that prohibits certain fuel sources without regard to the amount of energy that products would consume?

## STATEMENT OF THE CASE

### A. EPCA's regime for appliance energy consumption

#### 1. EPCA's appliance energy consumption standards and testing and labeling requirements

The first step to understanding what EPCA's appliance energy conservation program preempts is understanding what it regulates. The statute was borne out of a need to provide for uniform energy consumption standards for appliances across the country. In the aftermath of the 1973 oil embargo imposed by petroleum-producing countries against the United States, Congress recognized that the nation needed to "take steps to effectively reduce its vulnerability to future import interruptions." H.R. Rep. 94-340, pt. V, at 20 (1978); *see Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1364 (D.C. Cir. 1985). Against this backdrop, it enacted the Energy Policy and Conservation Act in 1975, with a goal of reducing domestic energy consumption through energy conservation plans and improved appliance efficiency. *See generally* 42 U.S.C. § 6201; *see also* H.R. Rep. 94-340, pt. V, at 94 (1978) (noting the degree to which residential energy use, and specifically residential appliances, contributed to overall domestic energy use).

At first, Congress and DOE simply required appliance manufacturers to measure the energy consumption of their products as designed and label the products with the results, hoping that market forces would encourage manufacturers to prioritize energy efficiency. *See Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 499 (9th Cir. 2005). When that didn't happen, Congress undertook a "complete overhaul" and amended EPCA to require the Department of Energy to establish mandatory efficiency standards—setting limits for the quantity of energy that products consume as designed—for covered home appliances. *See* Pub. L. No. 95-619 § 422.

DOE largely failed to implement the congressional mandate and instead granted waivers for states to establish their own appliance energy conservation standards. *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 499; S. Rep. No. 100-6, at 4 (1987). But that led to inconsistent standards posing significant complications for the design, production, and marketing of appliances nationwide. In response, industry trade groups and consumer groups negotiated to propose uniform national standards that would ease the burden on manufacturers while promoting appliance energy conservation. *Air Conditioning &*

4

*Refrigeration Inst*., 410 F.3d at 500, S. Rep. No. 100-6, at 4. In 1987, Congress amended EPCA to adopt those negotiated standards.

As amended by the 1987 legislation, the current version of EPCA's appliance conservation program establishes federal "energy conservation standards" applicable to certain consumer products and authorizes the Secretary of DOE to amend or add additional standards. 42 U.S.C. § 6295(a). Essentially, these are standards that set limits on the quantity of energy that appliances may be designed and manufactured to consume.[1]

As relevant here, an "energy conservation standard" is (1) "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use, or [for relevant products], water use, for a covered product, determined in accordance with test procedures prescribed under [§ 6293];" or (2) "a design requirement" for a specified list of products including dishwashers, clothes washers, clothes dryers, kitchen ranges and ovens, showerheads, and water closets. 42 U.S.C. § 6291(6).

---

[1] Congress later expanded EPCA's appliance efficiency regime to commercial and industrial equipment. *See* Pub. L. No. 102-486 (1992); Pub L. No. 110-140 (2007). This brief refers primarily to the provisions applying to consumer products, but the language applicable to commercial and industrial products tracks these provisions, and the same interpretations apply.

EPCA defines two key terms pertaining to "energy conservation standards"—"energy use" and "energy efficiency"—that are mirrored in its preemption clause and thus particularly important here.[2] Both are measures of products' level of energy consumption as designed. Energy use means "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under [§ 6293]." 42 U.S.C. § 6291(4). And energy efficiency means "the ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures under [§ 6293]." 42 U.S.C. § 6291(5).

Both terms refer to the quantity of energy a product is designed to consume; "energy use" measures it over time, while "energy efficiency" compares the energy used to the product's useful output of services. EPCA employs "energy use" as the relevant measure for some products, and "energy efficiency" for others. 42 U.S.C. § 6295. For example, room air conditioners—which consume energy only when being actively used to cool a room and have an output that can be readily quantified—are

---

[2] An "energy conservation standard" can also be a performance standard prescribing a maximum quantity of "water use" for "showerheads, faucets, water closets, and urinals." 42 U.S.C. § 6291(6)(A). Because "water use" is not at issue in this case, this brief does not dwell on its meaning. But that term too is mirrored in EPCA's preemption clause.

subject to specific "energy efficiency" ratios. 42 U.S.C. § 6295(c). Likewise, the rules DOE has promulgated for appliances like dishwashers and clothes washers and dryers require measuring those machines' energy consumption "per cycle." *See* 10 C.F.R. 430.23(c), (d), (j). The energy consumption of refrigerators and freezers, on the other hand, is subject to an "energy use" standard measured in kilowatt hours per year, 42 U.S.C. § 6295(b)—which makes sense because those appliances are designed to operate continuously and do not have discrete use cycles.

The "test procedures" used to measure products' energy use or energy efficiency must be formulated to measure the energy consumption "during a representative average use cycle or period of use." 42 U.S.C. § 6293(b)(3). After conducting the relevant tests, manufacturers must label covered products with the results, specifying the product's energy consumption and the estimated annual operating cost based on that value. 42 U.S.C. § 6294(c)(1). They must also provide the results of their tests to DOE on an annual basis, and must allow DOE to observe further testing upon request. 42 U.S.C. § 6296.

### 2. EPCA's preemption of other energy conservation standards

To ensure that there would no longer be a "patchwork of differing State regulations" after it adopted the negotiated uniform standards,

Congress also updated EPCA's preemption provision. *See* S. Rep. No. 100-6, at 4; *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 500. The subsection at issue here is entitled "General rule of preemption for energy conservation standards when federal standard becomes effective for a product." 42 U.S.C. § 6297(c). It provides that "effective on the effective date of an energy conservation standard established or prescribed under [§ 6295] for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product." *Id.*

This provision thus comes into play only when DOE has adopted an energy conservation standard for a particular product. And it uses the same terms to identify the statute's preemptive scope as were defined earlier in the statute: "energy use" and "energy efficiency," the two specified ways of measuring products' designed-for energy consumption for purposes of energy conservation standards, as well as "water use," which provides the consumption metric for certain plumbing products.

The statute also lists several exceptions to preemption. Among them, a state regulation is not preempted if DOE waives preemption

8

after analysis of specified criteria or the regulation is located in a building code for new construction and meets defined requirements.[3] *Id.*

### B. New York City's Local Law 154, which prohibits fuel combustion in new buildings

As the country's largest population area and densest urban center, New York City has an acute interest in improving air quality for its residents. And as it directly faces the effects of rising sea levels on nearly all sides, the City aims to be a leader in fighting climate change.

Against this backdrop, in 2021, the New York City Council passed Local Law 154, generally prohibiting the combustion of substances that emit measurable carbon dioxide in new buildings. This legislation, which effectively prevents the operation of gas and fuel oil appliances and building systems in new construction, was an effort both to meet the City's carbon-neutrality goals and improve local air quality (*see* JA41-42, JA66-67). As recent studies have found, the combustion of fossil fuels not only results in carbon emissions with harmful climate-change effects, but also emits air pollutants that pose health concerns,

---

[3] The remaining exceptions address state procurement standards and specific product classes that are not relevant here, such as faucets, water closets and lamp fixtures. 42 U.S.C. § 6297(c).

9

contributing to issues like childhood asthma.[4] This is a particular concern in New York City, where many residents face particularly high exposure rates to these dangerous pollutants (*see* JA73).[5]

To confront these issues, Local Law 154 amends the New York City Administrative Code to add a requirement that, with limited exceptions, "[n]o person shall permit the combustion of any substance that emits 25 kilograms or more of carbon dioxide per million British thermal units of energy" in newly constructed buildings. Admin. Code § 24-177.1(b), (c); *see also* Admin. Code § 28-506.1 (listing exceptions). Since the combustion of natural gas and fuel oil produces emissions exceeding this definitional threshold, this limit effectively prohibits the use of those fuels for cooking, heating, and hot water service in such buildings, and does so without regard to how much fossil fuel—or electricity—the appliances consume or how efficiently they consume it. The law is currently in effect for a significant subset of new construction and will be phased in to reach all new buildings by January 1, 2028 (A79). Admin. Code § 28-501.1. It does not affect existing buildings.

---

[4] *See* Gruenwald, Talor, Brady A. Seals, Luke D. Knibbs, and H. Dean Hosgood, III (2023), "Population Attributable Fraction of Gas Stoves and Childhood Asthma in the United States," *International Journal of Environmental Research and Public Health* 20, no. 1: 75, https://doi.org/10.3390/ijerph20010075.

[5] *Id.*

## C. The district court's dismissal of plaintiffs' complaint alleging that Local Law 154 is preempted by EPCA

Plaintiffs are trade associations and a union whose members work with fuel gas systems and appliances (Joint Appendix (JA) 16). They seek to permanently enjoin the City from enforcing Local Law 154, arguing that EPCA expressly preempts it (JA14-39).

The district court granted the City's motion to dismiss, analyzing the text of relevant EPCA provisions and concluding that Local Law 154 does not concern energy use or energy efficiency as EPCA defines those terms (JA80-95).

Recognizing that plaintiffs' argument was premised on the idea that Local Law 154 "sets fossil-fuel-powered appliances' maximum energy use to zero by prohibiting them from using any energy," the court began by considering the meaning of "energy use" under EPCA (JA87). It concluded that, under the statute, "energy use" is "a fixed value, determined using administratively prescribed testing measures ... that represents the amount of energy a product consumes under typical conditions" (JA88).

The court acknowledged that the Ninth Circuit had recently reached a different conclusion in *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024) (JA88). But the district

11

court observed that the Ninth Circuit had focused heavily on the fact that EPCA defines "energy use" as the quantity of energy consumed "at point of use," which that court interpreted to mean "the place where something is used," or the place where an end-user has installed a product (*id.* (citing *Cal. Rest. Ass'n*, 89 F.4th at 1101-02)). The district court explained that this reading was flawed because EPCA's explicit definition of "energy use" made clear that it referred to "a covered product's characteristics as manufactured" (JA89).

The district court found more persuasive the opinion of Judge Friedland, joined by ten colleagues, dissenting from the denial of rehearing en banc in *California Restaurant Association*, which explained why the panel's colloquial interpretation of "energy use" was mistaken. *See Cal. Rest. Ass'n*, 89 F.4th at 1120-26. The district court agreed with Judge Friedland's reasoning that the technical terms used in EPCA's regime for appliance energy conservation established Congress's focus on fixed measures of energy consumption by reference to products' design characteristics, explaining that the preemption clause did not "grant consumers an absolute right to use such products" (JA89-90).

With the statutory definition in mind, the district court held that Local Law 154 is unrelated to the state and local regulations of energy use or energy efficiency that Congress expressly preempted in EPCA

12

(JA90-91). The City's law does not set performance standards or "draw any distinction between products based on their energy efficiency or energy use as manufactured" (JA92). Instead, the court explained, it "regulates, indirectly, the type of fuel that a covered product may consume in certain settings, irrespective of that product's energy efficiency or use" (JA92-93).

## SUMMARY OF ARGUMENT

On de novo review, *Critcher v. L'Oreal USA, Inc.*, 959 F.3d 31, 34 (2d Cir. 2020), this Court should affirm the district court's thorough and well-reasoned ruling. EPCA preempts state regulations "concerning the energy efficiency [or] energy use … of … a covered product." 42 U.S.C. § 6297(c). Plaintiffs contend that Local Law 154 is a regulation "concerning" the "energy use" of covered products under EPCA. But they are mistaken because the City's law has no connection to products' "energy use," as EPCA defines that term.

EPCA's performance standards for the energy use and energy efficiency of appliances and Local Law 154's prohibition of gas and fuel oil combustion in new buildings operate in different regulatory spheres. EPCA's express definitions establish that the statute preempts only state regulations regarding the quantity of energy, from any source, that appliances subject to EPCA are designed to consume. And the broader

13

statutory structure and legislative history reinforce that Congress was concerned with making sure that manufacturers would not need to design their products to meet different performance targets imposed by different jurisdictions concerning their quantity of energy consumption.

Local Law 154 regulates on an entirely different axis. It bans particular fuel sources in a subset of local buildings, regardless of how much of that fuel a particular product would consume through its operation. It therefore does not require manufacturers to meet different performance standards for energy consumption—indeed, no change in energy use or efficiency would make appliances that burn fossil fuels permissible in new construction. Thus, the local law and EPCA are different legislative solutions to different problems. EPCA is designed to implement consistent appliance energy conservation standards to reduce the overall consumption of energy nationwide, while Local Law 154 focuses on curbing direct emissions of carbon dioxide and dangerous air pollutants locally. And it does so without regard to any product's tested measure of energy consumption.

In an effort to force a connection between these separate regulatory regimes, plaintiffs assert that the City's law actually sets a maximum energy use of zero for gas appliances because it prohibits their use. But this argument relies on plaintiffs' misreading of "energy use" in EPCA to

14

refer to the ability to operate a product that uses energy, when instead Congress defined that statutory term to refer to a characteristic of the product as designed. Giving the term the colloquial meaning plaintiffs propose would require setting aside established canons of statutory construction and rewriting the statute to fit plaintiffs' preferred goals. Plaintiffs' fail to identify any support for their reading in EPCA itself, and the limited precedent they rely on, the Ninth Circuit's decision in *California Restaurant Association*, is unpersuasive because it reflects the same core misunderstanding.

Local Law 154 prohibits fuel combustion in newly constructed buildings regardless of the quantity of a fuel-combusting product's energy consumption as designed. Given this agnosticism toward the subject matter that EPCA governs, Local Law 154 in no way concerns EPCA's preempted domain—and so is not preempted.

## ARGUMENT

## LOCAL LAW 154 IS OUTSIDE EPCA'S PREEMPTIVE REACH

When a federal statute contains an express preemption clause, courts must consider "the substance and scope of Congress'

15

displacement of state law[.]"[6] *Buono v. Tyco Fire Prods., LP*, 78 F.4th 490, 495 (2d Cir. 2023). "[T]he purpose of Congress is the ultimate touch-stone in every pre-emption case," *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485-86 (1996). And of course, the "plain wording" of an express preemption clause "necessarily contains the best evidence of Congress' preemptive intent." *Chamber of Com. of U.S. v. Whitting*, 563 U.S. 582, 594 (2011). After examining the text of a preemption provision, courts "move on, as need be, to the structure and purpose of the Act in which it occurs." *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995).

The preemption provision at issue here states, as relevant, that "effective on the effective date of an energy conservation standard … for

---

[6] Historically, courts have applied a presumption against preemption. *See Arizona v. United States*, 567 U.S. 387, 400 (2012); *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008). In 2016, however, the Supreme Court stated without elaboration that it was not "invok[ing] any presumption against preemption" where a statute contained an express preemption clause. *Puerto Rico v. Franklin Cal. Tax-Free Trust*, 579 U.S. 115, 125 (2016). The Court did not explain whether or why it was overruling its prior precedent, leading some jurists to question whether the presumption might still apply in at least some circumstances. *See Cal. Rest. Ass'n*, 89 F.4th at 1107 (O'Scannlain, concurring). But this Court has followed the example set in *Puerto Rico v. Franklin* and declined to apply an anti-preemption presumption when faced with an express preemption clause. *See Buono*, 78 F.4th at 495-96. In any event, both this Court and the Supreme Court have made clear that the key inquiry remains whether a state or local law falls within the scope of what Congress sought to preempt. *Puerto Rico*, 579 U.S. at 125, *Buono*, 78 F.4th at 495-96. And although a formal presumption may not apply, courts must still "construe the preempted domain narrowly in deference to state sovereignty." *Fed. L. Enf't Officer s Ass'n v. AG N.J.*, 93 F.4th 122 (3d Cir. 2024) (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

any covered product, no State regulation concerning the energy efficiency [or] energy use, … of such covered product shall be effective with respect to such product[.]" 42 U.S.C. § 6297(c). The relevant question here, then, is whether Local Law 154 "concern[s]" the "energy use" or "energy efficiency" of EPCA-covered products. As shown by the express statutory definitions of the relevant statutory terms, and confirmed by the broader statutory structure and relevant legislative history, Local Law 154 has no connection with or reference to the subject matter that EPCA preempts. Thus it is not preempted.

### A. EPCA preempts only state and local laws that concern covered products' energy consumption.

#### 1. The text of the preemption provision shows that it preempts only state regulations concerning covered products' energy consumption as designed.

The scope of the pertinent preemption clause here follows from an analysis of its core text. That text is defined in terms of the design-based statutory metrics by which federal energy conservation standards are set—standards that dictate the quantity of energy that covered products may be designed to consume. The clause therefore preempts state and local regulations that concern such performance metrics, absent a statutory exception. It does not guarantee an absolute right to use covered

17

products whose designs meet federal performance standards, free from state or local regulations that operate on entirely different regulatory axes—whether that be Local Law 154's regulation of systems, equipment, and appliances in new construction based on the type of fuel used or, to cite another example, New York City's law prohibiting operations of kerosene appliances due to fire risk.

Consider the key statutory text. The terms "energy use" and "energy efficiency" determine the subjects of EPCA preemption, and Congress expressly defined these terms for purposes of the statute. 42 U.S.C. § 6291(4), (5). When a statute "includes an explicit definition of a term, courts must follow that definition, even if it varies from a term's ordinary meaning." *Van Buren v. United States*, 593 U.S. 374, 387 (2021) (cleaned up); *see also Burgess v. United States*, 553 U.S. 124, 129-30 (2008); *accord United States v. Kelly*, 128 F. 4th 387, 418 (2d Cir. 2025) (applying ordinary meaning of a term "[a]bsent a definition in the statute"). Moreover, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of the Treasury*, 489 U.S. 803, 809 (1989).

EPCA's definitions of "energy use" and "energy efficiency" establish that Local Law 154 has no connection to the preempted subject

18

matter. "Energy use" is defined as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with" specified test procedures. 42 U.S.C. § 6291(4). And the "ratio of the useful output of services from a consumer product" to the product's energy consumption is its "energy efficiency." 42 U.S.C. § 6291(5). In short, "energy use" and "energy efficiency" are different ways of expressing a product's level of energy consumption. "Energy efficiency," generally measured per use cycle, is the appropriate metric for products that operate in discrete cycles and have an easily identifiable useful output of services. For products that run continuously, "energy use," measured per period of time, makes more sense. *See* 42 U.S.C. § 6295; *Cal. Rest. Ass'n*, 89 F.4th at 1122 (Friedland, J.).

Both of these types of measures are performance standards that must be determined according to test procedures formulated to produce results measuring the energy consumption "during a representative average use cycle or period of use." 42 U.S.C. § 6293(b)(3).  As both the district court and Judge Friedland and her dissenting colleagues in the Ninth Circuit recognized, this requirement signals that "energy use" and "energy efficiency" are fixed values based on the product's operation as designed (*see* JA88). *Cal. Rest. Ass'n*, 89 F.4th at 1122 (Friedland, J.). Those measures do not depend on whether an appliance is actually

19

installed and operated; instead, they are assessed in controlled labora-
tory conditions that represent the conditions in which a product is de-
signed to operate. In other words, once the required test procedures
have been performed and a product's energy use has been measured for
purposes of EPCA, that value remains the same whether the product is
sitting in a showroom, in transit on a delivery truck, or installed and
operating in a home or business.

Indeed, after the relevant tests have been performed, EPCA re-
quires manufacturers to place information about a product's energy
consumption on product labels before the products enter the market.
*See generally* 42 U.S.C. § 6294. The statute also authorizes DOE to re-
quire manufacturers to submit information about their products' energy
use, *see* 42 U.S.C. § 6296—something which, as the district court ob-
served, would be impossible if "energy use" depended on real-world
measurements of the energy a product actually consumed after it was
purchased and installed (*see* JA89). *See also Cal. Rest. Ass'n*, 89 F.4th
at 1123 (Friedland, J.) (same). Understanding "energy use" and "energy
efficiency" as fixed values measured before products are offered for sale
is the only way the provisions make sense.

These textual points show that when Congress preempted state
and local laws "concerning the energy efficiency [or] energy use" of

covered products, its intent was to prevent competing regulations on products' energy consumption as designed. Because Local Law 154 instead prohibits a particular fuel source and takes no view on how efficiently products consume energy, it is well outside EPCA's preemption clause.

> **2. The statutory structure confirms that Congress was focused on energy conservation standards for covered products.**

Plaintiffs' argument hinges entirely on their reading of the phrase "energy use." While this Court need go no further than EPCA's text to reject their argument, the term's function as describing one type of performance standard is confirmed by the broader statutory structure. Every component of EPCA's regime is focused on the amount of energy that covered products are designed to consume, demonstrating that this is the domain of state regulation that Congress sought to address with EPCA's preemption provision.

EPCA requires DOE to set energy conservation standards, whether measured in terms of "energy use," "energy efficiency," or "water use" for covered products. The statute thus envisions that DOE will set these standards for manufacturers to meet when designing their products, and manufacturers must then certify and label that their

21

products achieved the standards when tested. *See* 42 U.S.C. § 6294. EPCA also regulates manufacturer's representations about the energy consumption of their covered products. *See* 42 U.S.C. § 6296. Taken together, this framework makes plain that Congress was focused on energy use, energy efficiency, and water use of products as they were designed. Congress then used the same terms—"energy use," "energy efficiency," and "water use"—to define EPCA's scope of preemption. This symmetry makes clear that the preemption clause's purpose is to prevent states and localities from adopting regulations that operate within this domain and effectively create conflicting energy conservation standards that manufacturers must design their products to achieve.

The fact that preemption is not triggered with respect to a given product until DOE has established an energy conservation standard for that product further confirms this intended domain. Preemption does not come into play until there is a federal standard in place that a state or local regulation could conflict with or impede. This, too, demonstrates that Congress intended for EPCA to preempt state and local regulations concerning the subject the federal standards govern, which is a product's level of energy consumption as designed.

The title of EPCA's preemption provision drives the point home yet further. The provision is entitled "General rule of preemption for

22

energy conservation standards when Federal standard becomes effective for product." 42 U.S.C. § 6297(c). This title shows once again that Congress's focus was on state regulations that function as energy conservation standards. That makes sense, because the subject matter that the provision expressly preempts (energy use, energy efficiency, and water use) are three metrics that may define an energy conservation standard under the statute. 42 U.S.C. § 6291(6). The title of a statutory section commonly "suppl[ies] cues as to what Congress intended" in the provision in question. *See Rudisill v. McDonough*, 601 U.S. 294, 309 (2024) (cleaned up). And while plaintiffs protest that the title cannot supersede statutory text (App. Br. 29-30), our point is that the title supports the same result as the text: EPCA is designed to preempt state and local regulations that would compete with the energy conservation standards created by the federal government.

Together, these various statutory components only serve to underscore what the text of the preemption provision already makes clear: Congress was concerned about making sure manufacturers needed to comply with one uniform standard for the energy consumption of a given product, and intended to preempt state and local laws that would undermine this effort.

23

### 3. EPCA's legislative and regulatory history further support this limited scope.

Finally, while there is no ambiguity about the meaning of "energy use" in EPCA, the legislative history further demonstrates that Congress intended only to preempt state regulations that function as energy conservation standards. *See Lee v. Bankers Trust Co.*, 166 F.3d 540, 544 (2d Cir. 1999) (noting legislative history supporting statute's interpretation even where text was unambiguous).

The initial problem that Congress sought to address through EPCA was a potentially problematic reliance on foreign oil sources. H.R. Rep. 94-340, pt. V, at 20, 94 (1978); *see Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d at 1364. In the years that followed, Congress amended the statute to address the patchwork of conflicting state regulations that had emerged as states attempted to reduce that energy reliance. *See Air Conditioning & Refrigeration Inst.*, 410 F.3d at 499-500; S. Rep. No. 100-6 at 4. Congress recognized that this inconsistent regime "complicate[d] [manufacturers'] design, production, and marketing plans," and it resolved to replace "State standards" with ones that would apply at a federal level. S. Rep. No. 100-6 at 1, 4; *see also* H.R. Rep. No. 100-11 at 24 (describing EPCA as "preempting State energy efficiency standards"); 133 Cong. Rec. 3070-3072 (statements of

24

Senators recognizing difficulty of designing products to comply with separate and conflicting standards).

To accomplish this, Congress adopted the terms of a negotiated compromise between appliance manufacturers and consumer groups in which manufacturers agreed to abide by stringent federal energy consumption standards on the understanding that they would no longer be subject to this complicated framework of conflicting state standards. *See Air Conditioning & Refrigeration Inst.*, 410 F.3d at 499-500. And in retaining and amending the preemption provision that had already existed in the law, Congress "continue[d] the basic concept of preempting State energy efficiency standards." H.R. Rep. No. 100-11, at 23-24.

Despite this history, both plaintiffs and the federal government (App. Br. 31-32; U.S. Br. 24-28) contend that Congress's amendments to EPCA over time indicate an intent to broaden the scope of preemption. But that is not so. To begin with, "energy use" was defined in 1975 exactly as it is today, and that definition has never changed. Pub. L. No. 94-163, § 321(a)(4). And while the wording of the preemption provision has varied somewhat, it has always referenced "energy use." In the 1975 law, Congress "supersede[d]" any "energy efficiency standard or similar requirement with respect to energy efficiency or energy use of a covered

25

product" if there was a federal standard "applicable to such product." Pub. L. No. 94-163, § 327(a).[7]

Plaintiffs assert that the 1987 amendments then "deleted the term 'energy efficiency standard' and replaced it with 'energy conservation standard' throughout the statute," but declined to add that new phrase in the preemption provision (App. Br. 31-32). But this account does not fully capture what Congress did. The former phrase "energy efficiency standard" referred only to a "performance standard" "which prescribes a minimum level of energy efficiency for a covered product" determined in accordance with the relevant test procedures. Pub. L. No. 94-163, § 321(a)(6). As explained above, "energy conservation standard" means something broader, encompassing measures of both "energy use" and "energy efficiency," along with "water use," depending on which is appropriate for a particular product type. Congress's decision to list the three available metrics for an "energy conservation standard" in the preemption clause's operative text—under a heading using the term itself, where the trigger for preemption also uses that term—suggests no broader preemptive scope, as the committee report confirms.

---

[7] Notably, plaintiffs argue at length that "with respect to," "concerning," and "relating to" all mean the same thing, so they cannot suggest that the statute's original "with respect to" language conveyed a narrower preemptive scope (App. Br. 52-57).

26

**B. EPCA's preemption provision does not enshrine a right to use all appliances that are subject to energy conservation standards.**

Plaintiffs pointedly ignore the statutory definition of "energy use," going so far as to call it "a distraction" (App. Br. 18). But while they insist that "nothing turns" on the meaning of the term (App. Br. 17), their argument would require this Court to reject the meaning that Congress explicitly provided. Instead, they suggest that "energy use" should be read in a colloquial sense, such that any regulation barring or limiting operation of a covered product necessarily regulates energy use, because the product's operation uses energy. But the Supreme Court has instructed that courts "must follow" an explicit statutory definition of a term, "even if it varies from a term's ordinary meaning." *Van Buren*, 593 U.S. at 387; *see Burgess*, 553 U.S. at 130. This Court should reject plaintiffs' attempt to rewrite the definition Congress provided here.

**1. "Energy use" refers to a fixed value based on product design, not the ability to use a product.**

As explained above, "energy use" under EPCA means a product's level of energy consumption according to procedures that measure the quantity of energy the product uses as designed; it does not refer to the plain fact of the product's use.

This is where the Ninth Circuit erred in striking down the City of Berkeley's ordinance prohibiting natural gas infrastructure in new construction. *See Cal. Rest. Ass'n*, 89 F.4th 1094, 1101-03. While that court paid lip service to EPCA's definition of "energy use," it overlooked the significance of the fact that this is a fixed measure to be determined in accordance with designated test procedures. *Id.* at 1101. Instead, the court focused on the statute's directive that energy use be measured "at point of use," deciding to give that phrase its supposed "ordinary meaning," based on a nontechnical dictionary definition, as a "place where something is used." *Id.* at 1101. But this ignores the fact that "point of use" is a technical term that must be construed in a technical manner. *See Van Buren*, 593 U.S. at 388-89; *Corning Glass Works v. Brennan*, 417 U.S. 188, 201 (1974) ("Where Congress has used technical words or terms of art, it is proper to explain them by reference to the art or science to which they are appropriate." (cleaned up)).

As Judge Friedland detailed, "point of use" in the context of energy consumption has long been understood to distinguish a product's "site energy" from its "source" or "full-fuel-cycle" energy. *See Cal. Rest. Ass'n*, 89 F.4th at 1123-24; 76 Fed. Reg. 51281, 51282 (Aug. 18, 2011). "Site energy" is the energy a product consumes at a location to perform its function, such as heating or lighting, while "source energy" accounts for

the additional energy consumed to extract, generate, transmit, and distribute energy to a product. *See* David Santana Ortiz and Mark Allen Bernstein, RAND, *Measures of residential energy consumption and their relationships to DOE policy* xii-xiv, 6-7 (1999); *available at* https://www.rand.org/content/dam/rand/pubs/monograph_reports/2005/MR1105.0.pdf.

Congress has consistently recognized the distinction between site energy and source energy and has debated which one energy conservation standards should consider. But, as a group of Senators observed during these policy debates, "Congress and the President ... rejected [a source energy] approach in 1975" when adopting the first version of EPCA, which first defined energy use in terms of consumption at the point of use. *Id.*, *see* 144 Cong. Rec. S12706-07 (Oct. 20, 1998). And DOE itself defines "site energy" as "energy measured at the point of use." Federal Energy Management Program, U.S. Dep't of Energy, *Reporting Guidance for Federal Agency Annual Report on Energy Management* 6 (Sept. 2023), *available at* https://perma.cc/ZLF2-NEUD; *see also* U.S. Dep't of Energy, *Energy Intensity Indicators: Terminology and Definitions*, https://perma.cc/7782-P3XE.

The Ninth Circuit panel completely ignored the fact that "point of use" is a term of art, and instead relied on its colloquial meaning. *See*

29

*Cal. Rest. Ass'n*, 89 F.4th at 1101 ("[a]s a matter of ordinary meaning, 'point of use' means the 'place where something is used'" (citing Oxford English Dictionary Online (2022)). Plaintiffs do not even attempt to defend this reading of the term. Instead, they try to downplay the significance of the Ninth Circuit's error, insisting that the panel "understood [point of use] as just one of many statutory cues demonstrating that EPCA extends beyond the factory floor" (App. Br. 30, 34-35). But even a cursory look at the Ninth Circuit's opinion disproves that contention. The court spent more than two pages emphasizing that Congress had supposedly been concerned with energy use "where consumers *use* the products," resting its definition of "energy use" on that assumption. *Cal. Rest. Ass'n*, 89 F.4th at 1101-4. Plaintiffs conspicuously omit that fact when they observe that "point of use" was not mentioned on a subsequent page of the opinion (App. Br. 30).

And the misreading of "point of use" was a linchpin of the court's flawed analysis. The Ninth Circuit panel relied on EPCA's supposed reference to "the place where [appliances] are used" to make an immediate logical leap, declaring that "[r]ight off the bat, we know that EPCA is concerned with the end-user's ability to *use* installed covered products at their intended final destinations." *Id*. at 1101-02. In other words, the court thought that Congress intended EPCA to "ensure[] that States and

localities could not prevent consumers from using covered products in their homes, kitchens, and businesses." *Id.* at 1103. Plaintiffs, along with the United States appearing as amicus curiae, embrace this shift in focus, arguing that Congress was always concerned with ensuring that states could not remove particular products from the market (App. Br. 39-40; Brief for United States as Amicus Curiae ("U.S. Br.") 17-21).

But as Judge Friedland and her colleagues recognized in their dissent from the denial of rehearing en banc, that leap in logic is unsupported by EPCA's text. *See* 89 F.4th at 1121. Indeed, EPCA makes no reference whatsoever to consumers' general ability to purchase and use covered products. At most, it suggests that energy conservation standards themselves should not be set so stringently that they remove certain product characteristics from the market. Both plaintiffs and the Ninth Circuit panel have constructed this supposed right by breezing past the relevant statutory definitions and instead substituting colloquial meanings, ignoring EPCA's broader purpose and structure in the process.

It is thus unsurprising that plaintiffs run away from the Ninth Circuit's colloquial interpretation of point of use. And the federal government offers a tepid-at-best defense of the court's reading (U.S. Br. 14-15). In fact, as it obliquely acknowledges (U.S. Br. 2 n.1), it took the

opposite position before the Ninth Circuit, filing a brief in support of the City of Berkeley's petition for rehearing en banc. That brief cogently summarized the problems with the Ninth Circuit panel's reading of EPCA's preemption provision, explaining that nothing in EPCA "addresses whether and to what extent a covered product subject to a federal energy conservation standard must be able to be used by a consumer in various circumstances," and that "energy use" was instead defined to "give meaning to the 'energy conservation standards' that the Act empowers [DOE] to issue." *See* Ninth Circuit Docket No. 21-16278, Dkt. Entry 94. The United States does not attempt to square its prior advocacy with its current support of plaintiffs' arguments, other than acknowledging it has "reconsidered its position" (U.S. Br. 2 n.1).

2. **Nothing else in EPCA's text supports plaintiffs' broad view of its preemption provision.**

To support their fundamentally flawed reading of "energy use," plaintiffs, now supported by the federal government, search for some other indication that Congress was concerned with the ability of consumers and manufacturers to freely buy and sell appliances. But they come up empty.

32

First, plaintiffs assert that EPCA must preempt more than just energy conservation standards because Congress did not use that phrase in the text of the preemption provision (App. Br. 28-29). But this is merely an extension of their misreading of "energy use." EPCA makes clear that "energy use," "energy efficiency," and "water use" are metrics to measure products' designed-for energy and water consumption for purposes of setting an "energy conservation standard." *See* 42 U.S.C. § 6291(6). Thus, as already discussed, *see supra* at 26-26, 31, Congress simply broke "energy conservation standard" down into its component parts when defining the scope of preemption. At most, this drafting choice suggests that a state regulation need not be expressly framed as an energy conservation standard to be preempted; it may be enough that the regulation concerns one of the measures that define such a standard. But again, those measures focus on the products' fixed level of energy consumption as designed, not their ability to operate in a particular setting.

Along the same lines, plaintiffs' argument that limiting preemption to energy conservation standards would "replac[e] the operative statutory phrase with a phrase from the heading" (App. Br. 30) misses the point. The provision's title, describing it as a "rule of preemption for energy conservation standards," just confirms what the text already

33

says: EPCA preempts state and local laws concerning the fixed measures of energy consumption that are the subject of federal regulation.

Plaintiffs make a perfunctory argument that EPCA's test procedures "reinforce [Congress's] concern for what happens in the real world" and show that "Congress cared about actual use in homes and businesses" (App. Br. 40). This turns the point of the testing requirements on its head. EPCA requires test procedures that measure energy consumption in "a representative average use cycle or period of use," 42 U.S.C. § 6293(b)(3), precisely because it would be impractical to measure the energy that a product actually consumes as it operates in the place where it is installed.

Next, both plaintiffs and the federal government try unsuccessfully to glean a broader preemptive intent from EPCA's exceptions to preemption (App. Br. 39-41; U.S. Br. 18-21). But their strained reading of these provisions gets them nowhere, because "[e]xceptions to a general rule, while sometimes a helpful interpretive guide, do not in themselves delineate the scope of the rule." *Dan's City Used Cars, Inc. v. Pilkey*, 569 U.S. 251, 264 (2013). And in fact, the exceptions they point to actually reinforce the fact that EPCA is concerned only with the fixed characteristics of products, not a broad right to use them.

Plaintiffs first focus on the provisions set forth in § 6297(d), which allow states and localities to petition DOE to waive preemption and permit a regulation that would otherwise be preempted by the statute. If a state establishes "by a preponderance of the evidence that such State regulation is needed to meet unusual and compelling State or local energy or water interests," then DOE "shall ... prescribe such rule." 42 U.S.C. § 6297(d)(1)(B). Beyond that, DOE "may not prescribe a rule" under the waiver provision if it finds by a preponderance of the evidence the rule "will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis," or "that the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available" at the time. 42 U.S.C. § 6297(d)(3), (4). DOE can also delay approval of a state regulation if "additional time is necessary due to the substantial burdens of retooling, redesign, or redistribution needed to comply with the State regulation." 42 U.S.C. § 6297(d)(5)(A).

Plaintiffs emphasize that EPCA does not allow DOE to waive preemption if a state regulation is likely to lead to the "unavailability" of a covered product type. 42 U.S.C. § 6297(d)(4). In fact, EPCA has the

35

same requirement for federal energy conservation standards, stating that DOE may not prescribe a standard if it leads to that same unavailability. 42 U.S.C. § 6295(o)(4). By including a corresponding limitation on DOE's ability to grant waivers, Congress was simply making clear that DOE could not authorize states to prescribe standards that it could not put in place itself. In any event, both of these provisions merely reflect that Congress wanted to ensure that energy conservation standards themselves would not completely remove product characteristics from the market. That does not evince any intent to broaden EPCA's preemptive scope to reach laws that might affect a covered product's availability on an entirely different basis.

The waiver provision's stipulation that DOE cannot grant a waiver for a regulation that would "significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis," 42 U.S.C. § 6297(d)(3), also does not reflect any broader congressional intent to regulate products' use of energy after they are installed (App. Br. 39-40). Plaintiffs home in on the inclusion of "servicing," asserting that it is evidence of Congress's concern about more than just "what happened on the factory floor" (App. Br. 40).

But "servicing" is intimately tied to the way a product is designed and built. A competing energy conservation standard that forced

product redesign would also potentially affect component parts, manuals, and standard servicing and repair techniques for that appliance. Congress recognized that where the burdens caused by the need for such a redesign would be significant, DOE should not grant a waiver. This consideration only confirms that Congress's focus was ensuring against a patchwork of competing state and local regulations that would be untenable for appliance manufacturers, a problem it addressed by preventing DOE from freely granting waivers where state or local energy conservation regulations would cause significant burdens along those lines.

Plaintiffs' reference to the preemption provision's building code exception (App. Br. 36-39) is also unavailing. The exception allows regulations in state and local building codes that would otherwise be preempted to avoid preemption if they meet a list of seven statutory conditions. *See* 42 U.S.C. § 6297(f)(3); *Bldg. Indus. Ass'n v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1145 (9th Cir. 2012). Essentially, this exception allows states and localities to set building-level efficiency standards in their building codes and encourage builders to install appliances that are even more efficient than what is required federally—something that may "concern[]" the "energy use" or "energy efficiency" of covered appliances—so long as those rules meet certain requirements. The conditions include that builders must be able to "select[] items

37

whose combined energy efficiencies meet the objective," that no individual product is "require[d]" to meet an energy conservation standard more stringent than the federal one, and that if a building code implements a credit system for buildings, the credits must be granted without favoring particular products or methods of reducing energy consumption. *See* 42 U.S.C. § 6297(f)(3); *Bldg. Indus. Ass'n*, 683 F.3d at 1145-46.

Plaintiffs assert that the existence of the building code exception shows that the district court misunderstood the preemption provision; they posit that, under the court's view, regulations meeting the conditions for the exception would not be preempted in the first place, rendering the exception superfluous (App. Br. 37). But their characterization of the court's decision is wrong. It didn't say that EPCA preempts "just direct regulations of covered products" (id. at 36-37). Instead, it recognized that the use of the word "concerning" means that the preemption provision may reach indirect regulations that do not expressly dictate energy use or efficiency (see JA11-12). So, a state regulation might "concern[]" energy use or energy efficiency, triggering the preemption provision, but also fall within the conditions for application of the building code exception.

The state building code provisions at issue in *Building Industry Association* provide a useful illustration. Washington State's building code mandated an across-the-board reduction in buildings' energy consumption and allowed builders to earn credit toward that requirement if they installed certain appliances that were more energy efficient than the federal standards required. *Id.* at 1148-49. There was no question that this law, which essentially established economic incentives for buildings to install higher-efficiency products, "concern[ed]" energy use or energy efficiency for purposes of EPCA preemption. *Id.* at 1150-51. The question was whether the challenge law qualified for the building-code exception, which turned on whether the law's incentives constituted a "require[ment]" that a product have an energy efficiency exceeding the applicable federal energy conservation standard, and the Ninth Circuit held that they did not. *Id.* at 1151-55.

The criteria for the building code exception make clear that efforts like this to further encourage energy efficiency—though they might trigger the preemption provision on the theory that they "concern" energy use or energy efficiency—are not preempted so long as they meet specific requirements ensuring that builders retain some choice about which individual products to select. Contrary to plaintiffs' contention, then, there is no inconsistency between the building code exception and the

district court's construction of the preemption provision. And in fact, EPCA's inclusion of this exception demonstrates an intent to avoid limiting states and localities even in their efforts to further reduce energy consumption, so long as they do not do so in a way that unduly burdens product design and manufacturing at the national level.

Ultimately, plaintiffs are attempting to rewrite the relevant provisions of EPCA, eliminating the definitions provided and inserting a broad right of consumer use that is nowhere to be found in the text. The Ninth Circuit panel went along with this judicial revision. But Judge Friedland—joined by ten colleagues—rejected it in an opinion dissenting from the denial of rehearing en banc that makes far better sense of the statutory text, structure, and purpose. The district court here has done the same. And so should this Court.

### C. Local Law 154 does not "concern[]" "energy use" or "energy efficiency" because it prohibits gas appliances regardless of their energy consumption.

With the narrow preemptive scope of § 6297(c) established, this Court must then determine whether Local Law 154 is the kind of regulation that Congress sought to preempt. Because it does not rely on or regulate products' energy use or energy efficiency as defined by EPCA, it does not fall within the scope of EPCA's preemption provision.

EPCA preempts state regulations that "concern[]" the energy use or energy efficiency of covered products. 42 U.S.C. § 6297(c). Local Law 154 is agnostic as to the level of energy consumption of any appliance because it addresses a fundamentally different subject matter—the *type* of fuel that the appliance uses. For this reason, it does not "concern" the domain preempted by EPCA.

As the district court cogently explained (JA90-91), there is good reason to believe that "concerning" does not carry the breadth that plaintiffs believe it does. But this case does not turn on that question. The preemptive reach of the word "concerning" is, at most, no broader than that of the term "related to"—something plaintiffs do not dispute. And that term is not limitless; as the Supreme Court has explained, "if 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course." *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319 (2016) (cleaned up). Courts must therefore "reject uncritical literalism" in applying the term. *Id.* Instead, a state law is "related to" a federal statute if it "reach[es] any subject that has a connection with, or reference to, the topics the statute enumerates." *Coventry Health Care of Missouri, Inc. v. Nevils*, 581 U.S. 87, 96 (2017). This standard is met if the state law "acts immediately and exclusively upon" the federally regulated subject

41

matter, "the existence of [the subject] is essential to the law's operation," or the state law governs "a central matter" of the preempted domain. *Gobeille*, 577 U.S. at 319-20 (cleaned up).

Local Law 154 does none of those things. To be sure, prohibiting fuel combustion in certain buildings will mean that some covered products cannot be used in those buildings. But that is because of the type of fuel they require, not because of the quantity of energy that they consume.

Contrary to plaintiffs' contention (App. Br. 27, 51-52), this is far removed from the situation this Court addressed in *Metropolitan Taxicab Board of Trade v. City of New York*, 615 F.3d 152 (2d Cir. 2010). In that case, this Court, addressing a different part of EPCA and a different preemption provision, held that the City law in question was preempted because it relied on preempted subject matter. The City had issued rules regulating taxi lease caps, setting different caps for hybrid and non-hybrid vehicles. *Id.* at 155. The Court concluded that these rules were preempted by a separate EPCA provision that preempted regulations related to vehicle fuel economy standards because the rules directly referenced fuel economy standards and incorporated those standards into their operation. *Id.* at 156-58.

42

As the Court explained, "[t]he requirement that a taxi be a hybrid in order to qualify for the upwardly adjusted lease cap does nothing more than draw a distinction between vehicles with greater or lesser fuel-efficiency. The equivalency of the term 'hybrid' with 'greater fuel efficiency' for purposes of the new rules is self-evident." *Id.* at 157. Thus, far from being neutral as to the fuel economy of the vehicles they regulated, the rules necessarily relied on "fuel economy, and on nothing else, as the criterion for determining the applicable lease cap." *Id.* at 158.

Unlike those rules, Local Law 154 does not reference or incorporate the subject matter that the relevant EPCA provision here preempts. Far from making a product's energy use or efficiency as defined by EPCA "essential to the law's operation," Local Law 154 is agnostic as to those fixed measures. *See Cal. Div. of Labor Stds. Enforcement v. Dillingham*, 519 U.S. 316, 324-25 (1997). Plaintiffs' contention otherwise rests on their erroneous interpretation of "energy use" as conferring an absolute right to use a product.

After the enactment of Local Law 154, gas appliances remain subject to the same federal energy conservation standards that they were before. There is now simply a restriction on where those appliances can be used in New York City, on grounds entirely unrelated to their level of energy consumption as designed. And while plaintiffs contend that the

43

law affects "design and manufacturing choices" because manufacturers must now "design their appliances to use electricity, not gas" (App. Br. 18-19), nothing in Local Law 154 requires manufacturers to redesign their existing products to reduce energy use or increase energy efficiency, as a competing energy conservation standard might. If the law were to end up encouraging appliance manufacturers to develop and market additional products that run on a different fuel source, as plaintiffs posit, that would not alter the energy use or energy efficiency of their gas appliances in any way.

According to plaintiffs, Local Law 154 indirectly regulates EPCA's subject matter because it "effectively limits the maximum energy use for all gas appliances in new buildings in New York City to zero" (App. Br. 24). But applying the proper definition of "energy use" makes it clear that this is simply not what Local Law 154 does. As explained above, *see supra* at 21-23, "energy use" for purposes of EPCA is a fixed value measuring the amount of fossil fuel or electricity a product consumes as designed, obtained according to controlled test procedures that measure its energy consumption during a representative use cycle. Thus, restricting the ability to combust fuel is not simply "moving the regulations one step down the energy chain," as plaintiffs contend (App. Br. 27); it is regulating on an entirely different axis.

Ultimately, Local Law 154 prohibits access to particular fuel sources in new buildings, regardless of how efficiently products would use that fuel. It has nothing to say about the energy consumption levels of any given product, directly or indirectly. Instead, it prohibits the operation of gas appliances in a subset of buildings, and is completely neutral as to their statutorily defined energy use where they are permitted to operate.

As the district court noted (JA93), to accept plaintiffs' premise that prohibiting a fuel source actually sets a standard for appliances' maximum energy use would mean that a broad swath of longstanding health and safety regulations could also be at risk of preemption. For example, New York City prohibits the operation of kerosene heaters—not because they are inefficient, but because they create a potentially dangerous fire risk in a densely populated urban area. *See* N.Y.C. Fire Code § 313.3. For similar reasons, the City also prohibits all "oil-fired cooking appliances" and some gas-fired refrigerators, space heaters, and water heaters. *See* N.Y.C. Admin. Code §§ 27-2034, 27-2035(a); N.Y.C. Mechanical Code 917.1. And there are countless state and local regulations across the country restricting where appliances can be placed, when they can be used, and what safety measures must be in place—in other words, preventing products from using energy in a colloquial

45

sense, either in certain settings or altogether. Plaintiffs identify no meaningful limiting principle to explain why Local Law 154 would be subject to preemption but these other regulations would not. Instead, under plaintiffs' theory, any regulation that prevents a product from operating, regardless of the reason, sets that product's maximum energy use to zero, triggering preemption.

Plaintiffs attempt to wave this issue away, baldly asserting that "ordinary health and safety regulations" would not be affected (App. Br. 46-47). As supposed support, they cite the Supreme Court's opinion in *Dan's City Used Cars*, 569 U.S. 251, for the idea that regulations with a "tangential effect" on covered subject matter are not preempted (App. Br. 46). But they fail to show that the effect of these health and safety regulations would be any more "tangential" to products' energy use than Local Law 154 is. All of these regulations would prevent consumers from using the prohibited products, regardless of the products' tested energy consumption.

Moreover, *Dan's City* can't solve plaintiffs' problem because it did not establish a carveout from preemption for so-called tangential effects. Rather, it held that a state law was not preempted for reasons that similarly illustrate why Local Law 154 is not preempted by EPCA. The federal statute at issue in *Dan's City* preempted state laws "related to a

46

price, route, or service of any motor carrier … with respect to the transportation of property." 569 U.S. at 256. The Court held that this preemption clause did not reach a state-law claim regarding disposal of towed vehicles, which was "far removed from Congress's driving concern" of ensuring the "free flow of trade, traffic, and transportation of interstate commerce." *Id.* at 263. Abandoned-vehicle laws like the one being challenged in the case did not "hamper the operations of tow truckers," and therefore were "not the kind of burdensome state economic regulation Congress sought to preempt." *Id.* at 263-64. This analysis had nothing to do with whether the state-law claim's effect on the federal statute's subject matter was large or small. The question was not one of degree, but of kind: the state-law claim was not preempted because it addressed a different subject matter.

The same principle applies here. EPCA's text, construction, and history all make clear that Congress sought to preempt state and local regulations that would effectively set energy conservation standards that compete with federal ones. Local Law 154 does not reference or establish any energy conservation standard and takes no view about any product's designed-for level of energy consumption. The same is true of the City's regulations prohibiting various other appliances based on safety concerns. And plaintiffs provide no viable limiting principle to

47

explain why one law with no connection to energy use is preempted while the others are not. This Court should not embrace such a dangerous reading of EPCA's preemption provision, especially where statutory text, structure, and history all contradict it.

## CONCLUSION

This Court should affirm the district court's order.

Dated:  New York, New York
October 30, 2025

Respectfully submitted,

MURIEL GOODE-TRUFANT
*Corporation Counsel*
*of the City of New York*
Attorney for Appellee

By: _____

REBECCA L. VISGAITIS
Assistant Corporation Counsel

100 Church Street
New York, New York 10007
212-356-0858
rvisgait@law.nyc.gov

RICHARD DEARING
CLAUDE S. PLATTON
REBECCA L. VISGAITIS
  *of Counsel*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word, and according to that software, it contains 10,162 words, not including the table of contents, table of authorities, this certificate, and the cover.

_____
REBECCA L. VISGAITIS