# 25-977

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

ASSOCIATION OF CONTRACTING PLUMBERS OF THE CITY OF NEW YORK, INC.; PLUMBING-HEATING-COOLING CONTRACTORS— NATIONAL ASSOCIATION; PLUMBERS LOCAL UNION NO. 1, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA;

[*caption continued on inside cover*]

On Appeal from the United States District Court for the Southern District of New York

**BRIEF OF *AMICI CURIAE* NATIONAL LEAGUE OF CITIES AND THE NEW YORK CONFERENCE OF MAYORS IN SUPPORT OF DEFENDANT-APPELLEE**

Michael Burger (*counsel of record*)
Amy E. Turner
Vincent M. Nolette
  SABIN CENTER FOR CLIMATE CHANGE
  LAW COLUMBIA LAW SCHOOL
435 W. 116th St.
New York, NY 10027
(212) 854-2372
mburger@law.columbia.edu

DATED: November 6, 2025          *Counsel for Amici Curiae*

[*continued caption*]

NEW YORK STATE ENERGY COALITION, INC.; PLUMBING FOUNDATION
CITY OF NEW YORK, INC.; LICENSED PLUMBING ASSOCIATION OF NEW
YORK CITY, INC., D/B/A/ MASTER PLUMBERS COUNCIL OF THE CITY OF
NEW YORK; AND BUILDING INDUSTRY ASSOCIATION OF NEW YORK CITY,
INC.,

*Plaintiffs - Appellants*,

v.

CITY OF NEW YORK,

*Defendant-Appellee.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. Rule 26.1, *amici curiae* state that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...................................................... ii

TABLE OF CONTENTS .......................................................................... ii

TABLE OF AUTHORITIES .................................................................... iv

IDENTITIES AND INTERESTS OF *AMICI CURIAE* ........................................1

INTRODUCTION ................................................................................3

ARGUMENT .....................................................................................4

I.   Local Law 154 Reflects an Exercise of Traditional Local Police Power That Appellants' Expansive EPCA Reading Would Improperly Displace ......................4

A.   Local Law 154 is the Product of Traditional Police Authority Exercised by Local Governments Nationwide ...........................................................5

B.   Appellants' Reading of EPCA Would Produce Absurd and Unworkable Results....................................................................................12

II.   The History and Text of EPCA Demonstrates its Narrow Preemptive Reach ...............................................................................................14

A.   EPCA's Origins, Text and Context Illuminate its Purpose and Scope, Which are Unrelated to Most Local Government Regulation .........................................15

B.   Appellants' Misinterpretation of EPCA Preemption Runs Counter to the Federal Government's Longstanding Practices in Implementing EPCA.............18

III.    Federalism Principles Remain Central to Construing Express Preemption

Provisions of Federal Statutes.......................................................................20

CONCLUSION ..................................................................................................22

CERTIFICATE OF COMPLIANCE .................................................................24

CERTIFICATE OF SERVICE...........................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Assn. of Contracting Plumbers of City of New York, Inc. v. City of New York*, No. 23-CV-11292 (RA), 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025) ............. *passim*

*Assn. of Home Appliance Manufacturers v. City of New York*, 36 F. Supp. 3d 366, 372-373 (S.D.N.Y. 2014) ........................................................................5

*Buono v. Tyco Fire Products*, LP, 78 F.4th 490, 495-96 (2d Cir. 2023) .................16

*California Rest. Assn. v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024) .... *passim*

*Cuthill v. Blinken*, 990 F.3d 272, 281 (2d Cir. 2021) .............................................11

*Fed. L. Enf't Officers Assn. v. Atty. Gen. New Jersey*, 93 F.4th 122, 134 (3d Cir. 2024) ................................................................................................................16

*Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) .......................................................4

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ....................................................4, 17

*Molinari v. Bloomberg,* 564 F.3d 587, 590-591 (2d Cir. 2009) ...............................5

*Mulhern Gas Co., Inc. v. Mosley*, No. 1:23-CV-1267 (GTS/PJE), 2025 WL 2062194 (N.D.N.Y. July 23, 2025) ...................................................................11

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995).......................................................................................................16

*Nat. Resources Def. Council, Inc. v. Muszynski*, 268 F.3d 91, 98 (2d Cir. 2001)...11

*Natl. R.R. Passenger Corp. v. Su*, 41 F.4th 1147, 1152-1153 (9th Cir. 2022) ........16

**Statutes**

42 U.S.C. § 6201 ...................................................................................2

Beacon, N.Y., City Code, Art. V, All-Electric Buildings, §§ 106-30 to 106-35.......9

Cambridge, MA Code of Ordinances, chapter 8.67 ...............................10

Denver, Colo. Code Chap. 10, art. XIV.................................................10

Evanston, Ill., Ord. No. 1-O-25 (2025).......................................................9

Ithaca, N.Y., City Code, Art. VII, Establishment and Implementation of the Ithaca
  Energy Code Supplement, §§ 146-50 to 146-58 ................................9

Local Law No. 154 of 2021 ......................................................................2

Montgomery County Code, § 8-14D .......................................................10

N.Y. Mun. Home Rule Law § 10(1)(ii)(a)(12) .....................................5

N.Y. Mun. Home Rule Law art. 6 § 51 .................................................5

N.Y.C. Admin. Code § 28-506.1 ...............................................................2

Town of Ithaca, N.Y., Town Code, Ch. 144, Energy Code Supplement, §§ 144-1 to
  144-6 ......................................................................................................9

**Regulations**

42 U.S.C. § 6297(c) ................................................................................15

**Constitutional Provisions**

N.Y. Const. art. IX § 3(c).........................................................................5

N.Y. Const. art. IX, § 2(c)(10)................................................................5

U.S. Const. Amdt. X ................................................4

**Treatises**

6A McQuillin Mun. Corp. § 24:1 (3d ed.)................................5

8 McQuillin Mun. Corp. §§ 25:40 and 25:85 (3d ed.).....................12

**Other Authorities**

*About the National BPS Coalition*, INST. FOR MKT. TRANSFORMATION (last

accessed Oct. 23, 2025), https://nationalbpscoalition.org ...................10

Allison R. Crimmins et al., U.S. GLOB. CHANGE RSCH. PROGRAM, Fifth National

Climate Assessment (2023), https://rb.gy/qtarzq ...................7

Brady Anne Seals & Andee Krasner, HEALTH EFFECTS FROM GAS STOVE

POLLUTION, ROCKY MTN. INST., PHYSICIANS FOR SOC. RESPONSIBILITY, MOTHERS

OUT FRONT, AND SIERRA CLUB (2020),

https://www.publichealthlawcenter.org/sites/default/files/inline-files/PSR-

Report-Health-Effects-from-Gas-Stove-Pollution.pdf.........................8

*City Climate Policy*, CTR. FOR CLIMATE & ENERGY SOLUTIONS,

https://www.c2es.org/content/city-climate-policy/ ................................8

HEARING ON INTRO. 2317-2021-A BEFORE THE N.Y. CITY COUNCIL COMM. ON

ENV'T PROTECTION, Nov. 17, 2021 (Testimony of the Mayor's Office)..............6

James Burton, *2025 Building Policies Outlook: More and Smaller Cities Still*

*Passing Building Performance Standards*, INST. FOR MKT. TRANSFORMATION

(Mar. 20, 2025), https://imt.org/news/2025-building-policies-outlook-more-and-smaller-cities-still-passing-building-performance-standards/ ...............................9

NEW YORK CITY COUNCIL, ENV'T. PROTECTION COMMITTEE REPORT: OVERSIGHT – BUILDING ELECTRIFICATION (Nov. 17, 2021), available at: https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4966519&GUID=714 F1B3D-876F-4C4F-A1BC-A2849D60D55A&Options=ID .................................6

NEW YORK CITY COUNCIL, TRANSCRIPT OF THE MINUTES OF THE COMMITTEE ON ENVIRONMENTAL PROTECTION, at 22:10 to 22:15 (Nov. 17, 2021), https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4966519&GUID=714 F1B3D-876F-4C4F-A1BC-A2849D60D55A&Options=ID .................................6

NEW YORK CITY COUNCIL, TRANSCRIPT OF THE MINUTES OF THE COMMITTEE ON ENVIRONMENTAL PROTECTION, at 3:19 to 3:21 (Dec. 14, 2021), https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4966519&GUID=714 F1B3D-876F-4C4F-A1BC-A2849D60D55A&Options=ID .................................6

*Priority Climate Actions Plans for States, MSAs, Tribes, and Territories*, U.S. ENV'T PROTECTION AGENCY, https://www.epa.gov/inflation-reduction-act/priority-climate-action-plans-states-msas-tribes-and-territories .....................8

Richard Briffault, *Our Localism: Part I*, 90 COLUM. L. REV 1, 15 (1990) ...............4

S. Rep. No. 100-6 (1987) and H.R. Rep. No. 100-11, at 24 (1987) .......................14

*See* Jason Plautz & Niina H. Farah, *Berkeley plans to repeal first US gas ban*, E&E NEWS (Mar. 26, 2024), http://eenews.net/articles/berkeley-plans-to-repeal-first-us-gas-ban/ ................................................................................................17

## IDENTITIES AND INTERESTS OF *AMICI CURIAE*[1]

The National League of Cities (NLC), founded in 1924, is the oldest and largest organization representing U.S. municipal governments. NLC works to strengthen local leadership, influence federal policy, and drive innovative solutions. In partnership with forty-nine state municipal leagues, NLC serves as a national advocate for more than 19,000 cities, towns, and villages representing more than 218 million Americans. NLC's sustainability and resilience program serves as a resource hub for climate change mitigation and adaptation for cities.

The New York State Conference of Mayors and Municipal Officials (NYCOM), founded in 1910, is a not-for-profit voluntary membership association representing New York's cities and villages, including the City of New York. NYCOM's membership includes 61 of the State's 62 cities and 517 of the State's 532 villages, serving more than 12 million New Yorkers. NYCOM works as an advocate, educator, and resource for local governments and their officials, promoting effective municipal governance and addressing issues of critical importance to communities in every region of New York State. Through its work,

---

[1] All parties have consented to the filing of this amicus brief. Pursuant to Fed. R. App. P. 29(a)(4), *amici curiae* state that no party's counsel authored this brief in whole or in part, and no party or party's counsel contributed money intended to fund the preparation or submission of this brief. No person—other than the *amicus curiae* or their counsel—contributed money intended to fund the preparation or submission of this brief.

NYCOM advances policies and initiatives that foster effective, resilient, and sustainable local governments across the State.

*Amici*, who broadly represent the interests of local governments, large and small, across New York State and in every region of the country, rely on the proper interpretation of federal laws to inform their actions to protect the health, safety, and welfare of their residents. One of the ways local governments do this is by taking actions within their authority that reduce greenhouse gas (GHG) emissions, adapt to the impacts of climate change, and improve air quality. Emissions from buildings are significant contributors to GHG and local air pollution, and represent a sector of the economy with readily available technological interventions to mitigate sectoral emissions contributions. *Amici* are implicated by this Court's adjudication of the preemptive scope of the Energy Policy and Conservation Act of 1975 because they have an interest in ensuring that local governments can take actions to protect the health, safety, and welfare of their communities to the fullest extent. *See generally*, 42 U.S.C. §§ 6201 et seq. *Amici* also have an enduring interest in this case because it will broadly affect the autonomy of municipalities across New York, Connecticut and Vermont, with ripple effects across the country, and their relationship with higher levels of government within the U.S.'s federalist system.

*Amici* therefore submit this memorandum to respectfully urge the Court to uphold the District Court's order dismissing Appellants' lawsuit with prejudice. Doc. 51 (hereinafter "Op.").[2]

## INTRODUCTION

In 2021, New York City (the "City") enacted Local Law 154 (or the "Law"), a piece of legislation that sets indoor air emissions limits for fossil fuel combustion in most new building construction. Local Law No. 154 of 2021 (NYC); N.Y.C. Admin. Code § § 24-177.1; 28-506.1. The limits prohibit the burning of "any substance that emits 25 kilograms or more of carbon dioxide per million British thermal units of energy." N.Y.C. Admin. Code § 24-177.1(b). The U.S. District Court for the Southern District of New York (the "District Court") upheld the Law against a plumbing and building trade group's challenge, which was predicated on the theory that the Law was preempted by Section 6297(b) of the Energy Policy and Conservation Act ("EPCA"). *Assn. of Contracting Plumbers of City of New York, Inc. v. City of New York*, No. 23-CV-11292 (RA), 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025). There, the District Court held that the Law was a proper exercise of municipal authority beyond EPCA's preemptive purview. *Id*. at *6. On appeal now before the Second Circuit Court of Appeals, *Amici* support the City's position

---

[2] Entries on the District Court's docket are cited "Doc". The City's brief in this Court is cited "City Br.", and the Appellants' brief is cited "Appellants' Br."

3

because the contrary view would (1) erroneously and detrimentally constrain the scope of local police power; (2) unjustifiably expand the scope of EPCA preemption; and (3) cause significant uncertainty for local governments in policy areas beyond the limits on fossil fuel combustion created by the City's Local Law 154. The Court should affirm.

## ARGUMENT

## I.    Local Law 154 Reflects an Exercise of Traditional Local Police Power That Appellants' Expansive EPCA Reading Would Improperly Displace

Local governments, like *Amici's* members, are *loci* of substantial experimental and innovative policy development, wielding their long-established authority to support the health, safety, and well-being of their residents.[3] Appellants' interpretation of EPCA is a direct threat to local governments' ability to properly protect their residents in consideration of new and evolving risks to community welfare. Such an interpretation would represent an inappropriate expansion of federal preemption, and result in sweeping and absurd results both known and unknown, while eroding this country's long-standing balance between centralized federal authority and other levels of government.

---

[3] *See generally* Richard Briffault, *Our Localism: Part I*, 90 COLUM. L. REV 1, 15 (1990) (observing that "local governments have wielded substantial lawmaking power and undertaken important public initiatives.").

4

### A. Local Law 154 is the Product of Traditional Police Authority Exercised by Local Governments Nationwide

The police power (both state and local) is an essential component of the cooperative federalism system upon which the U.S. legal system rests. *See Gonzales v. Oregon*, 546 U.S. 243, 270 (2006). The Tenth Amendment of the U.S. Constitution reserved to the states, and to the people, all "powers not delegated to the United States by the Constitution, nor prohibited by it." U.S. Const. Amdt. X. It is fundamental to our system of government that certain areas of traditional state and local regulation, including those related to protecting public welfare, remain with the states so long as they are not preempted. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). As the level of government closest to the experiences of their community members, local governments are particularly well-positioned to assess and respond to risks to their communities, including negative impacts to residents' health, heightened potential for catastrophic incidents, and particular locational vulnerabilities.[4]

Cities in New York "are given broad power to enact local laws[.]" *Molinari v. Bloomberg,* 564 F.3d 587, 590-591 (2d Cir. 2009). The State "delegates certain [] such powers—e.g., legislative authority relating to local safety, health and well-being—to its municipalities through the state constitution, the Municipal Home Rule Law [("MHRL")] and the General Cities Law." *Assn. of Home Appliance*

---

[4] 6A McQuillin Mun. Corp. § 24:1 (3d ed.).

*Manufacturers v. City of New York*, 36 F. Supp. 3d 366, 372-373 (S.D.N.Y. 2014). New York State's constitution authorizes local governments to adopt laws relating to "the government, protection, order, conduct, safety, health and well-being of persons or property therein[,]" so long as they are not inconsistent with the constitution or general laws of the state. N.Y. Const. art. IX, § 2(c)(10). The MHRL provides a similar grant of power. N.Y. Mun. Home Rule Law § 10(1)(ii)(a)(12). These powers are required to be "construed liberally." N.Y. Const. art. IX § 3(c); N.Y. Mun. Home Rule Law art. 6 § 51.

Local Law 154 represents an exercise of the City's local police power, enacted to protect the health, safety, and welfare of New York City residents by lessening local air pollution and abating the impacts of global climate change by reducing GHG emissions from buildings.[5] New York City assessed its own circumstances and responded with a local law designed to "reduce [] greenhouse gas emissions . . . and

---

[5] In a hearing considering the legislation, Ben Furnas, the Director of the Mayor's Office of Climate and Sustainability at the time, stated that, "[t]he fossil fuels used to heat, cool, and power our buildings . . . emit a wide range of air pollutants that harm the health of New Yorkers, especially our most vulnerable." NEW YORK CITY COUNCIL, TRANSCRIPT OF THE MINUTES OF THE COMMITTEE ON ENVIRONMENTAL PROTECTION, at 22:10 to 22:15 (Nov. 17, 2021), https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4966519&GUID=714F1B3D-876F-4C4F-A1BC-A2849D60D55A&Options=ID. He continued that the law was enacted to "meet [New York City's] carbon-neutrality goals, improve air quality, and create a city that is cleaner and greener. HEARING ON INTRO. 2317-2021-A BEFORE THE N.Y. CITY COUNCIL COMM. ON ENV'T PROTECTION, Nov. 17, 2021 (Testimony of the Mayor's Office).

transition to a sustainable future."[6] In a report authored by the New York City Council's Environmental Protection Committee, the committee observed that to comply with New York City's mandate to reduce its emissions to 80% lower than 2005 levels by 2050, the task "falls largely on the City's over one million buildings, which is by far the largest source of local GHG emissions."[7] The Committee's report documents the significant risks posed by failing to mitigate GHG emissions, including increasing rates of sea level rise, increased frequency of extreme weather events, and rising temperatures, which the Committee observes already causes, and will continue to cause, damage to critical infrastructure and property.[8] Further, the report explains that these impacts are often inequitably distributed, with low-income and communities of color more likely to experience the effects of the climate crisis, such as extreme weather.[9]

---

[6] NEW YORK CITY COUNCIL, TRANSCRIPT OF THE MINUTES OF THE COMMITTEE ON ENVIRONMENTAL PROTECTION, at 3:19 to 3:21 (Dec. 14, 2021), https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4966519&GUID=714F1B3D-876F-4C4F-A1BC-A2849D60D55A&Options=ID.

[7] In 2014, New York City passed Local Law 66, which requires the city-wide emissions reductions that Local Law 154 was enacted to pursue. *See* NEW YORK CITY COUNCIL, ENV'T. PROTECTION COMMITTEE REPORT: OVERSIGHT – BUILDING ELECTRIFICATION (Nov. 17, 2021), available at: https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4966519&GUID=714F1B3D-876F-4C4F-A1BC-A2849D60D55A&Options=ID.

[8] *Id*. at 3.

[9] *Id*. at 4.

The same public health and safety considerations that provided the impetus for the Law's passage are issues prevalent and recurring in every jurisdiction across the country. Though local governments may take different approaches to addressing it, climate change threatens local health and safety with its increasingly devastating impacts, such as more frequent extreme heat events and heat-related deaths, dirtier air, damaged and disappearing coastlines, increased wildfire risk, higher prevalence of infectious diseases, and more frequent and severe storms.[10] The multiple and compounding effects of climate change can amplify cities' existing challenges, including social inequality, aging and deteriorating infrastructure, stressed ecosystems, and threats to the public health of vulnerable communities.[11] Indoor air pollution from fossil fuel combustion also poses a significant public health risk.[12] Appellants' interpretation of EPCA's preemptive reach threatens the very actions that permit local governments to protect residents from climate change and localized air pollution through interventions that mitigate GHG emissions and other harmful pollutants.

---

[10] *See* Allison R. Crimmins et al., U.S. GLOB. CHANGE RSCH. PROGRAM, Fifth National Climate Assessment 12-12 (2023), https://rb.gy/qtarzq.
[11] *Id.*
[12] *See, e.g.*, Brady Anne Seals & Andee Krasner, HEALTH EFFECTS FROM GAS STOVE POLLUTION, ROCKY MTN. INST., PHYSICIANS FOR SOC. RESPONSIBILITY, MOTHERS OUT FRONT, AND SIERRA CLUB (2020), https://www.publichealthlawcenter.org/sites/default/files/inline-files/PSR-Report-Health-Effects-from-Gas-Stove-Pollution.pdf.

In the last decade, mitigating the impacts of climate change has become a central exercise of local police power, essential to protecting residents' health and safety. New York City and hundreds of other local governments, of all sizes and in every region of the United States, including the cities of Ithaca and Beacon and town of Ithaca in New York State, have committed themselves to substantial reductions in GHG emissions in the coming decades, and many other communities adopted local emissions reduction goal.[13]

Local governments have increasingly relied on their home rule powers to regulate building energy efficiency and limit air emissions, exercising the federalist principle that municipalities may tailor protections to the needs of their communities. Across the country, municipalities are demonstrating leadership by adopting

---

[13] *See, e.g.*, *City Climate Policy*, CTR. FOR CLIMATE & ENERGY SOLUTIONS, https://www.c2es.org/content/city-climate-policy/ (explaining that more than 350 Climate Mayors in the U.S "have adopted the Paris Agreement goals for their cities . . . [m]ore than 400 U.S. cities are participating in the [electric vehicle] [p]urchasing [c]ollaborative, and more than 125 cities both large and small have pledged to transition their communities to 100% clean energy."); *Priority Climate Actions Plans for States, MSAs, Tribes, and Territories*, U.S. ENV'T PROTECTION AGENCY, https://www.epa.gov/inflation-reduction-act/priority-climate-action-plans-states-msas-tribes-and-territories (program under the IRA that provided grants to eighty-one of the nation's largest metropolitan areas to create climate action plans that include specific priority measures to reduce climate pollution in their communities). *See also,* Beacon, N.Y., City Code, Art. V, All-Electric Buildings, §§ 106-30 to 106-35 (adopted Mar. 20, 2023, by L.L. No. 1-2023); Ithaca, N.Y., City Code, Art. VII, Establishment and Implementation of the Ithaca Energy Code Supplement, §§ 146-50 to 146-58 (added May 5, 2021, by Ord. No. 2021-02); and Town of Ithaca, N.Y., Town Code, Ch. 144, Energy Code Supplement, §§ 144-1 to 144-6 (adopted June 14, 2021, by L.L. No. 5-2021).

ambitious standards to reduce greenhouse gas emissions and promote energy efficiency. For example, this year, the City of Evanston, Illinois, adopted the Healthy Building Ordinance, which requires commercial, multifamily, condominium, and municipal buildings to meet "two performance targets by 2050: zero on-site emissions and 100% renewable electricity procurement."[14] To achieve these ambitious goals, the ordinance provides multiple compliance pathways, allowing building owners and developers flexibility in selecting strategies and technologies that best fit their projects. This approach accommodates the diversity of building types, uses, and local contexts, ensuring that the regulation is practical, achievable, and effective in advancing meaningful emissions reductions.

Other localities are taking similar steps to address energy and climate goals. In Denver, Colorado, large commercial and multifamily buildings must meet a maximum site Energy Use Intensity based on building occupancy type by 2030, with some building owners selecting to install appliances more efficient than required under EPCA regulations.[15] Cambridge, Massachusetts, through its Building Energy Use Disclosure Ordinance, requires its largest buildings to reduce emissions while

---

[14] *See* Evanston, Ill., Ord. No. 1-O-25 (2025); *see also* James Burton, *2025 Building Policies Outlook: More and Smaller Cities Still Passing Building Performance Standards*, INST. FOR MKT. TRANSFORMATION (Mar. 20, 2025), https://imt.org/news/2025-building-policies-outlook-more-and-smaller-cities-still-passing-building-performance-standards/.
[15] Denver, Colo. Code Chap. 10, art. XIV.

also implementing measures to improve overall building efficiency and transparency.[16] Montgomery County, Maryland enacted the "Comprehensive Building Decarbonization" law, directing the County to issue building standards eliminating fossil fuel combustion in certain buildings.[17] Moreover, many other municipalities, including cities in Michigan, Minnesota, Vermont, Pennsylvania, Louisiana, and Ohio, have committed to developing similar building standards to "address public health, energy efficiency, housing affordability, and climate" objectives.[18]

These types of building regulations have long been a core exercise of local governments' police power, reflecting the principle that local governments may protect public health, safety, and welfare within their communities. While these standards may influence a building owner's choice of appliances "in the colloquial sense," as do many other state and local policies, from zoning regulations to safety standards, they fall outside the preemptive scope of EPCA, which was never intended to displace the traditional authority of states and municipalities to regulate energy use in buildings. *See, e.g., Mulhern Gas Co., Inc. v. Mosley*, No. 1:23-CV-1267 (GTS/PJE), 2025 WL 2062194 (N.D.N.Y. July 23, 2025) (finding that EPCA

---

[16] Cambridge, MA Code of Ordinances, chapter 8.67.
[17] Montgomery County Code, § 8-14D.
[18] *About the National BPS Coalition*, INST. FOR MKT. TRANSFORMATION (last accessed Oct. 23, 2025), https://nationalbpscoalition.org.

11

does not preempt state laws prohibiting fossil-fuel equipment and systems in new buildings in part because the "challenged statutes neither directly regulate energy use of any [EPCA] covered equipment, nor do they in any way concern the energy use of a covered product[.]").

## B. Appellants' Reading of EPCA Would Produce Absurd and Unworkable Results

A core principle of statutory interpretation is to avoid absurd results. *See Cuthill v. Blinken*, 990 F.3d 272, 281 (2d Cir. 2021); *Nat. Resources Def. Council, Inc. v. Muszynski*, 268 F.3d 91, 98 (2d Cir. 2001). As the District Court correctly recognized, Appellants' overbroad interpretation of EPCA would undermine state and local laws outside the narrow scope of energy-efficiency standards for covered appliances and could lead to absurd and untenable results. This outcome becomes particularly evident when applied to land use and zoning regulation.[19] Nearly every municipality in the U.S. enforces residential zoning that excludes commercial and industrial operations, which, as a result, prohibits the use of commercial or industrial appliances in those areas. Many of those appliances are regulated by standards promulgated under EPCA. Holding that EPCA preempts Local Law 154 would arguably render a fundamental zoning requirement, a cornerstone of local governments' spatial organization, preempted by a completely unrelated federal law.

---

[19] 8 McQuillin Mun. Corp. §§ 25:40 and 25:85 (3d ed.).

12

The District Court further observed that similar "absurd" results would arise if EPCA's preemptive scope extended to local restrictions on the use of certain types of fuels and appliances in different building types. Op. at 13. Under Appellants' reading of the statute, local laws prohibiting cooking appliances from using liquefied petroleum gas, the installation of kerosene or oil-fired stoves, and the installation of commercial cooking appliances in domestic dwelling units, among other restrictions, would be preempted. *Id*. These types of restrictions protect residents' health and safety, reduce fire risk, and preserve the character and habitability of residential neighborhoods, which are the very functions that zoning and building codes are designed to safeguard. Other routine exercises of police power, like energy safety and ventilation standards, would likewise be at risk. Although this Circuit does not recognize a presumption against preemption in express preemption cases, such as this one, the sweeping federal intrusion that Appellants' interpretation would authorize underscores why their reading is indefensible.

Judge Friedland's dissent from the Ninth Circuit's denial of rehearing *en banc* in *California Restaurant Association v. City of Berkeley* is instructive and highly relevant here. While dissenting opinions are not precedential, Judge Friedland provides persuasive reasoning on the limits of federal preemption in areas traditionally reserved for states and local governments. She observes that "[o]ur system of federalism requires much more respect for state and local autonomy."

13

*California Rest. Assn. v. City of Berkeley*, 89 F.4th 1094, 1120 (9th Cir. 2024) (Friedland, J., dissenting). He further notes that a finding of preemption would "needlessly block [New York City's] effort to combat change, along with the relevant laws passed by other local governments." *Id*. In this respect, deference to state and local lawmaking "permits innovation and experimentation [and] enables greater citizen involvement in democratic processes." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015) (quotation marks omitted) (quoting Bond v. United States, 564 U.S. 211, 221 (2011)). This deference is critically needed to allow municipalities in New York and across the county to exercise their police powers in regulating building energy efficiency and protecting public health.

## II.    The History and Text of EPCA Demonstrates its Narrow Preemptive Reach

The City's Brief provides a detailed analysis of EPCA and explicates why its preemptive scope was never intended to apply to Local Law 154. City Br. at 15-48. While we fully concur with the City's legal arguments, it is neither the intent nor purpose of appearing as *amici* to reiterate legal arguments already presented to this Court. Instead, this brief highlights the potentially unforeseen impacts on municipalities and presents the perspective of local governments by focusing on the implications for municipalities statewide, throughout the Second Circuit, and across

14

the country, if this Court were to hold that EPCA's preemption reaches Local Law 154.

### A. EPCA's Origins, Text and Context Illuminate its Purpose and Scope, Which are Unrelated to Most Local Government Regulation

As the District Court recognized, and as the City emphasizes, EPCA is a statute containing technical terms in its substantive provisions and its preemption authority is limited in scope. *See* Doc. 20 at 11-12, 16. EPCA is grounded in the federal government's commerce clause power and grew out of the Congressional desire to effectuate a consistent set of energy conservation standards on which appliance manufacturers could rely, irrespective of where their products were sold in the national markets.[20] EPCA is not designed to ensure market demand for any such appliances, but rather to create or guarantee a uniform set of design standards.[21] 42 U.S.C. § 6297(c).

To that end, EPCA preempts state and local regulations "concerning the…energy use" of "covered product[s]." *Id*. Before a manufacturer can distribute a product into the stream of commerce, it must perform standardized test procedures, certify to the U.S. Department of Energy ("DOE") the product complies with the applicable conservation standard, and display appropriate labeling. Op. at 7. As intimated by

---

[20] *See* S. Rep. No. 100-6 (1987) and H.R. Rep. No. 100-11, at 24 (1987).
[21] EPCA's preemption provision is triggered when a federal "energy conservation standard" comes into effect for "any covered appliance." 42 U.S.C. § 6297(c).

this pre-market responsibility, "energy use" refers to a fixed value, "determined using administratively prescribed testing procedures . . . that represents the amount of energy a product consumes under typical conditions." *Id*. It does not reflect the energy used during actual consumer operation. Op. at 10; *see also Cal. Restaurant Ass'n*, 89 F.4th at 1123-1124 (Friedland, J., dissenting) (supporting this interpretation in other industrial and regulatory contexts). Local Law 154 does not regulate the energy use of EPCA-covered appliances. Instead, it imposes emissions standards on fossil fuel combustion in new construction, a restriction entirely separate from the technical purpose addressed by EPCA.

Even without invoking the presumption against preemption, the scope of express preemption must be interpreted in context. *See Altria Group, Inc. v. Good*, 555 U.S. 70, 76 (2008); *Buono v. Tyco Fire Products*, LP, 78 F.4th 490, 495-96 (2d Cir. 2023). Courts interpreting the ambiguous term "concerning," treat it the same as the term "related to." *See Lamar, Archer & Cofrin, Llp v. Appling*, 584 U.S. 709, 716 (2018). The scope of preemption invoked by both terms is not limitless, and courts look to the objectives of the statute to give those terms shape. *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) ("If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes there would be no limits, as really, universally, relations stop nowhere.").

When operating in areas of traditional state and local regulation, courts should interpret vague preemption terms like "concerning" or "relating to" with federalism principles in mind, even in the absence of a presumption against preemption. *See, e.g., Fed. L. Enf't Officers Assn. v. Atty. Gen. New Jersey*, 93 F.4th 122, 134 (3d Cir. 2024) (citing *Medtronic,* 518 U.S. at 485 (1996)) (explaining that even where a Congressional enactment contains an express preemption clause, courts must "construe the preempted domain narrowly in deference to state sovereignty."); *Natl. R.R. Passenger Corp. v. Su*, 41 F.4th 1147, 1152-1153 (9th Cir. 2022) (quoting *Medtronic*, 518 U.S. at 484 (1996) and emphasizing consideration of "the surrounding statutory framework" and "Congress's stated purposes in enacting the statute" to "'identify the domain expressly pre-empted by that language.'").

Here, Local Law 154 is focused on reducing GHG emissions from buildings, not regulating the energy consumption of covered appliances. By restricting the use of fossil fuels in new construction and major renovations, the Law addresses indoor air quality, public health, and broad environmental harms. This regulation does not "concern" energy use in the narrow way Congress intended EPCA to preempt. Expanding the scope of EPCA preemption would prevent local governments from crafting local health and safety policies in areas reasonably understood to be safe from federal interference. As has been the case in the Ninth Circuit, such an interpretation would have an obvious chilling effect on municipal action to protect

17

community welfare.[22] Had Congress intended to reach so far beyond appliance energy conservation standards to control local fuel sources or infrastructure decisions, it would have done so expressly. *See Medtronic,* 518 U.S. at 485-486 (1996).

### B. Appellants' Misinterpretation of EPCA Preemption Runs Counter to the Federal Government's Longstanding Practices in Implementing EPCA.

Appellants' interpretation of EPCA runs counter to the DOE's own longstanding practices in implementing the statute. In its first amicus brief to the Ninth Circuit panel in *Cal. Restaurant Ass'n v. City of Berkeley*, the United States explained that DOE has for at least forty years considered EPCA preemption to apply only to "State regulations that are appliance *efficiency* standards," not requirements "that have only a peripheral effect on the energy efficiency of a covered product." *Cal. Restaurant Ass'n v. City of Berkeley*, Docket No. 21-16278 (9th Cir. 2021), Doc. BL-33, at 14. In its second amicus brief supporting rehearing *en banc*, the government emphasized that an expansion of EPCA preemption into the well-established police power of local governments to enact health and safety regulations would "likely inundate" the DOE with waiver requests, greatly burdening the agency's resources. *Id*., Doc. BL-

---

[22] *See* Jason Plautz & Niina H. Farah, *Berkeley plans to repeal first US gas ban*, E&E News (Mar. 26, 2024), http://eenews.net/articles/berkeley-plans-to-repeal-first-us-gas-ban/ (noting that, "[i]n the aftermath of the [*Berkeley*] decision, California cities including Santa Cruz and Encinitas rescinded their bans, while others like Sacramento elected not to enforce them.").

94, at 20.  If this Court were to expand EPCA preemption to reach Local Law 154, the DOE would be compelled to evaluate matters far beyond the narrow context of energy conservation standards Congress intended, including local emission limits, building electrification mandates, and allowable fuel sources. Such an expansion would force the agency to operate without a clear regulatory or technical framework, creating uncertainty about how compliance should be measured and inviting disputes with local governments that have enacted these laws. *Id*. at 20-21. This misinterpretation would destabilize the "long-standing understanding" shared by the DOE, state and local governments, and courts, undermining the balance that has allowed both federal and local authorities to fulfill their respective roles. *Id*. at 22.

In its latest brief before this Court, the United States has departed from its earlier view that the Ninth Circuit's interpretation of EPCA preemption was "likely to put enormous strain on" the DOE and would draw it into "needless disputes with States and localities [while] the harms targeted by [their] regulations would continue unchecked." *See Cal. Restaurant Ass'n*, Docket No. 21-16278 (9th Cir. 2021), Doc. BL-94, at 20. That change in position does not alter the practical consequences for local governments. If this Court reverses, a municipality considering an ordinance subject to DOE waiver review would face significant disincentivizes. Local governments would need to expend resources crafting policies to meet waiver criteria, while still risking outright rejection. Given potential delays in processing

many such waiver requests, urgent local health and welfare needs could remain unaddressed. Facing this uncertainty, many local governments may reasonably abandon these efforts or redirect their already limited resources toward initiatives with a higher likelihood of success and faster implementation, to the detriment of residents' well-being.

Rather than creating a coordinated federal-state-local regulatory framework, this interpretation would produce a regulatory gap by undermining local governments' ability to respond to critical health and welfare needs. We respectfully urge this Court to recognize that local governments are the level of government with both the authority and expertise to fill that gap, and that EPCA does not preclude them from doing so.

### III.    Federalism Principles Remain Central to Construing Express Preemption Provisions of Federal Statutes

Again, we respectfully urge this Court to interpret the preemptive scope of a federal statute with careful attention to the principles of federalism. Accounting for Congress's intended balance is critical both to *Amici's* local government members, who operate fully within the constraints of federal and state law, and to the efficient and coordinated operation of law across all levels of government.

The District Court's opinion embodies the principles of federalism by creating clear cut boundary lines for local authority over regulations that concern energy use,

in line with the statute's text, history, and structure. In contrast, the Ninth Circuit panel's opinion in *California Restaurant Association v. City of Berkeley* lacks limiting principles, which has produced legal and regulatory confusion across the region. For example, while the panel's decision and Judge Baker's concurrence suggest that the decision "doesn't touch on whether [Berkeley] has any obligation to expand the availability of a utility's delivery of gas to meters[,]" they simultaneously conclude that an ordinance restricting gas infrastructure is preempted. This language does not clearly articulate the limits of EPCA preemption, leaving local governments uncertain about what actions might be subject to EPCA litigation.

Here, the District Court provides certainty by grounding its opinion in the federalist framework that is essential to balancing governmental centralization and the responsiveness of local governance in three ways. First, the court recognizes New York localities' ability to regulate certain types of fuels and appliances in common zoning districts as "integral to municipal construction and fire codes." Op. at 13-14. Second, the District Court distinguishes regulations that focus on performance standards of covered products from restrictions that limit fuel emissions in building settings. *Id.* Local Law 154 does not "have a connection with EPCA's subject matter" because it does not regulate the performance standards of a covered product. *Id.* The District Court properly differentiates the Law as a common exercise of local authority to protect the health and safety of local residents, placing it wholly

21

beyond EPCA's reach. Third, the District Court asserts that EPCA preemption applies to covered products at the time of manufacture. The City has not banned federally authorized products "from using *any* energy[,]" but rather regulates certain products' use within local buildings. Appellants' Br. at 1. Clarifying the limits of EPCA preemption ensures that local governments understand the types of regulations they may enact to manage energy systems, including local natural gas infrastructure, without conflicting with federal law.

This Court's decision will have far-reaching consequences both for local governments seeking to reduce building emissions and how courts will interpret the scope of federal preemption. Affirming the decision below would affirm the authority of municipalities to implement ordinances like Local Law 154, and further, would empower those local governments outside of the Ninth Circuit, which may have been chilled by its decision, to renew their pursuit of policy interventions that protect and improve their residents' quality of life and defend their communities against worsening climate impacts and the public health risks posed by local air pollution.

## CONCLUSION

For the reasons above, and for the reasons set forth more fully in the City's Brief, the Court should affirm the District Court's order upholding Local Law 154

as a proper exercise of local authority that is beyond the preemptive scope of EPCA.

Respectfully Submitted,

/s/ Michael Burger
MICHAEL BURGER (*counsel of record*)
AMY E. TURNER
VINCENT M. NOLETTE
SABIN CENTER FOR CLIMATE
    CHANGE LAW
435 West 116th Street
New York, NY 10027

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 29.1(c) because it contains 5,106 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-pointfont, a proportionally spaced typeface.

/s/ Michael Burger
MICHAEL BURGER

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of November 2025, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court of the United States Court of Appeals for the Second Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

/s/ Michael Burger
MICHAEL BURGER