# 25-977

## United States Court of Appeals
*for the*
## Second Circuit

ASSOCIATION OF CONTRACTING PLUMBERS OF THE CITY OF NEW YORK, INC.; PLUMBING-HEATING-COOLING CONTRACTORS— NATIONAL ASSOCIATION; PLUMBERS LOCAL UNION NO. 1, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA; NEW YORK STATE ENERGY COALITION, INC.; PLUMBING FOUNDATION CITY OF NEW YORK, INC.; LICENSED PLUMBING ASSOCIATION OF NEW YORK CITY, INC., D/B/A MASTER PLUMBERS COUNCIL OF THE CITY OF NEW YORK; and BUILDING INDUSTRY ASSOCIATION OF NEW YORK CITY, INC.,

*Plaintiffs-Appellants*,

-versus-

CITY OF NEW YORK,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Southern District of New York, No. 1:23-cv-11292,
Hon. Ronnie Abrams, District Judge

## BRIEF OF AMICUS CURIAE WE ACT FOR ENVIRONMENTAL JUSTICE IN SUPPORT OF DEFENDANT-APPELLEE

Dror Ladin
Meagan Burton
EARTHJUSTICE
48 Wall Street, 15th Floor
New York, NY 10005
(917) 410-8701
dladin@earthjustice.org
mburton@earthjustice.org

*Attorneys for Amicus Curiae*

### RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *Amicus Curiae* WE ACT for Environmental Justice is a nonprofit 501(c)(3) corporation incorporated in New York State. It does not have a parent corporation, and it does not have any publicly traded stock.

Dated: November 6, 2025    /s/ Dror Ladin    
              Dror Ladin

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................II

TABLE OF AUTHORITIES...............................................III

INTEREST OF AMICUS CURIAE ......................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................2

ARGUMENT ..............................................................4

    I.    Local Law 154 Concerns Health and Welfare, Not the Energy
        Use of Covered Appliances. .................................4

        A.    Local Law 154 addresses the health and safety effects of indoor
            fossil fuel combustion. .................................4

        B.    Local Law 154 addresses the urgent need to reduce carbon
            emissions. ...............................................9

        C.    Local Law 154 does not regulate "energy use" within the
            meaning of EPCA. ....................................11

    II.    Appellants' Reading of EPCA's Preemption Clause Produces
        Absurd and Dangerous Results. ...........................14

CONCLUSION ...........................................................20

CERTIFICATE OF COMPLIANCE ......................................21

CERTIFICATE OF SERVICE ...........................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cal. Rest. Ass'n v. City of Berkeley*,
    89 F.4th 1094 (9th Cir. 2024) ..................................................11, 13

*Dan's City Used Cars, Inc. v. Pelkey*,
    569 U.S. 251 (2013)..................................................................15

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*,
    508 F. Supp. 2d 295 (D. Vt. 2007) ...........................................15

*Huron Portland Cement Co. v. City of Detroit*,
    362 U.S. 440 (1960)....................................................................3

*Massachusetts v. EPA.*,
    549 U.S. 497 (2007)....................................................................9

*Metro. Taxicab Bd. of Trade v. City of New York*,
    615 F.3d 152 (2d Cir. 2010) ................................................12, 13

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
    514 U.S. 645 (1995)..................................................................15

*In re Nine W. LBO Sec. Litig.*,
    87 F.4th 130 (2d Cir. 2023) .......................................................20

*Queenside Hills Realty Co., Inc. v. Saxl*,
    328 U.S. 80 (1946)......................................................................3

*W. Virginia v. EPA.*,
    597 U.S. 697 (2022)..................................................................10

**Statutes**

49 U.S.C. § 32919(a) ..................................................................12

Energy Policy and Conservation Act,

42 U.S.C. § 6292(a)(9).............................................................16

42 U.S.C. § 6313(a)(4)(D) .......................................................18

N.Y.C. Admin. Code § 27-4253 ...............................................16

N.Y.C. Admin. Code § 313-01(c) .............................................16

N.Y.C. Loc. L. No. 43 .........................................................17, 18

**Regulations**

10 C.F.R. pt. 430, subpt. B, app. G at 1.4.4 ............................16

62 Fed. Reg. 38652 (July 18, 1997)........................................5–6

71 Fed. Reg. 61144 (Oct. 17, 2006)........................................5–6

72 Fed. Reg. 20586 (Apr. 25, 2007) ..........................................6

75 Fed. Reg. 6474 (Feb. 9, 2010) ..............................................6

76 Fed. Reg. 54294 (Aug. 31, 2011)...........................................5

86 Fed. Reg. 66403 (Nov. 23, 2021)..........................................16

**Other Authorities**

Am. Pub. Health Ass'n, *Gas Stove Emissions Are a Public Health
    Concern* (Nov. 8, 2022), https://www.apha.org/Policies-and-
    Advocacy/Public-Health-Policy-Statements/Policy-
    Database/2023/01/18/Gas-Stove-Emissions......................8

Brady A. Seals & Andee Krasner, RMI, Health Effects from Gas
    Stove Pollution (2020), https://rmi.org/insight/gas-stoves-
    pollution-health/..................................................................7

EPA, Integrated Science Assessment for Carbon Monoxide (2010),
    https://www.epa.gov/isa/integrated-science-assessment-isa-carbon-
    monoxide.............................................................................6

EPA, Nitrogen Oxides EPA-600/1-77-013 (1977),
    https://nepis.epa.gov/Exe/ZyPDF.cgi/2000XWPA.PDF?Dockey=2
    000XWPA.PDF .....................................................................5

Gary Adamkiewicz et al., *Moving Environmental Justice Indoors: Understanding Structural Influences on Residential Exposure Patterns in Low-Income Communities*, 101 Am. J. Pub. Health S238 (2011), https://doi.org/10.2105/AJPH.2011.300119 .................................7

Intergovernmental Panel on Climate Change, Sixth Assessment Report, The Physical Science Basis: Headline Statements (2021) ......................9

Lisa K. Baxter et al., *Predictors of Concentrations of Nitrogen Dioxide, Fine Particulate Matter, and Particle Constituents Inside of Lower Socioeconomic Status Urban Homes*, 17 J. Exposure Sci. & Env't Epidemiology 433 (2007), https://doi.org/10.1016/j.atmosenv.2007.04.027 ..................................................8

Nat'l Ctr. for Healthy Hous., *Studying the Optimal Ventilation for Environmental Indoor Air Quality* (Apr. 2022), https://nchh.org/resource-library/report_studying-the-optimal-ventilation-for-environmental-indoor-air-quality.pdf ...........................................8

Physicians for Soc. Resp., WE ACT, & Sierra Club, The Outdoor Pollution Is Coming from Inside the House: National Building Pollution Report 11–12 (2023), https://weact.org/wp-content/uploads/2023/10/AppliancePollution_Report_FINAL.pdf ...................8

Robert D. McFadden, *Fire Kills 4 and Burns 2 in a Home in Brooklyn*, N.Y. Times (Dec. 28, 1990) ...............................................................16

The City of New York Office of the Mayor, *Mayor de Blasio and DEP Announce that All 5,300 Buildings Have Discontinued Use of Most Polluting Heating Oil, Leading to Significantly Cleaner Air* (Feb. 9, 2016), https://a860-gpp.nyc.gov/concern/nyc_government_publications/vx021h521?locale=en ....................................................................................................................18

Vic Hasselblad et al., *Synthesis of Environmental Evidence: Nitrogen Dioxide Epidemiology Studies*, 42 J. Air & Waste Mgmt. Ass'n 662 (1992), https://doi.org/10.1080/10473289.1992.10467018 ..........................7

WE ACT, Out of Gas, In with Justice (2023), https://weact.org/wp-content/uploads/2023/02/Out-of-Gas-Report-FINAL.pdf ................................5, 9

Weiwei Lin et al., *Meta-Analysis of the Effects of Indoor Nitrogen Dioxide and Gas Cooking on Asthma and Wheeze in Children*, 42 Int'l J. Epidemiology 1724 (2013), https://doi.org/10.1093/ije/dyt150 ........................................................................7

## INTEREST OF AMICUS CURIAE[1]

WE ACT for Environmental Justice ("WE ACT") files this brief in support of Appellee the City of New York ("the City") pursuant to Federal Rule of Appellate Procedure 29(a)(2).

WE ACT is a New York City membership organization whose mission is to build healthy environments for its members and the communities they represent. Since its formation in Harlem in 1988 as the first people-of-color-led environmental justice organization in New York State, WE ACT has been building healthy communities by ensuring that people of color and low-income residents participate meaningfully in the creation of sound and fair environmental policies.

For the past thirty-five years, WE ACT has sought to address health disparities caused by environmental factors, including higher burdens from climate change and other impacts of pollution from fossil fuels, such as indoor air quality. WE ACT's work includes organizing, research, public education, advocacy, and design of legal reforms. WE ACT's integrated advocacy has been instrumental in enacting reforms to improve New Yorkers' air quality. For example, WE ACT

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E) and Local Rule 29.1(b), Amicus Curiae state: (1) no party's counsel authored the brief in whole or in part; (2) no party and no party's counsel contributed money that was intended to fund preparation or submission of this brief; and (3) no person contributed money that was intended to fund preparation or submission of this brief. All parties have consented to the filing of this brief.

1

followed its production of a report on pediatric asthma disparities with a lead role in drafting the Asthma-Free Housing Act in New York City, which the City Council passed in December 2017. In 2021, WE ACT launched a pilot program and published a report, *Out of Gas, In with Justice*, to demonstrate the feasibility and benefits of transitioning from fossil fuels to renewable energy in affordable housing. WE ACT has a direct interest in Local Law 154 because its membership comprises low-income tenants who depend on local regulation to control how much indoor pollution they are subjected to.

## INTRODUCTION AND SUMMARY OF ARGUMENT

There is broad medical and scientific consensus that indoor combustion of fossil fuels inside of our homes, schools, and workplaces is dangerous. Indoor fossil fuel combustion emits numerous air pollutants that the government has determined carry significant health risks, particularly for vulnerable New Yorkers. In addition to producing indoor air pollution, the fossil fuels used for New York City's buildings play a disproportionate role in accelerating the dangers climate change poses for New Yorkers, because buildings constitute the City's largest single source of greenhouse gas emissions. New York City has responded to the twin threats posed by indoor fossil fuel combustion by banning this harmful practice in most new buildings.

2

The Supreme Court has recognized time and again that health and welfare laws concerning pollution and safety are traditionally matters of local control. *See e.g., Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442 (1960) ("Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power."); *Queenside Hills Realty Co., Inc. v. Saxl*, 328 U.S. 80, 82–83 (1946) ("Protection of the safety of persons is one of the traditional uses of the police power of the State.").

Appellants nonetheless maintain that the City lacks any authority to restrict the emissions of appliances within its limits, because in their view the Energy Policy and Conservation Act ("EPCA")—a federal law that does not address emissions—preempts any regulation that prevents any covered appliance from operating for any reason. According to their theory, EPCA guarantees the unrestricted use of all appliances covered by a federal energy conservation standard—from commercial boilers to industrial fans to walk-in freezers. This argument rests on an astonishing premise: The promulgation of a federal energy conservation standard invalidates all local health, safety, zoning, and noise restrictions that would otherwise prohibit an appliance's use—even if such restrictions have nothing to do with an appliance's energy efficiency.

3

Appellants' theory is both radical and wrong. EPCA, a federal law that concerns neither pollution nor safety, does not purport to displace local health and welfare authority. At every turn, its text, structure, and history convey that Congress intended to preempt only state and local laws that address appliance energy and water conservation. EPCA therefore does not preempt Local Law 154, which addresses the health, safety, and environmental impacts of indoor fossil fuel combustion. Appellants' contrary interpretation of EPCA produces absurd results that would significantly diminish the traditional health and safety authority that allows cities to protect their residents. The district court was correct to reject it.

## ARGUMENT

### I. Local Law 154 Concerns Health and Welfare, Not the Energy Use of Covered Appliances.

#### A. Local Law 154 addresses the health and safety effects of indoor fossil fuel combustion.

As the record confirms, Local Law 154 is concerned with the public health impact of fossil fuel combustion on New Yorkers. The law arises from the City's recognition that "[t]he fossil fuels used to heat, cool, and power our buildings . . . emit a wide range of air pollutants that harm the health of New Yorkers, especially our most vulnerable. Joint Appendix ("JA") 41. Indoor fossil fuel combustion can lead to a range of serious negative health outcomes, including the development and exacerbation of lung diseases, such as asthma and chronic obstructive pulmonary

4

disease, cardiovascular disease, cognitive deficits, cancer, and death. Government regulations, peer-reviewed scientific literature, the nation's leading public health bodies, and local experts all support the urgency of reducing air pollution inside buildings. "Robust research exists on the health impacts of gas stoves at the national level," JA43, and that the City's law is directly responsive to this research.

Research demonstrates that methane gas combustion releases harmful pollution including nitrogen oxides (NOx, which collectively describes gases including nitric oxide (NO) and nitrogen dioxide ($NO_2$)), fine particulate matter ($PM_{2.5}$), and carbon monoxide (CO).[2] As the U.S. Environmental Protection Agency ("EPA") explained nearly half a century ago, nitrogen oxide pollution is "an inherent consequence of fossil fuel combustion."[3] Carbon monoxide "is formed primarily by the incomplete combustion of carbon-containing fuels." 76 Fed. Reg. 54294, 54297 (Aug. 31, 2011). $PM_{2.5}$, or fine particulate matter, refers to inhalable particles with diameters that are 2.5 micrometers and smaller and is mainly produced by "combustion processes and by atmospheric reactions of

---

[2] *See, e.g.*, WE ACT, Out of Gas, In with Justice 8 (2023), https://weact.org/wp-content/uploads/2023/02/Out-of-Gas-Report-FINAL.pdf [hereinafter Out of Gas, In with Justice].
[3] EPA, Nitrogen Oxides EPA-600/1-77-013 at 1-1 (1977), https://nepis.epa.gov/Exe/ZyPDF.cgi/2000XWPA.PDF?Dockey=2000XWPA.PDF.

various gaseous pollutants." 62 Fed. Reg. 38652, 38654 n.5 & n.6 (July 18, 1997); 71 Fed. Reg. 61144, 61146 (Oct. 17, 2006).

These pollutants pose serious risks to human health. EPA has determined that even short-term $NO_2$ exposure can cause respiratory health effects, such as impaired lung function, respiratory symptoms, inflammation of the airway, and asthma exacerbations requiring hospitalization. 75 Fed. Reg. 6474, 6479–80 (Feb. 9, 2010). In 2010, EPA concluded that short-term CO exposure can cause cardiovascular morbidity and mortality, such as heart attack, congestive heart failure, and ischemic heart disease.[4] Elevated $PM_{2.5}$ levels have been linked to premature mortality; heart attacks, worsening of chronic heart failure, and sudden cardiac death; acute and chronic decreases in lung function; respiratory infections and emergency department visits, hospitalizations, and deaths; and development and exacerbation of asthma. *See* 72 Fed. Reg. 20586, 20586–87 (Apr. 25, 2007).

In the specific context of indoor fossil fuel combustion, research has increasingly shown a link to negative human health effects, including higher rates of respiratory and cardiovascular illnesses, childhood asthma, as well as reduced lung function and premature death. As far back as 1992, studies found that children exposed to higher levels of indoor $NO_2$—at an increment "comparable to the

---

[4] EPA, Integrated Science Assessment for Carbon Monoxide (CO) 2-5–2-6 (2010), https://www.epa.gov/isa/integrated-science-assessment-isa-carbon-monoxide.

6

increase resulting from exposure to a gas stove"— had an elevated risk of respiratory illness.[5] More recently, a 2013 meta-analysis of 41 studies spanning 36 years of research demonstrated that children living in homes with gas stoves had a 42 percent higher risk of experiencing asthma symptoms and, over their lifetime, a 24 percent increase in the risk of being diagnosed with asthma.[6] Children aged four and under who are exposed to indoor nitrogen dioxide from gas appliances are also more likely to experience impaired cognitive function and are at greater risk of developing attention deficit or hyperactivity disorder symptoms.[7]

Housing conditions in low-income communities contribute to socioeconomic disparities in household exposure to indoor air pollution. For example, smaller units, higher occupant density, and inadequate ventilation all contribute to higher levels of $NO_2$ in lower-income multifamily buildings.[8] A 2022 study by the

---

[5] Vic Hasselblad et al., *Synthesis of Environmental Evidence: Nitrogen Dioxide Epidemiology Studies*, 42 J. Air & Waste Mgmt. Ass'n 662, 662 (1992), https://doi.org/10.1080/10473289.1992.10467018.

[6] Weiwei Lin et al., *Meta-Analysis of the Effects of Indoor Nitrogen Dioxide and Gas Cooking on Asthma and Wheeze in Children*, 42 Int'l J. Epidemiology 1724 (2013), https://doi.org/10.1093/ije/dyt150.

[7] Brady A. Seals & Andee Krasner, RMI, Health Effects from Gas Stove Pollution 13 (2020), https://rmi.org/insight/gas-stoves-pollution-health/ (citing Eva Morales et al., *Association of Early-life Exposure to Household Gas Appliances and Indoor Nitrogen Dioxide with Cognition and Attention Behavior in Preschoolers*, 169 Am. J. Epidemiology 1327 (2009), https://doi.org/10.1093/aje/kwp067).

[8] *See* Gary Adamkiewicz et al., *Moving Environmental Justice Indoors: Understanding Structural Influences on Residential Exposure Patterns in Low-*

National Center for Healthy Housing revealed that 90% of rental homes did not have adequate ventilation,[9] and another study showed that gas stove pollution was highest in multi-unit buildings.[10]

Low-income communities and renters are therefore particularly vulnerable to indoor air pollution in the absence of restrictions on indoor combustion of fossil fuels.[11] Replacing fossil fuel appliances in these communities with electric appliances brings measurable health benefits: In 2021, WE ACT launched a pilot program to demonstrate the feasibility and desirability of transitioning from fossil fuels to renewable energy in affordable housing. WE ACT conducted a pilot study comparing gas stoves to electric stoves in New York City Housing Authority apartments. The *Out of Gas, In with Justice* study is the first study of its kind to

*Income Communities*, 101 Am. J. Pub. Health S238 (2011), https://doi.org/10.2105/AJPH.2011.300119.

[9] *See* Am. Pub. Health Ass'n, *Gas Stove Emissions Are a Public Health Concern* (Nov. 8, 2022), https://www.apha.org/Policies-and-Advocacy/Public-Health-Policy-Statements/Policy-Database/2023/01/18/Gas-Stove-Emissions (citing Nat'l Ctr. for Healthy Hous., *Studying the Optimal Ventilation for Environmental Indoor Air Quality* (Apr. 2022), https://nchh.org/resource-library/report_studying-the-optimal-ventilation-for-environmental-indoor-air-quality.pdf).

[10] Lisa K. Baxter et al., *Predictors of Concentrations of Nitrogen Dioxide, Fine Particulate Matter, and Particle Constituents Inside of Lower Socioeconomic Status Urban Homes*, 17 J. Exposure Sci. & Env't Epidemiology 433 (2007), https://doi.org/10.1016/j.atmosenv.2007.04.027.

[11] *See* Physicians for Soc. Resp., WE ACT, & Sierra Club, The Outdoor Pollution Is Coming from Inside the House: National Building Pollution Report 11–12 (2023), https://weact.org/wp-content/uploads/2023/10/AppliancePollution_Report_FINAL.pdf.

focus on the effects of residential cooking electrification with tenants in an urban public housing setting. The study's findings include that "$NO_2$ concentrations when cooking with gas stoves increased to" nearly double the level that EPA has determined to be "[u]nhealthy for sensitive groups."[12] Meanwhile, $NO_2$ concentrations in kitchens using electric appliances were more than 90 percent lower than in the gas-combusting kitchens.[13]

While New Yorkers who own their homes can choose whether to use gas stoves in their kitchens and may take advantage of high-priced ventilation systems to mitigate emissions, poorer New Yorkers are subjected to greater indoor air pollution burdens. In accord with WE ACT's study data, the City's requirement that new buildings not combust fossil fuels will have direct and substantial effects on air pollution, abate negative health outcomes, and address the environmental justice implications of appliance pollution.

**B.    Local Law 154 addresses the urgent need to reduce carbon emissions.**

As the Supreme Court acknowledged nearly two decades ago, "[t]he harms associated with climate change are serious and well recognized." *Massachusetts v. EPA.*, 549 U.S. 497, 521 (2007). "Modern science is 'unequivocal that human

---

[12] Out of Gas, In with Justice, *supra* note 2, at 4.
[13] *Id.*

9

influence'—in particular, the emission of greenhouse gases like carbon dioxide—'has warmed the atmosphere, ocean and land.'" *W. Virginia v. EPA.*, 597 U.S. 697, 753 (2022) (Kagan, J., dissenting (quoting Intergovernmental Panel on Climate Change Sixth Assessment Report, The Physical Science Basis: Headline Statements 1 (2021))).

Local Law 154 targets the combustion of carbon-intensive fuels in buildings because this combustion is the source of the overwhelming majority of New York City's carbon emissions. While in most of the country the proportion of greenhouse gas emissions attributable to fossil fuel combustion for residential and commercial buildings accounts for a relatively smaller portion of total emissions, "[t]he fossil fuels used to heat, cool, and power our buildings are responsible for nearly 70% of greenhouse gas emissions in New York City." JA41. As testimony from the Mayor's Office explains, "we must take every opportunity to reduce greenhouse gas emissions for our city and our planet." *Id.* The Intergovernmental Panel on Climate Change has reported that "unless there are immediate and large-scale reductions in greenhouse gas emissions, the world will continue to see increases in the frequency and intensity of extreme weather events and heat waves that would imperil global agriculture and health." *Id.* Local Law 154 recognizes this reality and protects New Yorkers' health and well-being.

10

### C. Local Law 154 does not regulate "energy use" within the meaning of EPCA.

While EPCA is concerned with standards for energy conservation, Local Law 154's restriction on any combustion of greenhouse-gas-emitting fuels bears no inherent relationship with the quantity of energy used by New York City appliances. Where it applies, Local Law 154 bars all fossil fuel combustion. The law sets an emissions limit; it does not prescribe standards for any appliance's energy use of energy efficiency. In fact, some electric appliances used in new buildings consume more energy or perform less efficiently than the gas-burning alternatives available in older construction. Thus, "[t]ransitioning from fossil fuels to non-greenhouse-gas-producing energy sources may not decrease total energy consumption." *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1126 (9th Cir. 2024) (Friedland, J., dissenting).

Local Law 154 neither sets energy conservation standards nor affects the design of any product covered by EPCA. It universally prohibits combustion of certain fuels in certain buildings. Local Law 154 thus "gives manufacturers no reason to change the design of their natural gas products to meet standards higher than those prescribed by DOE. It simply directs consumers to one set of products with one set of federal efficiency standards (electric appliances) over another set of products with different federal efficiency standards (gas appliances)." *Cal. Rest.*

11

*Ass'n*, 89 F.4th at 1126 (Friedland, J., dissenting) (citing 42 U.S.C. § 6295(e)(1)(A), (C) (setting one standard for gas water heaters and another for electric water heaters)). There is no inherent relationship between the energy conservation achieved by a product and the question of whether it may be used in new buildings. Electric appliances—regardless of energy consumption or efficiency—are permitted; gas-combustion appliances—regardless of energy consumption or efficiency—are prohibited.

The Court's decision in *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 157–58 (2d Cir. 2010) illustrates the difference between laws that effectively establish energy conservation standards—and are therefore subject to EPCA preemption—and laws like Local Law 154, which do not directly or indirectly regulate energy conservation. In that decision, the Court addressed a City rule that incentivized the use of hybrid taxicabs by increasing "the maximum dollar amount per shift for which [such] taxis can be leased." *Id*. at 155. As the Court determined, the rule was entirely aimed at fuel efficiency: "The requirement that a taxi be a hybrid in order to qualify for the upwardly adjusted lease cap does nothing more than draw a distinction between vehicles with greater or lesser fuel-efficiency." *Id.* at 157. Similar to its preemption of laws relating to appliance energy conservation standards, EPCA "preempts state laws that are 'related to fuel economy standards.'" *Id.* (quoting 49 U.S.C. § 32919(a)). Therefore, because

12

"'hybrid' is simply a proxy for 'greater fuel efficiency' . . . the rules in question directly regulate the relevant preempted subject matter." *Id.* at 158.

As the analysis in *Metro. Taxicab* shows, Local Law 154 is readily distinguishable from laws that directly or indirectly concern energy conservation standards. First, while in the taxicab case, "[t]he equivalency of the term 'hybrid' with 'greater fuel efficiency' for purposes of the new rules is self-evident," there is no such equivalency between the emissions addressed by Local Law 154 and the efficiency of any EPCA-covered appliance. *Id.* at 157. "Indeed, some gas appliances are more efficient than electric appliances, so the ordinance may have the indirect effect of *increasing* energy consumption in new buildings in some circumstances." *Cal. Rest. Ass'n*, 89 F.4th at 1126 (Friedland, J., dissenting) (citing 10 C.F.R. § 430.32(e)(1)(ii) (setting a more stringent standard for gas furnaces than for electric furnaces)). Second, while "imposing reduced lease caps solely on the basis of whether or not a vehicle has a hybrid engine has no relation to an end other than an improvement in fuel economy across the taxi fleets operating in New York City," the ends served by Local Law 154 are wholly distinct from energy efficiency. *Metro. Taxicab Bd. of Trade*, 615 F.3d at 157. As described above, Local Law 154 produces no inherent improvement of the city's energy usage or energy conservation. Instead, the law serves different ends: reducing harmful emissions

13

that are making New Yorkers sick and mitigating the climate crisis that threatens the city's future. *See supra*.

## II. Appellants' Reading of EPCA's Preemption Clause Produces Absurd and Dangerous Results.

Appellants press an interpretation of EPCA's preemption clause that is breathtakingly expansive: If the City restricts an appliance from operating for any reason, the City must be understood to be "[b]anning an appliance from using any energy—and thus setting its maximum energy use to zero." Pls.' Br. 1. Following this logic, once an appliance is subject to a federal energy efficiency standard, no state or local authority can ever restrict its use in any location. Any law that prohibits the use of any EPCA-covered appliance, according to Appellants, "concerns that appliance's energy use and is therefore preempted." *Id.*

Because Appellants mistake every appliance prohibition for a zero "maximum energy use" standard, Appellants' reading would insulate EPCA-covered appliances from virtually all zoning, fire safety, and air pollution legislation. This sweeping rule creates bizarre and dangerous results. According to Appellants, it makes no difference that EPCA does not authorize the Department of Energy ("DOE") to regulate the safety, health, environment impact, or suitability of a product for a particular location. In their view, once DOE has prescribed an energy efficiency standard for a product, state and local authorities lose all power to restrict the use of that product on any other ground. And because DOE has no

14

ability to create substitute health and safety protections, the result of Appellants'
theory is to create a regulatory vacuum: Once an appliance is subject to a federal
energy conservation standard, it is simultaneously insulated from every other form
of regulation.

While Appellants perceive every form of appliance prohibition as setting a
"maximum energy use standard" of "zero," they provide no reason to believe that
Congress shares this unorthodox view. There is no indication that Congress
considered appliance prohibitions to be "maximum energy use standards," much
less intended EPCA preemption to extend to arenas far removed from energy (and
water) conservation. EPCA does not concern the health, safety, or environmental
impacts of appliances. *See N.Y. State Conf. of Blue Cross & Blue Shield Plans v.
Travelers Ins. Co.*, 514 U.S. 645, 646 (1995) (courts look to statute's "objectives"
as a "guide to the scope of the state law that Congress understood would survive");
*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295,
347 (D. Vt. 2007) ("It bears noting here that EPCA expresses no environmental
objective or purpose . . ."). The "[f]ederal law does not speak to these issues."
*Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 265 (2013). If EPCA
nonetheless preempts Local Law 154, it would preempt much of the local authority
that New Yorkers take for granted.

15

For example, New York City, the densest city in the country, has long banned the use of kerosene space heaters for fire safety reasons. *See* N.Y.C. Admin. Code § 313-01(c) (requiring label stating "The New York City Fire Code prohibits the . . . use of kerosene fueled heaters for space heating."). Such heaters have been banned from use in all New York City homes since 1959, *see* N.Y.C. Admin. Code § 27-4253, and are so "highly flammable" that "fire officials confiscate[] them whenever they [a]re spotted in homes or apartments." Robert D. McFadden, *Fire Kills 4 and Burns 2 in a Home in Brooklyn*, N.Y. Times (Dec. 28, 1990) (quoting N.Y.C. Fire Department spokesman).

Yet kerosene space heaters are a covered appliance under EPCA. *See* 42 U.S.C. § 6292(a)(9). And DOE has issued regulations governing testing standards for the energy consumption of this dangerous appliance. *See* 10 C.F.R. pt. 430, subpt. B, app. G at 1.4.4. DOE has not yet promulgated energy conservation standards for this particular EPCA-covered appliance—but not because of any fire safety concerns, but because in its most recent assessments there would not be sufficient energy savings to do so. *See* Energy Conservation Program: Energy Conservation Standards for Direct Heating Equipment, 86 Fed. Reg. 66403, 66404 (Nov. 23, 2021) (determining that there would be "minimal potential for energy savings" for unvented home heating appliances).

16

According to Appellants' strained reading of EPCA, by banning kerosene space heaters New York City has issued a standard setting the heaters' "maximum energy use to zero." Pls.' Br. 1. Thus, if DOE at any point finds a potential for energy savings and issues an energy conservation standard for kerosene space heaters, the existing fire safety law banning them would immediately be preempted. Appellants assert that Congress commanded exactly this result: once DOE issues an energy efficiency standard, any ban is preempted, regardless of local conditions or fire safety measures. It does not matter that DOE's decision turns only a product's energy savings, and not on its suitability or safety—according to Appellants, EPCA requires that if an energy conservation standard exists, any other form of regulation gives way.

The problems produced by Appellants' interpretation are not limited to fire safety. If Appellants' theory is correct, EPCA requires that New Yorkers also forfeit local air quality protections specifically developed to address the city's unique housing stock. In 2010, for example, the City enacted a law addressing the disproportionate air pollution caused by the small number of New York City buildings that combusted high-sulfur fuel oil in their boilers. *See* N.Y.C. Loc. L. No. 43 (2010) ("[T]he strongest predictor of particulate matter and sulfur dioxide in the air in New York City is the density of nearby buildings that burn fuel oil."). Finding it "necessary to address pollutants from the heating oil sector," the City

imposed limits on the type of fuel that could be burned in the city's large boilers. *Id.* The law was immediately successful at improving New Yorkers' health and air quality, and by December 31, 2015, all buildings registered as burning the dirtiest heating oil had switched to cleaner fuels.[14] The result was "a substantial reduction in air pollution, which models show will prevent 210 premature deaths and 540 hospitalizations each year."[15]

 If Appellants are correct, then the City was required to allow the most polluting boilers to use the most polluting fuels in perpetuity—with the result that New Yorkers would be forced to endure hundreds of excess deaths each year. Appellants' interpretation of EPCA leads to this inevitable result because large oil-fired packaged boilers are subject to an EPCA efficiency standard. *See* 42 U.S.C. § 6313(a)(4)(D). The City's law explicitly imposes a restriction on fossil fuels that may be burned in its most polluting boilers, preventing any combustion of the most dangerous fuel oils. According to Appellants' expansive reading of EPCA's preemptive clause, the City's boiler fuel law therefore concerns "energy use" within the meaning of the statute because it bars certain fuels entirely. Under the

---

[14] The City of New York Office of the Mayor, *Mayor de Blasio and DEP Announce that All 5,300 Buildings Have Discontinued Use of Most Polluting Heating Oil, Leading to Significantly Cleaner Air* (Feb. 9, 2016), https://a860-gpp.nyc.gov/concern/nyc_government_publications/vx021h521?locale=en.
[15] *Id.* at 2.

reading they propose, by passing EPCA Congress stripped the City of local authority to regulate the type of heating oil burned in its boilers—regardless of whether the regulation concerns energy conservation or whether it concerns something else entirely, such as air pollution.

There is no reason to stop there. If a noise ordinance prohibits any operation of the loudest industrial fans within the City's limits, should this be understood as a "zero energy use standard" because industrial fans are subject to an EPCA energy conservation standard? If City zoning law prevents the installation of industrial furnaces anywhere in Manhattan, has it issued a standard setting the "maximum energy use" of such furnaces at zero? If the City does not allow walk-in freezers in most buildings, has it set a standard that their "maximum energy use" is zero?

As these examples illustrate, Appellants propose a scheme that no rational Congress could have conceivably required. Appellants would convert EPCA from a law focused on energy conservation into a wrecking ball that automatically displaces a staggering number of state and local laws that have nothing to do with EPCA's purpose and everything to do with the States' traditional police powers. And because EPCA does not authorize DOE to grant waivers on health and safety grounds, no actor at any level of government would have authority to reinstate or create adequate substitutes for the countless health, welfare, and zoning laws that EPCA would displace.

19

Appellants have no answer to any of this, instead insisting weakly that "[t]his Court need not and should not decide today what will happen in cases about other regulations that are not yet and may never be before it." Pls.' Br. 48. But Appellants cannot simply wave away the implications of their view. It is only by inventing a sweeping rule against regulations that "prohibit covered gas appliances' energy use" that Appellants are able to argue that Local Law 154 is preempted. Pls.' Br. 47. As described above, this interpretation of EPCA produces bizarre and dangerous consequences. "Courts should interpret statutes to avoid absurd results." *In re Nine W. LBO Sec. Litig.*, 87 F.4th 130, 145 (2d Cir. 2023). This is reason enough to reject Appellants' theory, particularly when the interpretation offered by the City is more faithful to EPCA's text, definitions, structure, and history.

## CONCLUSION

For the reasons above, the district court's decision should be affirmed.

Dated: November 6, 2025

Respectfully submitted,

/s/ Dror Ladin
Dror Ladin
Meagan Burton
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(917) 410-8701
dladin@earthjustice.org
mburton@earthjustice.org

*Attorneys for Amicus Curiae*

20

## CERTIFICATE OF COMPLIANCE

I, Dror Ladin, do hereby certify, pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure as follows:

1.       This amicus brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Local Rules 32.1(a)(4)(A), 29.1(c) because it contains 4,496 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.       This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated: November 6, 2025

/s/ Dror Ladin
Dror Ladin
Meagan Burton
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(917) 410-8701
dladin@earthjustice.org
mburton@earthjustice.org

*Attorneys for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2025, I electronically filed the

foregoing with the Clerk of the Court for the United States Court of Appeals for the

Second Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and

that service will be accomplished by the appellate CM/ECF system.

Dated: November 6, 2025

/s/ Dror Ladin
Dror Ladin
Meagan Burton
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(917) 410-8701
dladin@earthjustice.org
mburton@earthjustice.org

*Attorneys for Amicus Curiae*