# 25-977

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

Association of Contracting Plumbers of the City of New York, Inc.; Plumbing-Heating-Cooling Contractors-National Association; Plumbers Local Union No. 1, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada; New York State Energy Coalition, Inc.; Plumbing Foundation City of New York, Inc.; Licensed Plumbing Association of New York City, Inc., DBA Master Plumbers Council of the City of New York; Building Industry Association of New York City, Inc.,

Plaintiffs-Appellants,

v.

City of New York,

Defendant-Appellee.

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR THE NATURAL RESOURCES DEFENSE COUNCIL
## AS *AMICUS CURIAE* SUPPORTING DEFENDANT-APPELLEE

Natasha Brunstein
Natural Resources Defense Council
40 W 20th St.
New York, NY 10011
NBrunstein@nrdc.org
Phone: 212-727-2700

Thomas Zimpleman
Natural Resources Defense Council
1152 15th St. NW, Suite 300
Washington, DC 20005
TZimpleman@nrdc.org
Phone: 202-289-6868

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ ii

CORPORATE DISCLOSURE STATEMENT ....................................... vii

INTRODUCTION AND INTEREST OF AMICUS CURIAE ................................1

SUMMARY OF ARGUMENT ..............................................................2

ARGUMENT ............................................................................2

I.     LL154 reduces emissions from combustion of fossil fuels and improves local air quality ........................................................2

II.    EPCA's preemption provision concerns appliance performance standards and does not preempt local regulations of the fuel used by an appliance ....................................4

      A.    EPCA defines "energy use" in the context of appliance testing procedures ................................................4

      B.    EPCA's preemption provision must be read consistent with the statute's technical definitions of statutory terms ........................................................12

III.   Appellants' reading of the statute lacks plausible limiting principles ............................................................................16

CONCLUSION ............................................................................19

CERTIFICATE OF COMPLIANCE ........................................................21

CERTIFICATE OF SERVICE ..............................................................22

i

# TABLE OF AUTHORITIES

## Cases

*Air Conditioning & Refrigeration Inst. v. Energy Res.*
  *Conservation & Dev. Comm'n*,
  410 F.3d 492, 500-01 (9th Cir. 2005) ........................................................... 13

*Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*,
  683 F.3d 1144 (9th Cir. 2012) ..................................................................... 13

*Bond v. United States*,
  572 U.S. 844 (2014) ..................................................................................... 12

*California Restaurant Association v. City of Berkeley*,
  89 F.4th 1094 (9th Cir. 2024) ........................................................ 6, 8, 12, 19

*Dolan v. U.S. Postal Serv.*,
  546 U.S. 481 (2006) ...................................................................................... 5, 16

*Dubin v. United States*,
  599 U.S. 110 (2023) ..................................................................................... 15

*E. Ohio Gas Co. v. Tax Comm'n of Ohio*,
  283 U.S. 465 (1931) ..................................................................................... 11

*Egelhoff v. Egelhoff*,
  532 U.S. 141 (2001) ..................................................................................... 16

*Env't Encapsulating Corp. v. City of New York*,
  855 F.2d 48 (2d Cir. 1988) .......................................................................... 17

*Esquivel-Quintana v. Sessions*,
  581 U.S. 385 (2017) ....................................................................................... 5

*FCC v. AT&T Inc.*,
  562 U.S. 397 (2011) ..................................................................................... 16

*Gen. Motors Corp. v. Tracy*,
  519 U.S. 278 (1997) ..................................................................................... 11

*Huron Portland Cement Co. v. Detroit*,
        362 U.S. 440 (1960)................................................................17

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
        514 U.S. 645 (1995)................................................................16

*NRDC v. Abraham*,
        355 F.3d 179 (2d Cir. 2004) ...................................................1

*NRDC v. Herrington*,
        768 F.2d 1355 (D.C. Cir. 1985) .............................................1

*ONEOK, Inc. v. Learjet, Inc.*,
        575 U.S. 373 (2015)................................................................11

*Powerex Corp. v. Reliant Energy Servs., Inc.*,
        551 U.S. 224 (2007)................................................................14

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*,
        484 U.S. 365 (1988)................................................................16

*United States v. Lopez*,
        514 U.S. 549 (1995)................................................................17

*United States v. Morrison*,
        529 U.S. 598, 618-19 (2000) ..................................................17

*United States v. Morton*,
        467 U.S. 822 (1984)................................................................5

*Van Buren v. United States*,
        141 S. Ct. 1648 (2021)............................................................5

**Statutes**

24 N.Y.C. Admin. Code § 109(a)(3) ...............................................18

24 N.Y.C. Admin. Code § 109(a)(4) ...............................................18

24 N.Y.C. Admin. Code § 109(a)(5) ...............................................18

24 N.Y.C. Admin. Code § 109(a)(8) ...............................................18

iii

24 N.Y.C. Admin. Code § 109(a)(10) ........................................................18

24 N.Y.C. Admin. Code § 109(a)(11) ........................................................18

24 N.Y.C. Admin. Code § 109(a)(12) ........................................................18

24 N.Y.C. Admin. Code § 109(a)(17) ........................................................18

24 N.Y.C. Admin. Code § 120 ..................................................................18

24 N.Y.C. Admin. Code § 122(b) ..............................................................18

24 N.Y.C. Admin. Code § 125 ..................................................................18

24 N.Y.C. Admin. Code § 128 ..................................................................18

24 N.Y.C. Admin. Code § 129 ..................................................................18

24 N.Y.C. Admin. Code § 141 ..................................................................18

24 N.Y.C. Admin. Code § 142 ..................................................................18

24 N.Y.C. Admin. Code § 144 ..................................................................18

24 N.Y.C. Admin. Code § 145(b) ..............................................................18

24 N.Y.C. Admin. Code § 149.5 ...............................................................18

24 N.Y.C. Admin. Code § 153 ..................................................................18

24 N.Y.C. Admin. Code § 165 ..................................................................18

24 N.Y.C. Admin. Code § 168 ..................................................................18

24 N.Y.C. Admin. Code § 168.1 ...............................................................18

24 N.Y.C. Admin. Code § 169 ..................................................................18

24 N.Y.C. Admin. Code § 24-160 .............................................................18

24 N.Y.C. Admin. Code § 24-177.1 ...........................................................4

iv

24 N.Y.C. Admin. Code § 24-178 ................................................4

24 N.Y.C. Admin. Code § 28-506 ................................................4

15 U.S.C. § 717(b) .................................................................11

42 U.S.C § 6311(4) ..........................................................5, 7

42 U.S.C. § 6202(1) ...............................................................7

42 U.S.C. § 6291(4) .........................................................5, 6, 7

42 U.S.C. § 6291(5) ...............................................................6

42 U.S.C. § 6291(6)(A) ........................................................14

42 U.S.C. § 6297(c) .........................................................6, 15

42 U.S.C. § 6297(g) ...............................................................7

42 U.S.C. § 6311(18)(A) ........................................................7

42 U.S.C. § 6311(3) ...............................................................6

42 U.S.C. § 7401(a)(3) .........................................................17

42 U.S.C. § 7407 ..................................................................17

42 U.S.C. § 6291(6)(A) ..........................................................7

Pub. L. No. 100-12, § 7(b), 101 Stat. 103 (1987) ....................14

Pub. L. No. 109-58, § 1802, 119 Stat. 594 (2005) ...................10

## Regulations

6 N.Y.C.R.R. § 212-1.2(18) ..................................................18

6 N.Y.C.R.R. § 212-1.5 .........................................................18

6 N.Y.C.R.R. § 227-2.4 .........................................................18

v

Energy Conservation Program for Consumer Products and Certain Commercial
    and Industrial Equipment: Statement of Policy for Adopting Full-Fuel-Cycle
    Analyses Into Energy Conservation Standards Program,
    76 Fed. Reg. 51,281 (Aug. 18, 2011) ..........................................................10

Energy Conservation Program for Consumer Products; Proposed Rulemaking and
    Public Hearing Regarding Energy Conservation Standards for 3 Types of
    Consumer Products,
    53 Fed. Reg. 48,798 (Dec. 2, 1988)...................................................................9

Energy Conservation Program for Consumer Products; Proposed Rulemaking and
    Public Hearings Regarding Energy Efficiency Standards for Refrigerators
    and Refrigerator-Freezers, Freezers, Clothes Dryers, Water Heaters, Room
    Air Conditioners, Kitchen Ranges and Ovens, Central Air Conditioners, and
    Furnaces,
    47 Fed. Reg. 14,424 (Apr. 2, 1982)...................................................................9

Response to December 9, 2013, Clean Air Act Section 176A Petition From
    Connecticut, Delaware, Maryland, Massachusetts, New Hampshire, New
    York, Pennsylvania, Rhode Island and Vermont,
    82 Fed. Reg. 6,509 (Jan. 19, 2017)...................................................................3

## Other Authorities

DOE, *The Difference Between Source and Site Energy* ...........................................8

EPA, *Commercial and Residential Sector Emissions*
    (March 31, 2025) ...........................................................................................3

S. Rep. No. 100-6 (1987) .................................................................................. 1, 15

Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (2012)...............5

## CORPORATE DISCLOSURE STATEMENT

The Natural Resources Defense Council (NRDC) is a non-profit environmental and public health organization committed to protecting the public and environment through research and advocacy. NRDC has no parent companies, and there are no publicly owned corporations that have a ten-percent or greater ownership interest in NRDC.

*/s/Thomas Zimpleman*
Thomas Zimpleman

## INTRODUCTION AND INTEREST OF AMICUS CURIAE

For decades, the Natural Resources Defense Council (NRDC) has been involved in the Department of Energy's energy conservation standards program under the Energy Policy and Conservation Act (EPCA). NRDC has litigated several cases to compel the Department of Energy to set and maintain energy conservation standards.[1] *See NRDC v. Herrington*, 768 F.2d 1355, 1362-64 (D.C. Cir. 1985) (challenging decision not to issue standards); *id.* at 1368 (noting that NRDC had earlier sued to compel promulgation of appliance efficiency standards in *NRDC v. Edwards*, Civ. No. 81-2546 (D.D.C.)); *NRDC v. Abraham*, 355 F.3d 179 (2d Cir. 2004) (challenging revocation of standards); *NRDC v. Granholm*, No. 20-cv-9127-JMF (S.D.N.Y. 2020) (challenging failure to abide by statutory deadlines). NRDC negotiated the energy conservation standards that Congress incorporated into EPCA in 1987. *See* S. Rep. No. 100-6, at 4 (1987), *as reprinted in* 1987 U.S.C.C.A.N. 52, 55. NRDC also has a longstanding interest in combating climate change, including by reducing carbon emissions from the built environment. Contrary to the premise of Appellants' lawsuit, setting energy conservation standards and confronting climate change are complementary, rather

---

[1] NRDC is filing this brief with the consent of the parties. No party or party's counsel authored this brief in whole or in part and no one other than the *amicus curiae*, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief.

1

than contradictory, actions, and NRDC has an interest in ensuring that EPCA's

express preemption provision is not incorrectly interpreted as an obstacle to state

and local climate change efforts.

## SUMMARY OF ARGUMENT

New York City adopted Local Law 154 to reduce emissions from fuel

combustion in buildings. This exercise of its police powers is not preempted by

EPCA. That statute preempts state and local performance requirements for

appliances – either by setting requirements for the "energy use" of an appliance (as

defined in the statute) or the "energy efficiency" of an appliance (again, as defined

in the statute). It does not cut a wide swath through state and local authority by

preempting any regulation that could affect how an appliance is operated.

Appellants' argument to the contrary discards the technical definitions of statutory

terms and distorts their meaning beyond a sensible reading of the statute. Adopting

Appellants' reading threatens dramatic intrusions on state and local police powers

and the Court should affirm the district court's decision rejecting it.

## ARGUMENT

## I.     LL154 reduces emissions from combustion of fossil fuels and improves local air quality

Burning fossil fuels for heating and cooking both contributes to climate

change and degrades local air quality. Direct emissions from residential and

commercial buildings account for "13% of total U.S. greenhouse gas emissions in

2

2022." EPA, *Commercial and Residential Sector Emissions*,

https://www.epa.gov/ghgemissions/commercial-and-residential-sector-emissions

(March 31, 2025). Annually, this amounts to approximately 1 billion tons of $CO_2$-equivalent emissions. *Id.* These emissions harm public health as well as the

climate. Home appliances burning fossil fuels also "emit[] carbon

dioxide, methane, and nitrous oxide." *Id.* Methane contributes to ground level

ozone, a pollutant that "causes a variety of negative effects on human health,

vegetation, and ecosystems." Response to December 9, 2013, Clean Air Act

Section 176A Petition From Connecticut, Delaware, Maryland, Massachusetts,

New Hampshire, New York, Pennsylvania, Rhode Island and Vermont, 82 Fed.

Reg. 6,509, 6,511 (Jan. 19, 2017).

New York City's Local Law 154 reduces carbon emissions and improves

local air quality by prohibiting the onsite combustion of fuels that emit more than

25kg $CO_2$/MMBtu in new construction buildings. The law phases in over several

years, beginning with new construction buildings less than seven stories high and

covering all new construction by the end of 2027.

Local Law 154 contains exceptions for specific types of buildings and for

specific occupants of buildings. It does not apply, for example, to buildings used

by a regulated utility for energy generation or to laboratories, hospitals,

laundromats, and commercial kitchens. It also exempts spaces within buildings

where combustion of fossil fuels is necessary to provide emergency or backup

power. Local Law 154 is codified in the New York Administrative Code. *See* 24

N.Y.C. Admin. Code §§ 24-177.1, 24-178, 28-506.

## II.    EPCA's preemption provision concerns appliance performance standards and does not preempt local regulations of the fuel used by an appliance

Local Law 154 does not regulate "energy use" as EPCA defines that term

and is not preempted by EPCA. As a regulation of building emissions, Local Law

154 does not set testing, labeling, or design requirements for any class of

appliances, and the efforts of Appellants and the Department of Energy, as *amicus*

*curiae*, to recast it as a law setting a "zero energy use" standard do not establish

EPCA preemption.

### A.    EPCA defines "energy use" in the context of appliance testing procedures

Local Law 154 is an air quality regulation that addresses the health and

climate effects of the combustion of fossil fuels. It does not set energy

conservation standards or labeling requirements for any class of appliances.

Appellants argue that it is nevertheless preempted under EPCA because it concerns

the "energy use" of appliances that run on natural gas. Dkt. 23.1, Brief of

Plaintiffs-Appellants at 22-26 (Pls. Br.). Appellants' argument stitches together

disparate phrases in EPCA and wrenches them from context, distorting the

meaning of the statute and turning it from a program establishing federal energy

4

conservation standards for appliances into a steamroller displacing any local or state regulation that might affect how an appliance is used. That reading of EPCA is wrong.

Statutory construction "begin[s], as always, with the text." *Esquivel-Quintana v. Sessions*, 581 U.S. 385, 391 (2017). Yet text always exists in context. *See Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute[.]"); *United States v. Morton*, 467 U.S. 822, 828 (1984) ("We do not, however, construe statutory phrases in isolation; we read statutes as a whole."). Here, the vital context is that EPCA is a technical statute. When interpreting such statutes, technical definitions should not be supplanted by colloquial ones. *See Van Buren v. United States*, 141 S. Ct. 1648, 1658 n.7 (2021) ("But when a statute, like this one, is 'addressing a . . . technical subject, a specialized meaning is to be expected.'" (quoting Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 73 (2012))).

There are two parts of EPCA relevant to Appellants' claims: the definition of "energy use" and the preemption provision. First, EPCA defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title." 42 U.S.C. § 6291(4); *see also id.* § 6311(4) (using the same definition of energy use

5

for commercial appliances). Second, another part of EPCA, entitled "[g]eneral rule of preemption for energy conservation standards before Federal standard becomes effective for product," provides that once "an energy conservation standard established in or prescribed under section 6295 of this title" goes into effect, then "no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product," subject to certain exceptions. *Id.* § 6297(c).

Appellants argue that "energy use" refers to the energy running the appliance for the end user, and that EPCA preempts regulation relating to the end user's consumption of energy. Pls. Br. 22-25. In making this argument, they rely heavily on *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024), which found that a city ordinance prohibiting building owners from extending natural gas piping beyond the meter in new construction buildings was preempted by EPCA. *See id.* at 1101-02. The problem with this argument is that, as the entire statutory definition clarifies, "energy use" refers to a performance standard developed for a covered product using specified test procedures and expressed in terms of total energy consumed. *See* 42 U.S.C. § 6291(4). Energy conservation standards in EPCA are expressed in terms of either energy use or "energy efficiency," which is the ratio of useful output divided by energy use. *See id.* § 6291(5); *id.* § 6311(3). "[E]nergy conservation standard"

6

means, in relevant part, "a minimum level of energy efficiency or a *maximum quantity of energy use*." *Id.* § 6291(6)(A) (emphasis added); *accord id.* § 6311(18)(A) (using the same definition for industrial products).

Understanding that the "energy use" of a product under EPCA is determined according to test procedures set by the Department of Energy, *see id.* §§ 6291(4), 6311(4), 6202(1), is critical because EPCA's energy conservation standards program is primarily a regulation of manufacturers and sellers, not of end users. Someone who frequently leaves their refrigerator door open—and thereby consumes more energy than the maximum allowable kWh per year for their refrigerator—does not violate EPCA. Indeed, EPCA warns consumers that a "disclosure with respect to energy use, energy efficiency, or estimated annual operating cost . . . shall not create an express or implied warranty under State or Federal law that such energy efficiency will be achieved or that such energy use or estimated annual operating cost will not be exceeded under conditions of actual use." *Id.* § 6297(g). The "energy use" component of a federal energy conservation standard does not refer to the energy that each consumer uses to power the product. That would be impossible, because "energy use" is determined in accordance with specified test procedures. *See id.* § 6291(4).

Before the District Court, Appellants argued that the phrase "point of use" in the definition of "energy use" expanded EPCA's preemptive scope to reach the

7

actual use of covered products, and therefore that a regulation affecting the energy supply available for an appliance concerns energy use and is preempted. But the District Court correctly determined that "point of use" is not a roundabout way to greatly expand the meaning of "energy use" and with it the scope of EPCA's preemption provision. Dkt. 22.1, Joint Appendix 88-90 (J.A.). It is another technical phrase that instructs the Department of Energy how to measure energy use when setting energy conservation standards. *See City of Berkeley*, 89 F.4th at 1123 (Friedland, J., dissenting).

There are two broad ways to think about the energy consumed in a building. One is the amount of energy consumed by a product directly, that is, the amount you would read if you were directly measuring how many kWh a product consumed. This is called "site energy," the energy measured at the *point of use*. This is distinct from source energy, sometimes referred to as full fuel cycle energy, which also captures the energy that is consumed in the production and distribution of site energy. For example, because power generation is not one hundred percent efficient, and because some energy is lost through the distribution of electricity, it takes more than one kWh of generation to deliver one kWh of usable energy to a home. *See* DOE, *The Difference Between Source and Site Energy*, https://www.energystar.gov/buildings/benchmark/understand-metrics/source-site-difference (last visited Nov. 4, 2025).

8

This is how the Department of Energy has understood EPCA's reference to "point of use" when setting standards. *See* Energy Conservation Program for Consumer Products; Proposed Rulemaking and Public Hearings Regarding Energy Efficiency Standards for Refrigerators and Refrigerator-Freezers, Freezers, Clothes Dryers, Water Heaters, Room Air Conditioners, Kitchen Ranges and Ovens, Central Air Conditioners, and Furnaces, 47 Fed. Reg. 14,424, 14,427 (Apr. 2, 1982) ("'Energy use' is defined in the Act as the quantity of energy directly consumed by a consumer product at point of use. This is sometimes referred to as 'site' energy, as opposed to source energy."); Energy Conservation Program for Consumer Products; Proposed Rulemaking and Public Hearing Regarding Energy Conservation Standards for 3 Types of Consumer Products, 53 Fed. Reg. 48,798, 48,803 (Dec. 2, 1988) (similar). Congress could have directed the Department of Energy to regulate products based on source energy, but this would have raised several problems. For example, the amount of source energy a product consumes depends in part upon the composition of the electric grid where the product is used. Even if the Department of Energy were to use a national average for source energy, it would vary over time—making it harder for manufacturers to know whether their products would comply with the conservation standard. By defining "energy use" in terms of point of use, or site energy, ECPA avoided these problems.

9

After Congress passed EPCA, the Energy Policy Act of 2005 directed the National Academy of Sciences to study "whether the goals of energy efficiency standards are best served by measurement of energy consumed, and efficiency improvements, at the actual site of energy consumption, or through the full fuel cycle, beginning at the source of energy production." Pub. L. No. 109-58, § 1802, 119 Stat. 594, 1123 (2005). After this report, the Department of Energy began quantifying the energy savings from conservation standards on a full fuel cycle basis. *See* Energy Conservation Program for Consumer Products and Certain Commercial and Industrial Equipment: Statement of Policy for Adopting Full-Fuel-Cycle Analyses Into Energy Conservation Standards Program, 76 Fed. Reg. 51,281, 51,282 (Aug. 18, 2011). But the fact that the Department of Energy quantifies the source energy savings from new conservation standards does not change the fact that the standards themselves are defined and set in terms of point-of-use energy consumption.[2]

---

[2] In its *amicus curiae* brief, the Department of Energy claims that although "compliance testing for EPCA standards happens in a laboratory setting that is intended to eliminate real-world variables, the Department nonetheless considers 'where the appliance is operated.'" Dkt. 26.1, Department of Energy Br. at 14 (citing 76 Fed. Reg. at 51,283). The full sentence quoted in the Department's brief is an explanation of the concept of site energy: "The point-of-use method for measuring energy consumption considers the use of electricity, natural gas, propane, and/or fuel oil by an appliance at the site where the appliance is operated." 76 Fed. Reg. at 51,283. That citation does not demonstrate that the

Appellants are also incorrect that EPCA established a regulatory scheme that "encourage[s] diverse energy sources and rel[ies] on neutral energy consumption and conservation objectives." Pls. Br. 42. While EPCA's energy conservation standards are "fuel neutral" in the sense that the Department of Energy regulates both gas and electric products (and thus neither can avoid reducing energy consumption), EPCA does not establish a nationwide policy of fuel neutrality that requires cities and states to supply fuels on an equivalent basis.

In fact, federal energy law respects state and local control of decisions about distribution. The Natural Gas Act of 1938 established federal authority over interstate transmission of natural gas but preserved the authority of state and local governments over retail sales and delivery. 15 U.S.C. § 717(b); *see also E. Ohio Gas Co. v. Tax Comm'n of Ohio*, 283 U.S. 465, 471 (1931) ("[T]he furnishing of gas to consumers … is not interstate commerce, but a business of purely local concern exclusively within the jurisdiction of the state."); *see also ONEOK, Inc. v. Learjet, Inc.*, 575 U.S. 373, 384-85 (2015) ("As we have repeatedly stressed, the Natural Gas Act was drawn with meticulous regard for the continued exercise of state power, not to handicap or dilute it in any way." (citations and internal quotation marks omitted)); *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 292 (1997)

---

Department has understood its energy conservation standards to restrict states and cities from using their police powers to regulate natural gas or electricity.

11

("Congress's purpose in enacting the [Natural Gas Act] was to fill the regulatory void created by the Court's earlier decisions prohibiting States from regulating interstate transportation and sales for resale of natural gas, while at the same time leaving undisturbed the recognized power of the States to regulate all in-state gas sales directly to consumers."). Congress did not disturb this existing balance with EPCA's requirements for energy conservation standards—EPCA says nothing about obligating cities and states to create or maintain natural gas services. *See Bond v. United States*, 572 U.S. 844, 858 (2014) ("[I]f the Federal Government would radically readjust the balance of state and national authority, those charged with the duty of legislating must be reasonably explicit about it." (cleaned up)).

**B.    EPCA's preemption provision must be read consistent with the statute's technical definitions of statutory terms**

In their brief to this Court, Appellants largely forego reliance on the "point of use" language and instead argue that the District Court erred by supposedly conflating regulations concerning energy use with energy conservation standards. *See* Pls. Br. 28-30. Here they rely on a different part of the Ninth Circuit's opinion in *City of Berkeley*. *Id.* at 30 (citing *City of Berkeley*, 89 F.4th at 1105). But the district court made no such error, and this argument gets Appellants no further.

For a state or local regulation to be preempted, it must concern the "energy efficiency, energy use or water use" of a covered product, as those terms are defined in EPCA. EPCA preempts state and local testing and labeling

12

requirements, *see Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 500-01 (9th Cir. 2005), and the provision's exclusion for conforming building codes otherwise preempts codes that require the installation of products that exceed federal standards, *see Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1151 (9th Cir. 2012). But contrary to Appellants, New York City is not "effectively" setting a quantity of energy use for natural gas appliances by prohibiting emissions from on-site combustion of certain fuels. Pls. Br. 17; Department of Energy Br. 15. Natural gas appliances sold in New York City are subject to the Department of Energy's labeling and energy conservation standards and manufacturers are not required to produce different appliances for sale in New York City. Local Law 154 concerns the emissions that fuel combustion produces, not the quantity of fuel that appliances consume.

The District Court correctly interpreted the preemption provision in line with those principles. It recognized that "'energy use' is a component of" federal energy conservation standards and that once a federal energy conservation standard takes effect "state regulations concerning the product's energy efficiency or energy use—the bases upon which energy conservation standards are determined—are preempted." J.A. 92 (citation omitted). Appellants argue that the phrase "regulation concerning . . . energy use" must extend beyond appliance testing because

13

otherwise it would be redundant with the phrase "energy conservation standard." *See* Pls. Br. 28-30. But "energy conservation standard" is defined as "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use . . . determined in accordance with test procedures prescribed under section 6293 of this title." 42 U.S.C. § 6291(6)(A). The District Court correctly ascribed the different statutory meanings to the terms: "energy use." In EPCA, it is just one component used to develop an "energy conservation standard." Contrary to Appellants' reading, "energy use" does not lose its statutory definition and take on a new and more expansive meaning along the lines of "the ability to use a preferred energy source" when it appears in the preemption provision. "Energy use" retains the same meaning that it has throughout EPCA, *see Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("[I]dentical words and phrases within the same statute should normally be given the same meaning."), and does not suddenly drop its technical meaning in this otherwise technical statute.[3]

---

[3] Appellants also argue that their reading of the preemption provision follows from Congress's amendments to the preemption provision in 1987. Pls. Br. 31-32. But the change that Congress made – stating that preemption applied to a "regulation concerning the energy efficiency or energy use" of covered appliances – is reflected in the district court's reading of the statute, which ascribed the correct independent meaning to these terms. *See* Pub. L. No. 100-12, § 7(b), 101 Stat. 103 (1987). And while Congress observed that manufacturers were "confronted with the problem of a growing patchwork of differing State regulations which would increasingly complicate their design, production and marketing plans," S. Rep. No.

14

Nor can Appellants save this argument by relying on the preemption provision's use of the word "concerning." Appellants overread "concerning" to give it a meaning it cannot bear in the context of the statute. Pls. Br. 26-28. Under Appellants' reading, because Local Law 154 may be said to "concern" natural gas, a type of fuel, it therefore concerns "energy use" as defined by EPCA. But reading "concerning" to expand the preemption clause to reach any law concerning any aspect of energy would render the remainder of the preemption clause superfluous. The preemption clause specifies that state laws "concerning" "energy efficiency" and "energy use" are preempted. Had Congress intended to preempt all state laws concerning energy in any respect, Congress would not have needed to delineate those two categories. *See* 42 U.S.C. § 6297(c).

Appellants' overreading is exactly the type of error the Supreme Court has cautioned against. *See Dubin v. United States*, 599 U.S. 110, 119 (2023) ("If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes there would be no limits, as [r]eally, universally, relations stop nowhere.") (quoting *N.Y. State Conf. of Blue Cross & Blue Shield Plans v.*

---

100-6 at 4-5, Congress tackled that problem by setting criteria for when the Department of Energy could issue waivers to states. *See id.* at 9. With respect to the rule of preemption for conflicting state regulations when a federal energy conservation standard takes effect, Congress seemed to view the provision as reflecting current law. *See id.* ("New section 327(c) states that on the effective date for each Federal energy conservation standard, that standard preempts State regulation, as provided under current law.").

*Travelers Ins. Co.*, 514 U.S. 645, 655 (1995)) (internal quotation marks omitted); *see also Egelhoff v. Egelhoff*, 532 U.S. 141, 147 (2001) ("[W]e have cautioned against an 'uncritical literalism' that would make pre-emption turn on 'infinite connections.'") (quoting *Travelers Ins. Co*, 514 U.S. at 656). Appellants' reading flouts the Supreme Court's guidance.

"[C]onstruing statutory language is not merely an exercise in ascertaining 'the outer limits of [a word's] definitional possibilities.'" *FCC v. AT&T Inc.*, 562 U.S. 397, 407 (2011) (quoting *Dolan*, 546 U.S. at 486) (cleaned up). The Court should uphold Local Law 154 and find that EPCA's preemption provision has a "meaning[] [that] produces a substantive effect that is compatible with the rest of the law." *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988). Because Local Law 154 does not set testing, labeling, or manufacturing standards for appliances, it is not preempted under a proper reading of EPCA's preemption provision.

## III.   Appellants' reading of the statute lacks plausible limiting principles

Appellants' reading of EPCA's preemption provision transforms it into a broadly intrusive limit on state and local authority. Using just one source of authority as an example, it calls into question many garden-variety limits on air pollution that protect public health and safety.

16

Federal law recognizes that state and local governments have primary authority to regulate air quality. *See* 42 U.S.C. § 7407. In the Clean Air Act, Congress stated expressly that "air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) and air pollution control at its source is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3). The authority to set limits on air pollution has traditionally been a part of the police power. *See Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 442 (1960) ("Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power"); *see also Env't Encapsulating Corp. v. City of New York*, 855 F.2d 48, 53 (2d Cir. 1988). The police power was "reposed in the States" and "denied the National Government" by design. *United States v. Morrison*, 529 U.S. 598, 618-19 (2000); *see also United States v. Lopez*, 514 U.S. 549, 566 (1995) (the Constitution "withhold[s] from Congress a plenary police power").

New York City has used its police power to set numerous air quality limits. Appellants' reading of the preemption clause would call into question scores of those air pollution laws and regulations that have previously been firmly within the City's domain. Congress did not intend such a radical result in EPCA's preemption provision.

17

Numerous otherwise unobjectionable city regulations may restrict an end user from being able to simply connect and use an EPCA-rated appliance. For example, New York City requires registration for the use of certain EPCA-rated appliances, including boilers and water heaters. 24 N.Y.C. Admin. Code §§ 109(a)(3)-(5), (8), (10)-(12), (17). The City also requires certificates of operation and work permits for certain EPCA-rated appliances. *Id.* §§ 120, 122(b), 125, 128, 129. In addition, the City sets limits on certain types of air pollution from appliances and equipment, including limits on emissions of particulates, *see id.* § 145(b); 6 N.Y.C.R.R. § 212-1.2(18), nitrogen oxides, *see* 24 N.Y.C. Admin. Code § 144; 6 N.Y.C.R.R. § 227-2.4, odorous air contaminants, *see* 24 N.Y.C. Admin. Code § 141, smoke, *see* 24 N.Y.C. Admin. Code § 142, and other air contaminants, *see* 24 N.Y.C. Admin. Code § 153; 6 N.Y.C.R.R. § 212-1.5. The City also requires that cook stoves be equipped with an emission control device, *see* 24 N.Y.C. Admin. Code § 149.5, and similarly, that boilers be equipped with an air contaminant recorder, *see id.* §§ 24-160, 165. And finally, the City sets standards related to the type of fuel that may be used in appliances, including the use of proper fuel in fuel-burning equipment, s*ee id.* § 168, the use of clean heating oil in heating systems, s*ee id.* § 168.1, and the sulfur content in fuel, *see id.* § 169.

Appellants' theory of the preemption clause would call into question each of these laws, insofar as they may limit how an EPCA-rated commercial or consumer

appliance could be used. (Or, to use Appellants' preferred formulation, these laws set a requirement of "zero energy use" when an appliance is not in compliance with the air code.) These results are neither what Congress intended nor what it wrote in EPCA.

The preemption provision saves manufacturers from having to comply with a patchwork of state and local energy conservation standards and manufacture different models for sale in different locations. Regulations that "give[] manufacturers no reason to change the design of their natural gas products to meet standards higher than those prescribed by DOE" are not preempted by EPCA. *See Berkeley*, 89 F.4th at 1126 (Friedland, J., dissenting). Instead, they "simply direct[] consumers to one set of products with one set of federal efficiency standards (electric appliances) over another set of products with different federal efficiency standards (gas appliances)." *Id.*

## CONCLUSION

Local Law 154 is not preempted by EPCA, and the Court should affirm the District Court's ruling upholding the law.

Dated: November 6, 2025                    Respectfully submitted,

                                           */s/Thomas Zimpleman*
                                           Thomas Zimpleman
                                           Natural Resources Defense Council
                                           1152 15th St. NW, Suite 300

Washington, DC 20005
TZimpleman@nrdc.org
Phone: 202-289-6868

Natasha Brunstein
Natural Resources Defense Council
40 W 20th St.
New York, NY 10011
NBrunstein@nrdc.org
Phone: 212-727-2700

*Counsel for Amicus Curiae Natural
Resources Defense Council*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29 and 32, undersigned counsel certifies that the foregoing brief:

1. Complies with the type-volume limitation of Local Rules 29.1(c) and 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,527 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

_/s/Thomas Zimpleman_
Thomas Zimpleman

## CERTIFICATE OF SERVICE

I hereby certify that, on November 6, 2025, this brief was served through the

Court's ECF system on counsel for all parties.

*/s/Thomas Zimpleman*
Thomas Zimpleman
