# 25-977

IN THE UNITED STATES COURT OF APPEALS FOR THE
SECOND CIRCUIT

Association of Contracting Plumbers of the City of New York, Inc.; Plumbing-Heating-Cooling Contractors—National Association; Plumbers Local Union No. 1, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada; New York State Energy Coalition, Inc.; Plumbing Foundation City of New York, Inc.; Licensed Plumbing Association of New York City, Inc., d/b/a Master Plumbers Council of the City of New York; and Building Industry Association of New York City, Inc.,

*Plaintiffs-Appellants,*

*v.*

City of New York,

*Defendant-Appellee*

On Appeal from the United States District Court for the
Southern District of New York

**BRIEF OF *AMICUS CURIAE* PUBLIC HEALTH LAW CENTER
SUPPORTING DEFENDANT-APPELLEE AND AFFIRMANCE**

Daniel Carpenter-Gold          Public Health Law Center
Jamie Long                     875 Summit Ave.
Mia Montoya Hammersley         St. Paul, MN 55105
                               (651) 290-6329

*Attorneys for* Amicus Curiae *Public Health Law Center*

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), the

Public Health Law Center states that it has no parent corporation and that no

publicly held corporation owns 10 percent or more of its stock.

# TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENT ...................................................... i

TABLE OF AUTHORITIES ............................................................... iv

STATEMENT OF IDENTIFICATION ..................................................... 1

SUMMARY OF ARGUMENT ............................................................. 1

ARGUMENT ................................................................................. 3

  I.   EPCA's Legislative History Supports the City's Reading of Its Preemption Provision ................................................................................. 3

    A.    EPCA's Five Decades of Amendments Demonstrate Precise Targeting of EPCA Preemption ...................................................... 3

    B.    EPCA's Amendment History Supports a Reading of Its Preemption Provisions that Excludes Local Law 154 ........................................... 7

    C.    Congress's Concern with Avoiding a "Patchwork" of Appliance Conservation Standards Does Not Implicate Local Law 154 ........................... 12

  II.   Reading EPCA Preemption to Cover Air Quality Regulations Would Be an Absurd Result Not Contemplated by EPCA ....................................... 15

    A.    Natural Gas is a Significant Source of Pollution Meriting Clean Air Regulation ................................................................................. 16

    B.    There is No Indication that Congress Intended EPCA to Preempt Clean Air Laws ................................................................................. 17

    C.    By Comparison, the Vehicle-Efficiency Side of EPCA Explicitly Acknowledges and Addresses Overlap with Clean Air Regulations ................. 18

    D.    Local Law 154 is Not a Building Code as Contemplated for EPCA Preemption ................................................................................. 19

    E.    Reading EPCA to Preempt Local Air Pollution Controls Would Put Common Clean Air and Public Health Regulations at Risk ........................... 21

III. If Local Law 154 were Part of a Building Code, It Would Be Exempt from EPCA Preemption ................................................................. 24

    A.    Local Law 154 would Meet the Requirement for Regulations of Industrial Appliances .................................................................. 25

    B.    Local Law 154 and the City's Energy Code Meet the Requirements for Regulations of Consumer Appliances .............................. 26

IV. Upholding Local Law 154 Does Not Require Creating a Circuit Split ......... 31

CONCLUSION ...................................................................... 33

# TABLE OF AUTHORITIES

### Cases

*Beijing Neu Cloud Oriental Sys. Tech. Co. v. Int'l Bus. Machs. Corp.*, 110 F.4th 106 (2d Cir. 2024) .................................................................... 33

*Cal. Restaurant Ass'n v. City of Berkeley*, 65 F.4th 1045 (9th Cir. 2023) ............... 20

*California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024).................................................................2, 19, 20, 24, 25, 31, 32

*Cipollone v. Liggett Group, Inc.*, 506 U.S. 504 (1992)............................................. 18

*Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251 (2013) ...................................... 31

*Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564 (1982) ........................................ 22

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ............................................................ 22

*Nat. Res. Def. Council v. Abraham*, 355 F.3d 179 (2d Cir. 2004) .................... 3, 4, 6

*Rinnai Am. Corp. v. S. Coast Air Qual. Mgmt. Dist.*, No. 25-5129 (9th Cir. filed Aug. 13, 2025)........................................................................................... 32

*Rinnai Am. Corp. v. South Coast Air Quality Mgmt. Dist.,* No. CV 24-10482 PA, 2025 WL 2427844 (C.D. Cal. Jul. 22, 2025)....................................... 17, 22, 24, 31

*United States v. Silver*, 954 F.3d 455 (2d Cir. 2020)................................................. 32

### Statutes

30 Tex. Admin. Code § 117.3205(b) (2023)........................................................... 21

42 U.S.C. § 32902 ................................................................................................... 18

42 U.S.C. § 6295(b) ................................................................................................ 10

42 U.S.C. § 6295(c) ................................................................................................ 10

42 U.S.C. § 6297(c) .......................................................................................... 3, 15, 17

42 U.S.C. § 6297(f).................................................................2, 25, 26, 27, 28, 29, 30

iv

42 U.S.C. § 6316(b) ................................................................ 2, 3, 25, 26, 27

42 U.S.C. § 7521 ................................................................................ 18

Colo. Rev. Stat. § 25-7-1504(1) (2024) .................................................. 21

Utah State Code § 19-2-107.7(2) (2025) ................................................. 21

Other Authorities

2020 N.Y.C. Energy Cons. Code § C407.1 ............................................. 34

2020 N.Y.C. Energy Cons. Code § R405 ............................................... 34

2020 N.Y.C. Energy Cons. Code § R406 ............................................... 34

2020 N.Y.C. Energy Cons. Code Appx. CA ............................................ 34

Am. Lung Ass'n, *Literature Review on the Impacts of Residential Combustion: Final Report* (2022) ............................................................................. 19

Am. Med. Assn., *Informing Physicians, Health Care Providers, and the Public that Cooking with a Gas Stove Increases Household Air Pollution and the Risk of Childhood Asthma*, Directive D-135.964 (2022) ..................................... 19

Am. Pub. Health Ass'n, *Gas Stove Emissions are a Public Health Concern: Exposure to Indoor Nitrogen Dioxide Increases Risk of Illness in Children, Older Adults, and People with Underlying Health Conditions*, Policy Number 20225 (2022) ........................................................................................... 18

*Final Rule for Clothes Dryers and Kitchen Ranges and Ovens*, 47 Fed. Reg. 57,198 (Dec. 22, 1982) ........................................................................ 10, 35, 36

*Local Law 154: Building Electrification*, N.Y.C. Dep't of Bldgs. ............ 18

N.Y.C. Admin. Code § 24-168 (2025) ................................................... 28

N.Y.C. Admin. Code § 24-169 (2025) ................................................... 28

N.Y.C. Admin. Code § 24-173 (2025) ................................................... 28

N.Y.C. Admin. Code § 24-177.1 (2025) ................................................. 23

N.Y.C. Admin. Code § 28-506.1 (2025) ................................................... 24

N.Y.C. Admin. Code, Fuel Gas Code § 623.1.1 (2025) ........................... 28

Public Health Law Center, *Cooking with Smoke: How the Gas Industry Used Tobacco Tactics to Cover Up Harms from Gas Stoves* (2024) ........................... 25

San Diego Air Pollution Control District, Rule 69.5.1(d) (2015) ............................ 26

Stephen Mushegan & Talor Gruenwald, *New York Emits More Building Air Pollution than Any Other State: Going Electric can Fix That*, RMI (May 18, 2021) ........................................................................................... 19

U.S. Energy Info. Admin., *Residential Energy Consumption Survey* (2023) ........... 16

**Regulations**

40 C.F.R. pt. 50 (2025) ................................................................. 25

**Session Laws and Legislative Materials**

124 Cong. Rec. 34,563 (1978) ........................................................... 10, 11

133 Cong. Rec. 4501 (1987) ............................................................ 15, 16

Air Pollution Control Act of 1955, Pub. L. No. 84-159, 69 Stat. 322 ..................... 20

Air Quality Act of 1967, Pub. L. No. 90-148, 81 Stat. 485 ........................... 20

*Appliance Standards: Hearing on H.R. 5465 Before the Subcomm. on Energy Cons. & Power of the Comm. on Energy & Comm.*, 99th Cong. (Sept. 10, 1986) ........................................................................................... 15, 16

Clean Air Act Amendments of 1977, Pub. L. No. 95-95, 91 Stat. 685 ................... 22

Clean Air Act of 1963, Pub. L. No. 88-206, 77 Stat. 392 ........................... 20

Clean Air Act of 1970, Pub. L. No. 91-604, 84 Stat. 1676 ........................... 20

Energy Independence and Security Act of 2007, Pub. L. 110-140, 121 Stat. 1492 ... 8

Energy Policy Act of 1992, Pub. L. 102-486, 106 Stat. 2776 ..................... 8

Energy Policy Act of 2005, Pub. L. 109-58, 119 Stat. 594 ........................................ 8

Energy Policy and Conservation Act of 1975, Pub. L. No. 94-163, 89 Stat. 871 ................................................................................... 4, 12, 13, 22

H.R. Rep. No. 94-340 (1975) ........................................................................ 22

H.R. Rep. No. 95-1294 (1978) ........................................................................ 5

H.R. Rep. No. 95-1751 (1978) ............................................................... 5, 10, 11

H.R. Rep. No. 100-11 (1987) ........................................... 6, 7, 8, 11, 14, 32

National Appliance Energy Conservation Act Amendments of 1988, Pub. L. 100-357, 102 Stat. 671 ........................................................... 8

National Appliance Energy Conservation Act of 1987, Pub. L. 100-12, 101 Stat. 103 ................................................................. 6, 7, 11, 12, 35

*National Appliance Energy Conservation Act: Hearing on S.2781 Before the Subcomm. on Energy Regs. and Cons. of the Comm. on Energy and Nat. Res.,* 99th Cong. (Sept. 16, 1986) ........................................................ 6, 15

National Energy Conservation Policy Act of 1978, Pub. L. No. 95-619, 92 Stat. 3206 ............................................................................ 4, 5, 9, 12, 13

S. Rep. No. 100-6 (1987) ............................................................................. 6

## STATEMENT OF IDENTIFICATION

The Public Health Law Center (Center) is a public interest legal resource center dedicated to improving health through the power of law and policy. The Center helps local, state, national, Tribal, and global leaders promote health by strengthening public policies. These policies include regulations, such as the rule challenged in this case, that reduce indoor and outdoor pollution caused by the combustion of certain fuels. The Center is also concerned with preserving the power of state and local governments to protect their constituents through regulations that protect public health. The Center files this brief with the consent of all parties.[1]

## SUMMARY OF ARGUMENT

The Energy Policy and Conservation Act (EPCA) does not preempt New York City Local Law 154. This is clear from a straightforward reading of the statute's preemption provisions, as Defendant-Appellee the City of New York (City) has demonstrated. *See generally* Br. for Def.-Appellee (City Br.) 15-21, 27-40. A thorough understanding of the history of EPCA's amendments and their legislative record supports this reading, as the Center describes below.

---

[1] No party's counsel authored this brief in whole or in part. No party's counsel, or any person other than the Center, contributed money intended to fund the preparation or submission of this brief.

1

EPCA deals with energy conservation; Local Law 154 does not. Congress was explicit in the goals of EPCA's appliance-efficiency provisions: to establish unified federal energy-conservation standards, thus capturing the benefits of energy efficiency while eliminating the economic harms caused by numerous, conflicting, and variable state and local standards. Local Law 154 does not impede these goals because it does not threaten federal standards or the efficiencies of scale that appliance manufacturers have achieved. Interpreting EPCA's preemption provision to eliminate Local Law 154 would also eliminate a host of other public health provisions—this was not the intent of Congress in enacting the relevant statutory language.

Upholding Local Law 154 does not require creating a circuit split. The only other federal appellate opinion on this issue is *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). The ordinance challenged in that case was a "building code," a fact which was a crucial element of the Ninth Circuit's reasoning. *E.g., id.* at 1101. Local Law 154 is not a building code. And if it were part of the City's building code, it would be protected by the exemptions in EPCA for regulations contained in qualifying codes, 42 U.S.C. §§ 6297(f)(3), 6316(b)(2)(B), which the *California Restaurant Association* opinion did not analyze. Thus, a holding from this Court that Local Law 154 is not a building code, or that it is part of

2

the City's building code and therefore exempt from EPCA preemption, would not require disagreement with the Ninth Circuit.

## ARGUMENT

### I. EPCA's Legislative History Supports the City's Reading of Its Preemption Provision

The history of amendments to EPCA and the legislative record surrounding key changes support the City's interpretation of 42 U.S.C. §§ 6297(c) and 6316(b). There is nothing in EPCA's history to suggest that Congress intended to *sub silentio* preempt basic health, safety, and environmental measures like Local Law 154. On the contrary, the care and nuance with which Congress has treated EPCA preemption indicate the opposite: that the law is meant to preempt only the specific and local regulations that would supplant federal energy-efficiency standards.

#### A. *EPCA's Five Decades of Amendments Demonstrate Precise Targeting of EPCA Preemption*

Congress has amended EPCA numerous times since its enactment in 1975. EPCA's original appliance-efficiency provisions relied on labeling and voluntary targets to encourage greater energy conservation. *See, e.g., Nat. Res. Def. Council v. Abraham,* 355 F.3d 179, 185 (2d Cir. 2004). Binding appliance standards would apply, however, if these voluntary measures turned out to be insufficient. *Id.* at 186. State and local appliance conservation standards would only be preempted if those mandatory standards were triggered. *See* Energy Policy and Conservation Act of

3

1975 (1975 EPCA), Pub. L. No. 94-163, § 327(A)(2), 89 Stat. 871, 927. If preemption applied to a state or local appliance conservation standard, the corresponding government could petition to waive that preemption, which required showing "a substantial State or local need," that the standard would "not unduly burden interstate commerce," and that the state or local standard was more stringent than the preempting federal standard. *Id.* § 327(b)(2), 89 Stat. at 927.

Three years after EPCA's passage, Congress passed the National Energy Conservation Policy Act of 1978 (NECPA), Pub. L. No. 95-619, 92 Stat. 3206. NECPA eliminated the target-based system in the original EPCA, instead requiring the U.S. Department of Energy (DOE) to set mandatory efficiency standards for 13 types of home appliances at levels that were "technologically feasible" and "economically justified." *Nat. Res. Def. Council*, 355 F.3d at 186. State and local appliance conservations standards for any of those 13 appliance types would be preempted until July 1, 1980. NECPA § 424(a), 92 Stat. at 3264; *see also* H.R. Rep. No. 95-1751, at 117-118 (1978) (describing the interim preemption). At the same time, however, NECPA loosened the standards for preemption waivers: a state or local government no longer needed to show "substantial...need" but rather "significant...interest"; in addition, the burden of proof was reversed, so that the waiver would be granted unless the DOE affirmatively determined that the standard

4

would burden interstate commerce. NECPA § 424(a), 92 Stat. at 3264; *see also* H.R. Rep. No. 95-1294, at 118 (1978) (discussing the change in burden of proof).

NECPA's changes made it far easier for states to secure preemption waivers. Thus, when the DOE, after years of delay, issued standards that preempted state and local appliance conservation standards without providing numeric federal standards in their place, state and local governments began requesting—and receiving—waivers en masse. *Nat. Res. Def. Council*, 355 F.3d at 186; S. Rep. No. 100-6, at 4 (1987) (describing "a general policy of granting petitions from States requesting waivers from preemption"); H.R. Rep. No. 100-11, at 27 (1987) (noting over sixteen current or planned state appliance efficiency standards, in addition to state and local appliance efficiency standards contained in building codes). As one DOE witness put it, under NECPA, "Essentially, the only thing that the State had to prove was that the standard that they were proposing was tougher than the Federal standard...." *National Appliance Energy Conservation Act: Hearing on S.2781 Before the Subcomm. on Energy Regul. & Conservation of the Comm. on Energy & Nat. Res.*, 99th Cong. 255 (Sept. 16, 1986) (*Senate Subcomm. Hearing*) (statement of Alan J. Streb, Deputy Assistant Sec'y for Conservation, DOE).

This absence of federal standards, combined with a flood of preemption waivers for state and local standards, led to the National Appliance Energy Conservation Act of 1987 (NAECA), Pub. L. 100-12, 101 Stat. 103. The text of

NAECA was negotiated by energy-efficiency advocates, who sought federal appliance conservation standards, and appliance manufacturers, who sought to rein in "a growing plethora of differing state regulations." H.R. Rep. 100-11, at 27-28. *See also Nat. Res. Def. Council*, 355 F.3d at 186 (summarizing NAECA's history).

NAECA therefore represents a delicate balance between competing interests. It sets out many energy conservation requirements in the statute, while also requiring DOE to revisit those standards on a regular basis to advance them as technology and economics allow. *Nat. Res. Def. Council*, 355 F.3d at 186-88. NAECA also added complexity to EPCA's preemption provision, preempting some state and local appliance conservation standards while creating permanent carveouts for others. In addition, the law tightens the standard for receiving preemption waivers, while also creating an entirely new category of automatic exemptions for building codes. NAECA § 7, 101 Stat. at 118, 121. This nuance was not meant to radically expand EPCA preemption—rather, Congress intended NAECA preemption to "follow[] substantially the preemption requirements in [NECPA]" and to "continue[] the basic concept of preempting State energy efficiency standards." H.R. Rep. No. 100-11, at 23-24.

The specificity and nuance with which Congress addressed EPCA preemption in NAECA has continued through subsequent amendments. When Congress expanded EPCA's energy conservation regime to industrial appliances in the Energy

6

Policy Act of 1992, it added new carveouts for state and local governments and made the exemption for building codes even easier to use. Pub. L. 102-486, § 122(e)(2), 106 Stat. 2776, 2816-17. Other amendments exempted still more categories. *See* National Appliance Energy Conservation Act Amendments of 1988, Pub. L. 100-357, § 2(f), 102 Stat. 671, 674 (certain fluorescent-lamp standards); Energy Policy Act of 2005, Pub. L. 109-58, §§ 135(d)(3), 136(h)(3), 119 Stat. 594, 634, 644 (certain standards for pedestrian crossing lights and industrial cooling equipment); Energy Independence and Security Act of 2007, Pub. L. 110-140, §§ 312(e)(2), 321(d)(3), 325(f)(2), 121 Stat. 1492, 1567, 1585, 1594-95 (certain walk-in freezers and lighting equipment standards).

### B. *EPCA's Amendment History Supports a Reading of Its Preemption Provisions that Excludes Local Law 154*

It is impossible to reconcile the attention to detail with which Congress has treated EPCA with Appellants' sweeping reading of EPCA preemption. Appellants' theory is predicated on congressional intent to radically expand EPCA preemption in NECPA and NAECA. *E.g.*, Br. for Pls.-Appellants (Appellants' Br.) 28 (arguing that reading EPCA to preempt only appliance conservation standards "would roll the provision back to its original 1975 version"). Indeed, they appear to agree that the original version of EPCA would not have preempted Local Law 154. *Id.* at 31 ("The preemption provision used to say almost exactly what the district court

7

concluded it means now."). Appellants' sole argument, then, is that NECPA and NAECA fundamentally changed EPCA preemption. This is incorrect, as EPCA's history demonstrates.

For NECPA, Appellants rest their claim on a single word change: replacing the phrase "similar requirement" with "other requirement." *Id.* (quoting NECPA § 424(b), 92 Stat. at 3264). This change had a specific purpose: to include in the scope of EPCA preemption those regulations that are specifically targeted at appliance energy conservation but were not "similar" to federal standards because, for example, they imposed "design regulations" for efficiency, rather than numeric requirements. 124 Cong. Rec. 34,563 (1978) (reprinting conference summary of NAECA provisions). The example provided in the legislative record is a prohibition on gas pilot lights, which conserves energy (by eliminating the constant use of gas while the appliance is not in use) but does not set a numeric standard. *Id.*; *see also* H.R. Rep. No. 95-1751, at 118 ("[E]stablishment of a Federal standard, for example, with respect to the energy efficiency of gas ranges would automatically preempt both State efficiency standards affecting such ranges and any other State requirements affecting gas range energy efficiency such as a State prohibition on gas pilot lights."). In other words, Congress did not intend this change to drastically expand EPCA

8

preemption. It merely intended to capture design requirements that were aimed at controlling energy efficiency but were not stated numerically.[2]

Appellants then argue that NAECA must have expanded EPCA preemption because of the use of "energy conservation standard" in place of "energy efficiency standard" in the preemption provision. Appellants' Br. 31-32. But this change is not about the scope of EPCA preemption, as the City explains. City Br. 25-26. Congress intended to "continue[] the basic concept of preempting State energy efficiency standards" from NECPA. H.R. Rep. No. 100-11, at 24. However, NAECA's statutory appliance standards incorporated metrics for both "energy efficiency" (a minimum amount of useful output per unit of energy input) and "energy use" (a maximum amount of energy to be consumed over a period of time or to produce a specific result). NAECA § 5, 101 Stat. at 108-17. For example, NAECA set "energy efficiency" standards for air conditioners, requiring them to produce a certain

---

[2] The United States, as *amicus curiae*, agrees that regulations prohibiting pilot lights "could be viewed as...'other requirement[s] respecting energy use' that are preempted" under NECPA. Br. for U.S. as *Amicus Curiae* Supp. Appellants (U.S. Br.) 27 (quoting *Final Rule for Clothes Dryers and Kitchen Ranges and Ovens*, 47 Fed. Reg. 57,198, 57,215 (Dec. 22, 1982)). The United States argues that this implies that NECPA would also preempt appliance prohibitions. *Id.* Given that the pilot-light prohibition is specifically called out in the legislative record and appliance prohibitions are not, however, the better reading is that NECPA's "other requirement" language refers only to design requirements that address efficiency, not to regulations like Local Law 154. *See* 124 Cong. Rec. 34,563; H.R. Rep. No. 95-1751, at 118.

9

amount of cooling per unit of energy, but "energy use" standards for refrigerators, requiring them to keep energy use under a certain level each year. *Id.,* 101 Stat. at 108-09 (codified as amended at 42 U.S.C. § 6295(b)-(c)).

Congress therefore created the umbrella term "conservation standard" to refer to either type of federal standard.[3] Notably, state and local standards did not require an equivalent change because the language referring to non-federal standards in EPCA's preemption provision already included both "energy efficiency" and "energy use." *E.g.,* 1975 EPCA § 327(a)(2), 89 Stat. at 927 (preempting state or local "requirement[s] with respect to energy efficiency or energy use of a covered product"). Therefore, Congress simply carried forward the preexisting preemption language in NAECA, preempting "regulation[s] concerning the energy efficiency or energy use of [a] covered product." NAECA § 7, 101 Stat. at 118. The resulting provision refers to federal standards with language that is different from that used in state or local standards—a reasonable choice for Congress to make, since it avoids confusion between the two sources of standards.

---

[3] NAECA also clarified DOE's authority to set either type of standard, where previous versions had only referenced "energy efficiency" standards. *Compare, e.g.,* NAECA § 5, 101 Stat. at 108 (noting that one purpose of section is to authorize "energy conservation standards"), *with* NECPA § 422, 92 Stat. at 3259 (authorizing "energy efficiency standard[s]").

10

NAECA's dichotomy between the description of federal and state or local standards was not new. EPCA's original language referred to federal standards as simply "standard[s]," while referring to preempted state standards as "State regulation[s]...provid[ing] for...(2) any energy efficiency standard or similar requirement." 1975 EPCA § 327(a), 89 Stat. at 926-27. Similarly, NECPA referred to "Federal energy efficiency standard[s]," on the one hand, and "State regulation[s] which provide[] an energy efficiency standard or other requirement respecting energy use or energy efficiency," on the other. NECPA § 424(a), 92 Stat. 3264. Thus, NAECA's reference to federal "energy conservation standard[s]" and state or local "regulation[s] concerning...energy efficiency or energy use" simply carries forward the same grammatical structure that EPCA has always had.

In short: the parties agree that EPCA would not have preempted Local Law 154 as it was drafted in 1975. The only change from the NECPA amendments that Appellants point out is specifically explained in the legislative record in a way that does not implicate Local Law 154. And the NAECA provision carries forward the same structure, despite quite substantial changes to the rest of the statute. Meanwhile, Congress took a highly detailed approach in amending other elements of EPCA preemption—showing no intent to create sweeping changes in state or local authority outside of energy-efficiency standards. All signs point to congressional

11

intent to limit EPCA preemption to state and local regulations that directly establish energy conservations standards for appliances, not to expand it beyond that point.

### C. Congress's Concern with Avoiding a "Patchwork" of Appliance Conservation Standards Does Not Implicate Local Law 154

Appellants claim that a "patchwork of banned products is just as disruptive as a patchwork of different standards" for NAECA's purposes. Appellants' Br. 44. This is incorrect. NAECA's drafters were concerned with the specific harms to manufacturers caused by "numerous conflicting State requirements." H.R. Rep. No. 100-11. Fuel prohibitions are not "numerous" or "conflicting," nor could they ever be: Whether a given fuel can be used in a given area is a binary question that creates no risk of fracturing the market, only shifting demand from one existing category of appliance to another. Thus, fuel prohibitions cannot create the same type of economic disruption that is caused by subjecting the same type of appliance to multiple, rapidly fluctuating standards.

As Sen. Wendell Ford, a cosponsor of NAECA, described it, the bill was meant to prevent manufacturers from having "to produce 50 separate pieces of equipment, separate stoves, separate refrigerators, whatever it might be." *Senate Subcomm. Hearing* 256. This would destroy economies of scale because each type of product would need to be manufactured to 50 different standards. *See, e.g., Appliance Standards: Hearing on H.R. 5465 Before the Subcomm. on Energy*

12

*Cons. & Power of the Comm. on Energy & Comm.* (*House Subcomm. Hearing*), 99th Cong. 142 (Sept. 10, 1986) (statement of Robert J. Bauer, Chairman, Gas Appliance Mf'rs Ass'n) ("Instead of making a run of a thousand products, I may now have to take that product and make it into 50 of these and 25 of those, and so forth, and my production efficiencies go down tremendously in my plant.").[4] It would likewise mean that "distribution costs would be horrendous" because each slightly different product would need to be sent to the specific jurisdiction with corresponding standards. *Id.*

      The "volatility" of state and local appliance standards was key to this economic disruption. 133 Cong. Rec. 4501 (1987) (statement of Rep. Carlos J. Moorhead). If different jurisdictions' standards were static, producers could design their products to meet the most stringent of the standards and thereby reclaim some scaling efficiencies. But this was not the case: Some jurisdictions were reconsidering their appliance standards annually, leaving manufacturers unable to make informed investments in product lines. *E.g., id.* (noting that Austin, Texas adopted new air-conditioner standards in both 1986 and 1987 and was planning to change them again

---

[4] The statements from the manufacturers' associations at NAECA's hearings are relevant because they, along with energy-efficiency advocates, drafted the original bill language. *See, e.g., Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 202-03 & n.24 (1976) (finding "significant" the "explanation of [a bill provision] by a spokesman for its drafters" despite the fact that the drafters were not legislators).

in 1988); *House Subcomm. Hearing* 104 (statement of Robert Bauer) (noting that differing regulations "create great unpredictability in the marketplace...because they are...subject to change at any time").

These concerns do not apply to fuel prohibitions, for the simple reason that a prohibition is a binary; that is, it is impossible to have 50 different fuel prohibitions affecting the same appliance. At most, a fuel prohibition divides the country into two markets: one where appliances using the fuel may operate, and one where they may not.[5] There are many appliances available to serve both markets, so no alteration to existing product lines is necessary. In other words, the only impact for a fuel prohibition on the manufacturing economy is to reduce the market share for appliances that use that fuel—and there is no indication that Congress intended EPCA to safeguard any particular product's market share.

Appellants' argument that "a patchwork of energy conservation standards can be expressed as a patchwork of bans," Appellants' Br. 44, misses the point. Congress's concern with a regulatory "patchwork" did not arise merely because

---

[5] In fact, this is no different from the status quo, since there are already many places in the country where there is no market for gas appliances because there is no gas distribution network available. *See, e.g.*, U.S. Energy Info. Admin., *Residential Energy Consumption Survey* tbl. HC2.1, at 5 (2023), https://www.eia.gov/consumption/residential/data/2020/hc/pdf/HC%202.1.pdf (about 34 million homes in the U.S. have no access to gas).

different jurisdictions have prohibited different things, but because many small variations in what is permitted, applied to the same type of appliance, threatened to lead to fragmented and unpredictable market conditions. And this is exactly how EPCA is written: if a state or local regulation prohibited all EPCA-covered appliances that did not meet an energy-conservation target, as Appellants hypothesize, Appellants' Br. 45, that regulation would "concern[] the energy efficiency" or "energy use" of those appliances and therefore be preempted. 42 U.S.C. § 6297(c). But a fuel prohibition like Local Law 154 is not defined in terms of energy conservation—indeed, it does not factor in energy conservation at all—and therefore EPCA does not preempt the regulation.

## II. Reading EPCA Preemption to Cover Air Quality Regulations Would Be an Absurd Result Not Contemplated by EPCA

The District Court noted that interpreting EPCA as Plaintiffs request would lead to an absurd result regarding fuel source prohibitions that are commonplace in construction and fire codes. Joint Appx. (JA) 92-93. So too would an absurd result occur in the context of clean air regulations—a freestanding and robust area of law not contemplated for preemption under EPCA—were Plaintiffs' argument to prevail.

### A. Natural Gas is a Significant Source of Pollution Meriting Clean Air Regulation

Local Law 154 was adopted to "further the City's goals of reducing carbon emissions and improving local air quality."[6] This is sensible, as burning natural gas produces air pollutants commonly targeted by local and national air pollution regulations, with demonstrated harm to human health.[7] Likewise, the combustion of fossil fuels in buildings is a significant contributor to climate pollution. "In New York City, burning fossil fuels for space and water heating accounts for roughly 40 percent of the city's greenhouse gas (GHG) emissions."[8]

---

[6] *Local Law 154: Building Electrification*, N.Y.C. Dep't of Bldgs., https://www.nyc.gov/site/buildings/codes/ll154-building-electrification.page (last visited Nov. 5, 2025).

[7] *See, e.g.*, Am. Pub. Health Ass'n, *Gas Stove Emissions are a Public Health Concern: Exposure to Indoor Nitrogen Dioxide Increases Risk of Illness in Children, Older Adults, and People with Underlying Health Conditions*, Policy Number 20225 (2022), https://www.apha.org/getcontentasset/9526a86f-bc00-40c4-ba58-d7950217ab40/7ca0dc9d-611d-46e2-9fd3-26a4c03ddcbb/gas_stoves_public_health_concern_20225.pdf; Am. Med. Assn., *Informing Physicians, Health Care Providers, and the Public that Cooking with a Gas Stove Increases Household Air Pollution and the Risk of Childhood Asthma*, Directive D-135.964 (2022), https://policysearch.ama-assn.org/policyfinder/detail/D-135.964?uri=%2FAMADoc%2Fdirectives.xml-D-135.964.xml; Am. Lung Ass'n, *Literature Review on the Impacts of Residential Combustion: Final Report* (2022), https://www.lung.org/getmedia/2786f983-d971-43ad-962b-8370c950cbd6/icf_impacts-of-residential-combustion_final_071022.pdf.

[8] Stephen Mushegan & Talor Gruenwald, *New York Emits More Building Air Pollution than Any Other State: Going Electric can Fix That*, RMI (May 18, 2021), https://rmi.org/new-york-emits-more-building-air-pollution-than-any-other-state/.

### B. *There is No Indication that Congress Intended EPCA to Preempt Clean Air Laws*

Clean air regulation has a venerable history in the United States that predates EPCA's 1975 enactment. Federal legislation addressing air quality dates to the Air Pollution Control Act of 1955, Pub. L. No. 84-159, 69 Stat. 322, followed by the Clean Air Act of 1963, Pub. L. No. 88-206, 77 Stat. 392, and the Air Quality Act of 1967, Pub. L. No. 90-148, 81 Stat. 485. The Clean Air Act as we know it was created in 1970, signed into law by President Nixon. Pub. L. No. 91-604, 84 Stat. 1676.

This well-developed context for clean air regulation was present when Congress first enacted EPCA, and yet EPCA's preemption provision includes no textual references to the Clean Air Act or other state or local clean air regulations. *See Rinnai Am. Corp. v. South Coast Air Quality Mgmt. Dist.,* No. CV 24-10482 PA, 2025 WL 2427844 (C.D. Cal. Jul. 22, 2025) ("[T]here is no reason to believe that Congress ever intended or even contemplated that the EPCA would preempt emission regulations designed to combat air pollution."). As discussed above, *supra* § I, Congress took care to precisely target EPCA's preemption scope, with a focus on avoiding a "patchwork" of state appliance efficiency standards. The preemption provision in EPCA is described in the subsection title as a "General rule of preemption for energy conservation standards when Federal standard becomes effective for product." 42 U.S.C. § 6297(c). The preemption section does not

17

reference clean air regulations. *See Cipollone v. Liggett Group, Inc.*, 506 U.S. 504, 517 (1992) ("Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted....").

### C. By Comparison, the Vehicle-Efficiency Side of EPCA Explicitly Acknowledges and Addresses Overlap with Clean Air Regulations

Congress's silence on the overlap between clean air and efficiency regulations for appliances contrasts with its clear acknowledgment of tension between EPCA and the Clean Air Act in an area where the two statutes actually do overlap: vehicle regulation. EPCA regulates vehicle fuel economy: that is, a vehicle's miles per gallon. 42 U.S.C. § 32902. The Clean Air Act, meanwhile, regulates air pollutants emitted by vehicles. 42 U.S.C. § 7521.

Mileage and emissions interact with each other in various ways. For example, at the time of EPCA's original passage, Congress was concerned that emissions controls would reduce vehicles' fuel economy. *See* H.R. Rep. No. 94-340, at 86-87 (1975). Congress addressed this overlap by explicitly recognizing it and cross-referencing the applicable EPCA and Clean Air Act provisions. When it first passed EPCA in 1975, Congress included a provision specifically allowing for less stringent fuel-economy standards for technologies that could be shown to meet "Federal standards," including "Emissions standards under section 202 of the Clean Air Act." 1975 EPCA § 301, 89 Stat. 871 at 904-05. Two years later, Congress incorporated

EPCA into the Clean Air Act, allowing manufacturers flexibility on emissions standards for technologies that could meet EPCA fuel-economy standards. Clean Air Act Amendments of 1977, Pub. L. No. 95-95, § 201(c), 91 Stat. 685, 753.

Congress's careful treatment of the overlap between the Clean Air Act's emissions standards and EPCA's vehicle-efficiency preemption provisions argues for a narrow reading of the appliance-efficiency portion of EPCA. Congress has demonstrated that, when it found that the two statutes could conflict, it explicitly delineated which would prevail.

### D. Local Law 154 is Not a Building Code as Contemplated for EPCA Preemption

While EPCA's preemption text does not contemplate an interaction with clean air laws, it does anticipate that building codes could regulate appliance energy efficiency. The Ninth Circuit in *California Restaurant Association* recognized this focus of EPCA preemption, repeatedly referring to natural gas restrictions at issue in that case as a "building code." *Cal. Rest. Ass'n,* 89 F.4th at 1098. Local Law 154 is not a building code. It sets emissions limits in the same manner as has been done for decades under clean air statutes at the federal and local level, and accordingly

19

codifies these air pollution limits under Title 24, which governs "Environmental Protection and Utilities." N.Y.C. Admin. Code § 24-177.1 (2025).[9]

The Ninth Circuit understood that extending its EPCA preemption indefinitely could have significant consequences, noting that its opinion was limited to the subject before it: a particular type of "building code." *Cal. Rest. Ass'n*, 89 F.4th at 1103. Indeed, the panel amended its opinion specifically to add clarity on this point. *Compare, e.g., Cal. Restaurant Ass'n v. City of Berkeley*, 65 F.4th 1045, 1050 (9th Cir. 2023), *with Cal. Rest. Ass'n*, 89 F.4th at 1101 ("[W]e conclude EPCA preempts building codes like Berkeley's Ordinance that ban natural gas piping within new buildings. Our holding here is limited." (new language underlined)); *compare* 65 F.4th at 1051, *with* 89 F.4th at 1102 ("[A] building code regulation that imposes a total ban on natural gas is not exempt from EPCA just because it lowers the 'quantity of energy' consumed to 'zero.'" (new language underlined)). Reading *California Restaurant Association* to reach beyond building codes and also affect regulations like Local Law 154 stretches the opinion beyond the point where the panel intended it to reach.

---

[9] For enforcement practicality, the air pollution limits set in Title 24 of the City's Administrative Code are implemented through Title 28, covering construction codes. N.Y.C. Admin. Code § 28-506.1 (2025). But the relevant air pollution limits that would govern any appliances that concern Plaintiffs are codified in Title 24.

### E. Reading EPCA to Preempt Local Air Pollution Controls Would Put Common Clean Air and Public Health Regulations at Risk

In many areas, the Clean Air Act sets a floor for air quality regulation, but local jurisdictions can and often do enact stronger restrictions to confront local air pollution. Gas emissions are a logical target, as several of the major pollutants covered by the Clean Air Act are emitted by burning gas, including carbon monoxide, particulate matter, and nitrogen oxides.[10]

This tried-and-true federalism approach has led to a wide range of local controls on appliances, including those that burn gas. For instance, to reduce local pollution impacts, many states and local air pollution districts set stricter nitrogen oxide standards for natural gas fired water heaters by requiring "ultra low-NOx" water heaters that use less energy. *See, e.g.,* Utah State Code § 19-2-107.7(2) (2025); San Diego Air Pollution Control District, Rule 69.5.1(d) (2015); Colo. Rev. Stat. § 25-7-1504(1) (2024); 30 Tex. Admin. Code § 117.3205(b) (2023). If the Court were to adopt Plaintiffs' expansive reading that EPCA preempts any regulation limiting the energy use of a gas appliance, this would also call into question whether many local and state air quality standards would be preempted under EPCA. *See*

---

[10] Public Health Law Center, *Cooking with Smoke: How the Gas Industry Used Tobacco Tactics to Cover Up Harms from Gas Stoves* 4-7 (2024), https://www.publichealthlawcenter.org/sites/default/files/resources/Cooking-With-Smoke.pdf (collecting sources); *see also generally* 40 C.F.R. pt. 50 (2025) (providing standards for the pollutants pursuant to the Clean Air Act).

*Rinnai Am. Corp.*, 2025 WL 2427844 at *6 (noting that, "if taken to its logical conclusion," a finding that EPCA preempts clean air regulations "would upset the historic and recognized powers of states and local governments to set emissions standards and implement other regulations designed to protect the health and safety of their citizens"). This would be an absurd result that the court should avoid given the lack of statutory basis and the longstanding independence of clean air regulations as a distinct area of law. *See, e.g., Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) (absurd results should be avoided).

The U.S. Supreme Court itself has expressly affirmed the limitation of greenhouse gas emissions under clean air regulations, holding that the Clean Air Act's definition of "air pollutant" unambiguously covers greenhouse gas emissions like carbon dioxide. *Massachusetts v. EPA*, 549 U.S. 497, 529 (2007). In that case, the EPA argued that it was the Department of Transportation's job to regulate emissions from cars, but the Court disagreed, noting that EPA's charge with protecting "health" and "welfare" was an independent statutory obligation than the Department of Transportation's automobile energy efficiency charge. *Id.* at 531-32. So, too, is the obligation to protect New Yorkers from air pollution a distinct legal framework than the energy efficiency concerns generally contemplated for appliances under local building codes.

Plaintiffs' attempts at a limiting principle on preemption also fail. They argue that "[i]ncidental impacts do not trigger preemption" but that EPCA preempts where the "practical effect is to categorically prohibit covered gas appliances' energy use." Appellants' Br. 19, 47 (internal quotation omitted). But their attempts to define "incidental" and "categorical" quickly fall apart. Plaintiffs cite the Ninth Circuit's example of limiting gas distribution as an incidental impact acceptable under EPCA. *Id.* at 46. Yet restricting the gas distribution system would have just the practical effect that crosses Plaintiffs' proposed line, prohibiting the energy used for gas appliances wherever there is new construction without gas lines. Plaintiffs also point to one example from the District Court's opinion as an acceptable restriction on "where and how" an appliance can be used. *Id.* at 46-47 (citing JA 93 regarding restrictions near gas station pumps). But they ignore other health and safety regulation examples cited by the District Court, such as New York City's full prohibition on the use of liquefied petroleum gas in cooking appliances—far more "categorical" than "incidental." N.Y.C. Admin. Code, Fuel Gas Code § 623.1.1 (2025). Plaintiffs' interpretation would also call into question other "categorical" air pollution prohibitions New York City places on using certain heavily polluting fuels. N.Y.C. Admin. Code §§ 24-168(d)-(e) (fuel oil grade no. 4 and high-sulfur diesel), 24-169 (high-sulfur fuel oil), 24-173(a) (coal) (2025).

Plaintiffs reassure that health and safety restrictions like those cited in the District Court opinion "have long coexisted with EPCA," so they are not at risk. Appellants' Br. at 46. So, too, have clean air regulations long coexisted with EPCA without a legal challenge of this nature, even where they are restricting air pollutants from EPCA-regulated appliances. The far better reading of EPCA, and the one consistent with the legislative history discussed above, *supra* § I, is that Congress was concerned with a patchwork of energy efficiency restrictions on appliances and not with unrelated regulations in areas traditionally subject to state and local control—whether the gas distribution system, local health and safety laws, or regulating air pollution. *See Rinnai Am. Corp.*, 2025 WL 2427844 at *6 (finding that a Southern California clean air regulation "does not implicate any of the issues the EPCA was intended to address").

## III.    If Local Law 154 were Part of a Building Code, It Would Be Exempt from EPCA Preemption

Local Law 154 is an air-pollution measure, not an element of the City's building code. *See supra* § II.D. However, Appellants' argument is based entirely on a holding that is explicitly limited to building codes. *E.g., Cal. Rest. Ass'n*, 89 F.4th at 1106 ("We only hold that EPCA prevents Berkeley from prohibiting new-building owners from 'extending' fuel gas piping within their buildings...by way of a building code.... Our holding is very narrow....").

24

The reason that *California Restaurant Association*'s holding is limited to building codes is that regulations in building codes are specifically exempted from EPCA preemption. 42 U.S.C. §§ 6297(f)(3), 6316(b)(2)(B). Because of this, the *Berkeley* panel considered building codes to be clearly within the scope of potential EPCA preemption, even while other types of regulation were not. *See, e.g., Cal. Rest. Ass'n*, 89 F.4th at 1101 (noting that the exemption for building codes is "[o]f critical importance" in the panel's determination); *id.* at 1119 (Baker, J., concurring) ("[A]lthough EPCA has little, if anything, to say about a state or local government's regulation of a utility's distribution of natural gas to consumers, it has everything to say about 'State or local building code[s] for new construction concerning the...energy use of...covered product[s]....'" (quoting 42 U.S.C. § 6297(f)(3)).

By the same token, a regulation that is swept into EPCA preemption as a "building code" must also be protected by the relevant exemptions, if the requirements are met. In the case of Local Law 154, all requirements are met and therefore, even if Local Law 154 were considered a building code, it could not be preempted by EPCA.

### A. Local Law 154 would Meet the Requirement for Regulations of Industrial Appliances

Two different EPCA exemptions are relevant here: 42 U.S.C. § 6316(b)(2) protects regulations of certain industrial and commercial equipment (Industrial

Code Exemption) and 42 U.S.C. § 6297(f)(3) protects regulations of consumer appliances (Consumer Code Exemption).

The requirement of the Industrial Code Exemption is straightforward: a building code's regulation of industrial appliances is protected from preemption as long as it does not mandate that an appliance be more efficient than required by ASHRAE/IES Standard 90.1. 42 U.S.C. § 6316(b)(2)(B)(i).

Nothing in Local Law 154 imposes a minimum efficiency requirement on any appliance, let alone a minimum efficiency that exceeds the specific standard called out by the Industrial Code Exemption. The law only restricts the type of fuel that may be combusted in buildings. Although the fuel permitted in a building could affect *which* appliances may be used in that building, it does not affect *how efficient* those appliances are. While it is true that some types of appliances using electricity, which is permitted under Local Law 154, are more efficient than some appliances using other, prohibited fuels, this is irrelevant to the Industrial Code Exemption's requirement, which only applies to the choice of efficiency levels for a given type of product, not the choice of fuel to use in the first place.

### B. Local Law 154 and the City's Energy Code Meet the Requirements for Regulations of Consumer Appliances

The requirements of the Consumer Code Exemption are structured somewhat differently. They apply to the code as a whole, not to the specific

26

regulation within the code at risk of preemption. *Compare, e.g.*, 42 U.S.C. § 6297(f)(3)(A) ("The *code* [must] permit[] a builder to meet an energy consumption or conservation objective for a building...." (emphasis added)), *with id.* § 6316(b)(2)(B)(i) ("the *standard in the building code* does not require that the energy efficiency of such product exceed the applicable minimum..." (emphasis added)).

There are seven different requirements for a code to qualify for the Consumer Code Exemption. These requirements ensure that the code allows for "performance-based" compliance, H.R. Rep. No. 100-11, at 26, granting builders a certain degree of flexibility so long as a certain level of energy efficiency is achieved. The requirements also ensure that a code does not "expressly or effectively require the installation of covered products whose efficiencies exceed...the applicable Federal standard." *Id.* The City's Energy Conservation Code (NYCECC) offers multiple performance-based compliance pathways that do not require a minimum efficiency level and therefore meets all of the Consumer Code Exemption requirements. And because Local Law 154 does not change any of these aspects of the NYCECC, it would also be exempted from EPCA preemption if it were part of the City's building code.

Appellants assert broadly that Local Law 154 could not be protected by the Consumer Code Exemption because it does not meet two of the requirements: to

27

"provide credits on a one-for-one basis for energy efficiency of appliances" and to "set an energy consumption objective that allows builders choice in how to meet it." Appellants' Br. 57-58 (citing 42 U.S.C. § 6297(f)(3)). The correct question is not whether Local Law 154 meets those requirements but whether the City's building code, if Local Law 154 is included in it, does. 42 U.S.C. § 6297(f)(3)(C) (requiring that "[t]he credit to the energy consumption or conservation objective allowed *by the code* for installing [high-efficiency] covered products...is on a one-for-one...basis" (emphasis added)); *id.* § 6297(f)(3)(A) (requiring that "*[t]he code* permit[] a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective" (emphasis added)).

Even if Local Law 154 is included in the NYCECC, the code still meets those requirements. The NYCECC offers several "performance" compliance paths which set an energy conservation objective for each proposed building and allow the builder to choose how to meet that objective. *See generally* 2020 N.Y.C. Energy Cons. Code §§ C407.1, R405, R406, Appx. CA.[11] Each of these models the overall energy use or energy costs of the proposed building when comparing it against the objective. *Id.* Therefore, each path gives full credit toward the building's objective for

_____

[11] NYCECC provisions are available at
https://www.nyc.gov/site/buildings/codes/2020-energy-conservation-code.page.

whatever efficiency measures the builder chooses, including the use of higher-efficiency appliances—complying with both requirements.

Local Law 154 does nothing to change the NYCECC's compliance with these requirements. The code's performance-based compliance pathways are still available to builders, and using a higher-efficiency version of an appliance is still credited toward a building's energy conservation objective. The only relevant impact of Local Law 154 is that appliances that exclusively use prohibited fuels will no longer be available to builders. But this does not change the system by which the NYCECC assigns credit, nor does it prevent builders from choosing how their buildings will meet the code's energy-conservation objectives. At most, Local Law 154 narrows the range of builders' options under the NYCECC's performance paths, but so do a wide range of other building-code provisions, as the District Court pointed out. JA 92-94. This does not violate the requirement to allow "selecting items whose combined energy efficiencies meet the objective" because builders may still "select[]" a wide range of "items" to improve their energy efficiency, as 42 U.S.C. § 6297(f)(3)(A) requires.[12]

---

[12] The United States offers a quote from a DOE analysis, finding that "[s]tandards subject to preemption [under EPCA] would include standards...established by mandatory State or local building codes," in support of its argument that the Consumer Code Exemption "forecloses imposing product-specific requirements like Local Law 154." U.S. Br. 22 n.9 (citing *Final Rule for Clothes Dryers and Kitchen*

29

Neither does Local Law 154 affect the NYCECC's compliance with any of the other requirements of the Consumer Code Exemption. It does not require any appliance to be more efficient than the federal standards for that appliance mandate. 42 U.S.C. § 6297(f)(3)(B). It does not require buildings to be compared to "baseline" buildings with higher-than-EPCA appliance efficiency. *Id.* § 6297(f)(3)(D). It does not affect the "optional combinations of items" offered by the NYCECC, where they are used. *Id.* § 6297(f)(3)(E). And it does not change the test procedures used by the NYCECC. *Id.* § 6297(f)(3)(F). Thus, if Local Law 154 were part of the City's "building code," it would be protected by the Consumer Code Exemption.

---

*Ranges and Ovens*, 47 Fed. Reg. 57,198, 57,215 (Dec. 22, 1982)). This argument makes at least two errors: First, the Consumer Code Exemption did not exist when the proffered document was published; they were added five years later as part of the NAECA amendments. NAECA § 7, 101 Stat. at 121. Second, the term "standards" as used here refers specifically to "energy efficiency standard[s]," as can be seen from the text immediately prior to the quoted language. 47 Fed. Reg. at 57,215 ("DOE read 'energy efficiency standard' to be as set forth in section 321(6) of the Act: 'a performance standard * * * which prescribes a minimum level of energy efficiency for a covered product * * * .' Standards could be set either by legislation or regulation. Standards subject to preemption would include standards...established by mandatory State or local building codes...."). That the analysis was referring specifically to efficiency standards is demonstrated by the fact that the analysis goes on to declare that a "[p]rohibition against placing oversized furnaces and air conditioners in new buildings"—a "standard" that is not an "energy efficiency standard"—"would not be subject to preemption" under its interpretation. *Id.*

30

IV.     Upholding Local Law 154 Does Not Require Creating a Circuit Split

Contrary to Appellants' claims, *e.g.* Appellants' Br. 1, this Court need not contradict the interpretation of the Ninth Circuit in *California Restaurant Association* in order to uphold Local Law 154. Local Law 154 is either not a building code at all, *supra* § II.D, or else it is protected by the EPCA exemptions for building codes, *supra* § III. In either case, Local Law 154 falls into a category that was not considered by the Ninth Circuit.

By its own terms, *California Restaurant Association*'s holding is limited to building codes, on the theory that, while "building codes" are an area with which the statute "suggests...concern," 89 F.4th at 1117 (Baker, J., concurring), EPCA preemption must stop somewhere, *see id.* at 1103 (panel opinion) ("[T]he breadth of EPCA's preemption provision 'does not mean the sky is the limit.'" (quoting *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013)). The *California Restaurant Association* panel declined to decide where that stopping point was, instead "only decid[ing] that EPCA's preemptive scope applies to building codes" that are similar to the regulation at issue in that case. *Id.* Holding that EPCA preemption does not reach *beyond* building codes does not contradict this holding. Indeed, a district court within the Ninth Circuit has taken this approach in upholding a similar regulation to Local Law 154. *Rinnai Am. Corp.*, 2025 WL 2427844, at *7 (*California Restaurant Association*'s "narrow holding—expressly limited to building

31

codes that concern an appliance's actual energy use—does not reach the state regulation of toxic emissions from appliances in order to comply with federal air pollution standards.").[13]

The *California Restaurant Association* panel also did not address the applicability of EPCA's exemptions from preemption. The question was "undisputed" before the panel. *Cal. Rest. Ass'n*, 89 F.4th at 1101 n.1. The panel opinion does not apply the requirements of the exemptions to the regulation in question or otherwise analyze their applicability. The only appearances the exemptions make in the opinion is as a reference point in interpreting the scope of EPCA's preemption provisions. *Id.* at 1101. Thus, a ruling from this Court that EPCA exempts Local Law 154 from preemption would not disagree with the holding or the logic of the *California Restaurant Association* opinion.

In other words, *California Restaurant Association* is "not only distinguishable" from the instant case, but "also consistent with" an opinion that upholds Local Law 154. *United States v. Silver*, 954 F.3d 455, 458 (2d Cir. 2020) (finding no circuit split between consistent opinions for purposes of determining likelihood of grant of certiorari). This Court has broad authority to affirm the lower court's decision on

---

[13] An appeal of the district court's decision is pending before the Ninth Circuit. *Rinnai Am. Corp. v. S. Coast Air Qual. Mgmt. Dist.*, No. 25-5129 (9th Cir. filed Aug. 13, 2025).

32

any ground supported by the record. *E.g., Beijing Neu Cloud Oriental Sys. Tech. Co. v. Int'l Bus. Machs. Corp.*, 110 F.4th 106, 113 (2d Cir. 2024). Therefore, this Court is not forced to choose between creating a circuit split and upholding Local Law 154.

## CONCLUSION

The Center respectfully requests that the Court affirm the District Court's decision.

Dated: November 6, 2025          Respectfully submitted,

/s/ Daniel Carpenter-Gold
Daniel Carpenter-Gold
daniel.carpentergold@mitchellhamline.edu
(651) 290-6329

Jamie Long
Mia Montoya Hammersley
Public Health Law Center
875 Summit Ave.
St. Paul, MN 55105

*Counsel for* Amicus Curiae *Public Health Law Center*

**Federal Rules of Appellate Procedure Form 6. Certificate of Compliance With Type-Volume Limit**

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

1. This document complies with <u>the word limit of Fed. R. App. P. 29(a)(5) and Local R. 29.1(c)</u> because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

   [X] this document contains <u>6,664</u> words, **or**

   [ ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

   [ ] this document has been prepared in a proportionally spaced typeface using [*state name and version of word-processing program*] in [*state font size and name of type style*], **or**

   [ ] this document has been prepared in a monospaced typeface using [*state name and version of word-processing program*] with [*state number of characters per inch and name of type style*].

   (s) <u>Daniel Carpenter-Gold</u>

   Attorney for <u>Public Health Law Center</u>

   Dated: <u>11/6/2025</u>