# 25-977

# United States Court of Appeals
*for the*
# Second Circuit

ASSOCIATION OF CONTRACTING PLUMBERS OF THE CITY OF NEW YORK, INC., PLUMBING-HEATING-COOLING CONTRACTORS-NATIONAL ASSOCIATION, PLUMBERS LOCAL UNION NO. 1, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA, NEW YORK STATE ENERGY COALITION, INC., PLUMBING FOUNDATION CITY OF NEW YORK, INC., LICENSED PLUMBING ASSOCIATION OF NEW YORK CITY, INC., dba Master Plumbers Council of the City of New York, BUILDING INDUSTRY ASSOCIATION OF NEW YORK CITY, INC,

*Plaintiffs-Appellants,*

– v. –

CITY OF NEW YORK,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Southern District of New York, No. 1:23-cv-11292,
Hon. Ronnie Abrams, District Judge

## PETITION FOR REHEARING EN BANC

BRIAN C. BARAN
REICHMAN JORGENSEN
  LEHMAN & FELDBERG LLP
1909 K Street NW, Suite 800
Washington, DC 20006
(202) 894-7310
bbaran@reichmanjorgensen.com

SARAH O. JORGENSEN
REICHMAN JORGENSEN
  LEHMAN & FELDBERG LLP
1201 West Peachtree Street,
  Suite 2300
Atlanta, Georgia 30309
(650) 623-1401
sjorgensen@reichmanjorgensen.com

*Attorneys for Plaintiffs-Appellants*

COUNSEL PRESS
A Proceed Service
The Appellate Experts®
(800) 4-APPEAL • (394584)

## TABLE OF CONTENTS

INTRODUCTION AND RULE 40(b)(2) STATEMENT ...........................1

BACKGROUND .........................................................................................2

REASONS FOR GRANTING REHEARING EN BANC .........................8

I. Rehearing En Banc Is Warranted to Restore Uniformity Among the Circuits on an Issue of National Importance. ..............................8

II. The Panel's Decision Is Wrong. .........................................................8

    A. The gas bans "concern" covered appliances' energy use because they effectively cap it at zero. ...........................................9

    B. The panel's contrary conclusion fails to consistently account for the text, context, and congressional objectives......................11

        1. "Technical meaning" cannot save the panel's reading. ...........11

        2. The panel's answer to the building code exception falls short..................................................................................14

        3. The panel gave short shrift to gas bans' interference with Congress's preemption-related objectives..............................15

CONCLUSION .......................................................................................19

CERTIFICATE OF COMPLIANCE ....................................................20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*23-34 94th St. Grocery Corp. v. N.Y.C. Bd. of Health,*
685 F.3d 174 (2d Cir. 2012) ................................................................ 11

*Air Conditioning & Refrigeration Inst. v. Energy Res.
Conservation & Dev. Comm'n,*
410 F.3d 492 (9th Cir. 2005) ................................................................ 2

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles,*
569 U.S. 641 (2013) ........................................................................ 12-13

*Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A.,*
519 U.S. 316 (1997) ........................................................................... 17

*Cal. Rest. Ass'n v. City of Berkeley,*
89 F.4th 1094 (9th Cir. 2024) ..................................................... *passim*

*Chevron USA Inc. v. Plaquemines Parish,*
146 S. Ct. 1052 (2026) ....................................................................... 10

*Coventry Health Care of Mo., Inc. v. Nevils,*
581 U.S. 87 (2017) ............................................................................. 10

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.,*
541 U.S. 246 (2004) ........................................................................... 12

*Lamar, Archer & Cofrin, LLP v. Appling,*
584 U.S. 709 (2018) .......................................................................... 9-10

*Montgomery v. Caribe Transp. II, LLC,*
146 S. Ct. 1199 (2026) ......................................................................... 9

*Morales v. Trans World Airlines, Inc.,*
504 U.S. 374 (1992) .......................................................................... 9-10

*Pulsifer v. United States,*
144 S. Ct. 718 (2024) ......................................................................... 14

*Rowe v. N.H. Motor Transp. Ass'n,*
552 U.S. 364 (2008) ....................................................................... 12, 14, 18

*Wos v. E.M.A. ex rel. Johnson,*
568 U.S. 627 (2013) ................................................................................ 12

**Statutes**

Energy Policy and Conservation Act,
42 U.S.C. §§6201-6422 ................................................................. *passim*

§6291(3) ............................................................................................... 9

§6291(4) ...................................................................................... 9-10, 14

§6291(6)(A) .................................................................................... 9-10

§6292 ................................................................................................... 2

§6293 ............................................................................................. 9, 14

§6293(b)(3) ..................................................................................... 9, 13

§6294(a)(2)(I), (a)(3) ........................................................................ 13

§6295 ................................................................................................... 3

§6295(o)(4) ........................................................................................ 12

§6295(q)(1) ........................................................................................ 12

§6295(q)(1)(A) ............................................................................... 2, 17

§6297(c) ..................................................................................... *passim*

§6297(d) .............................................................................................. 3

§6297(d)(3) .......................................................................................... 3

§6297(d)(4) .................................................................................... 4, 12

§6297(f)(3) ...................................................................................... 3, 14

§6297(f)(3)(A)-(C), (F) ........................................................................ 3

§6297(f)(3)(B) ........................................................................ 15

§6297(g) ............................................................................... 13

§6316(b)(2)(A) ........................................................................ 4

**Rules**

Fed. R. App. P. 40(b)(2)(C) ................................................. 1, 8

Fed. R. App. P. 40(b)(2)(D) ..................................................... 1

**Regulations**

10 C.F.R. §430.32(j)(1)(iii) ............................................... 2, 10

N.Y.C. Local Law No. 154 (2021) ............................................ 6

N.Y.C. Admin. Code §24-177.1 ................................................ 6

N.Y.C. Admin. Code §27-2034(e) ........................................... 16

N.Y.C. Admin. Code §28-506.1 ................................................ 6

N.Y. Energy §11-104(6)-(8) ..................................................... 6

N.Y. Exec. §378(19) ................................................................ 6

**Other Authorities**

S. Rep. No. 100-6 (1987) ....................................................... 16

U.S. Census Bureau, Government Organization Summary
    Report: 2022 and 2025 (2026), https://www.census.gov/content
    /dam/Census/library/publications/2025/econ/govtorg2225.pdf ............ 17

iv

## INTRODUCTION AND RULE 40(b)(2) STATEMENT

Rehearing en banc is warranted because the panel opinion expressly created a circuit split on an important question of federal preemption, disagreeing with both the Ninth Circuit and the federal government's own interpretation of a federal statute. Fed. R. App. P. 40(b)(2)(C)-(D). The question involves the Energy Policy and Conservation Act, 42 U.S.C. §§6201-6422 ("EPCA"), which preempts state and local "regulation[s] concerning" certain appliances' "energy use," *id.* §6297(c).

The Ninth Circuit held that a local ban on gas piping was preempted because, by preventing gas appliances from using any energy—and thus capping their energy use at zero—it concerned those appliances' energy use. *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1098-99 (9th Cir. 2024). The panel here disagreed, holding that states and cities may ban gas appliances because doing so regulates only fuel type, not amount. The resulting circuit split warrants the full Court's attention.

The panel decision puts this Court on the wrong side of the split. The decision skirts fundamental problems with its analysis, including the inability to distinguish between undisputedly preempted regulations setting a maximum energy use and the challenged provisions, which effectively cap energy use at zero. As a result, the decision is irreconcilable with Supreme Court precedent, conflicts with critical

1

statutory context, and allows the very patchwork of regulations Congress sought to avoid. This Court should grant rehearing en banc.[1]

## BACKGROUND

**1.** Responding to the early 1970s oil crisis, Congress enacted EPCA in 1975 to create a "comprehensive energy policy" addressing "the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 498 (9th Cir. 2005). One component of Congress's national policy is EPCA's energy conservation program for appliances.

Congress expanded the federal role over time, eventually mandating federal energy efficiency or energy use standards for many common appliances. 42 U.S.C. §6292;[2] *see Air Conditioning*, 410 F.3d at 498-500. Congress charged the Department of Energy with setting and updating standards, and it established guardrails to protect consumer choice. That includes choice among fuels; the Department must set different standards for products that use "different kind[s] of energy." §6295(q)(1)(A). So, for example, gas cooking tops' energy use is capped at 1,770 kBtu/year, while electric versions are limited to 207 kWh/year. 10 C.F.R. §430.32(j)(1)(iii).

---

[1] Plaintiffs are filing identical petitions in these related cases.

[2] All statutory references are to 42 U.S.C. unless otherwise noted.

As Congress expanded the federal role, it contracted state and local governments' role. EPCA's preemption provision for consumer products now reads:

> [E]ffective on the effective date of an energy conservation standard established in or prescribed under [§6295] for any covered product, **no State regulation concerning the energy efficiency, energy use**, or water use **of such covered product** shall be effective with respect to such product … .

§6297(c) (emphasis added).

Two narrow exceptions are informative here. First, regulations that would otherwise be preempted are allowed if they are in a building code for new construction that satisfies seven strict requirements. §6297(f)(3). The thrust of these requirements is that the code must set a general energy conservation objective, allow builders the freedom to choose a mix of products to meet that objective, and treat products evenhandedly without requiring them to exceed federal standards. *See, e.g.*, §6297(f)(3)(A)-(C), (F).

Second, the Department may waive preemption under certain circumstances. §6297(d). Congress carefully cabined the waiver authority. Waivers are prohibited when the "regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis," §6297(d)(3), or is "likely to result in

3

the unavailability" of appliance types, classes, or features that were generally available beforehand, §6297(d)(4).[3]

**2.** Until the panel's decision here, only one court of appeals had addressed the scope of preemption under §6297(c). When Berkeley, California effectively banned gas appliances by banning gas piping, "rendering the gas appliances useless," a unanimous Ninth Circuit panel held that §6297(c)'s plain text preempted that ban. *Cal. Rest.*, 89 F.4th at 1098.

The Ninth Circuit explained that "Congress expressly expanded EPCA's reach" beyond direct regulations of covered appliances "to regulations that 'concern'" those appliances' energy use. *Cal. Rest.*, 89 F.4th at 1103 (cleaned up). And it held that a ban on gas piping "'concerns' the energy use of those products as much as a direct ban on the products themselves." *Id.* Recognizing that "EPCA would no doubt preempt an ordinance that directly prohibits" gas appliances, *id.* at 1107, the court reasoned that Berkeley could not take a "more circuitous route to the same result" by prohibiting the necessary piping, *id.* at 1098. After all, "States and localities can't skirt the text of broad preemption provisions by doing *indirectly* what Congress says they can't do *directly*." *Id.* at 1107.

---

[3] A separate preemption provision governs industrial equipment. §6316(b)(2)(A). Because all agree the provisions work the same way, Op.9 n.3, this petition focuses on the consumer provision.

4

Statutory context confirmed the court's interpretation. *Cal. Rest.*, 89 F.4th at 1101-04. "Of critical importance" was the building code exception, which confirms that §6297(c) reaches building code requirements that regulate appliances in the real world and thus is not limited to regulations that operate on the "factory floor." *Id.* at 1101-03. The court explained that the waiver provision likewise illustrated §6297(c)'s "extensive scope." *Id.* at 1103-04. By requiring the Department to "consider the complete lifecycle of an appliance[,] from manufacturing to servicing," that provision demonstrates EPCA's concern with regulations that burden any part of the distribution chain—not just design and manufacturing. *Id.*

The Ninth Circuit rejected the argument that §6297(c) preempts only "energy conservation standards" or their "equivalent." *Cal. Rest.*, 89 F.4th at 1105-07. Among other problems, the court explained, that interpretation would require giving different statutory terms the same meaning. *Id.* at 1105. And it would contradict Supreme Court precedent by "engraft[ing] a limiting component onto the statute." *Id.* at 1106-07 (cleaned up).

An overwhelming majority declined to reconsider the issue en banc. *Cal. Rest.*, 89 F.4th at 1098, 1119 (only 8 of 28 active judges dissenting from the denial).

**3.** The two related cases here present the same issue the Ninth Circuit resolved in *California Restaurant Ass'n*. Following Berkeley's

5

lead, New York City and New York State both banned gas appliances in most new buildings. Op.4-6; *see* N.Y.C. Local Law No. 154 (2021) (codified at N.Y.C. Admin. Code §§24-177.1, 28-506.1); N.Y. Energy §11-104(6)-(8); N.Y. Exec. §378(19).[4] Although the mechanisms differ—the City banned combustion, whereas the State banned gas infrastructure and appliances—the result is the same: Gas appliances cannot be installed or used in affected new buildings. Op.4-6. As a result, no party contends (and the panel did not hold) that any difference between the provisions affects the preemption analysis.

Two plaintiff groups brought these suits in the Southern and Northern Districts of New York, contending that EPCA preempts the City and State gas bans. Plaintiffs are small businesses, trade associations, and labor unions that collectively represent or employ tens of thousands of New Yorkers harmed by the bans, which outlaw businesses, jeopardize jobs, and slash revenues and profits. Mulhern.Br.13-17; City.JA16-24.

Both district courts held that EPCA does not preempt the challenged laws. Op.5-6. Plaintiffs appealed.

**4.** The panel heard the appeals in tandem and, in a single opinion, affirmed both judgments, explicitly disagreed with the Ninth Circuit, and

---

[4] Both bans apply to all appliances that combust fossil fuels, including natural gas, propane, and fuel oil. Because the exact fuel makes no legal difference, this petition refers to "gas appliances" for simplicity.

"reluctantly" concluded that it was "necessary to create a split among the Circuits." Op.38-39 (cleaned up). In the panel's view, EPCA "does not directly regulate the availability of fossil-fuel-powered appliances," and the challenged bans were too "far beyond its defined regulatory reach" to be preempted. Op.7. The panel focused on the term "energy use," concluding that it refers only to a lab-tested, labeled value. Op.9-14. And it reasoned that because "the challenged laws govern via the type of energy" consumed, not "the amount," they "do not implicate Congress's objectives in passing EPCA." Op.22-25. Under the panel's view, regulations are not preempted unless they at least "apply … significant pressures on manufacturers to produce appliances that exceed federal standards." Op.23.

The panel rested its disagreement with the Ninth Circuit on the definition of "energy use" and, in particular, that definition's term "point of use." Op.38-46. It did not address the Ninth Circuit's textual reasons for rejecting the view that EPCA preemption is limited to energy conservation standards or their equivalents—none of which involved "point of use." *Compare id.*, *with Cal. Rest.*, 89 F.4th at 1105. Nor did it acknowledge the overlap between that rejected view and its own interpretation. And despite acknowledging that "states cannot circumvent preemption just by shifting their regulatory focus from one angle to another," Op.19 n.5 (cleaned up), the panel never explained how expressly setting covered gas appliances' maximum energy use to zero—

7

which undisputedly is preempted—is any different from the angles by which the City and State reached the same result here. *Cf. Cal. Rest.*, 89 F.4th at 1102 (rejecting the argument that zero is not a quantity).

## REASONS FOR GRANTING REHEARING EN BANC

### I. Rehearing En Banc Is Warranted to Restore Uniformity Among the Circuits on an Issue of National Importance.

The panel decision acknowledges that it "create[s] a split among the Circuits." Op.39 (cleaned up). That alone warrants en banc review. Fed. R. App. P. 40(b)(2)(C).

Restoring uniformity is particularly important here. Uniformity is, after all, the point of an express preemption provision. Leaving conflicting interpretations of §6297(c) in place would interfere with Congress's decision to strike the same balance between federal and state authority across the nation. That is no abstract consideration here; the challenged bans will harm tens of thousands of New Yorkers. Mulhern.Br.13-17.

Beyond breaking with the Ninth Circuit, the panel's decision contradicts the federal government's own interpretation of the federal statute at issue. U.S.Br. (No. 25-977). That further warrants review.

### II. The Panel's Decision Is Wrong.

The panel did not just create a split; it put this Court on the wrong side. EPCA's plain text preempts the challenged bans because they

8

effectively impose energy conservation standards that cap covered appliances' energy use at zero.

### A. The gas bans "concern" covered appliances' energy use because they effectively cap it at zero.

EPCA's plain text is the beginning and end of the preemption inquiry here. Because the bans effectively impose an energy use limit of zero on all gas appliances, they are preempted "regulation[s] concerning" covered products' "energy use." §6297(c).

To see why, take the statutory terms step by step. "[E]nergy" includes "fossil fuels." §6291(3). "[E]nergy use" means "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293." §6291(4). And an "energy conservation standard" includes a regulation that "prescribes … a maximum quantity of energy use," calculated using the same test procedures. §6291(6)(A). Those procedures must be "reasonably designed" to measure energy use "during a representative average use cycle or period of use." §6293(b)(3).

Perhaps the most important term is "concerning," which carries a well-established meaning in preemption provisions. "'Concerning' means 'relating to,' and is the equivalent of 'regarding, respecting, about.'" *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 716-18 (2018) (attribution omitted); *accord Montgomery v. Caribe Transp. II, LLC*, 146 S. Ct. 1199, 1204-05 & n.3 (2026); *Morales v. Trans World Airlines, Inc.*,

9

504 U.S. 374, 383-84 (1992). Those terms "express[] a broad pre-emptive purpose," *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 95-96 (2017) (attribution omitted), "ensuring that the scope of a provision covers not only its subject but also matters relating to that subject," *Lamar*, 584 U.S. at 717-18. *Accord Cal. Rest.*, 89 F.4th at 1103. "One thing can relate to another even if the connection is indirect." *Chevron USA Inc. v. Plaquemines Parish*, 146 S. Ct. 1052, 1060-61 (2026) (cleaned up).

Putting all that together, the gas bans are "regulation[s] concerning" the "quantity of energy" consumed by gas appliances because they effectively cap it at zero. §§6291(4), 6297(c). Indeed, the bans are functionally indistinguishable from the strictest "energy conservation standard" possible—one "prescrib[ing]" zero as the "maximum quantity of energy use." §6291(6)(A). Under the federal standard, a gas stove can have any energy use number on its label up to 1,770 kBtu/year. 10 C.F.R. §430.32(j)(1)(iii). But in New York, that number cannot exceed zero.

All agree that "EPCA preempts energy conservation standards." Op.4. Had the State or City expressly set covered gas appliances' maximum energy use to 0.0001 Btu/year, the laws would undisputedly be preempted. Setting the maximum to zero instead is equally preempted—and so is achieving the same result indirectly. *See Cal. Rest.*, 89 F.4th at 1102, 1106-07.

**B. The panel's contrary conclusion fails to consistently account for the text, context, and congressional objectives.**

**1. "Technical meaning" cannot save the panel's reading.**

**a.** The panel rested first and foremost on its view that "energy use" refers only to a fixed, lab-tested number printed on a factory label. Op.10-14, 39-46. Even accepting that premise, the panel's conclusion does not follow.

The panel acknowledged that §6297(c) reaches not just "energy conservation standards" but also regulations that "operate in a similar manner." Op.4. Or put Defendants' way, EPCA preempts regulations that "effectively impose" energy conservation standards, "whether in form or function." City.Br.1; Mosley.Br.1-2.

That is precisely what both bans do even when "energy use" is read the panel's way. If the fixed number on a gas appliance's label exceeds zero, the challenged provisions prohibit installing that appliance. There is no need to consider how much energy it uses "in the hands of consumers." *Contra* Op.10.

Had the City or State reached that result by expressly prescribing a maximum energy use of zero, that would undisputedly be preempted. Op.30 n.12 (using "the appliance's 'energy use' as a mechanism for regulating" is preempted). Writing around "energy use"—whether by banning combustion, infrastructure, or appliances—to achieve the same "practical effect" cannot circumvent preemption. *See 23-34 94th St. Grocery Corp. v. N.Y.C. Bd. of Health*, 685 F.3d 174, 183 (2d Cir. 2012).

11

What matters is "what the state law in fact does," not its "semantics." *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 636-37 (2013).

The panel never identified any practical difference between the challenged provisions and a preempted zero-energy-use standard. The closest it came was its contention that the "challenged laws govern via the type," not "the amount," "of energy an appliance consumes." Op.23. A wall of precedent blocks that approach. Time and again, the Supreme Court has stopped states and localities from evading preemption "by shifting their regulatory focus." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 569 U.S. 641, 652 (2013) (cannot "select[] an indirect but wholly effective means" to a prohibited end); *accord Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 371-72 (2008) (cannot "produce[] the very effect that the federal law sought to avoid"); *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 253-55 (2004); *Cal. Rest.*, 89 F.4th at 1106-07 (collecting cases). Contrary to the panel's view, the lack of a "direct[] reference[]" to energy use or the choice of a different "mechanism for regulating," Op.30 n.12, is not enough to avoid preemption.

The panel's only answer to these cases is that Congress did not intend to protect appliance availability or prohibit bans. Op.19 n.5, 23. That is no answer at all. To start, it is wrong; EPCA reflects a concern with consumer choice, including fuel type. *E.g.*, §6295(o)(4), (q)(1); §6297(d)(4); *supra* pp.3-5. Regardless, the panel's answer misses the point. Congress undisputedly prohibited energy use standards, but the panel did not

12

explain how the practical effect of the challenged provisions differs from the effect of a standard capping energy use at zero. "Slice it or dice it any which way," the challenged provisions' effect intrudes on EPCA's preempted domain, *Am. Trucking*, 569 U.S. at 652.

**b.** To be clear, the panel was wrong to reject the Ninth Circuit's ordinary-meaning understanding of "point of use" (and thus its view of "energy use"). *Contra* Op.39-46. Understanding "point of use" to mean the place where an appliance is used, *Cal. Rest.*, 89 F.4th at 1101-02, is consistent with EPCA's testing and labeling provisions. Appliances are tested using methods designed to reflect real-world conditions, §6293(b)(3), and the result goes on the label, §6294(a)(2)(I), (a)(3). But there is no guarantee that the "energy use" experienced "under conditions of actual use" will match the label. §6297(g). If "energy use" were just a fixed number on a label, that disclaimer would be pointless. *Contra* Op.12-13.

There is good reason to doubt that when Congress wrote the "energy use" definition in 1975, "point of use" had a "well-established technical meaning" that called for measuring only energy "directly consumed by the appliance," not energy consumed in generation or transmission. *Contra Cal. Rest.*, 89 F.4th at 1123 (Friedland, J., dissenting from the denial of rehearing en banc); Op.40-44. The purported evidence postdates the statute, and the few sources from shortly after enactment use "point of use" colloquially. Mulhern.Reply.Br.19-20.

The panel saw "point of use" as "filling [a] gap" in the statute as to which "scope[] of measurement" to use. Op.42. But there was no gap. Take out "point of use," and the "energy use" definition answers the question just as well: Measure "the quantity of energy directly consumed by a consumer product." §6291(4). Besides, the definition points to §6293—a whole section on testing procedures.

### 2. The panel's answer to the building code exception falls short.

Context further complicates the panel's interpretation. The building code exception, §6297(f)(3), is critical to understanding §6297(c)'s scope. As the panel acknowledged, the exception would not "make any sense" unless "the kind of regulation it describes [is] preempted in the first place." Op.29; *see Rowe*, 552 U.S. at 374 (when Congress "explicitly lists a set of exceptions" to preemption, those exceptions are helpful in determining Congress's intent). But despite various parties' and the panel's efforts, nobody has identified any specific regulation that both would be preempted under their view of §6297(c) and would satisfy the exception's criteria—leaving §6297(f)(3) with no work to do. "[T]hat kind of superfluity, in and of itself, refutes [the panel's] reading." *Pulsifer v. United States*, 144 S. Ct. 718, 731-32 (2024).

The panel declared that building-wide energy regulations that satisfy §6297(f)(3) "arguably reference appliances' individual energy use" because they "achieve[] the goal of regulating the performance of the

14

individual appliances within that building." Op.30-31 (cleaned up). And it contended that building-wide targets would allow "a simple refashioning of [states'] regulations"—regulating "on an aggregated scale" rather than EPCA's "per-product basis"—to disrupt "uniform energy conservation standards." Op.31. The panel did not explain either assertion. It did not say how a regulation could achieve that goal without impermissibly requiring any appliance to "exceed[]" federal standards. §6297(f)(3)(B). It did not square these assertions with its view of "energy use"; building-wide objectives neither change any appliance's "energy use" label nor require manufacturers to redesign appliances. Nor did it explain how regulating "on an aggregated scale" can be an impermissible end-run around preemption if the equally "simple refashioning" of a zero-energy-use standard into a ban is not, Op.31.

### 3. The panel gave short shrift to gas bans' interference with Congress's preemption-related objectives.

**a.** The panel's unduly narrow view of Congress's objectives led it to misapply the "connection with or reference to" test. Op.16-27. The bans readily satisfy at least the "connection with" prong: They undermine Congress's national approach in favor of a patchwork of standards and bans. And even on the panel's design-and-manufacturing-centric view of EPCA's objectives, bans still disrupt the federal regulatory scheme. The government explained exactly that. U.S.Br.28-31 (No. 25-977).

15

Allowing appliance bans would fracture Congress's carefully calibrated statutory scheme. Congress did not want a "patchwork" of regulations. S. Rep. No. 100-6, at 4 (1987). Yet the panel's decision would lead to just that by making EPCA trivially easy to evade. The decision's upshot is that EPCA has nothing to say about banning any particular covered appliance. This case illustrates how bans can be used to impose zero-energy-use standards. But nothing turns on the choice of zero. If New York wanted to impose a nonzero standard, all it would need to do is ban all unapproved appliances and then approve only those meeting its standard. *Cf.* N.Y.C. Admin. Code §27-2034(e) (prohibiting gas space or water heaters unless approved by two City departments). That approach is both fair game under the panel's interpretation and indistinguishable from the bans at issue here.

The result is that certain appliances would be unavailable for consumers in some areas but not others, and manufacturers would need to adjust design and production strategies based on what they can sell where. To be sure, once a manufacturer decides to make a gas appliance, the challenged laws say nothing more about its design. But the gas bans kick in a step earlier, when manufacturers are deciding what kind(s) of energy their appliances should use. In short, a patchwork of banned products is just as disruptive as a patchwork of standards. *Contra* Op.23.

The panel's answer to this admitted "regulatory disruption" is to assert that it is no big deal; Congress, it says, cared about "a patchwork

16

of *conservation standards specifically,*" not "the binary choice between electric and fossil-fuel-powered appliances." Op.23 n.8; *see also* Op.20-21 (recognizing the "role" of "consumer choice and market stability" but discounting these concerns on the ground that Congress did not "affirmatively protect" them). Not so. Congress specifically protected fuel choice. §6295(q)(1)(A). And as just explained, the panel cleared the way for far more than a binary choice. Nor can even a binary choice be so easily dismissed when that choice could vary across nearly 39,000 local governments.[5]

**b.** Enforcing §6297(c) as written will not make the sky fall. The panel feared that anything beyond a narrow reading would produce "absurd results" endangering run-of-the-mill health and safety regulations. Op.36-38. That fear is misplaced.

As with similarly broad preemption provisions, Congress's intent—as understood through the statute it wrote—provides a suitable limiting principle. *See, e.g., Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A.*, 519 U.S. 316, 324-25 (1997). Nothing about applying EPCA's plain text to hold that gas bans are preempted endangers regulations that have long coexisted with EPCA. EPCA is "unlikely" to preempt the "host of state and local regulations" that only "incidentally

---

[5] U.S. Census Bureau, Government Organization Summary Report: 2022 and 2025, at 3 tbl.1 (2026), https://www.census.gov/content/dam/Census/library/publications/2025/econ/govtorg2225.pdf.

impact" covered products' energy consumption. *Cal. Rest.*, 89 F.4th at 1117 (Baker, J., concurring); *accord Rowe*, 552 U.S. at 375 ("tenuous, remote, or peripheral" effects do not trigger preemption (attribution omitted)).

"Despite the importance" of health and safety objectives, EPCA does not "create[] an exception on that basis." *Rowe*, 552 U.S. at 373-75. EPCA's silence on "protecting public health and addressing climate change," Op.21-22, cannot justify an unwritten exception for health and safety regulations.

Finally, the need for line drawing is a feature of "concerning" and "related to" preemption provisions, not a bug. Given states' longstanding creativity in trying to evade preemption, Congress, as elsewhere, understandably chose breadth over specificity in EPCA.

## CONCLUSION

The Court should grant rehearing en banc.

Respectfully submitted,

/s/ Sarah O. Jorgensen

| | |
|---|---|
| Brian C. Baran | Sarah O. Jorgensen |
| REICHMAN JORGENSEN | REICHMAN JORGENSEN |
| LEHMAN & FELDBERG LLP | LEHMAN & FELDBERG LLP |
| 1909 K Street NW, Suite 800 | 1201 West Peachtree Street, |
| Washington, DC 20006 | Suite 2300 |
| (202) 894-7310 | Atlanta, GA 30309 |
| bbaran@reichmanjorgensen.com | (650) 623-1401 |
| | sjorgensen@reichmanjorgensen.com |

*Counsel for Plaintiffs-Appellants*

July 28, 2026

19

## CERTIFICATE OF COMPLIANCE

This petition complies with the type-volume limitation of Federal Rule of Appellate Procedure 40(d)(3) because, excluding the parts of the petition exempted by Federal Rule of Appellate Procedure 32(f), it contains 3,899 words.

Dated: July 28, 2026             */s/ Sarah O. Jorgensen*
                                               Sarah O. Jorgensen

# ADDENDUM

25-977; 25-2041
Ass'n of Contracting Plumbers v. City of New York; Mulhern Gas Co., Inc. v. Mosley

In the
United States Court of Appeals
for the Second Circuit

August Term 2025
Argued: January 30, 2026
Decided: June 30, 2026

No. 25-977; 25-2041

ASSOCIATION OF CONTRACTING PLUMBERS OF THE CITY OF NEW YORK, INC.,
PLUMBING-HEATING-COOLING CONTRACTORS-NATIONAL ASSOCIATION, PLUMBERS
LOCAL UNION NO. 1, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF
THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA,
NEW YORK STATE ENERGY COALITION, INC., PLUMBING FOUNDATION CITY OF NEW
YORK, INC., LICENSED PLUMBING ASSOCIATION OF NEW YORK CITY, INC., DBA
MASTER PLUMBERS COUNCIL OF THE CITY OF NEW YORK, BUILDING INDUSTRY
ASSOCIATION OF NEW YORK CITY, INC.,
*Plaintiffs-Appellants*,
v.
CITY OF NEW YORK,
*Defendant-Appellee*.

Appeal from the United States District Court
for the Southern District of New York
No. 23-cv-11292, Ronnie Abrams,
District Judge.

MULHERN GAS CO., INC., NEW YORK STATE BUILDERS ASSOCIATION, NATIONAL
ASSOCIATION OF HOME BUILDERS, NEW YORK PROPANE GAS ASSOCIATION,
NATIONAL PROPANE GAS ASSOCIATION, NORTHEAST HEARTH, PATIO AND
BARBECUE ASSOCIATION, PLUMBING CONTRACTORS ASSOCIATION OF LONG ISLAND,
LICENSED PLUMBING ASSOCIATION OF NEW YORK CITY, INC., DBA MASTER

PLUMBERS COUNCIL OF THE CITY OF NEW YORK, HOLMES MECH. LLC,
INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 1049,
INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL UNION 97,
PLUMBERS LOCAL UNION NO. 200, TRANSPORT WORKERS UNION LOCAL 101, AFL-
CIO,
*Plaintiffs-Appellants,*
v.
WALTER T. MOSLEY, IN HIS OFFICIAL CAPACITY AS NEW YORK SECRETARY OF STATE
AND MEMBER OF THE STATE FIRE PREVENTION AND BUILDING CODE COUNCIL,
FORMERLY KNOWN AS ROBERT J. RODRIGUEZ,
*Defendant-Appellee,*

NEW YORK GEOTHERMAL
ENERGY ORGANIZATION, PUSH
BUFFALO,
*Intervenor-Defendants-*
*Appellees.*[*]

---

Appeal from the United States District Court
for the Northern District of New York
No. 23-cv-1267, Glenn T. Suddaby,
District Court Judge.

---

Before: SACK and PÉREZ, *Circuit Judges*, and PRESKA, *District Judge*.[†]

New York City and New York State enacted laws which effectively prohibit the use of fossil-fuel-powered appliances in new buildings. Various trade associations and unions sued to stop the laws from going into effect, arguing that they are preempted under the Energy Policy and Conservation Act's express preemption provision. But the text of the preemption provision cannot support Appellants' expansive construction. At most, EPCA preempts energy

---

[*]  The Clerk of Court is respectfully directed to amend the caption accordingly.

[†]  Judge Loretta A. Preska, of the United States District Court for the Southern District of New York, sitting by designation.

conservation standards for covered appliances and a fairly limited realm of additional regulations that operate in a similar manner. The challenged laws fall outside of that realm. Therefore, we **AFFIRM** the judgments of the District Courts.

BRIAN C. BARAN (Sarah O. Jorgensen, *on the brief*), Reichman Jorgensen Lehman & Feldberg, LLP, Washington, DC, *for Plaintiffs-Appellants.*

CHARLES E. T. ROBERTS (Thomas Pulham, *on the brief*), for Brett A. Shumate, Assistant Attorney General, Civil Division, United States Department of Justice, Washington, DC, *as Amicus Curiae supporting Plaintiffs-Appellants in No. 25-977.*

REBECCA L. VISGAITIS (Richard Dearing, Claude S. Platton, *on the brief*), on behalf of Muriel Goode-Trufant, Corporation Counsel of the City of New York, New York, NY, *for Defendant-Appellee City of New York.*

DUSTIN J. BROCKNER (Barbara D. Underwood, Jeffrey W. Lang, *on the brief*), on behalf of Letitia James, Attorney General of the State of New York, New York, NY, *for Defendant-Appellee Walter T. Mosley.*

DROR LADIN (Meagan Burton, *on the brief*), EarthJustice, New York, NY, *for Intervenor-Defendants-Appellees New York Geothermal Organization and PUSH Buffalo.*

3

MYRNA PÉREZ, *Circuit Judge*:

New York City and New York State enacted laws which effectively prohibit the use of fossil-fuel-powered appliances in new buildings. Various trade associations and unions sued in two separate cases to stop the laws from going into effect, arguing that they are preempted under the Energy Policy and Conservation Act's ("EPCA") express preemption provision. But the text of the preemption provision cannot support Appellants' expansive construction. EPCA preempts energy conservation standards for covered appliances and a fairly limited realm of additional regulations which operate in a similar manner. The challenged laws fall outside of that realm. Therefore, we **AFFIRM** the judgments of the District Courts.

## BACKGROUND

Some city and state governments have imposed limits on the use of fossil-fuel-powered appliances in response to research suggesting such appliances are a significant source of pollution and greenhouse gas emissions.[1] New York City (the "City") and New York State (the "State") were among those to act.

---

[1] *See, e.g., Commercial and Residential Sector Emission*, U.S. Env't Prot. Agency (Mar. 10, 2026), https://www.epa.gov/ghgemissions/commercial-and-residential-sector-emissions ("Combustion of natural gas and petroleum products for heating and cooking emits carbon dioxide ($CO_2$), methane ($CH_4$),

The City enacted Local Law 154 (the "Local Law"), which provides that "[n]o person shall permit the combustion of any substance that emits 25 kilograms or more of carbon dioxide per million British thermal units of energy" in new residential buildings. N.Y.C. Local Law No. 154 (2021); N.Y.C. Admin. Code § 24-177.1. In effect, the Local Law prohibits the use of appliances that run on natural gas, heating fuel, and other fossil fuels.[2]

A group of trade associations and a union ("City Appellants") sued in the Southern District of New York on the theory that the Local Law is expressly preempted by EPCA, a federal statute that imposes energy conservation performance standards on certain appliances. City Appellants sought a declaratory judgment and permanent injunction preventing the Local Law from going into effect. Instead, Judge Abrams granted the City's motion to dismiss

---

and nitrous oxide ($N_2O$)."); *Carbon Monoxide's Impact on Indoor Air Quality*, U.S. Env't Prot. Agency (Oct. 7, 2025), https://www.epa.gov/indoor-air-quality-iaq/carbon-monoxides-impact-indoor-air-quality (listing "gas stoves" and other sources of carbon monoxide and explaining health effects); *Facts About Formaldehyde*, U.S. Env't Prot. Agency (July 7, 2025), https://www.epa.gov/formaldehyde/facts-about-formaldehyde (noting formaldehyde is found in "[e]missions from un-vented, fuel burning appliances, like gas stoves or kerosene space heaters" and that "[h]igh levels of exposure may cause some types of cancers"); *see generally* Anna Belova, et al., *Literature Review on the Impacts of Residential Combustion, Final Report*, American Lung Ass'n (July 10, 2022), https://www.lung.org/policy-advocacy/healthy-air-campaign/healthy-efficient-homes/residential-combustion.

[2] The law has applied to new buildings under seven stories since January 1, 2024. It will expand its coverage to taller buildings in July 2027. *See* N.Y.C. Admin. Code § 28-506.1(1)–(2).

pursuant to Fed. R. Civ. P. 12(b)(6), concluding that EPCA does not preempt the Local Law. City Appellants appealed.

Separately, the State enacted a law directing the State Fire Prevention and Building Code Council, a body within New York's Department of State, to adopt regulations prohibiting the installation of appliances that burn fossil fuels in new buildings. *See* N.Y. Energy L. § 11-104(6)–(8); N.Y. Exec. L. § 378(19) (the "State Law") (together with the Local Law, the "challenged laws"). A different group of companies, trade associations, and unions whose members would be impacted by the State Law ("State Appellants") sued in the Northern District of New York and argued that the State Law is expressly preempted by EPCA. After dismissing claims against several defendants as barred by the Eleventh Amendment, Judge Suddaby granted summary judgment to the remaining Defendant, the Secretary of State, similarly concluding that EPCA's preemption provision does not apply to the State Law. State Appellants also appealed.

We heard the appeals in tandem. We review the two District Courts' decisions de novo. *See Kellogg v. Nichols*, 170 F.4th 20, 24 (2d Cir. 2026) (motion to dismiss); *Nambiar v. Cent. Orthopedic Grp., LLP*, 158 F.4th 349, 363 (2d Cir. 2025) (summary judgment); *cf. Pac. Cap. Bank, N.A. v. Connecticut*, 542 F.3d 341, 351 (2d

6

Cir. 2008) ("A district court's determination as to preemption is a conclusion of law, which we review *de novo*.").

## DISCUSSION

These appeals concern whether EPCA preempts state and local laws which prohibit fossil-fuel-powered appliances. EPCA, in relevant part, imposes energy conservation standards on covered appliances, and its preemptive text closely aligns with its affirmative regulatory scope.

The statute does not directly regulate the availability of fossil-fuel-powered appliances, and its express preemption provision does not extend to laws far beyond its defined regulatory reach. Thus, for the reasons explained below, EPCA does not preempt the challenged laws.

## I. Preemption Framework and EPCA's Preemption Provision

Federal law is "the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "Under this principle, Congress has the power to preempt state law." *Arizona v. United States*, 567 U.S. 387, 399 (2012). "Federal preemption of a state statute can be express or implied, and generally occurs: '[1] where Congress has expressly preempted state law, [2]

7

where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law, or [3] where federal law conflicts with state law.'" *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 188 (2d Cir. 2007) (alterations in original) (quoting *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 313 (2d Cir. 2005)).

Here, we confront the first category, express preemption. "There is no doubt that Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision." *Arizona*, 567 U.S. at 399. However, "if 'a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains.'" *Buono v. Tyco Fire Prods., LP*, 78 F.4th 490, 495–96 (2d Cir. 2023) (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008)). "[W]hen 'a federal law contains an express preemption clause, we focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent.'" *Id.* at 495 (quoting *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011)). At the end of the day, "[p]reemption is 'a matter of statutory interpretation,'" and therefore, we must "ascertain the intent of Congress." *Id.* (first quoting *Cantero v. Bank of America, N.A.*, 49 F.4th 121, 130 (2d

8

Cir. 2022); then quoting *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280

(1987)).

Our conclusion, therefore, must be rooted in the relevant preemptive text in

EPCA:

> [O]n the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product.

42 U.S.C. § 6297(c).[3] The parties focus on the provision's inclusion of "energy use,"

and therefore, our task is to determine whether the challenged laws "concern[] the

. . . energy use" of covered appliances.

To accomplish this task, we must first ascertain the meaning of "energy use"

as it is used in EPCA. As discussed below, our interpretation of "energy use" alone

undercuts Appellants' primary argument for preemption from the start. Next,

with that interpretation of "energy use" in mind, we must determine whether the

challenged laws are nevertheless included in the scope of preemption through the

statute's broadening use of "concerning." Per the below, we conclude that

---

[3]  EPCA governs both consumer and industrial appliances. *See* 42 U.S.C. §§ 6291–6309 (consumer); *id.* §§ 6311–6317 (industrial). The parties agree that the relevant provisions are substantially the same for both kinds of appliances, and therefore, this opinion will cite the provisions that govern consumer products for ease of reference.

9

"concerning" does not save Appellants' case.  Finally, we turn to additional interpretative tools to confirm the soundness of our interpretation.

## II.    Interpreting "Energy Use" Undercuts Appellants' Case for Preemption

To ascertain the scope of EPCA's preemption provision, we first must uncover the meaning of the term "energy use."

Appellants contend the challenged laws are preempted by framing the challenged laws as "effectively set[ting] covered gas appliances' maximum energy use to zero" by prohibiting their use by consumers in new residential buildings. *See* City Appellants' Br. at 17; State Appellants' Br. at 23.  In essence, Appellants primarily argue that "energy use" refers to the amount of energy consumed by covered products in the hands of consumers.  *See* City Appellants' Br. at 28; State Appellants' Br. at 30, 34.

However, as explained below, we are not at liberty to ignore that the statute defines "energy use" differently, nor that the statutory context precludes Appellants' reading.

### A.    Statutory Definition

"When 'a statute includes an explicit definition' of a term, 'we must follow that definition, even if it varies from a term's ordinary meaning.'"  *Van Buren v.*

10

*United States*, 593 U.S. 374, 387 (2021) (quoting *Tanzin v. Tanvir*, 592 U.S. 43, 47 (2020)). EPCA defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293." 42 U.S.C. § 6291(4). In addition, the statute dictates that the referenced test procedures must "be reasonably designed to produce test results which measure . . . energy use . . . during a representative average use cycle or period of use." *Id.* § 6293(b)(3).

It is plain then that a product's "energy use" is a standardized, fixed measure assigned to a product before it reaches consumers. Manufacturers ascertain an appliance's "energy use" by using "test procedures"; indeed, the results of those test procedures are "determin[ative]." *Id.* § 6291(4). And those test procedures are designed to *replicate* the appliance's average use, meaning the tests are performed in a controlled setting, not at the appliance's ultimate destination in the hands of consumers. In all, once an appliance has been sold, nothing a consumer does with the appliance changes that appliance's "energy use."

Therefore, a regulation that effectively bars the use of a covered appliance by certain consumers, like the challenged laws, has little to do with that appliance's "energy use." The statutory definition all but confirms that the

11

preemption provision does not directly implicate the energy an appliance consumes in the hands of consumers, contrary to Appellants' view.

## B.  Context

The statutory context surrounding "energy use" confirms what the definition already makes plain.

"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Giovinco v. Pullen*, 118 F.4th 527, 531 (2d Cir. 2024) (quoting *West Virginia v. EPA*, 597 U.S. 697, 721 (2022)).  While "we begin . . . with the text of the provision in question," we may also consider, "the structure and purpose of the Act in which it occurs." *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010) (quoting *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995)).  Here, several components of EPCA are helpful.

First, EPCA provides that a manufacturer's "disclosure with respect to [the] energy use" of a covered product required by the statute, "shall not create an express or implied warranty . . . that such energy use . . . will not be exceeded under conditions of actual use."  42 U.S.C. § 6297(g).  For the statute's warranty

12

provision to make any sense, a covered product's "energy use" must be fixed and determined by the manufacturer, as no express or implied warranty could attach to a shifting value arising from a product's use by consumers. At the very least, the warranty provision unmistakably suggests that an appliance's "energy use" and the energy an appliance consumes "under conditions of actual use," are separate values.

Second, EPCA provides that manufacturers must disclose a covered product's "operating cost" on the product's label. *Id.* § 6294(c)(1)(A). The statute directs that those costs be determined in accordance with testing procedures explained in § 6293. *Id.* And per § 6293, a covered product's operating cost "shall be calculated from measurements of energy use." *Id.* § 6293(b)(4). Thus, an appliance's "energy use" must be determined *before* a label is created and the product is passed along to consumers. Moreover, if "energy use" referred to the fluctuating energy used by an appliance at its ultimate destination, it would hardly be possible for manufacturers to determine a fixed operating cost.

Third, EPCA requires that manufacturers "submit information or reports . . . with respect to . . . energy use" of a covered product to the Secretary of Energy under certain circumstances. *See id.* § 6296(d)(1). Necessarily then, a product's

13

"energy use" must be a pre-determined, fixed measurement that does not rely upon a product's real-world use. After all, manufacturers can hardly be expected to track and report on the performance of their products after they leave their control and are placed in the hands of consumers.

Fourth and finally, EPCA bars manufacturers and distributors, among others, from

> mak[ing] any representation in writing . . . or in any broadcast advertisement, with respect to the energy use or efficiency . . . of a covered product to which a test procedure is applicable . . . unless such product has been tested in accordance with such test procedure and such representation fairly discloses the results of such testing.

*Id.* § 6293(c)(1). Accordingly, the statute expressly ties a product's "energy use" to the results of test procedures conducted in the pre-marketing (and by extension, pre-consumer) context.

If any doubt remained after examining the statute's definition for "energy use," these provisions make abundantly clear that the term refers to a metric determined before an appliance ever reaches consumers, not the energy that appliance uses in the hands of consumers. Thus, Appellants' primary argument that the challenged laws are preempted because they "set" appliances "energy use" to zero by barring their use by consumers falls flat.

14

### III. "Concerning" Does Not Save Appellants' Case

But our interpretation of "energy use" does not end the preemption inquiry. The preemption provision covers regulations "*concerning* the . . . energy use" of covered appliances. *See* 42 U.S.C. § 6297(c) (emphasis added). And Appellants argue that even if the interpretation of "energy use" we hereby adopt is correct, the challenged laws nevertheless "concern" appliances' "energy use." *See* City Appellants' Br. at 33–35; State Appellants' Br. at 39–42. Ultimately, for the reasons set forth below, the provision's use of "concerning" cannot carry the weight Appellants assign to it.

### A. Interpreting "Concerning" Along the Lines of "Related To"

The parties agree that for our purposes, we can treat EPCA's deployment of "concerning" as synonymous with "related to," a term courts have regularly interpreted in other preemption contexts. *See* City of New York Br. at 41; Mosley Br. at 55. Indeed, courts have often grouped these terms together. *See Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018) (concluding, in the bankruptcy context, that "related to" and "concerning" are indistinguishable);

15

*Chevron USA, Inc. v. Plaquemines Parish*, 608 U.S. ----, 146 S. Ct. 1052, 1060 (2026) (reaching a similar conclusion in the federal officer removal context).[4]

Drawing on longstanding precedent interpreting "related to" in the preemption context, we read "concerning" to cover regulations that have one of two features: "'a connection with, or reference to,' the topics the statute enumerates." *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 96 (2017) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)) (interpreting "relate to" in the ERISA context); *see also Taxicab*, 615 F.3d at 156, 157 n.4 (interpreting "related to" similarly in another EPCA context).

First, whether a regulation is impermissibly "connected" to the forbidden subject matter (here, a product's "energy use") hinges on two inquiries: the *purpose of EPCA* and the *effect of the challenged laws*. We first use the federal statute's "objectives . . . as a guide to the scope of the state law that Congress understood

---

[4]    In *Lamar*, the Supreme Court's characterization of the terms as synonymous was expressly limited to the particular bankruptcy context the Court was facing. *See Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018) ("The Court finds no basis to conclude, however, *at least in this context* . . . ." (emphasis added)). Indeed, the Supreme Court has already warned against over-reading *Lamar*'s discussion of another broadening term, "with respect to." *See United States v. Miller*, 604 U.S. 518, 520, 533 (2025) ("Respondent's reliance on . . . cases that adopt capacious readings of phrases similar to 'with respect to' cannot support his argument, as those authorities all examine those terms in very different statutory contexts."). Moreover, EPCA uses "related to" in a different preemption provision, which may suggest the terms have divergent meanings at least within the statute. *See* 49 U.S.C. § 32919(a). But we need not reach the issue because we conclude there is no preemption even if the two terms are synonymous.

16

would survive" and then also consider "the nature of the effect of the state law"

on the federal statute's subject matter. *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312,

320 (2016) (first quoting *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 148 (2001);

then quoting *Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A., Inc.*, 519

U.S. 316, 325 (1997)).

Second, whether the challenged laws "reference" the preempted matter

(again, a product's "energy use") relies on their operation and terms. A local

regulation will be preempted by a preemption provision that bars laws "related

to" a subject if it contains a direct reference to that subject matter, "or makes the

existence of preempted subject matter essential to the law's operation." *Taxicab*,

615 F.3d at 156. A local regulation cannot avoid preemption merely by using a

"proxy" for, rather than a direct reference to, the preempted subject matter. *Id.* at

158.

Despite the amorphous nature of these inquiries, phrases such as "related

to," and "concerning" do not endlessly stretch the scope of preemption provisions.

*See Dubin v. United States*, 599 U.S. 110, 119 (2023) ("[R]elate[d] to" should not be

"taken to extend to the furthest stretch of its indeterminacy." (quoting *Travelers*,

514 U.S. at 655)). Indeed, the Supreme Court has "cautioned against an 'uncritical

17

literalism' that would make pre-emption turn on 'infinite connections.'" *Egelhoff*, 532 U.S. at 147 (quoting *Travelers*, 514 U.S. at 656).

Per the below, we conclude the challenged laws have "neither of th[e] impermissible relationships," and thus, are not covered by EPCA's use of "concern." *See Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 86 (2020).

## B. The Challenged Laws Are Not Connected to "Energy Use"

First, the challenged laws lack an impermissible connection with EPCA's regulation of appliances' "energy use." As explained above, we turn to *EPCA's objectives* and also to the *challenged laws' effect* on the preempted subject matter to determine whether an impermissible connection exists. *See Gobeille*, 577 U.S. at 320.

### 1. EPCA's Objectives

To determine the relevant statutory objectives for purposes of assessing for "connections," we must consider EPCA's purpose. *See Rutledge*, 592 U.S. at 86.

> EPCA was passed following the oil embargo imposed by the Organization of Oil Producing and Exporting Countries ("OPEC") in 1973. It was designed as a direct, comprehensive response to the energy crisis precipitated by the embargo . . . and among its stated purposes was the reduction of demand for energy through such measures as conservation plans and improved energy efficiency of consumer products.

18

*Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 185 (2d Cir. 2004) (citations omitted). After experimenting with a "voluntary market-based approach," and setting "targets," EPCA was updated to require the Department of Energy ("DOE") to "establish[] mandatory efficiency standards for covered home appliances that would achieve the maximum improvement in energy efficiency that was technologically feasible and economically justified." *Id.* at 185–86. When DOE proved incapable of promulgating such standards, Congress again updated the statute to "set . . . specific efficiency standards and testing methods for covered products" itself, which DOE could later amend through rulemaking. *Id.* at 186–87. In doing so, Congress was concerned both with meeting energy demands and combatting a "'growing patchwork' of state efficiency standards that had developed as the result of the absence of national standards." *Id.* at 186 n.3 (quoting S. Rep. No. 100-6, at 4 (1987)).[5]

---

[5] We agree with Appellants that "[s]tates cannot circumvent preemption just by 'shifting their regulatory focus' from one angle to another." State Appellants' Reply Br. at 5 (quoting *American Trucking Ass'ns v. City of Los Angeles*, 569 U.S. 641, 652 (2013)); *see also* City Appellants' Reply Br. at 6 (same). If a regulation's practical effect is "at odds with the statute's intended operation and effect" then the regulation is likely preempted. *See Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 636 (2013); *see also Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 371–72 (2008) (emphasizing the need to look at whether the regulation "produces the very effect that the federal law sought to avoid"). But we disagree that EPCA's "intended operation and effect," *see Wos*, 568 U.S. at 636, was to ensure access to all covered products, or that Congress, through EPCA, "sought to avoid" bans entirely, *see Rowe*, 552 U.S. at 371.

19

Appellants point to two provisions to support their view that Congress's objectives include protecting "consumer choice." *See, e.g.*, City Appellants' Br. at 43; State Appellants' Br. at 47.

First, Appellants make much of the statutory waiver provision which authorizes the DOE to reject waiver applications if DOE "finds (and publishes such finding) that interested persons have established, by a preponderance of the evidence, that such State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing" of a covered product on a national basis or "is likely to result in the unavailability in the State of any covered product type." 42 U.S.C. § 6297(d)(3)–(4).

Second, and similarly, Appellants point to text dictating that DOE cannot prescribe new standards, or amend old ones, if the revised standard "is likely to result in the unavailability in the United States in any covered product type." *Id.* § 6295(o)(4).

But these two provisions do not evince Congress's "objective" for purposes of preemption.[6] EPCA, at its core, sets energy conservation standards. It contains

---

[6]    We recognize that the Ninth Circuit believed these provisions to indicate that Congress intended to preempt a broader swath of regulations. *See Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1103–04 (9th Cir. 2024). For the reasons explained herein, we disagree.

no provisions which affirmatively protect consumers' ability to access covered products, nor does it include language affirmatively preserving manufacturers' ability to operate in static markets. Indeed, on a fundamental level, the statute operates to *confine* the choices of consumers and manufacturers by setting standards. We cannot conclude that Congress pursued an "objective" of consumer choice through the passage of a statute that says so little on the subject.

Moreover, "[e]xceptions to a general rule" such as DOE's ability to promulgate standards and grant waivers, "while sometimes a helpful interpretive guide, do not in themselves delineate the scope of the rule." *Dan's City Used Cars, Inc. v. Pilkey*, 569 U.S. 251, 264 (2013). Put differently, it is hard to draw conclusions about Congress's objective through the exceptions of a statute. At the very most, the two provisions identified by Appellants show that Congress thought energy conservation interests need not *always* be the only priority in setting energy conservation standards, and that consumer choice and market stability have a role to play in implementing that kind of regulation. But they say nothing about Congress's view of other interests, like protecting public health and addressing climate change, let alone whether those varying interests support imposing a

21

totally different kind of regulation (i.e., a prohibition on types of energy rather than a standard for the amount of energy consumed).[7]

In all, we think it is clear that EPCA's "objectives" were to establish a standardized set of performance standards for covered appliances to promote energy conservation. Those objectives serve "as a guide to the scope of the state law that Congress understood would survive." *Rutledge*, 592 U.S. at 86 (quoting *Dillingham Constr., N.A., Inc.*, 519 U.S. at 325). Since the challenged laws do not impose standards of their own, EPCA's objectives weigh against finding an impermissible connection.

### 2. The Challenged Laws' Effect

It is similarly difficult to establish that the challenged laws are impermissibly "connected" to appliances' "energy use" because the challenged

---

[7] To be clear, we should not be read as suggesting that Appellee's reasons for enacting the challenged laws bring those laws outside of EPCA's preemptive scope. *See Rowe*, 552 U.S. at 373–74. The Supreme Court has clarified that, absent clear language to the contrary, the purpose of a potentially preempted law cannot "exempt[] state laws that . . . would otherwise [be] pre-empt[ed]." *Id.* at 374. Instead, we reference the interests of public health and combatting climate change solely to illustrate the lack of evidence supporting Appellants' view of Congress's intent. Our holding that the challenged laws are not preempted is not premised, in any way, on the purpose of the challenged laws.

laws do not affect the statute's subject matter.  *See Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370 (2008).[8]

The same energy conservation standards will apply before and after the challenged laws are implemented.  The challenged laws will not dictate, or even incentivize, manufacturing or consumer choices along the lines of energy consumption and conservation.  Instead, the challenged laws govern via the type of energy an appliance consumes by barring the use of fossil-fuel-powered appliances, not the amount of energy it consumes (unlike, for example, a local law which significantly incentivizes the use of appliances that exceed federal energy conservation standards).  These distinctions ensure the challenged laws will not "produce[] the very effect that the federal law sought to avoid," because they will not apply any significant pressures on manufacturers to produce appliances that exceed federal standards.  *See id.* at 372.

---

[8]      Of course, the challenged laws represent a certain kind of regulatory disruption, which Appellants argue "affects" Congress's concern with uniformity.  But Congress was concerned with a patchwork of *conservation standards specifically*, not a patchwork of any kind of regulation, because they could "complicate [manufacturers'] design, production and marketing plans."  S. Rep. 100-6, at 4.  We do not think this specific concern can be extrapolated to cover all regulations which might impact the choices of manufacturers. Regardless, we think the binary choice between electric and fossil-fuel-powered appliances does not represent the same risk of complication of the market as the potential for fifty different energy conservation standards.

23

We do not mean to minimize the overall impact of the challenged laws. They will undoubtedly have an effect on the market for, and availability of, certain covered products. But that is irrelevant to the question at hand because the preemption provision targets regulations concerning appliances' "energy use," not, as Appellants sometimes seem to suggest, regulations concerning the covered appliances themselves. *Cf. Taxicab*, 615 F.3d at 157 (treating "fuel economy standards" as the preempted subject matter, not the covered automobiles).

Indeed, "federal regulation of certain activities," like the energy conservation standards of covered appliances, "does not mean that States must authorize activities antecedent to those federally regulated," like the production and sale of covered appliances, in the first place. *See Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 793 (2019) (Ginsburg, J., concurring); *cf. Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551, 554 (7th Cir. 2007); *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326, 333–34 (5th Cir. 2007); *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1149–51 (9th Cir. 2017). As a particularly instructive example, it is plain that a federal statute that sets standards for the construction and safety of manufactured homes (i.e., mobile homes) does not preempt zoning regulations that "exclude mobile homes" from certain areas

24

altogether.  *See Scurlock v. City of Lynn Haven*, 858 F.2d 1521, 1524–25 (11th Cir. 1988).[9]

The same holds true here; a regulatory bar on the use of covered appliances altogether is not the kind of effect capable of creating an impermissible connection for preemption purposes.

Because the challenged laws do not implicate Congress's objectives in passing EPCA, and absent an effect on the statute's subject matter, the challenged laws are not preempted through impermissible "connections."

## C.     The Challenged Laws Do Not Reference "Energy Use"

Having concluded there are no impermissible "connections," we next turn to whether the challenged laws "reference" or rely upon an appliance's "energy use," and thus, may still be preempted.  They do not.

As discussed, the challenged laws govern by the type of energy consumed by an appliance, not the amount of energy an appliance consumes under standardized testing procedures.  Put differently, an appliance's "energy use," as

---

[9]     The preemption provisions at issue in each of the cited cases apply to "requirements . . . with respect to" or "standards regarding" the statutes' subject matter.  *See Cavel*, 500 F.3d at 553 (citing 21 U.S.C. § 678); *Curry*, 476 F.3d at 333 (citing 21 U.S.C. § 678); *Becerra*, 870 F.3d at 1145 (citing 21 U.S.C. § 467e); *Scurlock*, 858 F.2d at 1525 (citing 42 U.S.C. § 5403(d)).  Appellants appear to agree that at least "with respect to" and "concerning" can be treated similarly.  *See* City Appellants' Br. at 54.  Thus, we think these cases are relevant for our purposes.

25

that term is used in the preemption provision, has no effect whatsoever on that appliance's coverage under the challenged laws. To enforce the challenged laws, regulators could very well remain blind to an appliance's "energy use."

Nor do the challenged laws operate as a "proxy" for "energy use." A "proxy" requires an "equivalency," but there is no "equivalency" between the type of energy an appliance uses and that appliance's "energy use." *Contra Taxicab*, 615 F.3d at 157–58. In fact, "some gas appliances are more efficient than electric appliances, so [the challenged laws] may have the indirect effect of *increasing* energy consumption in new buildings in some circumstances." *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1126 (9th Cir. 2024) (Friedland, J., dissenting) (citing 10 C.F.R. § 430.32(e)(1)(ii)). Thus, this case is not like *Taxicab*, where we concluded a regulation that privileged hybrid taxis ran afoul of an express preemption provision barring "a law or regulation related to fuel economy standards." 615 F.3d at 156 (quoting 49 U.S.C. § 32919(a)). Unlike in *Taxicab*, here there are "plausible alternative reason[s] for the imposition of [the challenged

26

laws]" beyond the desire to regulate along the lines of appliances' "energy use." *Id.* at 157.[10]

## IV.    Other Interpretative Inquiries Confirm Our View of Preemption

We need not venture further.  To summarize, the preemption provision is best understood as preempting 1) state and local energy conservation standards that interfere with Congress's objectives in passing EPCA, 2) regulations that reference or rely upon those standards in their operation, and 3) regulations that otherwise impermissibly affect appliances' "energy use."  Because the challenged laws do not fall into these categories, they are not preempted.

Nevertheless, we proceed to check our work against Appellants' remaining arguments, using additional interpretative aids at our disposal.

### A.    Preemption Provision Title

First and most obviously, the preemption provision is titled: "General rule of preemption for energy conservation standards when Federal standard becomes effective for product."  42 U.S.C. § 6297(c).  From the start, Congress made clear

---

[10]    Even if there is some kind of correlation between the use of fossil fuel power and an appliance's "energy use," we think such an indirect relationship is not enough.  Otherwise, regulating an appliance by size or weight might be preempted, since common sense would suggest a correlation between the size of an appliance and its "energy use."  *Contra* 47 Fed. Reg. 57,198, 57,215 (Dec. 22, 1982) ("Prohibition against placing oversized furnaces and air conditioners in new buildings, would not be subject to preemption.").

that it largely intended to preempt state and local energy conservation standards on covered products. Again, the challenged laws are decidedly not energy conservation standards, so the title supports our conclusion.

## B. Definition of "Energy Conservation Standard"

Second, the preemption provision's structure closely mirrors the statute's definition of "energy conservation standard." "Energy conservation standard" is defined in part as "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use, or, in the case of showerheads, faucets, water closets, and urinals, water use, for a covered product, determined in accordance with test procedures prescribed under section 6293 of this title." *See id.* § 6291(6)(A). Thus, an "energy conservation standard" is a standard governing a product's energy efficiency, energy use, or water use, depending on the type of product at issue.

That same formulation reappears in the text of the statute's preemption provision, which again, preempts state regulations "concerning the energy efficiency, energy use, or water use of . . . covered product[s]." *Id.* § 6297(c). The symmetry between the statute's definition of an "energy conservation standard" and the text it uses in its preemption provision confirms that Congress's driving

28

concern was to preempt state and local energy conservation standards, not prohibitions on types of energy like the challenged laws.

### C. Building Code Exemption

Third, our interpretation is consistent with EPCA's exemption for certain regulations in building codes.

EPCA provides that state laws that would otherwise be preempted are permitted if they exist "in a building code for new construction" and meet certain criteria. *Id.* § 6297(c)(3), (f)(3).[11] The criteria for triggering the exemption provide that the regulation must "allow builders the freedom to choose a mix of products to meet" a "general energy conservation objective . . . without requiring" that builders use covered products which "exceed federal standards." *See* State Appellants' Br. at 6–7 (citing 42 U.S.C. § 6297(f)(3)(A)–(C), (F)).

Of course, for the exemption to make any sense, the kind of regulation it describes must be preempted in the first place; otherwise, the exemption would do no work. And the building code regulations covered by the exemption look different from the kind of energy conservation standards that primarily concerned Congress; energy conservation standards are specific to a certain appliance and

---

[11] Appellees do not assert that the challenged laws fall under the building code exemption, so we need not decide whether the challenged laws meet the relevant criteria.

mandatory, whereas the regulations that are covered by the building code exemption operate on a building-wide basis through incentives. Therefore, the kind of regulations covered by the building code exemption provide a useful "check" for the viability of our interpretation of the preemption provision. If our interpretation were to exclude such regulations, we may have reason to pause.

Our interpretation of the preemption provision, however, is consistent with the building code exemption. Though they are not the kind of performance standards that Congress was most directly concerned with, the regulations covered by the building code exemption nevertheless have an "impermissible relationship[]" to EPCA's subject matter, and thus, are preempted under the interpretation we adopt in this opinion. *See Rutledge*, 592 U.S. at 479.[12]

By targeting building-wide energy conservation, such regulations arguably "reference" appliances' individual "energy use." Indeed, regulating on a building-wide scale simultaneously (and impermissibly) achieves the goal of

---

[12] For similar reasons, we think DOE's prior understanding that a "[p]rohibition of hook-ups for appliances with less than a certain efficiency would be subject to preemption" is consistent with our interpretation of the statute. *See Cal. Rest. Ass'n*, 89 F.4th at 1104 n.6 (quoting 47 Fed. Reg. 57,198, 57,215 (Dec. 22, 1982)). Such a regulation directly references and operates upon the preempted subject matter, the appliances' "energy use," but the same is not true of the challenged laws. Indeed, the very same regulation asserts that "[p]rohibitions against placing oversized furnaces and air conditioners in new buildings, would not be subject to preemption." *See* 47 Fed. Reg. at 57,215. These two examples illustrate the conclusion we reach today: it is not the prohibitive nature of a regulation governing covered products that triggers preemption; it is the law's use of the appliance's "energy use" as a mechanism for regulating.

regulating the performance of the individual appliances within that building. *See Taxicab*, 615 F.3d at 158 (pointing out the lack of a "plausible alternative reason for imposition" of a regulation).

Separately, the regulations covered by the building code exemption may also have an impermissible "connection" with products' "energy use" because they directly implicate Congress's objectives in maintaining uniform energy conservation standards. If states were permitted to regulate energy conservation on an aggregated scale (rather than the per-product basis employed by EPCA), states could easily escape the preemption provision's reach by a simple refashioning of their regulations.

Therefore, our interpretation of the preemption provision is internally consistent with the building code exemption. Rather than undermining our interpretation, the exemption provision further supports it.[13]

---

[13] In *Building Industry Association of Washington v. Washington State Building Code Council*, the Ninth Circuit addressed the relevant exemption. 683 F.3d 1144 (9th Cir. 2012). There, the relevant building code did not *require* the use of covered products that exceeded the standards imposed under EPCA, but instead, provided several options for meeting building-wide energy consumption goals, one of which was using more efficient products. The Ninth Circuit did not question that the regulation would be preempted, seemingly based on the regulation's "call for higher efficiency covered products." *See id.* at 1151. Instead, it focused squarely on whether the regulation would fall under the exemption. Its analysis squares with our interpretation.

## D.     EPCA's Changes Over Time

Fourth, the preemption provision's history reaffirms our interpretation.

In 1975, EPCA's preemption provision precluded "any energy efficiency standard or similar requirement with respect to energy efficiency or energy use of a covered product."  *See* Energy Policy and Conservation Act, Pub. L. No. 94-163, § 327(a)(2), 89 Stat. 871, 926–27 (1975).  And in 1978, "similar requirement" was switched to "other requirement."  *See* National Energy Conservation Policy Act, Pub. L. No. 95-619, § 424(b), 92 Stat. 3206, 3264 (1978).

Appellants concede that, as written, the 1975 and 1978 versions of the preemption provision illustrate that "Congress meant to preempt only 'energy conservation standards' and the like."  City Appellants' Br. at 17; State Appellants' Br. at 24; *see also* City Appellants' Br. at 31 ("The preemption provision used to say almost exactly what the district court concluded that it means now.").  DOE seemingly agreed with that interpretation; in 1982, in a proposed rule addressing state waiver applications, it explained that it would "review only State regulations that are appliance efficiency standards," not "State or local regulations that have only a peripheral effect on the energy efficiency of a covered product."  Energy of Conservation Program for Consumer Products; Proposed Rulemaking and Public

32

Hearings Regarding Energy Efficiency Standards for Refrigerators and Refrigerator-Freezers, Freezers, Clothes Dryers, Water Heaters, Room Air Conditioners, Kitchen Ranges and Ovens, Central Air Conditioners, and Furnaces, 47 Fed. Reg. 14,424, 14,456 (Apr. 2, 1982). DOE made that distinction because, in its view, state laws "whose purpose is other than energy efficiency such as a law on fire safety, would not appear to be preempted by the Federal rule, even if it has a secondary and incidental effect of improving the efficiency of a covered product." *Id.*

Thus, we think it is clear that the challenged laws would not be preempted under the prior versions of the preemption provision. The question then becomes whether further amendments change that conclusion.

Undoubtedly, Congress varied the structure of the preemption provision in the relevant version enacted in 1987. First, it changed the operative connecting phrase from "with respect to" to "concerning." Again, Appellants appear to agree that this change alone does not indicate that Congress intended to broaden the provision's scope. *See* City Appellants' Br. at 54 (noting that in *Dan's City*, the Supreme Court used "concern" and "with respect to" interchangeably). Second, rather than specifically list "energy efficiency standard[s]" and "other

33

requirements," Congress targeted "regulations" concerning energy efficiency, energy use, or water use.  *See* National Appliance Energy Conservation Act of 1987, Pub. L. No. 100-12, § 7, 101 Stat. 103, 118.

That 1987 amendment coincided with a broader, statute-wide change in the way EPCA described the standards it promulgated.  Instead of "energy efficiency standard," 42 U.S.C. § 6297(a)(2) (1982), the 1987 version of EPCA used the term "energy conservation standard," *see* § 2(a), 101 Stat. at 103.  And while the prior "energy efficiency standard" was defined to include "performance standard[s]," *see* § 321(a)(6), 89 Stat. at 917, the new term "energy conservation standard" was defined to include those standards *and* certain "design requirement[s]" for covered products, *see* § 2(a), 101 Stat. at 103.  Thus, "energy conservation standard" under the modern EPCA is a broader term than "energy efficiency standard" from the prior versions.

With this context, Congress's motivation for rewording the preemption provision emerges clearly.  Had it simply swapped "energy efficiency standard" for "energy conservation standard," the preemption provision would have covered a *new* kind of state law: design requirements.  Instead, Congress's decision to list three of the component parts of the term "energy conservation standard"

34

(i.e., energy efficiency, energy use, and water use) without listing the fourth (design requirements) indicates a conscious effort to avoid that outcome.

The legislative and administrative record supports this understanding of Congress's intent regarding the 1987 amendment. In describing the 1987 amendments, the House Committee on Energy and Commerce stated that the preemption provision "[i]n overall form . . . follows substantially the preemption requirements in current EPCA," including "continu[ing] the basic concept of preempting State energy efficiency standards." H. Rep. No. 100-11, at 23–24 (1987). The Senate Committee on Energy and Natural Resources shared that understanding; it explained that "[i]n general, [EPCA's] national standards would preempt all State standards" and that the "new" provision "preempts State regulation, *as provided under current law*." S. Rep. No. 100-6, at 2, 9 (1987) (emphasis added). And many years later, DOE continued to interpret the preemption provision in much the same way as it did before the 1987 amendments. In 2010, in another notice of proposed rulemaking, it expressly "interpret[ed] 'regulation concerning energy use' to be equivalent to 'energy conservation standard,'" and thus read the preemption provision to preclude state and local "performance-based standard[s]." Energy Conservation Program: Energy Conservation

35

Standards for Residential Refrigerators, Refrigerator-Freezers, and Freezers, 75

Fed. Reg. 59,470, 59,530 (Sep. 27, 2010) (quoting 42 U.S.C. § 6297(c)).

In all, a holistic view of the 1987 amendments illustrates that Congress's

revisions to the preemption provision were intended to reinforce the limits of its

scope, not broaden them.

### E. Absurdity

Finally, our interpretation avoids absurd results. *See Cuthill v. Blinken*, 990

F.3d 272, 281 (2d Cir. 2021) (noting that in interpreting ambiguous statutes, "we

are mindful of the well-established rule that 'absurd results are to be avoided'"

(quoting *McNeill v. United States*, 563 U.S. 816, 822 (2011))); *In re Nine W. LBO Sec.*

*Litig.*, 87 F.4th 130, 145 (2d Cir. 2023) (similar).

Take, for example, indoor kerosene heaters, which appear to be covered

products under EPCA. *See* 42 U.S.C. § 6292(a)(9) (listing "direct heating

equipment"). New York City has, quite understandably, long banned their use

because of fire safety concerns. *See* N.Y.C. Admin. Code § 313.3(1). After all, a fire

in a New York City apartment complex can quite quickly escalate into a

devastating event. Were we to interpret the preemption provision to preclude

state and local prohibitions on covered products, as Appellants ask us to do, EPCA

36

could preempt New York City's ban. We think it far-fetched to conclude that Congress imagined such consequences, let alone *intended* those consequences, when it drafted a preemption provision in a statute that by-and-large imposes energy conservation standards.[14]

Indeed, if the preemption provision covered the challenged laws, we see little reason why it would not also preclude a whole slate of seemingly standard regulations. Zoning laws that bar the use of certain appliances, like furnaces, in residential neighborhoods would be preempted because they bar the use of certain covered products, and thus, in Appellants' view, set their "energy use" to zero. *See* 42 U.S.C. § 6292(a)(5) (listing furnaces as a covered appliance). Noise ordinances prohibiting the use of industrial fans could similarly fall by the wayside. *See generally* Energy Conservation Program: Test Procedure for Fans and Blowers, 88 Fed. Reg. 27,312 (establishing standard for fans and blowers). Though our holding does not rely on the absurdity of these outcomes, they nevertheless

---

[14] Appellants point out that no federal standard has been imposed on indoor kerosene heaters, and thus, as of now, New York City's law would not be preempted under its interpretation. City Appellants' Br. at 27. That is beside the point. The canon against absurd results does not solely consider whether an absurd result will come about the day after a court issues its decision. *See, e.g.*, *In re Brandt-Airflex Corp.*, 843 F.2d 90, 96 (2d Cir. 1988) (invoking the absurd results canon where a proffered interpretation would have "empower[ed]" a bankruptcy court to act). DOE could impose a standard for kerosene heaters at any point if it chose to do so, and, on Appellants' account, such a standard would preempt New York City's longstanding ban.

37

buttress our conclusion.

### V. The Ninth Circuit's Contrary Holding and Defining "Point of Use"

Before concluding, we acknowledge that the Ninth Circuit disagrees with our interpretation of the preemption provision.[15] In *California Restaurant Association v. City of Berkeley*, the Ninth Circuit faced a similar preemption challenge to a local law which effectively barred the installation of natural gas piping in newly constructed buildings. 89 F.4th 1094 (9th Cir. 2024). After the district court dismissed the preemption claim, the Ninth Circuit reversed and held that the local law was preempted by EPCA under its interpretation of the relevant preemption provision. The Ninth Circuit reasoned that "EPCA is concerned with the end-user's ability to *use* installed covered products at their intended final destinations" based largely on the phrase "point of use" in the statutory definition of "energy use." *Id.* at 1101–02. The Ninth Circuit denied the ensuing petition for

---

[15] Beyond the two district court decisions relevant to this appeal, there is a growing consensus amongst district courts outside of the Ninth Circuit that EPCA does not preempt laws that effectively ban gas-powered appliances. *See Nat'l Ass'n of Home Builders of the U.S. v. Montgomery County*, No. 8:24-cv-03024, 2026 WL 817322, at *7 (D. Md. Mar. 25, 2026); *Nat'l Ass'n of Home Builders of the U.S. v. Dist. of Columbia*, No. 24-cv-02942, 2026 WL 837674, at *12 (D.D.C. Mar. 26, 2026).

rehearing en banc, with eight active judges dissenting from the denial of rehearing en banc.

Of course, we afford the decisions of other circuits respectful consideration, and often, their decisions are "persuasive." *See Charles W. v. Maul*, 214 F.3d 350, 357 (2d Cir. 2000). After much consideration of the statute's text and relevant precedent, however, we conclude that the reasons for divergence are too compelling and reluctantly believe it necessary to create "a split among the Circuits." *See Lamay v. Comm'r*, 562 F.3d 503, 508 (2d Cir. 2009). In the end, we think the opinion by Judge Friedland, dissenting from denial of rehearing en banc, has the better interpretation.

## A.    The Ninth Circuit's Interpretation Halves the Statutory Definition

In choosing to emphasize "point of use," our view is that the Ninth Circuit ignored the second half of the statutory definition. The statute defines energy use as "the quantity of energy directly consumed by a consumer product at point of use, *determined in accordance with test procedures under section 6293*." 42 U.S.C. § 6291(4) (emphasis added). But the Ninth Circuit cut off the definition after "point of use," *see Cal. Rest. Ass'n*, 89 F.4th at 1101, and from there, its interpretation went astray.

39

As we have already discussed, the statutory definition and its reliance on "test procedures" is simply incompatible with the idea that "energy use" refers to the energy an appliance consumes at its "intended final destination[]." *Id.* at 1102. Thus, the Ninth Circuit not only ignored crucial text; its reading would "render[] meaningless" part of the statute's definition, "mak[ing] the statute incoherent." *See Coon ex rel. Coon v. Willet Dairy, LP*, 536 F.3d 171, 175 (2d Cir. 2008).

**B.      The Ninth Circuit's Interpretation Overlooks Technical Meaning**

Of course, the Ninth Circuit was correct that "point of use" must mean *something*. The statute's specialized context provides the answer: "[W]hen a statute, like this one, is 'addressing a . . . technical subject, a specialized meaning is to be expected.'" *See Van Buren*, 593 U.S. at 388 n.7 (quoting Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 73 (2012)); *see Cal. Rest. Ass'n*, 89 F.4th at 1121 (Friedland, J., dissenting from the denial of rehearing en banc). In interpreting the statute's plain text, it is "reasonable to assume that Congress relied on the accepted" use of the language in its particular context. *See United States v. Hill*, 506 U.S. 546, 553 (1993); *see also Corning Glass Works v. Brennan*, 417 U.S. 188, 201 (1974) ("[W]here Congress has used technical words or terms of

40

art, 'it [is] proper to explain them by reference to the art or science to which they [are] appropriate.'" (quoting *Greenleaf v. Goodrich*, 101 U.S. 278, 284 (1880))).

Informed by its context, the "point of use" language unmistakably indicates the statute's chosen *scope* for regulating an appliance's consumption of energy.

There are two ways to measure an appliance's energy consumption: site energy and source energy. Site energy, in the words of DOE, "is the amount of energy consumed at the point of sale (e.g., that enters the home, building, or establishment) without adjustment for any energy loss in the generation, transmission, and distribution of that energy." *Energy Intensity Indicators: Terminology and Definitions*, U.S. Dep't of Energy (last visited Apr. 12, 2026), https://www.energy.gov/eere/analysis/energy-intensity-indicators-terminology-and-definitions. In other words, site energy is the energy consumed at an appliance's "point of use." In contrast, "source energy" is the site energy "plus the energy losses associated with the production of electricity by the utility sector (i.e., losses that occur in the generation, transmission, and distribution)." *Id.* Simply put, source energy casts a wider net.

As an illustrative example, "energy as measured at the 'point of use' would include only the natural gas needed to operate a gas stove, whereas 'source energy'

would also include the energy consumed in extracting that natural gas, removing its impurities, and transporting it to the location of the stove." *See Cal. Rest. Ass'n*, 89 F.4th at 1123 (Friedland, J., dissenting).

Congress needed to instruct regulators and manufacturers as to which of these scopes of measurement it was regulating and imposing standards upon. Without such instruction, the statute would not achieve its goals of standardization. The statute's inclusion of "point of use" is most naturally read as a way of filling that gap.

### C. Available Sources Support Our Reading of "Point of Use"

This technical interpretation of the work done by "point of use" not only makes sense but is also in lockstep with the interpretation pressed by DOE on multiple occasions. In a 2004 notice of proposed rulemaking, DOE explained that "EPCA . . . do[es] not permit the regulation of source energy" because it "specif[ies] that efficiency must be based on the energy consumption at the point of use." Energy Conservation Program for Consumer Products: Energy Conservation Standards for Residential Furnaces and Boilers, 69 Fed. Reg. 45420, 45426 (July 29, 2004) (citing 42 U.S.C. § 6291(4)). And in a separate 2010 notice of proposed rulemaking, DOE stated that "existing law . . . requires" measures of a

42

covered product's energy consumption "to be based solely on the energy consumed at the point of use" rather than "the energy consumed in extracting, processing, and transporting primary fuels and energy losses associated with generation, transmission, and distribution of electricity." Energy Conservation Program for Consumer Products and Certain Commercial and Industrial Equipment: Public Meeting and Availability of Statement of Policy for Adopting Full-Fuel-Cycle Analyses into Energy Conservation Standards Program, 75 Fed. Reg. 51423, 51424 (Aug. 20, 2010) (citing 42 U.S.C. § 6291(4)).[16]

A consistent stream of congressional and legislative sources similarly supports reading "point of use" as a technical term. In 1978, in the lead up to legislation that would amend parts of EPCA, the Congressional Research Service ("CRS") prepared reports for the House Subcommittee on Energy and Power addressing national energy needs. Notably, those reports drew distinctions between energy consumed by an appliance "at the point of use" and the energy expended "by conversion and transmission." *See* CRS, Energy and the Economy, 4339 (Apr. 1978); *see also* CRS, The National Energy Plan, 4541 n.1 (Apr. 1978)

---

[16] Judge Friedland's opinion dissenting from the denial of rehearing en banc in *California Restaurant Association* helpfully lists additional examples illustrating the technical meaning of "point of use." 89 F.4th at 1123–24.

(noting that "in arriving at [a certain figure] [CRS] considered the energy lost to convert fossil fuels to electricity at power plants, as well as the energy loss in transmitting electricity from the power plant to the point of use"). Thus, there is evidence that "point of use" has been used to indicate the scope of energy consumption measured by a given figure since the seventies, around the time the "point of use" language was introduced.

Later, in 1998, a Senate Appropriations Committee report recommending the passage of an appropriations bill funding DOE activities acknowledged that the standards implemented by DOE "presently reflect only the energy consumed at the point of use," and "ignore[] the total energy consumed over the full fuel cycle." S. Rep. 105-227, at 100 (1998). In response to the report's criticism of site energy, or point of use, methodology, the Chairman of the Senate Committee on Energy and Natural Resources and seven colleagues asserted that EPCA's definition of "energy use" settled the debate over whether the statute should implement standards based on site or source energy. *See* 144 Cong. Rec. S12706 (1998) (asserting that in passing EPCA, Congress opted for "determining the energy use of an appliance at its point-of-use" rather than a more "expansive definition of energy use . . . that included exogenous factors like 'total fuel cycle'

44

costs, emissions and externalities"). Senator Murkowski went on to explain that "the majority of Congress determined that energy consumed at the point of use can be measured . . . with greater accuracy than . . . 'source energy,'" and that Congress's "determination is clearly reflected in the authorizing statute." *Id.* (citing 42 U.S.C. § 6291). Underlying this debate is not only an apparent understanding of the technical meaning of "point of use," but also, a shared belief that EPCA governs along those lines.[17]

More recently, Congress commissioned a study by the National Academy of Sciences which explained that "[c]urrent DOE standards for the energy consumed by operating individual appliances call for measurement at the site (point of use) of the appliance." Nat'l Rsch. Council, *Review of Site (Point-of-Use) and Full-Fuel-Cycle Measurement Approaches to DOE/EERE Building Appliance Energy-Efficiency Standards: Letter Report* 3–4, 6 (2009). Just last year, Congress began to consider a bill "to amend [EPCA] to modify standards for water heaters,

---

[17] We recognize that these sources post-date the original enactment of the language at issue, though some precede Congress's later amendments. *See Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) (criticizing the use of "post-enactment legislative history"). However, given that the alternate interpretation advanced by the Appellants and adopted by the Ninth Circuit would render part of the statute meaningless, and given the abundance of consistent evidence of the technical meaning of "point of use" over time, we think the technical interpretation is plainly the better one. Regardless, the Supreme Court has sometimes relied on post-enactment evidence of a term's technical meaning to interpret a statute. *See Van Buren v. United States*, 593 U.S. 374, 388 n.6 (2023) (citing sources dated after the relevant statute's 1986 enactment).

furnaces, boilers, and kitchen cooktops, ranges, and ovens." H.R. 1281, 119th Cong. (2025). That bill directly refers to the National Academy of Sciences report and proposes incorporating the "full fuel cycle analysis for energy efficiency standards" described in that report into the statute. *Id.* These sources provide further evidence that "point of use" has long carried a technical meaning within this context.

We thus depart from our sister circuit's perspective.

## VI.    Conclusion

We hold that the challenged laws are not preempted under EPCA. Interpreting preemption provisions in federal statutes requires ascertaining Congress's intent. EPCA, a statute that at its heart promotes national energy conservation goals, does not preclude these particular state and local efforts to regulate the use of fossil fuels. For the foregoing reasons, the District Courts' judgments are **AFFIRMED**.